UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, and MICHAEL SICOLI,<br><br>Defendants. | Case No.: ____<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Plymouth County Retirement System ("Plaintiff") alleges the following upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by GTT Communications, Inc. ("GTT" or the "Company") and other related parties and non-parties; (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference calls and postings on GTT's website concerning the Company's public statements; and (d) review of other publicly available information concerning GTT and the Individual Defendants (as defined below).

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons or entities that purchased or otherwise acquired GTT common stock from February 26, 2018 through July 1, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges that Defendants violated the Exchange Act by publishing false and misleading statements to artificially inflate the Company's stock price.

1

2.      GTT provides cloud networking services to multinational enterprises.  Since 2015, the Company pursued growth through an aggressive roll-up strategy in which it would acquire relatively small companies through "tuck-in" acquisitions.  However, in February 2018, in sharp contrast to its historical strategy of acquiring smaller companies, GTT announced a transformational, $2.3 billion deal that essentially doubled GTT's size, namely the acquisition of Interoute Communications Holdings S.A. ("Interoute"), a telecommunications company that operated Europe's largest cloud services platform.

3.      From the announcement of the deal on February 26, 2018, and throughout the Class Period, GTT assured investors that it had conducted extensive due diligence on Interoute, and the acquisition was a natural strategic fit for GTT—that the two companies "fit together almost hand in glove."  After the deal closed, GTT assured investors that Interoute's integration into the Company was "on track" and "not as complex as many businesses we've integrated."  In truth, the Interoute acquisition was a disaster from day one.

4.      Investors began to learn the truth on May 8, 2019, when GTT disclosed a larger than expected loss for the first quarter of 2019, including a sequential decline in revenues.  GTT blamed its poor performance on a host of issues with the Interoute integration, including migrating legacy systems into GTT's management database, discrepancies with Interoute's billing systems, and a poor salesforce.  In addition, GTT disclosed that shortly before the acquisition, Interoute had made a strategic shift to sell cloud services that deviated from GTT's strategy of focusing exclusively on cloud networking.   In response to these disclosures, GTT's stock price plummeted 17.5% or over $7.00 per share, to close at $33.25 on May 8, 2019.  The stock price continued to fall the following day, closing at only $29.91 per share, for a two-day decline of over 25%.

5.      GTT's stock price continued to decline over the next two months, as analysts questioned the Company's business model, appropriateness and timeliness of its disclosures regarding the Interoute integration, and whether the Company utilized aggressive accounting to mask slowing revenue growth.  Since the Company's May 8 disclosures and in reaction to the new information disclosed in the analyst reports, GTT's stock price has declined by more than 65% – from over $40 on May 7, 2019 to a recent low of under $13 per share – wiping out over $1.5 billion in shareholder value.

6.      As a result of Defendants' false and misleading statements and omissions, and the precipitous declines in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as GTT is headquartered in this District.

## III.     CLASS ACTION ALLEGATIONS

10.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired GTT common stock from February 26, 2018 through July 1, 2019, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of GTT and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

11.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, GTT's common stock was actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "GTT."  Millions of GTT shares were traded publicly during the Class Period on the NYSE.  As of May 27, 2019, GTT had approximately 55.8 million shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by GTT and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

12.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

4

14.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of GTT;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of GTT;

e)      whether the market price of GTT common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

15.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IV.    <u>PARTIES</u>

16.     Plaintiff Plymouth County Retirement System purchased GTT common stock during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein.

17.     Defendant GTT is incorporated in Delaware, and the Company's principal executive offices are located in McLean, Virginia.  GTT common stock trades on the NYSE under the symbol "GTT."

18.      Defendant Richard D. Calder Jr. ("Calder") has served at all relevant times as the Company's Chief Executive Officer and President.

19.     Defendant Chris McKee ("McKee") has served at all relevant times as the Company's General Counsel and Executive Vice President, Corporate Development and Corporate Secretary for GTT's Board of Directors.

20.     Defendant Michael Sicoli ("Sicoli") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

21.     Defendants Calder, McKee and Sicoli are referred to as the "Individual Defendants."

22.     GTT and the Individual Defendants are referred to as the "Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of GTT, were privy to confidential, proprietary and material adverse non-public information concerning GTT, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of GTT's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to GTT's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of GTT's common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

7

27.   The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GTT's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

28.   GTT, incorporated in Delaware and headquartered in McLean, Virginia, owns and operates a global Tier 1 internet network and provides cloud networking services to multinational clients.  According to the Company's latest Form 10-K for the year ended December 31, 2018, GTT serves "large enterprise and carrier clients with complex national and global networking needs" "by providing an outstanding service experience built on our core values of simplicity, speed and agility."  The Company's portfolio of cloud networking services includes: wide area networking; transport and infrastructure services; internet services; managed services; and voice services.

29.   In order to compete against larger competitors such as AT&T and Verizon in the emerging cloud space, GTT engaged in an aggressive roll-up strategy through "tuck-in" acquisitions in which it acquired and consolidated multiple smaller companies in an effort to pool their resources, cut down on operational costs, and increase revenues.  However, in February 2018, GTT announced that it was purchasing Interoute in a transformative acquisition for €1.9 billion ($2.3 billion) in cash.  Interoute was a large European company with complex technology systems that differed from those used by GTT in the United States, and with twice the number of employees as GTT.  The Interoute deal was nearly four times larger than any of GTT's previous acquisitions,

and eighteen times larger than the average of GTT's ten other acquisitions since 2015, as set forth below.



**B.    Defendants' Materially False and Misleading Statements**

30.    When announcing the acquisition of Interoute on February 26, 2018, GTT issued a press release representing that the strategic combination would, among other things, expand "GTT's Tier 1 global IP network with one of Europe's most extensive fiber footprints," enhance "GTT's cloud connectivity platform," and enhance "GTT's global team with a world-class sales, operations and customer service organization."   In the press release, Calder represented, "[t]his combination creates a disruptive market leader with substantial scale, unique network assets and award-winning product capabilities to fulfill our clients' growing demand for distributed cloud network in Europe, the U.S. and across the globe."  Further, Calder represented that the integration of Interoute would be modeled after GTT's "successful, proven acquisition model" and that GTT expected "to complete this integration within three to four quarters post-close and achieve a post-synergy multiple of seven to eight times Adjusted EBITDA or better on a pro forma basis."

31.    On March 1, 2018, the Company issued a press release reporting financial results for its fourth quarter and full year ended December 31, 2017, and conducted an investor conference

call.  During the call, Calder represented that the "highly strategic combination significantly augments GTT's scale, expanding our Tier 1 global IP backbone with a robust network," and "creates a disruptive market leader with substantial scale, unique network assets and award-winning product capabilities to fulfill our clients' growing demand for distributed cloud networking services in Europe, the U.S. and across the globe."

32.     Calder further represented that the Interoute team is "fantastic" and Interoute is "very complementary to the strategy that we've employed.  It's sort of a mirror business." Moreover, Calder represented the compatibility between Interoute and GTT:

> One, a strategic fit.  Interoute is a highly complementary platform, essentially the European version of GTT. We sell the same services to the same type of customers, just in different geographies. And this gives us the ability to significantly increase our total addressable market and wallet share on both sides of the Atlantic.

> Two, ability to integrate successfully and quickly. Given how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters, which includes an extra quarter or 2 compared to our historical target integration time frame to account for Interoute's relative size and geographic footprint.

> Three, accretive post-synergy price. Once integration is complete, we expect to achieve a post-synergy purchase price multiple of 7 to 8x adjusted EBITDA, which is highly accretive. We have tremendous respect for the business that Interoute has built, and we think the value of that business will be enhanced significantly in combination with GTT.

> We are eager to build on the success and reputation for exceptional client service that the Interoute team has created and look forward to closing this deal as soon as possible and welcoming Interoute's employees and customers to GTT.

33.     On March 1, 2018, the Company filed an annual report on Form 10-K for the year ended December 31, 2017.  The Form 10-K contained signed certifications by Defendants Calder and Sicoli pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  As to the Company's integration strategy, GTT represented in the Form 10-K that its strategy is "based on a number of criteria,

including the strategic fit within our existing businesses, the ability to integrate people, systems and networks quickly, and the opportunity to create value through the realization of cost synergies." Moreover, GTT represented that it has "consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies. Acquisitions have the ability to increase the scale of our operations, which in turn affords us the ability to expand our operating leverage, extend our network reach, augment our product set, and broaden our customer base."

34.     On March 2, 2018, *LightReading* published an interview with Calder in which he represented that GTT's and Interoute's networks and services "fit together almost hand in glove." Calder also represented, "[i]n terms of integrating it, we want to be measured, make sure we get this right, so instead of our usual one to two quarters to integrate, here we are planning to take three to four quarters, after closing." According to Calder, this measured approach to integration was still "significantly faster than anyone else could do it, but this is our business, we understand it better than anyone else."

35.     On May 3, 2018, the Company reported its financial results for its first quarter ended March 31, 2018 and conducted an investor conference call. During the call, Calder represented that he viewed the transaction as pairing "together two incredibly like-minded companies that have similar values, the anti-incumbent values of simplicity, speed, agility." As part of the integration process, Calder represented that he had "spent most of the last 6 weeks traveling with Gareth Williams, current Interoute CEO, meeting with employees and key customers in every major Interoute office. I came away with an even deeper level of respect and appreciation for the business, the people and the strategic fit combined with GTT." Moreover, Calder touted that he "had a chance to see [] almost twenty different large clients" and received a "uniform reception from the client base [that] was extremely positive, given the scope and scale

of the combined company."  Calder represented that the Interoute acquisition "will have significantly enhanced global scale, the most comprehensive and competitive global cloud networking platform in the industry with enhanced infrastructure, edge and hosted services, a large base of marquee multinational clients, balanced across geographies and verticals, with very high levels of recurring revenue, strength and leadership in software-defined wide area networking, SD-WAN, and world-class sales operation and customer service teams."

36.     Regarding the integration of Interoute, Calder represented that GTT "has made good progress on integration planning since we announced the deal, which should help us proceed quickly with integration upon close across the three dimensions of organization, systems and network" and the deal "will position us to achieve our next financial objectives of $2 billion in revenue and $550 million in adjusted EBITDA."  Later in the call, Calder reiterated that in "talking with the Interoute employees, sales teams and clients," he was "incredibly impressed.  It's a fantastic team, deeply tenured in Europe.  To actually try to build that from scratch would take us a decade or more.  So being able to step into an existing, highly performing team across all of the major economies in Europe is just a fantastic combination with us."

37.     On May 31, 2018, GTT participated in the Cowen TMT Conference where Sicoli represented that GTT had a "really, really heavy focus on integrating that acquisition" and that there was "heavy hiring going on in our sales organization based on the market opportunity."  McKee represented that Interoute was really "a European-focused version of GTT" as "their network is predominantly in Western Europe; ours has been U.S. with extensions elsewhere.  So it really becomes kind of a hand in glove sort of filling out between Europe and U.S" as "the enterprise customers and the large customers of Interoute are not currently customers of GTT" and "a lot of our customers hadn't been served by Interoute."

38.     Moreover, McKee represented that Interoute will give GTT "great density in both markets" and will "have a field sales force that's great to help you grow organically" by cross-selling and upselling opportunities, given that "Interoute is a similarly sized business." Similarly, Sicoli represented that the combined company will have a "fairly robust sales force, globally, certainly north of 500 on a pro forma basis for the two."

39.     Tying GTT's Client Management Database ("CMD") to its efficiency in completing integrations, Sicoli represented the following:

> [I]t's really the end-to-end client experience part.  So, it's everything from the coding process, to ordering, to installation, to billing and then trouble ticket management when there is an issue in the network.  And that's the homegrown system and we've been refining it over the past couple of decades and got a nice size team now that, it supports that application 24/7 as well.

> So, the key is all the data is in one place for us from a customer standpoint.  Every other company we've bought or looked at doesn't have all of the data in one place like we do and that's a significant advantage for us, not just in terms of providing a good client experience for the customers we have, but it's the thing that enables us to get synergies and get integrations done quickly because our approach is to take all legacy systems from acquired companies and put – take the data out, put it into our CMD system, and shut down all other legacy systems as quickly as possible so that we have one database of record, one set of consistent processes hanging on going forward.

40.     Also, McKee represented that GTT's CMD is "the secret sauce for us" as it is the "only way we really [will] be able to do as much M&A activity and integration activity as we have is that every employee worldwide lives out of the same system in every department….  But what we have is sort of a real-time inventory of what GTT has on behalf of all of the customers, all the suppliers….  And so, that's been – if you really want to get to sort of what's been the secret of how we've grown and how we've been able to do integrations, it's that, it's a complete and total reliance on one back office system for sort of across all departments."

41.     Also, on May 31, 2018, GTT issued a press release announcing the completion of its acquisition of Interoute.  In the press release, GTT represented that the acquisition expands "GTT's Tier 1 global IP network with one of Europe's most extensive fiber footprints," "[c]reates the most comprehensive and competitive global cloud networking platform in the industry," and "[e]nhances GTT's global team with a world-class sales, operations and customer service organization."

42.     On June 2, 2018, GTT participated in the William Blair Growth Stock Conference where Calder represented that the Company would integrate Interoute into GTT's:

> client management database systems and create one database of record for the entire business which would occur in early fourth quarter, and that we would integrate the two networks together, and they're very non-overlapping, and so the combination of the two network assets is very powerful, particularly the deep and diverse fiber network footprint they have in the long haul throughout Europe that combines with our assets in the Atlantic and in the North and Eastern part of the United States and Canada.   And so, we think combination of those network or systems and organization we think we'd complete over the first two, three quarters post-close, which we did on May 31.

43.     Calder further represented that he had met "with about twenty of the very largest clients of Interoute" and "spent eight of the last ten weeks in Europe" and concluded that Interoute "is very similar to ours in that the Interoute business was about one-third carrier and two-third enterprise" and does "the same thing that we do, providing cloud networking services."  At the end of the conference, Calder represented that GTT felt "very confident in our ability to execute it, particularly having spent really eight of the past ten weeks there and I'll probably spend the bulk of the remainder of this year in Europe basically executing on the integration of the two companies."

44.     On August 3, 2018, GTT reported financial results for its second quarter ended June 30, 2018, and conducted an investor conference call where Calder represented that "GTT has

nearly doubled in size with the most comprehensive and competitive global cloud networking platform in the industry, serving a significantly larger base of marquee multinational clients with a tremendous global team." Furthermore, Calder represented that GTT's "target selection criteria remains the same, to find opportunities that fit our strategy of providing cloud networking services to large and multinational clients that can be integrated quickly and that can be acquired at highly accretive post-synergy prices" and is "well positioned to succeed … as the disruptor brand in the multi-hundred billion dollar cloud networking services market."

45.     As to the integration itself, Calder represented that GTT was "on track" to "allow the company to operate in one global system with access to the full reach of the network everywhere in the world, all of the Points-of-Presence, all of the network interconnects to our local loop providers everywhere in the world and have one consolidated service platform across the world." As such, Calder represented that GTT expects "to complete the majority of systems and network integration by year end as well" and "see the net trend of monthly recurring revenue installations growing into the second half of the year as we complete the integration of both the Interoute and sort of the final legacy integration of the previous deals." In response to an analyst's question about cross-sell opportunities and sales force, Calder responded,

> [W]e're seeing that interest from both sets of clients, some legacy clients in the U.S. who have deeper reach and opportunity in Europe.  And clearly, the Interoute clients who are very interested in getting quotations and delivery for services into the Americas.  So [] the key focus on the cross-sell is to get the systems integrated, and then we think that we'll see real upside opportunity in terms of productivity and sales, even above the records levels that we've been at today.  In terms of depth of services, to your other question, generally we sell the same thing.  So we think 95% of what Interoute did was exactly what we did.  There's a little bit of overlap in cloud services or additional business.  It's sold to some really great marquee clients, and we want to continue to grow that part of the advanced solutions business.  So we see some opportunity to cross-sell and upsell there.  However, we think the core business that we're in, cloud networking services, is very similar across the two platforms, which is why we thought it was a fantastic deal for us.

46.     Calder further represented that GTT is "inheriting a significant team from Interoute and is in the process of integrating them into the GTT way" and have "told the whole Interoute team prior to the CMD cutover on October 1, business as usual."  Significantly, Calder represented that GTT is "seeing great productivity on both sides - so legacy GTT, legacy Interoute.  And so our goal is to continue to drive that productivity up as we continue to hire.  I mean, we are absolutely continuing to hire quota-bearing reps across all geographies at this stage as we look to drive ever-increasing levels of rep-driven growth."  Moreover, Calder represented that GTT's objective "is to have double-digit growth with the combination of rep-driven and small M&A which we view as sort of organic part of our business as we buy books of business."

47.     On August 7, 2018, GTT participated in the Oppenheimer Technology, Internet & Communications Conference.  In response to a question about how much due diligence GTT had done in the last six months, McKee represented that GTT "had good information on Interoute at the time we did that because we had done a lot of diligence on it."  McKee further represented that GTT knows "a lot more now than we knew then and we're more confident than we were then" and "in terms of facts on the ground, they haven't changed or as we've learned more, it's just reinforced our opinion and our optimism about being able to get every single number that we forecast and then some."

48.     On August 13, 2018, GTT participated in the KeyBanc Capital Markets Technology Leadership Forum where McKee represented that the "complexity of Interoute business is actually not as much as – not as complex as many business we've integrated.  So, we have high confidence. When you look at Interoute, the thing we keep coming back to is, it's a European version of GTT. It really just looks just like us, with sort of easy mapping between, this is the service that they do

that maps nicely to a service that GTT does or this customer base sort of fits hand in glove with that."

49.     On November 8, 2018, the Company reported financial results for its third quarter ended September 30, 2018, and conducted an investor conference call.  During the conference call, Calder represented, "[g]iven our successful progress on Interoute integration, right after the quarter ended, we announced the acquisition of Access Point."  Calder represented that GTT has "made meaningful progress on the integration of our largest strategic acquisition, Interoute." Calder represented that despite the fact that Interoute was "on a declining path, we now feel that we have now arrested that," and Interoute "is now on a growth path moving forward."  Calder provided an update on the status of the integration of Interoute:

> We completed the organization integration in September and we expect the majority of those employees currently on transition to leave the company by year-end with the remainder leaving throughout the first half of 2019. The systems integration is also well underway as we consolidated all core business support systems to our Client Management Database, CMD, in October. Network integration is also on track for substantial completion in the next few months.

50.     As to the salesforce, Calder represented that there was "a whole series of very tenured salesforce from the Interoute acquisition into the UK and Europe divisions, we think really allow us to start, continue that productivity growth."  Likewise, Calder represented that "we'll continue to grow and mature the salesforce that we have, but we felt very comfortable.  That's one of the strategic benefits we got from the Interoute acquisition, is having a very balanced salesforce."  Calder represented that GTT has "actually completed now the integration of Interoute and taken folks that were – and decided who's quota-bearing, who's staying within the organization – and the majority of the performing quota-bearing organization is now with us."

51.     On December 4, 2018, GTT participated in the UBS Global Media and Communications Conference.  At the conference, Calder represented that GTT's acquisition strategy focuses on companies that "have to be strategic when we buy them, meaning they have to do exactly what I said, fulfilling our purpose of helping connect people, providing cloud networking services to large multinational clients and really focused on that networking element" and do "exactly what we do and are not far afield from us."  Calder also represented:

> We generally think about our business in quarters first and foremost because we're buying businesses that are strategic and that are doing exactly what we do and are not far afield from us; second, we look in diligence as to whether we can integrate it into what we call our client management database, and eliminate all of the other business support systems and the operating systems that exist in the acquired firm. And it is critically important to us that we run our business on one database of record.  There are even the businesses we buy sometimes have not integrated completely.  Interoute was one of those where [it] had not completely integrated across three different customer relationship management systems or business support systems, and we just now completed the complete integration of Interoute onto GTT's business….

52.     Calder also represented that "the first and foremost proof point of the integration is the fact that we had started our acquisitions again.  So, had we not felt really comfortable with where we stood with Interoute, we would not have done the Access Point integration."  Indeed, Calder represented the following:

> Exactly, we have made all of the organizational integration and have been very clear with the entire organization about who is part of the go forward, who is on transition as we put one company together with one organizational structure across all of our offices throughout the world.

> Two, we've completed, … all of the integration into our core Client Management Database and that is effectively complete, a little bit of cleanup activity as we continue to go but are starting the first billing out of our system and not out of any of the legacy systems.

53.     Likewise, Sicoli represented that GTT targets companies where they are "easy to integrate within a couple of quarters and then highly accretive."  Even though Interoute "was a

significantly larger transaction," Sicoli represented that "there really wasn't anything new that we found when we went through the integration" and "there were no new issues compared to what we've seen before, which is why it's not a surprise that it's on track."

54.    On February 28, 2019, the Company reported financial results for its fourth quarter and year ended December 31, 2018, and conducted an investor conference call.  During the call, Calder represented that the "integration of Interoute is on track....  Organization integration was completed back in September and most of the employees – associated employee reductions are now done.  Systems integration is nearly complete with all ordering, installation, billing and financial transactions now in GTT systems."  Also, Calder represented that "network integration is also on track as the core network has been consolidated and point of presence consolidation is well underway."  Similarly, Sicoli represented that "nothing's really changed from the way we thought about it previously which is that we expect to be done with the integration by the end of the second quarter."

55.    On March 1, 2019, the Company filed an annual report on Form 10-K for the year ended December 31, 2018.  The 2018 Form 10-K contained SOX certifications signed by Defendants Calder and Sicoli.  As to the Company's integration strategy, GTT represented in the Form 10-K that its strategy is "based on a number of criteria, including the strategic fit within our existing businesses, the ability to integrate people, systems and networks quickly, and the opportunity to create value through the realization of cost synergies."  Moreover, GTT represented that it has "consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies.  Acquisitions have the ability to increase the scale of our operations, which in turn affords us the ability to expand our operating leverage, extend our network reach, augment our product set, and broaden our customer base."  With respect to the Interoute integration, GTT

represented in the Form 10-K that the "integration efforts are designed to establish scale and align

Interoute's network assets and product offerings within our existing business."

56.     On March 4, 2019, GTT participated in the Raymond James Institutional Investors

Conference where GTT's Vice President and Corporate Controller Daniel Fraser ("Fraser")

represented that the Interoute acquisition "was a transformative deal for GTT."  Further, Fraser

represented that GTT asks three questions for every deal:

> [T]the first question is does this company add a strategic fit to the company,
> meaning does it expand our network, does it give us great customers that we didn't
> have, or does it give us a capability that we don't have…. The second question is
> that we must be able to integrate the company within a very short period of time.
> And that short period of time that we define it as two quarters.  And so we actually
> as a management team have a visceral reaction to a lot of people who view us as a
> roll-up shop because we're anything but that.  We integrate every acquisition that
> we buy and we make sure that it's even on the list that we must be able to actually
> integrate it.  And then the third thing, and probably most important from a numbers
> perspective, is that the acquisition must be accretive both from a revenue and on
> EBITDA basis.

57.     In terms of integrating a company's systems, Fraser represented GTT:

> So, we have an internally developed system called CMD and it's unique to us
> because it is the single database of record for both our vendor and our customer and
> we actually have the ability to tie the two together and so we can tell at the circuit
> level whether we have a profitable circuit or not.  And so what we strive to do is
> we take all the data from the old or the acquired systems and we push it into CMD
> within one quarter, sometimes maybe four or five months.  And we bill out of CMD.
> We have a database of vendors that we bump up against our payment records, so
> it's critical to actually making sure we have all the synergies in play by making sure
> that they're in the systems quickly.

58.     Moreover, Fraser represented that GTT has "almost a maniacal religious view to

integration and it just started simply as billing and we want all of our customers to have a single

invoice or a single bill coming from our system" that is "truly… one system, one invoice and one

team of people that – to really look after that customer."

59.     In regard to the Interoute acquisition, Fraser represented that the deal "was absolutely a strategic fit for us.  Not only did it expand our network into Europe, but it brought to us a number of high profile, high quality customers….  It was clearly accretive to revenue and EBITDA at close to €800 million in revenue and are now on a post-synergy basis it'll probably be right at the seven times."  Fraser also represented that GTT was "very encouraged by the sales team and their willingness and they really want – the one thing Interoute did historically over the last four years or five years is actually turned down customers in Europe that wanted to buy U.S. connectivity and now we're being approached by some of Interoute's largest clients….  So we're incredibly bullish about Interoute right now and the integration has gone really well."

60.     The above statements in paragraphs 30-59 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that the integration of Interoute was not progressing as: (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

C.   **The Truth Begins To Emerge**

61.    On May 8, 2019, GTT reported financial results for the quarter ending March 31, 2019.  Specifically, the Company reported revenue of $450.2 million, a decline of 1.0% compared to the fourth quarter of 2018.  The Company also reported a net loss of $27.3 million, compared to a net loss of $30.7 million in the first quarter of 2018 and net loss of $53 million in the fourth quarter of 2018.

62.    Also, on May 8, 2019, the Company conducted an investor conference call to discuss the financial results for the quarter ending March 31, 2019.  During the conference call, Calder disclosed that GTT's "rapid integration strategy is challenging for employees, clients and suppliers, and Interoute was no exception."  Specifically, Calder disclosed that revenue "declined 1% sequentially as our pace of installs was a little slower than expected due to some delays related to integration activities and training as we migrated Interoute's legacy systems and processes into GTT's single client management database system" in December 2018.  The migration of Interoute's legacy systems and processes into GTT's CMD had caused a "slowdown" in the integration of Interoute.  Consequently, Sicoli revealed that the first quarter ended with a cash balance and net cash provided by operating activities of $51 million and $16 million, respectively, as they were "negatively impacted by a significant use of working capital related to Interoute accounts receivable, as we transitioned billing and collections activity into our CMD system.  This resulted in some invoice delivery delays and slower payments as our clients review and validate the new billing format."

63.    Calder also disclosed that the "combined GTT is keenly focused on our strategy of selling cloud networking services to large and multinational clients" and "ha[s] deemphasized nonstrategic products that are tangential to our strategy."  Specifically, Calder disclosed that GTT

is "very focused on providing cloud networking services to large multinational clients," and not focused "on growing the cloud services" and "selling new cloud services, new hosting, new computer services and that has been a real shift with respect to legacy Interoute and the trajectory they have been on." Significantly, Calder revealed that Interoute had a "much higher percentage of their sales in the year or two leading up to the acquisition," and was focused on cloud services "because Interoute had made a strategic priority shift that we did not maintain."

64.     As a result, GTT's stock price declined $7.04 per share or 18%, to close at $33.25 per share on May 8, 2019. On May 9, 2019, GTT's stock price fell an additional $3.34 per share, to close at $29.91 per share.

65.     Several analysts covering GTT were surprised by the myriad issues disclosed and immediately downgraded GTT. For example, BTIG noted that "the more than 1% sequential decline in revenue this quarter was disappointing given the optimistic comments made by management over the past three quarters." Cowen attributed GTT's revenue shortfall to integration issues related to the transitioning of Interoute's legacy systems onto GTT's single platform "as employees (especially in Europe) had to be trained on the new system, which inevitably caused a slowdown in installations/provisioning and consequently had a negative impact on revenue during the quarter."

66.     On May 30, 2019, at approximately 2:45 p.m. ET, GTT made a presentation at the Cowen TMT Conference 2019, where McKee disclosed that the Interoute integration was "challenging … as we moved thousands of Interoute employees off of the Interoute systems and off of how they sold, installed, billed and moved everything into GTT systems there [were] some delays as we both went to render a new bill to the customers who are going to be getting a GTT bill instead of an Interoute bill." Sicoli disclosed that it "didn't yield quite as many salespeople at

the end of that process on the Interoute side as we initially thought" because Interoute "had hired

a lot more people focused on cloud services" and did not terminate the "bottom 10% of their sales

teams."   As a result, Sicoli disclosed that the "big issue is our sales force was too small in the

second half of last year.   We didn't necessarily intend to slow hiring, but naturally when you're

going through a large integration and you know going through that organizational process and

terminating a lot of employees, you kind of naturally slow down hiring."

67.     GTT's stock fell in response to the news.   On May 31, 2019, GTT's stock price fell

$1.22 per share, or 5%, to close at $23.78 per share.

68.     On June 24, 2019, analysts at Craig-Hallum reduced their price target on GTT

because "the company is in the midst of altering its DNA, which had been largely built of growth

via acquisitions, a process that has been challenged by debt levels and recent integration issues."

Craig-Hallum noted that instead of continuing its roll-up strategy, GTT is now trying to "rebuild

its organic growth platform" by hiring a new salesforce.

69.     GTT's stock price fell in response to the news.   On June 24, 2019, GTT's stock

price dropped another $2.87 per share, or 14%, to close at $19.97 per share.

70.     On July 2, 2019, KeyBanc downgraded GTT and highlighted how internal data on

GTT suggested hiring activity remained slow, indicating the increase in employee representatives

necessary to achieve revenue targets might be lower than expected.   KeyBanc also reported on

recent leadership changes in the Americas division, noting that they were "an indication that

organizational health is not great."

71.     GTT's stock price fell in response to the news.   On July 2, 2019, GTT's stock price

fell $0.50 per share, or 3%, to close at $18.30 per share.

**VI.     UNDISCLOSED ADVERSE FACTS**

72.     The market for GTT common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, GTT common stock traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein. Plaintiff and the other members of the Class purchased or otherwise acquired GTT common stock relying upon the integrity of the market price of the Company's securities and market information relating to GTT, and have been damaged thereby.

73.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.

## VII.   LOSS CAUSATION

74.     During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of GTT common stock and operated as a fraud or deceit on Class Period purchasers of GTT common stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When the Defendants' misrepresentations and fraudulent conduct were disclosed, the price of GTT common stock fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of GTT common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

75.     By Defendants' failing to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status.  Therefore, the

Defendants presented a misleading picture of GTT's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused GTT to conceal the truth.

76. The declines in the price of GTT's common stock after the truth came to light were a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of GTT's common stock price decline negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of GTT's common stock and the subsequent decline in the value of GTT's common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. SCIENTER ALLEGATIONS

77. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

78. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding GTT, their control over, receipt and/or modification of GTT's allegedly materially misleading statements and omissions, and/or their positions with the

Company which made them privy to confidential information concerning GTT, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

79.    At all relevant times, the market for GTT's common stock was an efficient market for the following reasons, among others:

a)    GTT's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)    As a regulated issuer, GTT filed periodic public reports with the SEC and the NYSE;

c)    GTT's common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)    GTT regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

80.    As a result of the foregoing, the market for GTT's common stock promptly digested current information regarding GTT from all publicly available sources and reflected such information in GTT's stock price. Under these circumstances, all purchasers of GTT's common stock during the Class Period suffered similar injury through their purchase of GTT's common stock at artificially inflated prices and a presumption of reliance applies.

81.    A class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding GTT's business practices, financial results and condition, and the

Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.   NO SAFE HARBOR

82.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

83.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GTT who knew that the statement was false when made.

## XI.   CLAIMS AGAINST DEFENDANTS

## COUNT I

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All the Defendants

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

85.     During the Class Period, GTT and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GTT common stock; and (iii) cause Plaintiff and the other members of the Class to purchase GTT common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

86.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for GTT common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of GTT, as alleged herein.

87.     GTT and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, business practices, performance, operations and future prospects of GTT as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information; and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of GTT's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about GTT and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein; and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of GTT's common stock during the Class Period.

88.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

89.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing GTT's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of GTT common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of GTT shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired GTT common stock during the Class Period at artificially inflated high prices and were damaged thereby.

91.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business

practices, future prospects and intrinsic value of GTT, which were not disclosed by the Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired GTT common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

92.     By virtue of the foregoing, GTT and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     The Individual Defendants were and acted as controlling persons of GTT within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     As set forth above, GTT and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: July 30, 2019

Respectfully submitted,

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Joseph E. White, III
Lester R. Hooker
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plaintiff*

34

## CERTIFICATION AND AUTHORIZATION

I, David Sullivan, on behalf of the Plymouth County Retirement System ("Plymouth"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint in this matter and I am authorized in my capacity as Executive Director of Plymouth to initiate litigation and to execute this Certification on behalf of Plymouth.

2.    Plymouth did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.    Plymouth is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    Plymouth's transactions in GTT Communications, Inc. common stock during the Class Period are set forth below:

| Date | Transaction | Shares | Price |
| --- | --- | --- | --- |
| 07/10/18 | Purchase | 607 | $45.12 |
| 07/10/18 | Purchase | 1,958 | $45.28 |
| 08/14/18 | Purchase | 1,603 | $36.26 |
| 01/16/19 | Purchase | 76 | $24.66 |

5.    Plymouth has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Hampton v. Aqua Metals, Inc.*, Case No. 4:17-cv-07142 (N.D. Cal.)

   *Plymouth County Ret. Sys. v. Patterson Companies, Inc.*, Case No. 0:18-cv-0871 (D. Minn.)

   *Schlimm v. Welbilt, Inc.*, Case No. 8:18-cv-3007 (M.D. Fla.)

   *Employees Ret. Sys. of the Puerto Rico Electric Power Authority v. Conduent, Inc.*, Case No. 2:19-cv-08237 (D.N.J.)

6.    Plymouth has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *In re Envision Healthcare Corp. Sec. Litig.*, Case No. 3:17-cv-01112 (M.D. Tenn.)

1

*Plymouth County Ret. Ass'n v. Advisory Board Co.*, Case No. 1:17-cv-01940 (D.D.C.)

*St. Clair County Employees Ret. Sys. v. Acadia Healthcare Company, Inc.*, Case No. 3:18-cv-0988 (M.D. Tenn.)

7.   Plymouth will not accept any payment for serving as a representative party on behalf of the Class beyond Plymouth's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2̲5̲ day of July, 2019.

*Plymouth County Retirement System*

David Sullivan, Executive Director

2