UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, and GINA NOMELLINI<br><br>                    Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................................. 1

II.     INTRODUCTION .......................................................................................................... 2

III.    JURISDICTION ............................................................................................................ 6

IV.     PARTIES ...................................................................................................................... 7

        A.      Lead Plaintiff ..................................................................................................... 7

        B.      Defendants ........................................................................................................ 7

V.      OVERVIEW OF DEFENDANTS' FRAUD ................................................................ 10

        A.      GTT's Growth Is Fueled By Its Historic "Roll-Up" Acquisition Strategy
                and Purportedly "Seamless" Integration Capabilities ........................................... 10

        B.      Defendants Announce the "Transformational" Acquisition of Interoute
                and Assure Investors that the Interoute Integration Would Be Seamless ............ 12

        C.      Defendants Repeatedly and Falsely Assured Investors That The Interoute
                Integration Was "On Track," And Specifically That It Had Achieved The
                "Key Milestone" Of Completing The CMD Migration ...................................... 16

        D.      In 2019 And Up To Mere Days Before The Truth Began To Emerge,
                Defendants Continued To Claim That Interoute "Closely Mirrored" GTT
                And That The Integration Was "Right On Track" .............................................. 19

        E.      Former GTT And Interoute Employees Confirm That, In Reality, Interoute
                And GTT Were "Totally Different"—And The Integration Was A
                Complete "Disaster" From Day One And Never Fully Completed .................... 20

                1.      Interoute Was A "Totally Different" Business From GTT—A Fact
                        Internally Acknowledged By Defendant Calder Prior To The
                        Acquisition ............................................................................................ 21

                2.      Defendants' Integration Timelines Were "Totally Unrealistic" .............. 25

                3.      Contrary To Defendants' Statements, Once the Interoute
                        Integration Was Underway, Nothing Went According To Plan ............... 32

        F.      The Truth Emerges—And GTT's Stock Collapses, Plummeting Over 80% ....... 41

VI.     POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD .................... 46

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 47

        A.      Interoute Acquisition Announcement .................................................................. 47

i

B.       GTT's 4Q 2017 Investor Call ......................................................... 49

C.       March 2, 2018 *LightReading* Article .................................................. 51

D.       GTT's 1Q 2018 Investor Call ......................................................... 52

E.       Cohen & Co. Technology, Media, and Telecom Conference and Acquisition Completion Announcement .......................................... 53

F.       William Blair Growth Stock Conference ........................................ 54

G.       GTT's 2Q 2018 Investor Call ......................................................... 56

H.       August 2018 Oppenheimer Technology, Internet & Communications Conference and KeyBanc Capital Markets Technology Leadership Forum ........ 58

I.       October 2018 Capacity Europe 2018 Conference and *Capacity* Article ............. 60

J.       GTT's 3Q 2018 Investor Call ......................................................... 62

K.       December 4, 2018 UBS Global Media and Communications Conference ........... 64

L.       GTT's 4Q and FY 2018 Investor Call ............................................ 66

M.      April 29, 2019 *The Wall Street Transcript* Article ............................... 67

N.       May 2, 2019 Bloomberg Appearance .............................................. 68

O.       GTT's Q1 2019 Investor Call ........................................................ 69

P.       Cohen TMT Conference ................................................................ 69

VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .............................. 70

IX.      LOSS CAUSATION ................................................................................. 78

X.       CLASS ACTION ALLEGATIONS ............................................................. 80

XI.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ................................................................................. 82

XII.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ........................................................... 83

XIII.    COUNTS .............................................................................................. 84

XIV.    PRAYER FOR RELIEF .......................................................................... 88

XV.     JURY TRIAL DEMAND ......................................................................... 88

## I.  <u>NATURE OF THE ACTION</u>

1.      Lead Plaintiff City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund ("Lead Plaintiff," or "Atlanta P&F") bring this securities class action seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq.* ("Exchange Act"), on behalf of itself and all other persons and entities who purchased or otherwise acquired any of the publicly-traded common stock of GTT Communications, Inc. ("GTT" or the "Company") from February 26, 2018 through August 7, 2019, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").  GTT is a Virginia-based provider of cloud networking services to multinational enterprises.

2.      Lead Plaintiff alleges the following upon personal knowledge as to allegations specifically pertaining to Lead Plaintiff and, as to all other matters, upon the investigation of Lead Counsel, which included: (a) analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by GTT; (b) interviews with former high-level employees of GTT and Interoute Communications Holdings S.A. ("Interoute"), including executives who were present at Company meetings where issues with the integration of Interoute was explicitly discussed and who had direct contact with the Individual Defendants; (c) analysis of press releases disseminated by GTT; (d) analysis of shareholder communications, conference calls and postings on GTT's website concerning the Company's public statements; (e) analysis of news articles concerning GTT and Interoute; and (f) analysis of other publicly available information concerning GTT and the Individual Defendants (as defined below).

3.      Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## II.    <u>INTRODUCTION</u>

4.       GTT's entire business model was predicated on a growth-through-acquisition strategy that was highly dependent on the Company's ability to "seamlessly" and "very quickly" integrate its acquisitions.  Indeed, throughout the Class Period, Defendants repeatedly touted to investors that the Company's integration capability was a "core competency" that was "second to none" in the industry and the key to GTT's success.  While the Company successfully completed numerous acquisitions in the years leading up to the Class Period, in 2017, GTT set its sights on a much larger acquisition that would significantly bolster its upward trajectory and catapult the Company to a global operational level.

5.       Accordingly, on February 26, 2018, GTT announced the $2.3 billion acquisition of Interoute, a telecommunications company that owned the largest fiber network in Europe. The Interoute acquisition was by far the single largest and most important transaction in GTT's history—four times larger than the Company's prior largest acquisition, and 18 times larger than its average acquisition.   Defendants trumpeted the Interoute transaction to investors as a "transformational" event that would double GTT's size and enable the Company to compete globally against larger industry rivals such as Verizon and AT&T.  Given the importance of the Interoute acquisition to GTT's future growth prospects, a quick and seamless integration of the two businesses was absolutely critical to the Company's success.

6.       In light of how critical the Interoute acquisition was to GTT's success, the Company averred to investors that its tried and true "seamless" integration method—which ensured that GTT only "bought businesses that are strategic and that are doing exactly what we do," *i.e.*, "providing cloud networking"—would work just as effectively with respect to Interoute because Interoute's business was identical to GTT's.  For example, Defendants repeatedly told investors during the Class Period that Interoute was "essentially the European version of GTT"; a

"mirror business"; did "exactly what we did"; fit together with GTT "hand in glove"; and "had a similar strategy to ours; that is, cloud networking services." Defendants asserted that, "[g]iven how similar the businesses are," Interoute—despite being by far the largest acquisition in GTT's history—could be effectively integrated on an accelerated timeline of just three to four quarters, or by the second quarter of 2019.

7.     Once the integration was underway, Defendants repeatedly reassured investors that the integration progress was "right on track" and timely meeting every pre-announced milestone.  Defendants further reassured investors that they personally had a "really, really heavy" focus on the integration, which was "priority number one" at GTT, to the extent that Defendant Calder spent the "bulk" of his time in 2018 at Interoute's offices in Europe "executing on the integration of the two companies."  In October 2018, Defendants proclaimed that the integration had reached its "key milestone"—GTT had successfully "cut over" all of Interoute's legacy billing and sales systems onto GTT's proprietary Client Management Database (or "CMD").  Finally, on May 2, 2019, Defendant Calder proudly proclaimed that GTT had successfully "created one organization, one mission," and that the integration had proceeded "<u>absolutely . . . right on track</u> with what we announced when we were here a year ago."

8.     Fueled by Defendants' statements, GTT's stock price soared, reaching a Class Period high of $61.85 per share.  Indeed, analysts took great comfort in Defendants' representations, stating "[w]e think Interoute is a strong strategic fit," and believing that GTT's "nearly flawless" integration record would ensure the success of the Interoute integration.

9.     However, as Plaintiffs' confidential witnesses ("CWs")—all high-level former employees of GTT and Interoute—independently corroborated, and as Defendants themselves admitted at the end of the Class Period, all of these statements were false.  First, rather than

Interoute being a "mirror business," the exact opposite was true.  As Plaintiffs' CWs stated, including the former CEO of Interoute Italia who was responsible for 30% of Interoute's business, by the time of acquisition, the "vast majority" of Interoute's business had shifted to selling cloud services—not cloud networking—which Plaintiffs' CWs uniformly stated was a "completely different industry" with "very different product sets."  Indeed, Defendants specifically told the market after the Interoute transaction closed that GTT was "not trying to get into" selling cloud services because it was an entirely "different business" that conflicted with GTT's strategy, which was "pretty tight around" cloud networking only.

10.     Second, Plaintiffs' CWs—each of whom had firsthand knowledge of the Interoute integration—confirmed that, contrary to Defendants' statements that the Interoute integration was "right on track" and going exactly as planned, in reality, it was an utter "disaster" from day one.  These executives uniformly stated that the integration was an "absolute nightmare," "very challenging" and "very problematic"—akin to "driving a car into mud"—and that Defendants' positive representations to the contrary were "not at all" true and "not what was happening."  For example, numerous CWs unequivocally stated that the Company's October 2018 announcement that the integration had reached its "key milestone" of cutting over Interoute's legacy systems onto GTT's CMD system was completely false.  To the contrary, the two systems "were simply not compatible" and the migration was never completed even after the Class Period ended.

11.     Significantly, Plaintiffs' CWs stated that they directly told the Individual Defendants about the problems with the integration as they were occurring, during face-to-face meetings and phone conversations.  For example, CW 7, the former CEO of Interoute Italia, stated that he had numerous face-to-face meetings and phone conversations with Defendant Calder during which he told Calder point blank that GTT's integration strategy and timeline were

completely unworkable and unrealistic.  Other CWs described face-to-face meetings with Calder during which they told him that the integration was not progressing, and the two companies were "still completely separate organizations."   Additionally, CWs described "very forthright discussions" and weekly calls with Defendants Sicoli and Nomellini, GTT's CFO and CMO, respectively, which "absolutely" included discussion of "the problems we had with CMD." Finally, one CW described how in October 2018—at the exact same time Defendants were publicly touting the "success" of the Interoute integration and professing that its "key milestone" had been met—Defendant Calder and Defendant McKee, GTT's General Counsel, visited his office and stated that the Interoute integration had several setbacks and was not going to plan.

12.     The truth regarding Defendants' fraud began to emerge on May 8, 2019—only six days after Defendant Calder had proclaimed that the Interoute integration had proceeded "absolutely . . . right on track."  On this date, GTT announced its first revenue decline in four years, which Defendants directly attributed to "delays related to integration activities and training as we migrated Interoute's legacy systems" onto GTT's CMD system.  Defendants also admitted that—contrary to their prior representations that the "cut over" of Interoute's legacy systems to CMD had occurred in October 2018—this "critically important" integration milestone was in fact delayed by several months because GTT was "retraining the organization." Remarkably, Defendants further revealed that, rather than fitting "hand in glove," Interoute had made what Defendants themselves called a "strategic priority shift" two years prior to the acquisition, pursuant to which Interoute almost exclusively focused on selling cloud services—a shift that directly conflicted with GTT's cloud networking strategy, and would significantly delay integration efforts.

13.     In response to this news, GTT's stock price plummeted more than 25%, from $40.29 per share to $29.91 per share.  Analysts were stunned, noting that the Company's announcement directly contradicted management's prior optimistic statements about the Interoute integration, with one report commenting that the revenue decline "was disappointing given the optimistic comments made by management over the past three quarters."

14.     Although Defendants falsely assured investors during the May 8, 2019 earnings call that the integration issues were now "behind us," the full truth regarding Defendants' fraud was not revealed until August 8, 2019.  That day, GTT announced another unexpected 3% decline in revenue that Defendants again directly attributed to "post integration challenges" arising from the Interoute acquisition.  Analysts were again stunned, commenting that "we clearly misjudged the magnitude of the issues affecting the financials," and excoriated GTT's management, which "should have been more forthcoming about the anticipated impact from such issues on [near term] results."

15.     In response to this news, GTT's stock price was crushed, falling 46% from $11.35 per share on August 7, 2019 to close at just $6.09 per share on August 8, 2019—a staggering 90% drop in value from the prices the stock traded at only a year earlier, wiping out roughly $2 billion in market capitalization.

16.     As a result of Defendants' violations of the federal securities laws, investors who purchased GTT common stock at artificially inflated prices during the Class Period have suffered substantial losses.  This action seeks redress on behalf of these aggrieved shareholders.

III.    **JURISDICTION**

17.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District, as GTT is headquartered in this District at 7900 Tysons One Place, Suite 1450, McLean, Virginia 22102.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## IV.   PARTIES

### A.     Lead Plaintiff

21.     Plaintiff Atlanta P&F, as set forth in the accompanying certifications, attached hereto, purchased GTT common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

### B.     Defendants

22.     Defendant GTT Communications, Inc. is a Delaware corporation with its principal executive offices located in McLean, Virginia. GTT went public in 2005 and its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "GTT."

23.     Defendant Richard D. Calder, Jr. ("Calder") is the President and Chief Executive Officer ("CEO") of GTT and has served in that role since May 2007.  Calder also serves as a Director on the Company's Board of Directors.  Calder was highly involved in GTT's day-to-day

business and in interfacing with its employees.  According to GTT's website, Calder "has full strategic and operational responsibility for the [C]ompany."  During the Class Period, Defendant Calder made materially false and misleading statements and omissions during earnings calls and investor conferences and in press releases and news articles, including on May 3, 2018, June 12, 2018, August 3, 2018, November 8, 2018, December 4, 2018, February 28, 2019, April 29, 2019, May 2, 2019, and May 8, 2019.

24.     Defendant Chris McKee ("McKee") joined GTT in 2008 and is the Company's General Counsel and Executive Vice President, Corporate Development and Corporate Secretary for GTT's Board of Directors. According to GTT's website, McKee "oversees the development of strategic business opportunities for the company, including all merger and acquisition activities."  During the Class Period, Defendant McKee made materially false and misleading statements and omissions during investor conferences, including on May 31, 2018, August 7, 2018, August 13, 2018, and May 30, 2019.

25.     Defendant Michael Sicoli ("Sicoli") served as the Chief Financial Officer ("CFO") of GTT from 2015 until his abrupt resignation from the Company announced on August 27, 2019. During the Class Period, Defendant Sicoli made materially false and misleading statements and omissions during earnings calls and investor conferences, including on May 31, 2018, December 4, 2018, February 28, 2019, and May 8, 2019.

26.     Defendant Gina Nomellini ("Nomellini") served as Chief Marketing Officer ("CMO") of GTT from 2015 until her abrupt departure in October 2019.  Nomellini is stated to be "presently on a career break to travel and volunteer."  During the Class Period, Defendant Nomellini made materially false and misleading statements and omissions during industry and

investor interviews, including on February 26, 2018, June 4, 2018, October 23, 2018 and October 24, 2018.

27.     Defendants Calder, McKee, Sicoli, and Nomellini are collectively referred to as the "Individual Defendants."

28.     GTT and the Individual Defendants are collectively referred to as the "Defendants."

29.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of GTT, were privy to confidential, proprietary and material adverse non-public information concerning GTT, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

30.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of GTT's business.

31.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts, and through them, to the investing public.  The Individual

Defendants were provided with copies of the Company's reports and publicly disseminated

documents alleged herein to be misleading, prior to or shortly after their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the

Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

32.     As senior executive officers and/or directors and as controlling persons of a

publicly traded company whose securities were, and are, registered with the SEC pursuant to the

Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the

Individual Defendants had a duty to disseminate promptly accurate and truthful information with

respect to GTT's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings, and present and future business prospects, to

correct any previously issued statements that had become materially misleading or untrue, so the

market price of GTT's common stock would be based on truthful and accurate information.  The

Individual Defendants' misrepresentations and omissions during the Class Period violated these

specific requirements and obligations.

## V.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     GTT's Growth Is Fueled By Its Historic "Roll-Up" Acquisition Strategy and Purportedly "Seamless" Integration Capabilities

33.     According to GTT's 2017 Form 10-K, GTT "provides cloud networking services

to multinational clients" through its operation of a "Tier 1" global network.  With approximately

$1.8 billion in revenue per year, GTT's primary competitors include AT&T, Verizon, and other

similar incumbent large-scale network providers.  During the Class Period, GTT purported to be

the "disruptor" brand in the industry, seeking to take market share from these entities through

aggressive growth.

34.     To accomplish its growth objectives, since 2015, GTT employed a "roll-up" acquisition strategy in which it acquired smaller companies in so-called "tuck-in" acquisitions. Indeed, just prior to the Class Period, GTT had grown rapidly and dramatically by completing 30 acquisitions over the prior 10 years.  GTT stated that the success of its acquisition strategy was due to its unique ability to "seamlessly" and "very quickly" integrate the companies it acquired. For example, in GTT's Form 10-K for the year-ended December 31, 2017, the Company represented that it had "completed many acquisitions throughout our history," and that it had "consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies."  Indeed, Defendants routinely referred to the Company's expedited process of integration as GTT's "core competency" that was "second to none."

35.     Significantly, GTT told investors that its ability to rapidly and seamlessly integrate the companies it acquired was attributable to two main factors.  First, as Defendant Calder explained during a December 4, 2018 investor conference, GTT would only "buy[] businesses that are strategic and that are doing exactly what we do"—*i.e.*, "providing cloud networking services to large multinational clients and really focused on that networking element."  Indeed, GTT was crystal clear that its strategy did not include providing cloud computing services (often referred to as simply "cloud services"), which Defendants explained was a completely "different business."  As Defendant McKee stated during an August 7, 2018 investor conference, GTT's strategy was  "pretty tight around connectivity-only":

> [O]ur strategy has been pretty tight around connectivity only, we're not trying to get into cloud services, those are different businesses, they have different competitive dynamics.  I think our customers appreciate that when they're doing business with us, we don't have a dog in the fight about what cloud service they use . . .

36.     Second, Defendant Calder stated that GTT ensured successful integrations by "look[ing] in diligence as to whether we can integrate [the new business] into what we call our

Client Management Database," or "CMD," which was GTT's internal proprietary system that handled customer ordering, installation, and billing all on one system—what Defendants referred to as GTT's "secret sauce."

37.     As set forth below, when GTT announced the largest acquisition in its history (by far) of the European-based Interoute, it strongly and repeatedly reassured investors that Interoute's business and strategy were identical to GTT's, and that as a result, the Company's tried and true integration strategy would be as effective as ever—which meant that, despite Interoute's size, the entire integration, including the migration of Interoute's legacy systems to CMD, could be fully completed "within three to four quarters" after close.  Even after the Interoute integration was well underway, Defendants did not change their story.  To the contrary, they averred that every single integration milestone was timely being met, such that the integration was exactly "on track," only confirming their confidence in how well the two businesses fit "hand in glove." However, the reality was exactly the opposite.  Indeed, as numerous former GTT and Interoute employees have unanimously confirmed—and as Defendants would themselves ultimately be forced to admit by the end of the Class Period— Interoute was a fundamentally different business from GTT.  Rather than sharing GTT's core strategy of being a cloud networking provider, Interoute was a cloud services provider—a business Defendants themselves had stated was completely "different" and not strategic to GTT. Moreover, these executives uniformly stated that the Interoute integration was a complete "disaster" from day one, to the extent that it was never fully completed.

**B.     Defendants Announce the "Transformational" Acquisition of Interoute and Assure Investors that the Interoute Integration Will Be Seamless**

38.     On February 26, 2018, the first day of the Class Period, GTT announced that it was acquiring Interoute, a privately held European-based telecommunications company that

operated one of Europe's largest independent fiber networks, for $2.3 billion in cash. Defendants left no doubt that the deal would be the most important deal in the Company's history—Defendants called the acquisition "transformative," and Defendant Calder stated that it was a "a major milestone for GTT," as it would virtually double GTT in size and catapult the Company toward becoming a global market leader with a "deep operating presence in the 2 major economic powerhouses in the world, North America and Europe." Defendant Calder proclaimed that the integration would be implemented through GTT's "successful, proven acquisition model," and that GTT "expect[ed] to complete this integration within three to four quarters post-close and achieve a post-synergy multiple of seven to eight times Adjusted EBITDA or better on a pro forma basis."

39.    Significantly, the Interoute acquisition was the largest in GTT's history by far. Indeed, as shown by the chart below, the Interoute deal was nearly four times larger than GTT's largest prior acquisition of approximately $600 million, and eighteen times larger than the average of GTT's ten other acquisitions since 2015.



40.     Given how important Interoute was to GTT's long-term prospects of becoming a global contender in the crowded incumbent market, a quick and seamless integration was critical to GTT's success.  Defendants therefore repeatedly reassured investors in the months following the acquisition announcement that GTT's tried and true integration strategy would work just as effectively with respect to Interoute because, aside from being based in Europe, Interoute was purportedly an identical business to GTT.

41.     For example, during the Company's March 1, 2018 earnings call for the fourth quarter of 2017, only a few days after GTT announced the Interoute acquisition, Calder claimed that Interoute was "highly complementary" to GTT because it was a "<u>mirror business</u>" and "<u>essentially the European version of GTT</u>"—meaning that GTT would have no problem at all completing the Interoute integration within the accelerated 3-4 quarter timeline the Company had announced on the day of the acquisition.

> Interoute is a highly complementary platform, <u>essentially the European version of GTT.  We sell the same services to the same type of customers</u>, just in different geographies . . . <u>Given how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters</u>, which includes an extra quarter or 2 compared to our historical target integration timeframe to account for Interoute's relative size and geographic footprint.

42.     Defendants also emphasized their personal involvement in the due diligence process for the deal, and how it had only confirmed that Interoute was a "mirror" business that fit "hand in glove" and could be integrated quickly.  For example, on May 3, 2018, during the Company's first quarter earnings call, Calder assured investors that he had personally evaluated Interoute's strategic fit with GTT, stating that he had "<u>spent most of the last 6 weeks traveling with Gareth Williams</u>"—the then-CEO of Interoute—"<u>meeting with employees and key customers in every major Interoute office</u>."  Calder stated that, as a result of this extensive tour

14

of Interoute's offices, he "came away with an even deeper level of respect and appreciation for . . . the strategic fit combined with GTT."

43.     On May 31, 2018, GTT's CFO, Defendant Sicoli, emphasized to investors during the Cowen CMT Conference that management was exclusively focused on the Interoute integration, stating that Defendants maintained a "really, really heavy focus" on integrating Interoute, and that it was "priority number one at this point."   Defendant McKee then assured investors that as a result of management's diligence on Interoute over the last two months, Defendants had only confirmed that Interoute "really is a European version of GTT" and that the two businesses fit together "hand in glove."

44.     Market analysts took great comfort in Defendants' statements, believing that GTT would successfully implement its proven integration model with respect to Interoute as it had in connection with past transactions.  For example, a February 27, 2018 Oppenheimer report stated "[w]e think Interoute is a strong strategic fit," highlighting how Interoute's physical network assets enhanced GTT's "cloud connectivity platform."   A May 2, 2018 Craig-Hallum report commented:   "[T]he team at GTT has had a nearly flawless [integration] record over the past several years despite a number of acquisitions across different geographies and mini-cycles."  A May 3, 2018 Oppenheimer report similarly commented that, with respect to the Interoute acquisition, the "primary risk is execution . . . but GTT has a reputation for successfully integrating accretive acquisitions in a timely manner." Fueled by Defendants' positive statements, GTT's stock price peaked at a Class Period high of $61.85 per share on March 20, 2018.

**C.**     **Defendants Repeatedly and Falsely Assured Investors That The Interoute Integration Was "On Track," And Specifically That It Had Achieved The "Key Milestone" Of Completing The CMD Migration**

45.     After the Interoute deal closed on May 31, 2018, and the Interoute integration was underway, Defendants repeatedly touted to investors that the integration was 100% "on track" and timely meeting every pre-announced milestone exactly as planned.   Defendants also consistently reassured investors that they were personally overseeing, and themselves executing, every step of the integration.

46.     For example, during the June 12, 2018 William Blair Growth Stock Conference, Defendant Calder announced the plan for how GTT's tried and true integration strategy—"one of the core competencies of our business"—would be implemented for Interoute.  Calder stated that the "organizational integration" (*i.e.*, headcount reductions based on redundancies) would be completed within 90 days (by September), and the "systems" integration—or the critical "cut over" from Interoute's legacy systems to GTT's proprietary CMD system—would be done by "early fourth quarter [2018]."

47.     Calder emphasized to investors that he had personally investigated the feasibility of this plan by "spen[ding] 8 of the last 10 weeks in Europe" at Interoute's offices, and based on that, he was "now very confident in our ability to execute [the integration]" and expected it to "probably materially be done by the fourth quarter . . . so we can prepare for doing another material transaction in 2019."  Calder then reassured investors that he would personally ensure the success of the plan by spending "the bulk of the remainder of this year in Europe basically executing on the integration of the two companies."

48.     On August 3, 2018, during the Company's second quarter earnings call, Calder told investors that the integration was fully underway, and that GTT continued to expect to "complete [it] within 3 to 4 quarters, if not sooner."  When an analyst specifically asked "would

you call out anything surprising, particularly as you work[ed] through the integration in the past few months," Calder responded with an unequivocal "no," referencing the extensive time he had spent at Interoute and claiming "we've put the businesses together" and GTT had already seen "record productivity."

49.     Calder also announced the precise date by when Interoute's legacy systems were scheduled to be "cut over" to GTT's CMD system, stating that it would be on October 1, 2018— a critical milestone Calder stated GTT was "on track" to meet because "95% of what Interoute did was exactly what we did," *i.e.*, "the core business that we're in, cloud networking services, is very similar across the 2 platforms."

50.     On November 8, 2018, Defendant Calder touted GTT's "successful progress on the Interoute integration," and specifically asserted that GTT had achieved the key milestone of migrating "all core [Interoute] business support systems" to CMD:

> We made meaningful progress on the integration of our latest strategic acquisition, Interoute. We completed the organization integration in September, and we expect the majority of those employees currently on transition to leave the company by year-end . . . The systems integration is also well underway as we consolidated all core business support systems to our client management database CMD, in October. Network integration is also on track for substantial completion in the next few months. We expect to complete the Interoute integration in early 2019 consistent with our prior estimate of 3 to 4 quarters post close and continue to expect to achieve at least $100 million in run rate cost synergies once the integration is complete.

51.     During the December 4, 2018 UBS Global Media and Communications Conference less than a month later, Defendant Calder emphasized that a "proof point" of how well the Interoute integration was progressing was that the Company had resumed its acquisitions by acquiring a company called Access Point:

> I think the first and foremost proof point of the [Interoute] acquisition is the fact that we'd started our acquisitions again. So had we not felt really comfortable with where we stood with Interoute, we would not have done the Access Point integration. We [were] very clear with the market for the first time, right after the

acquisition of Interoute, that we will pause on doing any further acquisitions. While we had a lot in our funnel, we didn't do anything in the third quarter simply because we wanted to make sure that we had everything right with Interoute, and we feel very comfortable with it.

52.     Defendant Calder also unequivocally asserted that "all of the integration into our [CMD] database" was now "effectively complete," with only "[a] little bit of cleanup activity" remaining.

53.     During the same conference, Defendant Sicoli further emphasized how incredibly smoothly the Interoute integration had gone, stating that "[e]ven though Interoute was a significantly larger transaction than we'd done before[,] [t]here really wasn't anything new that we found when we went through the integration" so it was "not a surprise that it's on track."

54.     Significantly, and as set forth further below, Plaintiffs' CWs uniformly stated that Defendants' statements that the Interoute integration was exactly on track, and that it had successfully achieved specific milestones, were demonstrably false.  For example, numerous CWs stated that Defendants' announcement in November 2018 that the "cut over" of Interoute's legacy systems to GTT's CMD system had been completed by October 2018 was "not at all" a true statement—indeed, as these witnesses stated, and as Defendants themselves would be forced to admit at the end of the Class Period, significant issues with the CMD migration persisted through 2019 such that its integration was never completed.  Additionally, rather than GTT's October 2018 acquisition of Access Point signaling that the Interoute integration was on track, Plaintiffs' CWs stated the exact opposite—in reality, immediately after that acquisition was announced, senior GTT management stated that the Access Point integration would be materially delayed because the Interoute integration was a "shit show."  Despite this reality, Defendants' exclusively positive statements touting the success of the Interoute acquisition continued unabated.

**D.** **In 2019 And Up To Mere Days Before The Truth Began To Emerge, Defendants Continued To Claim That Interoute "Closely Mirrored" GTT And That The Integration Was "Right On Track"**

55.      In 2019 and up to mere days before Defendants would be forced to admit the truth, Defendants continued to repeatedly assert that the Interoute integration was progressing exactly as planned.  Consistent with Defendants' December 2018 statements that the integration was effectively done and there was only "[a] little bit of clean-up activity" left, during the Company's February 28, 2019 fourth quarter earnings call, Defendant Calder proclaimed that "[o]ur integration of Interoute is on track" and that GTT accordingly "expect[ed] to complete all remaining activities by the end of the second quarter, consistent with the expectation we set when we announced the deal last year."  Calder reiterated that every single integration milestone had either already been completed or was progressing exactly as planned:

> Organization integration was completed back in September, and most of the employee-associated [] reductions are now done.  Systems integration is nearly complete with all ordering, installation, billing and financial transactions now in GTT's systems [CMD].  Network integration is also on track as the core network has been consolidated and point of presence consolidation is well underway.

56.      Defendant Sicoli echoed these statements, assuring investors that "nothing's really changed from the way we thought about it previously, which is that we expect to be done with the integration by the end of the second quarter."

57.      On April 29, 2019, *The Wall Street Journal* released a transcript of an interview with Defendant Calder, during which he again emphasized that Interoute was "the most strategic acquisition we've done to date" and "closely mirrors our business," because "Interoute had a similar strategy to ours; that is, cloud networking services to larger multinational clients."

58.      Indeed, as late as May 2, 2019—only six days before Defendants would be forced to begin revealing the truth about how disastrous the integration really had been—Defendant Calder proclaimed to *Bloomberg* that GTT had successfully "created one organization, one

mission," and that the integration was "<u>absolutely . . . right on track with what we announced</u> <u>when we were here a year ago</u>."

59.     However, as set forth below, and as Defendants themselves would be forced to admit only days later, every statement Defendants made about Interoute being a "mirror" business to GTT—and every statement Defendants made about the Interoute integration being exactly "on track," such that the "key milestone" of the CMD migration was "effectively complete"—were utterly false.  Indeed, as former high-level executives at Interoute and GTT independently confirmed, Interoute was not a "mirror business" of GTT with a "similar strategy."   To the contrary, Interoute had made what Defendants would later call a "strategic priority shift" to the "totally different" business of selling cloud services—indeed, Defendants themselves had publicly stated that GTT wanted no part of the cloud services business because it was not strategic for GTT.  These former employees also uniformly stated that, rather than being "on track," the Interoute integration was a "disaster" from day one—to the extent that GTT <u>never</u> fully and successfully integrated Interoute.

**E.     Former GTT And Interoute Employees Confirm That, In Reality, Interoute And GTT Were "Totally Different"—And The Integration Was A Complete "Disaster" From Day One And Never Fully Completed**

60.     Plaintiffs' independent investigation of the Interoute integration resulted in unanimous accounts from sixteen former GTT and Interoute employees that the integration was an unmitigated disaster from day one.  These former employees were all high-level individuals who were directly involved in the Interoute acquisition and integration during the Class Period. They include, among others, the former CEO of Interoute Italia who was responsible for 30% of Interoute's business, Executive Vice Presidents, Vice Presidents, Regional Vice Presidents, and Senior Directors, many of whom had numerous direct face-to-face meetings or phone

conversations with the Individual Defendants, including Defendant Calder, about the significant degree to which the Interoute integration was not going to plan.

61.     These witnesses described, among other things:   (i) how, by the time of the acquisition, Interoute had shifted the "vast majority" of its business to selling cloud services, which was "totally different" from GTT's cloud networking business; (ii) numerous face-to-face meetings and phone conversations with Defendant Calder, during which he was directly told point blank that GTT's integration strategy and timeline were "unrealistic" and not going according to plan; (iii) in-person and phone conversations with Defendants Sicoli, McKee, and Nomellini, during which they were either directly told or themselves expressed that the Interoute integration was not going smoothly or progressing as planned; and (iv) a host of serious integration issues that were never resolved or disclosed, and which occurred simultaneously with Defendants' contrary false statements to the market that the Interoute integration was "right on track" and "key milestones" were being met.

### 1.     Interoute Was A "Totally Different" Business From GTT—A Fact Internally Acknowledged By Defendant Calder Prior To The Acquisition

62.     Plaintiffs' CWs[1] confirmed that, contrary to Defendants' repeated statements that Interoute was a "mirror business" and the "European version of GTT," the two businesses were in fact "totally different" because, unbeknownst to investors, the "vast majority" of Interoute's business by the time of acquisition had shifted to selling cloud <u>services—not cloud networking</u>. Indeed, as Defendants themselves had explained, cloud services was <u>not</u> a strategic fit for the Company, as GTT was "not trying to get into cloud services" because "those are different businesses" and its strategy was "pretty tight around" cloud networking only.

---

[1] To further protect their identity, all of Plaintiffs' CWs are referred to herein using masculine pronouns.

63.     For example, CW 7, who had worked at Interoute since 2004 and served <u>as the former CEO of Interoute Italia from March 2010 to July 2018 in charge of all of southern Europe and the Middle East (or 30% of Interoute's business)</u>, explained that GTT—which used to be a customer of Interoute under CW 7's management—was a fundamentally different business from Interoute.  As CW 7 explained, "[GTT] always bought [network] capacity.  [It] never owned a network [like Interoute].  <u>To own a network is a completely different business</u>.  You need to operate [it], you need to maintain investment levels to keep the network at the state-of-the-art level."  In elaborating on how significant of a difference this was, CW 7 stated:  "You have to know where everything is on the network, you have to know the maps, you have to know where all the equipment is located on the network.  There is a lot of technical stuff . . . [T]he person in front of the system has to know the kind of network and the kind of architecture that has been sold to the customer, otherwise he cannot troubleshoot."

64.     CW 7 further explained that, unlike GTT, which stated that it was focused on selling "cloud networking," the "<u>vast majority</u>" of Interoute's business at the time of the acquisition (and for several years prior) was focused on <u>selling cloud services</u>.  Specifically, CW 7 stated:  "[Interoute] started selling cloud [services] maybe three or four years before the sale of Interoute.  The vast majority of our work was with large enterprise customers who were buying cloud services," including UEFA and European Space Programme.  "[A]ll the biggest companies were buying cloud services from us."  As a result of these differences, CW 7 said that from the beginning that the synergies GTT stated that it would achieve from the Interoute acquisition were never going to happen.  "[I]<u>t was completely clear from the beginning those kinds of synergies were not reachable</u>.  They were buying something that in certain ways was <u>completely different</u> from what they did before."  Indeed, as stated above, Defendant McKee had explicitly told the

market that GTT's was "not trying to get into cloud services" because "those are different businesses" that conflicted with GTT"s strategy.

65.    CW 15, a former Technical Specialist at Interoute in London from November 2016 until April 2018, and a former Business Development Executive at GTT from April 2018 through November 2019, also stated that the combination of the two businesses did not make sense because GTT sold peer-to-peer cloud networking capabilities while Interoute had always sold private cloud services.  CW 15 stated he had worked on Interoute's sales team, and cloud services was a "huge focus" for them, including because they would receive better commissions for selling cloud services.  CW 15 stated he would be "very surprised if someone from GTT could put their hand on their heart and say that they didn't know that cloud services were a big part of [Interoute's] product portfolio."

66.    CW 1, the former Executive Vice President Service Provider at Interoute through December 2016 and a former consultant to an American fund interested in purchasing Interoute in October 2017, similarly stated that rather than being "hand in glove"—the term Defendants had repeatedly used to describe GTT's acquisition of Interoute—the two businesses were in fact "right hand into left glove," because the companies' culture, mission and strategy were "totally different."  In fact, CW 1 stated that the "key point" to why everything went wrong was that Interoute had a "totally different business model" from GTT's.  Interoute was not focused on being a "cloud networking" company, but a "cloud services" company—and that had been the case from at least 2012.  CW 1 stated that these key differences were apparent to Defendants, as the data room for the deal showed that Interoute had experienced huge increases in cloud services sales in recent years, demonstrating its shift in strategic focus.

67.     CW 4, a former Interoute Sales Operations and Systems Training Manger in Prague from January 2006 to January 2019, likewise confirmed that Interoute had a fundamentally different business model from GTT.  CW 4 stated that Interoute's key assets were connected to its huge physical network, and specifically its numerous data service centers, 70,000 kilometers of fiber network, and five undersea cables.  CW 4 explained "if you have that much infrastructure there is only so much money you can make if you are not selling cloud services through the infrastructure.  Why would [Interoute] not be selling cloud services?"

68.     CW 5, a former Interoute Vice President of Commercial Operations in London from January 2001 to October 2018, likewise stated that the "primary difference" between the two companies "was [Interoute] owned a lot of assets, we were very asset-heavy, and [GTT was] a virtual network operator."  CW 5 stated that this resulted in very different business models, and it did not help that GTT was forced "to conceptualize a lot of product lines [it] had never sold before" due to Interoute's cloud services focus.

69.     CW 6, a former Client Account Manager in GTT's New York office from January 2017 to June 2018, also stated that he recalled being surprised in response to rumors that GTT was buying Interoute because Interoute was so far out of GTT"s usual acquisition wheelhouse, commenting:  "It's a completely different industry," and "unlike any of the acquisitions that were made during my time at GTT"—an overall "unnatural fit."

70.     CW 10, a former Lead Solutions Consultant for Interoute and then GTT in legacy Interoute's Geneva office from August 2010 to December 2018, similarly stated that the two companies had "very different types of markets" and "very different product sets."  Like CW 7, CW 10 stated that, for years prior to the acquisition, Interoute had shifted the majority of its business to selling cloud services.  "Interoute was saying we own a very large network but 90

percent of our activity was around additional [cloud] services." CW 10 stated that, for example, in the two years before GTT acquired Interoute, Interoute had a policy whereby its salespeople would only get commissions for the products they sold if they included an element of cloud services—that was how important selling cloud services had become to Interoute. CW 10 therefore emphasized that the way the two companies set about their business was "completely different." "You are selling ice cream and we are selling trains. So don't tell me how you are doing things and that we are going to work the same way . . . If they had been more realistic, the impact on their shareholders would have been less, perhaps."

71.    Significantly, CW 10 stated that Calder knew that Interoute had made a strategic shift to selling cloud services before signing the deal, but plunged ahead anyway. CW 10 stated that Defendant Calder visited Interoute's Geneva office where CW 10 worked at the tail-end of Calder's tour of Interoute's offices, when GTT's announcement of the Interoute merger was "imminent." CW 10 stated that Calder told the Geneva office during an internal meeting that GTT had "discovered your additional [cloud] services" that Interoute had been offering "lately," and that Calder explicitly stated that GTT "didn't want that business, those types of activities"— meaning that, unbeknownst to investors, the Interoute integration would require significant efforts by GTT to "cut" out Interoute's cloud services business, which CW 10 said did not seem feasible "from the very first day" due to how focused Interoute was on that business.

### 2.    Defendants' Integration Timelines Were "Totally Unrealistic"

72.    As set forth above, Defendants repeatedly stated during the Class Period that "[g]iven how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters," or by the second quarter of 2019. To meet that schedule, Defendants announced an aggressive timeline for achieving "key milestones" of the integration, including by stating that the critical CMD "cut over" would be completed by October 2018.

However, Plaintiffs' CWs unanimously confirmed that, from the outset of the Interoute acquisition, the accelerated timelines Defendants announced for completing the Interoute integration made no sense and were not at all feasible.  Significantly, CW 7 stated that he explicitly warned Defendant Calder of this fact numerous times based on his extensive knowledge of Interoute's business.

73.   Indeed, CW 7 stated that the timelines GTT announced for integrating Interoute were "absolutely ridiculous" and completely "unrealistic," which CW 7 knew from Interoute's own experience acquiring EasyNet in 2015—an integration that took more than two years to complete.  Significantly, CW 7 stated that he directly warned Calder of how "unrealistic" GTT's timelines were just prior to the acquisition and at the outset of the integration.  CW 7 stated that first, in February 2018, the same month the acquisition was announced, he met Calder four times in person—"a couple of times in Italy, one time in London and in Spain."  CW 7 stated that during this time, which was soon after GTT emerged as the favored buyer for Interoute, Calder "wanted to talk with all the [Interoute] VPs and I was the one responsible for southern Europe."  CW 7's face-to-face conversations with Calder included explicit back-and-forth about what Calder envisaged and why Calder was taking the wrong path with respect to the integration.  CW 7 stated:  "During those conversations, he was telling me . . . 'we have CMD, we are going to use our CMD because it is the best way to integrate the new company' . . . I was trying to explain that the company is a bit more complicated than what he thought.  That in this market, if you don't satisfy, if you don't treat the customer in a proper way, it's pretty simple for them to switch to a different provider."

74.   Once the integration began, CW 7 spoke with Calder again several times over the phone about CW 7's impending decision to quit due to GTT's unworkable integration plan.  "I

spoke with the guy four times over four months and I made my opinions clear. <u>I told him I don't think integration can be done in a short time</u> . . . I told him that this is not the way in which you can manage the company, I am going to leave." CW 7 stated that "[w]e spoke about the way to do the integration, the market approach, the organization, and we had completely different views on everything." CW 7 further commented that Calder was clearly "interested in doing the acquisition as fast as possible in order to start another acquisition," without regard to whether GTT successfully integrated Interoute. As a result, CW 7's view of Calder was that he was "just trying to tell a story to the markets and for as long as the markets believe him they will give him money. But the moment will come when they will ask for the money back and this guy will disappear. This is what is happening now. The market wants its money back."

75. Other CWs confirmed that, based on their direct knowledge of Interoute's business and internal systems, the timeline GTT announced for the integration and the CMD migration in particular was "totally unrealistic." For example, CW 1, a former Executive Vice President Service Provider for Interoute's London office and consultant to a prospective buyer of Interoute, stated that <u>GTT's announced timelines for the integration were "crazy" and "completely unrealistic."</u> CW 1 stated this was particularly true with respect to the CMD migration, as Interoute used a completely different system than GTT. <u>CW 1 stated that it would take at least two years to fully integrate the two companies</u>, and repeated that GTT's timelines were "totally wrong and crazy" and "totally, totally unrealistic."

76. CW 3, a former Interoute Field Engineering Manager for the Benelux and Nordics at Interoute for more than sixteen years until January 2019, also stated that the CMD timeline was completely unrealistic because Interoute relied on Seibel Tolls on a Cramer Systems platform—for which GTT had no equivalent, because unlike Interoute, GTT did not own any

27

proprietary network before the merger.  As a result, GTT had to gather a team of 60 people to build a brand new CMD to integrate both systems into one.  "They developed their own CMD with 60 people to gather all the information from Siebel and Cramer," CW 3 said.  Thus, when CW 3 first heard of the timeline Defendant Calder had set for the "cut over" of Interoute's platforms to the CMD platform, he knew immediately it was unrealistic.  "If you need to build a new platform and migrate all the old platforms into it, that takes time.  And it takes more than a couple of months.  I have worked at a lot of companies and every time they moved to a new platform it took at least a year before everything was going smoothly."

77.    CW 4, a former Interoute Sales Operations Systems & Training Manger in Interoute's Prague office from January 2006 until January 2019, stated that he was close with David Riva, the Director of Business Systems at Interoute in Prague.  CW 4 stated that Riva ran the Siebel platform for Interoute, and that he and Riva laughed together about the unrealistic timeline GTT had announced for the systems migration.  "We joked and laughed our asses off that they were full of shit, it will never happen."  CW 4 stated that Riva "would have told [GTT] twelve different times until he was blue in the face" that the timeline was unrealistic.

78.    CW 5, a former Interoute Vice President of Commercial Operations in London from January 2001 through October 2018, stated that it was "painfully obvious" internally that GTT had set itself deadlines that could not possibly be met.  "I met Rick [Calder] on day one.  He came in and said we will be integrated in six months.  I nearly fell off my fucking chair.  It was going to be easily a two-year job.  Easily."  CW 5 described Calder's publicly announced timelines as "total bollocks, total."  The integration was "never going to be done in months."  CW 5 explained that  much  of  what  was  on  Interoute's  Siebel  platform  was  extremely

complicated with some elements tailored to individual customers—none of it could easily be transferred to CMD and expected to work right away.

79.     CW 10, a former Interoute and GTT Lead Solutions Consultant in Interoute's Geneva office until December 2018, recalled Defendant Calder's announcement of the integration timelines during Calder's talk at Interoute's Geneva office just prior to the acquisition, and his reaction of how unrealistic it was.  "He was saying that in three months' time there will be one organization, in four months' time we will have the same processes, and in six months' time [GTT] will be buying another company."  CW 10 stated that the timelines made no sense.  "It was not feasible.  Because of the culture of Interoute and the complexity of Interoute. [Interoute] was a collection of colonies, a collection of countries that had somehow worked together."  CW 10 explained that it was impossible for everything to be migrated onto GTT's CMD platform on the timeline Calder described because so many of the contracts Interoute had with some of its largest customers (like UEFA) were so intricate.  Moreover, "[t]he two systems, regardless of their internal coherence, were simply not compatible.  They replaced the Interoute incentive plans and the way of selling the GTT way."

80.     CW 15, a former Business Development Executive at GTT in London from April 2018 until November 2019 (and prior to that, a former Interoute Technical specialist), similarly stated that GTT's announced timelines for the integration, and in particular the CMD migration, were "widely wrong" and "ridiculous."  CW 15 stated that CMD was antiquated, and "the worst system that I have ever seen.  Once we got our hands on CMD, we realized that it was nothing more than an Excel spreadsheet and something from the 1980's."  CW 15 explained that while GTT had stated it would take six months to fully complete the CMD migration, everyone at Interoute knew that was impossible, as evidenced by Interoute's acquisition of EasyNet in 2015.

29

Prior to that acquisition, EasyNet had itself acquired a company called Vetas. CW 15 stated that Interoute has yet to integrate Vetas and EasyNet's networks into its system—meaning it would have been impossible for GTT to integrate four different networks within six months, since Interoute had been unable to integrate those networks for years. "<u>The technical difficulties to integrate these networks within six months are ridiculous</u>. For GTT to assume that they could integrate these systems within that timeframe was ridiculous." CW 15 stated that "<u>[w]hen you are talking about two multi-billion networks, this wouldn't be possible to do within five years. A six month timetable is absolutely impossible</u>."

81.     Other CWs stated that Defendants had to have known their timelines were unrealistic because of GTT's negative experiences in prior integrations, and particularly with respect to the CMD migration. For example, CW 6, a former Client Account Manager in GTT's New York office from January 2017 to June 2018, stated that when he read in an article that someone at GTT "blamed the systems of Interoute that were not compatible" with CMD for the lack of success integrating, CW 6 and his coworkers "were all laughing, because we were like, '<u>This is no different from any other acquisitions [done by GTT]</u>. Why are they saying this about Interoute, but not admitting it about every other acquisition?'" <u>CW 6 explained that the entire time he was at GTT, "not a single acquisition was totally completed</u>." In fact, two years after his company, Yipes, was acquired by GTT, he "had engineers needing me to give them data that I had from old Yipes documents" because the systems were not fully integrated. CW 6 stated that <u>GTT "threw timelines around all the time" for integration completion</u>, and recalled thinking with respect to the timeline for Interoute, "[t]here's no way," and it was "almost comical" that GTT would represent that it would meet integration deadlines for a "massive company" when it

regularly failed to do so for small companies.  "<u>Nothing [GTT] had done in the past would</u> <u>indicate that [it] could do [an integration] (a) in a timely manner or (b) successfully</u>."

82.     CW 8, a former sales engineer in GTT's New York office from June 2016 to March 2018, similarly stated that when GTT acquired a company, <u>there were always "flow</u> <u>problems" with CMD, which CW 8 referred to as a "crappy, in-house system</u>."  CW 8 stated that in nearly every acquisition that happened during his tenure at GTT, there was immense difficulty porting information from the acquired company's system into CMD.   This meant that salespeople spent all their time trying to manually correct client information in CMD, and had no time to make new sales—meaning they were "wasting their whole day trying to clean up shit," and then getting fired for not meeting their quotas.

83.     CW 13, a former GTT Global Accounts Director form 2018 until January 2020 in GTT's Los Angeles, California office, stated that CMD was a "very kludgy, antiquated CRM [customer relationship management] system" that had caused significant issues in connection with GTT's 2016 $600 million acquisition of Hibernia, its second largest acquisition after Interoute.   CW 13 stated that Hibernia was never fully integrated into GTT's CMD, and "[b]ecause of this lack of integration, we couldn't issue quotes or process service orders."  CW 13 stated that, ultimately, "[n]one of the services that Hibernia Media provided got integrated into GTT's CMD system," and any time CW 13 sold a Hibernia service, it was a manual service that required a lot of tweaking to the system.  "We had to make our own quotes and it was very manual."  CW 13 further stated that Hibernia customers suffered the same billing issues that Interoute customers would suffer after they were acquired by GTT, receiving invoices that were inexplicably higher after the acquisition.  GTT lost a lot of Hibernia customers due to these issues, which took up to one year before they were resolved—causing GTT to lose millions in

revenue.  CW 13 stated that CMD was referred to internally as "changes made daily" because GTT was constantly updating the system due to integration issues—CW 13 therefore commented that rather than being the Company's "secret sauce," CMD was "shit sauce."

> **3.     Contrary To Defendants' Statements, Once the Interoute Integration Was Underway, Nothing Went According To Plan**

84.     Plaintiffs' CWs—virtually all of whom worked for either GTT or Interoute (or both) during the integration—uniformly attested that once the Interoute integration was underway, contrary to Defendants' repeated public averments, nothing went according to plan. Specifically, numerous CWs stated that Defendants' statements in November and December 2018—that GTT had "consolidated all [of Interoute's] core business support systems to [CMD] in October [2018]," and that by December 4, 2018 this effort was "effectively complete" with only "[a] little bit of cleanup activity" remaining—were demonstrably false.  To the contrary, upon Defendants' attempts to migrate CMD, the combined entity nearly ground to a standstill for months—to the extent that serious integration problems persisted through the end of the Class Period and beyond, meaning the CMD migration was <u>never</u> completed and the two companies were <u>never</u> fully integrated.

85.     For example, CW 2, a former Regional Vice President for Strategic Accounts at GTT from 2015 to December 2018, stated that <u>the Interoute integration was not "smooth by any stretch of the imagination</u>."  CW 2 stated that after the acquisition, his next eight months at GTT were a "<u>living hell</u>" due to significant and prolonged integration issues, particularly because he had two large enterprise clients who used GTT and Interoute prior to the acquisition who he had to appease. CW 2 stated that the Interoute integration caused great pain internally with employees, and externally with customers.  CW 2 stated that much of this pain and frustration was caused by GTT's attempted CMD migration, and particularly the billing component, which

CW 2 stated was a "major issue."  "<u>The billing was an absolute nightmare</u>."  CW 2 stated that, in addition, the entire client base that GTT acquired globally was unable to obtain any valid price quotes.  "Getting valid price quotes out the door was impossible because they were not on the CMD platform yet.  In the first 12 months, the customers felt a lot of pain and frustration."  For example, CW 2 stated that he would hear that pricing would be available in 90 days, then 120 days, then it would get delayed again.  CW 2 stated that due to this "internal mishegoss," instead of employees being in front of customers 65% of the time, it was 80-20 the other way.  CW 2 said Interoute and GTT billing was in fact never consolidated, as he fielded calls from former clients, including Fortune 500 clients, for a year after he left the Company in December 2018 regarding integration issues GTT was still trying to resolve.  These issues included billing discrepancies and the inability to get valid pricing and re-pricing quotes.

86.     CW 2 further stated that deadlines regarding the Interoute integration kept getting pushed back, and several processes that should be automated had to be done manually.  CW 2 stated that Defendant Calder held weekly meetings every Friday, which he referred to as "brown bag" meetings, for which the entire Company would dial in.  CW 2 stated that Interoute timing delays were discussed on these calls, and the message was "we were supposed to have this done this quarter, but it has been flipped to the next quarter.  They just kept moving the goal posts on us."

87.     CW 3, a former Interoute Field Engineering Manager through January 2019, stated that when GTT first attempted to migrate everything onto CMD in October 2018, the problems were instantaneous.  "<u>Nine times out of ten, [CMD] was not reachable</u>," and the result was that <u>Interoute employees were unable to be proactive in their day-to-day business "for months</u>."  The problems were so persistent that, at some point, they gave up on the CMD system

33

completely.  "At some stage, we changed back to our own system to move back later on because [CMD] was not working."  CW 3 further specifically stated that GTT's November 8, 2018 public announcement that the Company had "consolidated all [of Interoute's] core business support systems to our client management database, CMD, in October" was "not a true statement."  CW 3 stated that, in actuality, the problems with the integration were "not solved when I stopped working in January [2019]"—so there was "no way" everything was sorted out by the end of 2018, let alone October.  CW 3 stated "I know [GTT] w[as] aware" of the mess.  "We couldn't do anything without GTT because it was their platform."  CW 3 also stated that Defendant Calder was present in the Interoute Netherlands offices often during this period, stating "I know that Rick Calder did come to the Netherlands" during the integration.  CW 3 further noted that, even after CW 3 left the Company in January 2019, his former colleagues were calling him for help getting into the new system.  CW 3 also commented that he had recently heard from a former colleague still employed by GTT that Interoute had a board meeting in late November 2019 at which it was agreed that all the physical assets of Interoute—its fiber network—were to be sold off.  The decision was taken against the background of the merger of Interoute, and how it had not gone to plan.  The directors "were told it is not going very well with GTT and Interoute," and it was time to sell the network.

88.    CW 4, a former Interoute Sales Operations Systems & Training Manager until January 2019, stated that the impact of the acquisition on Interoute's sales operation was a disaster.  "In general, as soon as we were bought it was like driving a car into mud . . . [t]he whole office slowed to a sludge."  With respect to CMD, CW 4 stated that once the "cut over" was attempted in October 2018, "the system [was turned off] and all the development work just dried up.  They were just ticking over.  Half the people had nothing to do.  The whole office just

34

slowed down."  CW 4 stated that Defendant Calder had to have been aware of the integration issues, and any idea that he was ignorant of them was "nonsense."  CW stated Calder's "sticky fingers were involved in every single hiring and firing, all the pay increases . . . Everything had to be personally approved by him.  He was a micromanager."

89.    CW 5, a former Interoute Vice President of Commercial Operations through October 2018, stated that, during the integration, he reported directly to Defendant Gina Nomellini.  CW 5 stated that he was not free to do anything without passing it by her, and that she was very much "the one on point" on the GTT side when it came to the integration.  CW 5 stated that he was personally involved in the efforts to integrate all the Interoute data management and content onto GTT's CMD platform.  CW 5 stated that CMD was very clunky— "[i]t was a very old database, incredibly old," and had not been built with Interoute cloud services products in mind.  "[GTT was] in the connectivity business when [it] bought Interoute. [Interoute] had lots of products [GTT] had never put into CMD before."  CW 5 stated that a lot of the fallout from the botched CMD integration was billing mistakes that infuriated customers. CW 5 stated "[w]e got threatening feedback" from some of them.  For example, some customers were being told they faced losing service for non-payment of bills when in fact they had paid, while others were being billed twice for a single service.

90.    Significantly, CW 5 described Defendants Calder, Nomellini and Sicoli as each having direct involvement in the integration execution, and confirmed that they had direct awareness of the significant issues that arose.  With respect to Defendant Calder, CW 5 stated that he was heavily involved:  "He had his fingers in everything."  CW 5 underscored Calder's constant presence at Interoute's offices in Europe, stating "[Calder] was really there a lot," and "would spend weeks in the Interoute office[s].  He spent a lot of time in London, also in Prague

and in Sofia," with all of these visits occurring "during the integration phase."  CW 5 further stated that Calder would have regular "skip meetings" at Interoute, meaning he was digging lower into its executive hierarchy and having "one to ones with a lot of people."  With respect to Defendant Sicoli, CW 5 stated that CW 5 himself had "very forthright conversations" with Sicoli in an attempt to make him understand how to make money with the very different assets GTT had acquired from Interoute—there was a lot that Interoute did that "[GTT] had never done before.  I tried to go through all of that with him and get him to understand how they could make money out of it."  CW 5 also recalled that there were weekly calls with Defendants Sicoli and Nomellini "going through all the big deals."  The calls "absolutely" included discussion of the Interoute integration problems, including "around getting products into CMD—this isn't ready, that's not ready, we can't launch a wider product because of this . . . the problems we had with CMD, how things were misaligned, how processing was incorrect."  CW 5 stated that he specifically recalled Defendant Calder publicly announcing that the Interoute integration had been successfully completed, saying "We have done it"—to which CW 5 thought:  "No, you haven't," and that Calder's announcement "was just spin."

91.    CW 10, a former Lead Solutions Consultant for Interoute and then GTT until December 2018, stated that he and his colleagues were "laughing as usual" when GTT publicly announced that Interoute's integration deadlines were being met.  CW 10 stated: "We were not on track.  In which domain could we say we were on track?  The only progress they made was with merging the mailing lists so we could receive useless information."  CW 10 stated that by the fall of 2018, when GTT announced that the CMD migration milestone had been met, the migration of Interoute's systems onto CMD in fact "had not been successful . . .  [i]t was a very difficult campaign."

92.     CW 10 recalled that, in June 2018 while the integration was underway, Calder made another visit to the Geneva office and expressed interest in having a one-on-one (or "skip" meeting) with CW 10, which happened later that day.  CW 10 stated that the meeting went ahead as promised that evening in a meeting room in Geneva that had been set aside as Calder's temporary office.   CW 10 stated that, in this conversation, Calder did "not reference the difficulties" of the integration, which by now were obvious, and it took him aback.  "I was really thinking, 'This guy doesn't seem to be stupid, so he must be dishonest.'  Everyone was saying 'we are making tremendous progress, everything is going very well.'  It was a better thing for them to say that everything is going according to plan, everything is making huge progress."  CW 10 stated that he was aware that GTT also advertised this falsehood to the outside world. "The way of advertising this everywhere, that everything was going according to plan, was not a good idea.  Because it was not what was happening."  CW 10 stated that, during his meeting with Calder, he tried to convey his skepticism about the progress of the integration.  "I said I had some questions about how in the future he expected us to work inside GTT, that there were discrepancies between the way we worked and they worked . . . I cannot say that we are not still completely separate organizations.  I am impatient to work with GTT in reality but, as you know, Rick, right now we are two separate organizations and it is very difficult."

93.     Similarly, CW 9, who formerly worked in GTT's financial market sales department in its New York office from February 2017 to August 2019, stated that the Interoute integration "took a lot longer" than expected.   CW 9 stated that GTT was publicly "broadcasting" to everyone that the transition to CMD was complete when it was not.  CW 9 further stated that when GTT acquired Interoute, a timeline for integration was announced, but GTT "kept missing it.  They kept saying 'soon, soon, soon,' and giving dates," but internally

kept moving the deadline when GTT could not meet it.  CW 9 stated that business opportunities were lost because of this—when "critical information" was not properly rolled into CMD, it became impossible to provide clients with things like pricing.  Pricing was the "major delay" with the Interoute integration—"everybody wanted it but we couldn't get it out."

94.     CW 14, a former Sales Manager for Access Point (a company GTT acquired on October 1, 2018) from September 2004 until October 2018, and then GTT from October 2018 until March 2019, stated that on October 2, 2018, the day after GTT announced the Access Point acquisition, there was an internal meeting with GTT senior management during which the "shit show" of the Interoute integration was discussed.  The meeting was attended by GTT Senior Vice President/Channel Chief Rob Westervelt, Vice President of Channel Operations Gina Kennedy, and other GTT management.  GTT management greeted Access Point employees by stating:  "Welcome to the shit show," which CW 14 stated was "their reference to their Interoute debacle paving the way to screw up a lot of different things, and it trickled down and pushed back on the Access Point integration."  CW 14 stated that a week after the acquisition was announced on October 1, 2018, Defendant Calder visited Access Point with GTT's General Counsel—i.e., Defendant McKee—and GTT's Human Resources Team.  CW 14 recalled Calder making statements that GTT was still working on the integration of Interoute and they were not there yet, and that there were some hiccups.  After Calder made these comments, GTT employees laughed, indicating "they had a long way to go integrating Interoute."

95.     CW 14 further described how Access Point's integration was significantly delayed due to the issues GTT was having integrating Interoute into CMD—to the extent that by the end of CW 14's tenure in March 2019, Access Point still was not close to being integrated. CW 14 stated he was "told several times that our integration was being held up because of the

issues and delays with the Interoute integration," and "I heard several times that the Interoute integration wasn't going as planned."  CW 14 stated that the GTT executives kept telling Access Point staff that they were learning from the Interoute integration and it was "not going as smoothly as they thought it would."  CW 14 stated he also participated in several conference calls where the integration of Interoute was discussed because that process was pushing Access Point's integration out.  "It was always this has been backed up, or this didn't happen, we are still working through it . . . The integration on the Interoute side kept rearing its ugly head because that was why we couldn't do our migration from the Access Point side to the GTT side."

96.   CW 14 also stated that after he left the Company, his former customers kept calling him to complain about billing issues similar to those that ended up occurring with respect to Interoute.  When CW 14 was read GTT's public statements in November and December 2018 that GTT had made "meaningful" and "successful" progress on the Interoute integration, and that this was proven by GTT's announcement of the acquisition of Access Point, CW 14 laughed and repeated that Access Point was nowhere near being integrated by even March 2019 "because of the Interoute integration issues."

97.   CW 11, a former Key Account Manager for Interoute in its Paris office from May 2012 until May 2018, stated that GTT's attempt to impose its CMD system onto Interoute was met with resistance and created enormous problems during the integration.  One former colleague was "complaining that GTT was implementing new tools that no one knew how to use."  On one occasion, this person was unable to generate a purchase order for a customer on the CMD system and had to fly from Paris to Sofia where Interoute's operations were headquartered to get the purchase order sorted out.  CW 11 stated that this was entirely due to the chaos created by the CMD migration, as the new merged system "did not work."  "They knew

how to do it but they couldn't after GTT arrived.  They shut down many of the Interoute processes and put in place the GTT processes without anyone knowing how they worked."  CW 11 stated that the problems with CMD drove many to quit, leaving GTT with a plethora of young and inexperienced salespeople.

98.     CW 12, a former Senior Director of Enterprise Sales in GTT's New York office from May 2018 to October 2018, stated that after GTT bought Interoute, he "couldn't price" any products on Interoute's map and routinely dealt with "wrong bills."  CW 12 stated that all of his customers received invoices for goods and services that were not the products CW 12 had sold them, and they complained about being up-charged.

99.     CW 13, a former GTT Global Accounts Director in GTT's Los Angeles, California office from 2018 until January 2020, stated that while he did not sell Interoute products, he was well aware of the integration challenges from speaking with several of his colleagues at GTT.  CW 13 stated that GTT has always had trouble integrating systems onto CMD, and Interoute was no exception—the correspondence throughout the Company was that the Interoute integration was "very challenging to say the least" and "very problematic." Interoute employees "couldn't issue quotes utilizing Interoute resources and couldn't generate the service orders quite the same as if it was a native GTT product already integrated into CMD."

100.    CW 1, a former Executive Vice President Service Provider at Interoute in London, stated that GTT's public statement in November 2018 that it had "consolidated all core business support systems" onto CMD in October 2018 was "not at all" true.  CW 1 stated that old colleagues who stayed at Interoute after the merger told CW 1 that "this is a nightmare."  For a while Interoute could not even send invoices, and many invoices that were sent were wrong. CW 1 stated that as of October 2019, Interoute was still having problems fulfilling orders using

CMD, and information had to be converted into the old system in order for Interoute to fulfill those orders.

101.    Finally, CW 7, the former CEO of Interoute Italia until July 2018, stated that he was aware of serious problems with the integration because irate former customers would call him even after he had left the company.  "I spoke with a lot of Interoute customers . . .  I can tell you this integration has been a sort of disaster.  The customers were complaining about everything, about the bills they were receiving, about the quality of service.  They made their customers literally mad.  The integration is still ongoing today and it is not yet complete and there are a lot of problems in the billing area especially."

**F.    The Truth Emerges—And GTT's Stock Collapses, Plummeting Over 80%**

102.    On May 8, 2019—mere days after Defendant Calder had publicly told *Bloomberg* that the Interoute integration was "absolutely . . . right on track with what we announced when we were here a year ago"—the truth began to emerge.  That day, Defendants released GTT's financial results for the first quarter of 2019, and announced a surprising 1% sequential revenue *decline*—GTT's first such decline since when its "roll up" strategy began in 2015—that Defendants stated was directly attributable to "delays related to [Interoute] integration activities." Defendant Sicoli further stated that the Company's cash balance was also "negatively impacted by a significant use of working capital related to Interoute accounts receivable, as we transitioned billing and collections activity onto our CMD system."

103.    Defendants further revealed—for the first time since the Interoute acquisition was announced over a year ago on February 26, 2018—that, contrary to Defendants' exclusively positive statements about how the Interoute integration was "right on track," GTT's "rapid integration strategy" had in fact been "challenging" with respect to Interoute.

104.     Defendants then made a series of stunning admissions in this regard during the call.  First, as Plaintiffs' CWs had uniformly confirmed, Defendant Calder revealed that the CMD "cut over" to Interoute's legacy systems had <u>not</u> been completed in October 2018 as Defendants had previously announced on the Company's November 8, 2018 third quarter earnings call, nor was it "effectively complete" with only "[a] little bit of cleanup activity" remaining by early December as Defendants had announced on December 4, 2018.  To the contrary, <u>GTT announced that the CMD "cutover" had only just occurred, stating that GTT had</u> <u>only "now formally retired the major client management system that existed in Interoute.</u>" Indeed, Defendant Calder admitted that rather than only "[a] little bit of cleanup activity" remaining for the CMD migration in December 2018, in fact, "<u>most of the retraining of the</u> <u>organization [on CMD] was occurring in November, December and through the first quarter.</u>"

105.     Second, Defendant Calder also admitted to investors, for the first time, that the integration was negatively impacted by the fact that <u>Interoute had made a "real shift" of its</u> <u>primary strategy to "selling new cloud services,</u>" what Defendants themselves had called a completely "different business" that GTT was "not trying to get into"—meaning Interoute was decidedly <u>not</u> a "mirror business" or "the European version of GTT":

> <u>We're very focused on providing cloud networking services to large multinational</u> <u>clients</u> . . . And so that's what we have our sales force focused on.  With the Interoute acquisition, we acquired a base of clients who are fantastic, and we provide cloud services . . . but <u>we are not focused on selling new cloud services,</u> <u>new hosting, new compute services and that has been a real shift with respect to</u> <u>legacy Interoute and the trajectory they have been on</u> . . .

106.     While Defendant Sicoli attempted to downplay Interoute's strategy shift by claiming that it amounted to "roughly 5% of revenue," that was directly contradicted by Sicoli's next statement, in which he admitted that because Interoute had made a "<u>strategic priority shift</u>" to selling cloud services, that business was "<u>a much higher percentage of [Interoute's] sales in</u>

the year or 2 leading up to the acquisition."  Defendant Sicoli stated that as a result, GTT had lost "sales momentum," and that was why "organic growth" remained "challenging" for the Company.

107.    In response to these revelations, on May 8, 2019, GTT's stock price plummeted over 25%, from $40.29 per share to close at $29.91 per share on May 9, 2019, wiping out approximately $580 million in market capitalization.

108.    Analysts were shocked by Defendants' admissions, particularly in light of Defendants' prior exclusively positive public statements about the progress of the Interoute integration over the course of the last year.  For example, BTIG stated:  "We have lost confidence in GTT's ability to stem decline in revenue . . . the more than 1% sequential decline in revenue this quarter was disappointing given the optimistic comments made by management over the past three quarters."  A Cowen report similarly stated "[w]e view 1Q19 results as disappointing including the surprising 1% Q/Q decline in revenue growth," commenting that "this was largely attributable to the installation delays tied to the Interoute integration" and "was unexpected."

109.    In an attempt to stem the stock price collapse, Defendants asserted during the May 8, 2019 earnings call that despite the significant integration challenges with the CMD migration, those issues were now "behind us."  Specifically, Defendant Calder assured investors that the CMD migration was "now complete," and "we do believe we are past the training effort, and everyone is now fully aligned into one system, which is generally a huge victory for GTT."

110.    During the June 4, 2019 Credit Suisse Communications conference, Defendant Calder further confirmed that GTT "knew going in"—*i.e.*, from the outset of the transaction—

about Interoute's "strategic priority shift" to cloud services, and further knew that the shift had

caused significant integration issues because cloud services were "not strategic to us":

> They had over 2,000 employees.  We were 1,000 at the time . . . .One of the
> things we noted on our last earnings call is <u>Interoute had made a shift to take a</u>
> <u>small portion of their business and move into cloud services</u>, really competing
> against Amazon, Microsoft Azure, Google Cloud Perform, SAP, Oracle, etc.  And
> we felt that they are some of our best clients and partners and we connect our
> clients to those applications, that <u>adding those services onto our overall mix is not</u>
> <u>strategic to us</u> . . .And we've really refocused now the business around the
> purpose of selling cloud networking to larger multi-national clients. <u>So we knew</u>
> <u>that going in</u>, but <u>that shift of moving all that focus and mindshare back to cloud</u>
> <u>networking is something that's probably taking just a little bit longer than we had</u>
> <u>expected</u>.

111.    While Defendants again attempted to downplay the issue by claiming that only a

"small portion" of Interoute's business was devoted to cloud services, this was again

contradicted by Defendant Sicoli's confirmation that the impact of the shift on the integration

was in fact highly significant.  Specifically, Defendant Sicoli revealed that, <u>due to Interoute's</u>

<u>"cloud services pivot," GTT had been forced to fire no less than 50% of Interoute's workforce</u>,

or "about 1,000" of Interoute's 2,000 total employees, because those employees were involved in

cloud services:

> [T]he bigger [part] is, we didn't yield as many quota-bearing reps on the Interoute
> side as we initially thought.  <u>They had, as Rick mentioned, this cloud services</u>
> <u>pivot.  There were more reps focused on cloud services than we initially thought</u>,
> and they also hadn't been culling the bottom 10% of their population aggressively
> at all.  And so <u>there were more people at the end of the day that we ended up</u>
> <u>terminating or who left than we'd initially thought</u>.

112.    On August 8, 2019, during the Company's second quarter earnings call, the truth

fully emerged.  During that call, Defendants revealed that, despite having just reassured investors

that the CMD migration was "now complete" and those issues were "behind us," in fact the

migration was not complete and the issues were not behind them.  To the contrary, continued

44

"post-integration challenges" connected to the Interoute integration and the CMD billing migration had caused yet another significant revenue decline.

113.    Indeed, Defendant Sicoli disclosed that <u>revenue had declined another 3% "both year-over-year and sequentially</u>," with $12 million of the $14 million sequential reduction resulting from (i) Interoute negative net installs as a result of integration delays; and (ii) $6 million in billing credits that had to be issued to Interoute clients to resolve billing errors caused by the botched CMD migration.  While Defendant Sicoli attempted to downplay the issue by stating that "[i]ssuing dispute credits as a result of billing integrations is not uncommon," he also admitted that "<u>the magnitude is larger and the time frame is longer than we normally see</u>." During the question and answer session, Sicoli further stated that "[f]rom a margin perspective," the results were especially "disappointing," particularly since "<u>[t]he revenue credits that we talked about a minute ago are essentially 100% margin reductions to revenue in period</u>."

114.    In response to the increasingly negative impact of the significant issues connected to the Interoute integration, GTT's stock price was virtually halved, falling from $11.35 per share on August 7, 2019 to close at $6.09 per share on August 8, 2019—a staggering drop of 46% that wiped out nearly $300 million in market capitalization in a single day.

115.    Analysts were again stunned by this news, and excoriated GTT management over its failure to be "forthcoming" about the integration problems.  For example, a Cowen report commented that "we clearly misjudged the magnitude of the issues affecting the financials . . . <u>we believe mgmt.. should have been more forthcoming about the anticipated impact from such issues on NT results</u>."  A SunTrust report similarly commented on GTT's "disappointing 2Q19 results," which were "<u>marred by continued difficulties integrating Interoute</u>," including "<u>[b]illing systems difficulties and a continued lag of net installations</u>," "drove significant revenue and

EBITDA shortfalls." A Craig-Hallum report commented that GTT's strategy "just isn't working right now," stating "moves to swallow whales instead of fish have created integration challenges, disrupting the customer base."

116. All told, GTT's stock price fell precipitously during the Class Period as a result of Defendants' misrepresentations, crashing from its Class Period high of $61.85 per share on March 20, 2018 to be worth only $6.09 per share by the end of the Class Period—thus losing over 90% of its value.

## VI.    POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD

117. Even after the Class Period ended, the ramifications of Defendants' fraud and the disastrous Interoute integration continued.

118. First, only three weeks after the August 8 earnings call, on August 27, 2019, GTT announced that Defendant Sicoli was abruptly leaving the company for another position at a company called Internap. As a BWS Financial Inc. report commented, "[t]he departure of Mr. Sicoli from GTT looks sudden with GTT depending on promoting their principal accounting officer [Dan Fraser] to the role of interim CFO." The report further pointed out that Defendant Sicoli had not left for a better opportunity, but that "Mr. Sicoli's departure for a listed company with a market capitalization of less than $70 million"—compared to GTT's market cap of over $1 billion—"also draws more reason for concern."

119. Two months later in October 2019, Defendant Nomellini—who CWs had described as the "on point" person leading the Interoute integration on the GTT side—also abruptly left GTT, with her LinkedIn profile providing the only explanation, stating she was suddenly "on a career break to travel and volunteer."

120. Then on the Company's November 8, 2019 third quarter earnings call, Defendants disclosed that, despite their continued reassurances that the Interoute integration was now

complete, CMD billing integration issues continued to persist unabated, causing significant revenue declines of 6% year over year and 3% sequentially while "billing credits remained elevated." Additionally, Defendants revealed that, in order to pay down the $3.2 billion in debt they had amassed from a series of acquisitions that had failed to yield sufficient returns, including Interoute, they planned to sell off Interoute's huge physical fiber network in Europe— the same fiber network GTT had spent $2.3 billion to acquire—as a "non-strategic asset." Defendants therefore effectively admitted that virtually nothing about Interoute had been "strategic" from the outset.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

121.   Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Throughout the Class Period, GTT's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's business and operational practices and its Interoute Integration.

122.   Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of GTT's business, operational status, profitability, and future growth prospects, all of which artificially inflated the price of GTT's common stock.

### A.   Interoute Acquisition Announcement

123.   On February 26, 2018, the first day of the Class Period, Defendants caused the Company to issue a press release announcing a definitive purchase agreement to acquire Interoute for approximately €1.9 billion ($2.3 billion) in cash. GTT stated that the "strategic combination" would be modeled after GTT's "successful, proven acquisition model," and that

GTT expected "to complete this integration within three to four quarters post-close and achieve a post-synergy multiple of seven to eight times Adjusted EBITDA or better on a pro forma basis."

124.    Also on February 26, 2018, Defendant Calder discussed the Interoute acquisition on "Bloomberg Markets: European Close."[2]  During the interview, Calder touted the remarkable strategic fit of GTT and Interoute, stating:  "We have an almost parallel business in the United States and the combination of one plus one we think will absolutely be three, four, or even five. Just a fantastic combination."  Calder stated that, in light of the companies' similarities, Interoute would be integrated within "three to four quarters."

125.    Also on the day of the acquisition announcement, Defendant Gina Nomellini, GTT's Chief Marketing Officer, spoke to Channel Partners, in connection with its "GTT's $2.3 Billion Interoute Buy to Boost SD-WAN, Channel Program" article.[3]  The article stated: "Nomellini says the two companies take the same approach, focusing on 'breadth and depth of access technologies.'"  In further discussing the similarities between GTT and Interoute, Nomellini stated:  "It's fortunate for us that Interoute really follows the same strategy."

126.    The statements identified above in ¶¶123-125 were materially false and misleading, and omitted material facts when made.  In reality, Interoute was not a "parallel business," nor did it "take the same approach" and follow the "same strategy" as GTT; in fact, Interoute did just the opposite.  Numerous former GTT and Interoute employees attested to the fact that GTT and Interoute were fundamentally different businesses, with different strategies, systems and customers, because by the time of acquisition, Interoute had shifted the "vast majority" of its business to focus on selling cloud services.  Indeed, Defendants themselves

---

[2] Available at: https://www.bloomberg.com/news/videos/2018-02-26/gtt-has-become-a-disruptive-player-ceo-calder-says-video
[3] Available at: https://www.channelpartnersonline.com/2018/02/26/gtts-2-3-billion-interoute-buy-to-boost-sd-wan-channel-program/

admitted toward the end of the Class Period that Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT.  Moreover, Defendants later admitted that they "knew [about Interoute's strategy shift] going in."

127.    Defendants also knew that the announced integration timeline of "three to four quarters" was, as multiple former employees at both GTT and Interoute confirmed, "totally unrealistic" and completely inconsistent with GTT's own integration history in connection with much smaller and more similar businesses.  Indeed, the former CEO of 30% of Interoute's business directly told Defendant Calder numerous times in face-to-face meetings and phone conversations that GTT's integration strategy was unworkable and could not be completed on Defendants' announced timeline both prior to when the acquisition was announced and at the outset of the integration.

**B.      GTT's 4Q 2017 Investor Call**

128.    On March 1, 2018, GTT held an investor conference call to discuss its financial results for the fourth quarter and year ended December 31, 2017, as well as the progress of the Interoute acquisition.  Calder represented that Interoute is "very complementary to the strategy that we've employed.  It's sort of a mirror business."  Defendants repeatedly emphasized the "strategic fit" between the two companies, resulting in the Integration being completed "successfully and quickly," "within 3 to 4 quarters."  Specifically, Defendant Calder represented:

> One, a strong strategic fit.  Interoute is a highly complementary platform, essentially the European version of GTT. We sell the same services to the same type of customers, just in different geographies. And this gives us the ability to significantly increase our total addressable market and wallet share on both sides of the Atlantic.

49

<u>Two, ability to integrate successfully and quickly. Given how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters</u>, which includes an extra quarter or 2 compared to our historical target integration time frame to account for Interoute's relative size and geographic footprint.

129.    The statements identified above in ¶128 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' statements, Interoute was <u>not</u> a "<u>mirror business</u>" for GTT, nor did it follow a "<u>similar strategy</u>," nor did Interoute "<u>sell the same services to the same type of customers</u>."  The opposite was true.  Numerous former GTT and Interoute employees attested to the fact that GTT and Interoute were fundamentally different businesses, with different strategies, systems and customers, because by the time of acquisition, Interoute had shifted the "vast majority" of its business to focus on selling cloud services.  Indeed, Defendants themselves admitted toward the end of the Class Period that Interoute had made a "<u>strategic priority shift</u>" to being a provider of cloud <u>services</u> at least two years before the acquisition—what Defendants themselves stated was a "<u>different business</u>" that GTT was "<u>not trying to get into</u>" because it was not strategic to GTT.  Moreover, Defendants later admitted that they "<u>knew [about Interoute's strategy shift] going in</u>."

130.    Defendants also knew that the announced integration timeline of "<u>three to four quarters</u>" was, as multiple former employees at both GTT and Interoute confirmed, "<u>totally unrealistic</u>" and completely inconsistent with GTT's own integration history in connection with much smaller and more similar businesses.  Indeed, the former CEO of 30% of Interoute's business directly told Defendant Calder numerous times that GTT's integration strategy was unworkable and could not be completed on Defendants' planned timeline both prior to when the acquisition was announced.

### C.    March 2, 2018 *LightReading* Article

131.    On March 2, 2018, *LightReading* published an interview with Calder where he represented that GTT's and Interoute's networks and services "fit together almost hand in glove."[4]   Calder also again represented that, as a result of this strong strategic fit, the Interoute Integration would be completed within "three to four quarters, after closing."

132.    The statements identified above in ¶131 were materially false and misleading, and omitted material facts when made.   Interoute and GTT did not "fit together almost hand in glove," as the truth was exactly the opposite.   Indeed, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking—meaning the two companies were fundamentally different businesses, with different strategies, systems and customers.   As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT.   Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

133.    Defendants also knew that the announced integration timeline of "three to four quarters" was, as multiple former employees at both GTT and Interoute confirmed, "totally unrealistic" and completely inconsistent with GTT's own integration history in connection with much smaller and more similar businesses.   Indeed, the former CEO of 30% of Interoute's business directly told Defendant Calder numerous times that GTT's integration strategy was

---

[4] Available on GTT's website at https://www.gtt.net/us-en/news/news-coverage/?q=&page=5 and at https://www.lightreading.com/carrier-sdn/sd-wan/calder-gttinteroute-ready-to-rumble/d/d-id/741029

unworkable and could not be completed on Defendants' planned timeline both prior to when the acquisition was announced and at the outset of the integration.

### D.     GTT's 1Q 2018 Investor Call

134.    On May 3, 2018, the Company conducted an investor conference call to discuss its financial results for the first quarter ended March 31, 2018.   During the call, Calder represented that he viewed the transaction as pairing "together two incredibly like-minded companies that live similar values, the anti-incumbent values of simplicity, speed, agility."  As part of the integration process, Calder represented that he had "spent most of the last 6 weeks traveling with Gareth Williams, current Interoute CEO, meeting with employees and key customers in every major Interoute office and "came away with an even deeper level of respect and appreciation for . . . the strategic fit combined with GTT."

135.    The statements identified above in ¶134 were materially false and misleading, and omitted material facts when made.  The Interoute acquisition was not a pairing of "two incredibly like-minded companies that live similar values," nor could Defendant Calder have come away from his extensive time spent at Interoute's offices with "an even deeper level of respect and appreciation for . . . the strategic fit combined with GTT."  Indeed, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking—meaning the two companies were fundamentally different businesses, with different strategies, systems and customers.  As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that

GTT was "not trying to get into" because it was not strategic to GTT.  Moreover, Defendants

later admitted they "knew [about Interoute's strategy shift] going in."

> ### E.       Cowen & Co. Technology, Media, and Telecom Conference and Acquisition
> ### Completion Announcement

136.    On May 31, 2018, GTT participated at the Cowen & Co. Technology, Media, and

Telecom Conference where Defendant McKee represented that Interoute was really "<u>a</u>

<u>European-focused version of GTT</u>," and a "<u>kind of a hand in glove sort of filling out between</u>

<u>Europe and U.S.</u>," stating:

> Yeah. I mean, the more and more we – we've looked at <u>Interoute, it really is a</u>
> <u>European-focused version of GTT</u>. I mean, if you sort of drill in with their team
> and look at their customers and sort of their value proposition. It really is a lot like
> Mike [Sicoli] described except whereas our typical customer or typical customer
> profile has been U.S. based enterprises and their cloud connectivity needs all
> around the world.
>
> <u>Interoute has very similar approach except it's typically European-based [ph]</u>
> <u>business enterprises</u>. So for us, it's really sort of – and it sort of matches up the
> same way with network. Their network is predominantly in Western Europe; ours
> has been U.S. with extensions elsewhere. <u>So, it really becomes kind of a hand in</u>
> <u>glove sort of filling out between Europe and U.S</u>.

137.    In response to Cowen analyst Jonathan Charbonneau's question of what

"surprised you most as you've continued down the path to close since you first announced the

deal a couple months ago," Defendant McKee stated:

> Yeah. <u>So we've spent a lot of time back and forth with the team sort of during –</u>
> <u>the pre-close, the pre-close period that we're in now, and I would say, it sort of it's</u>
> <u>that alignment</u>. I think one of the challenges, at least that we thought would – in
> looking at the deal would be they operate in a lot of countries, employs in a lot of
> countries. Will that be a cultural challenge with us or where we've had a
> predominantly U.S. employee base?
>
> But I think, again, because <u>the business direction and because their sort of go-to-</u>
> <u>market strategy is [ph] so similar to us, I think one of the surprises has been . . .</u>
> <u>how sort of in alignment the employee base [ph] was already are.</u>

138.    The statements identified above in ¶¶136-137 were materially false and misleading, and omitted material facts when made. Interoute was not the "European-focused version of GTT" that had a "very similar approach" to GTT, nor was Interoute's "business direction," "market" strategy" and "employee base" "in alignment" with GTT.   Indeed, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking—meaning the two companies were fundamentally different businesses, with different strategies, systems and customers.  As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT. Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

**F.    William Blair Growth Stock Conference**

139.    On June 12, 2018, GTT participated in the William Blair Growth Stock Conference where Defendant Calder represented that he had met "with about twenty of the very largest clients of Interoute" and "spent eight of the last ten weeks in Europe," and concluded that Interoute does "the same thing that we do, providing cloud networking services."  Indeed, Calder stressed that Interoute "was effectively a similar company to us in Europe.  It was really the complement of our business in Europe."  Calder represented that GTT felt "very confident in our ability to execute [the integration], particularly having spent really eight of the past ten weeks [at Interoute] and I'll probably spend the bulk of the remainder of this year in Europe basically executing on the integration of the two companies."

140.    Regarding the timeline of the Integration, Calder stated that it would "occur over the next two to three quarters. And we expect it probably materially to be done by the fourth quarter, so that we can prepare to actually – the second quarter of next year, probably first quarter of next year, so we can prepare for doing another material transaction in 2019."

141.    The statements identified above in ¶¶139-140 were materially false and misleading, and omitted material facts when made. First, Defendant Calder's statements stating that Interoute does "the same thing that we do, providing cloud networking services," was clearly false, as Interoute did not do "the same thing as [GTT] do[es]."  Indeed, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking— meaning the two companies were fundamentally different businesses, with different strategies, systems and customers.  As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT.  Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

142.    Second, Defendant Calder's statements regarding the timeline of the Integration were materially false and misleading.  In fact, CW 7, former CEO of Interoute Italia and head of 30% of Interoute's business, directly informed Calder on multiple occasions that GTT"s integration strategy was unworkable and "told him I don't think an integration can be done in a short time."  Moreover, by this time, Defendant Calder—who was spending several weeks in Europe, and who several former Interoute employees stated was directly involved in executing the integration—knew that, from day one, there were a host of significant issues with the

Interoute integration, including Interoute's "strategic priority shift" to cloud services, difficulties with the migration of Interoute's incompatible legacy systems onto CMD, and serious discrepancies with Interoute's billing systems.  Indeed, CW 10 stated that, this same month, he had a "one-on-one" "skip" meeting with Calder in Interoute's Geneva office, during which CW 10 told Calder point blank that <u>the two organizations were still "completely separate" and "as you know, Rick, right now we are two separate organizations and it is very difficult</u>."

G.     **GTT's 2Q 2018 Investor Call**

143.    On August 3, 2018, GTT conducted an investor conference call to discuss its financial results for the second quarter ended June 30, 2018.  During the call, Cohen analyst Jonathan Charbonneau asked Defendants: "In terms of Interoute, would you call out anything surprising, particularly as you work through the integration in the past few months?"  Calder responded by unequivocally denying that GTT had seen any surprises, and by confirming the Interoute integration was going exactly as planned:

> "I've spent a lot of time with it . . . we close[d], as we mentioned, on the early end.  <u>And I've gotten that question from lots of folks actually privately, and the short answer is, no.</u>  I mean, we think the combination of these 2 businesses creates a fantastic opportunity . . . [I]n terms of performance and productivities, <u>we've put the businesses together</u>.

144.    In response to an analyst's question about cross-sell opportunities, Calder stated that such opportunities were dependent on the systems integration, which was "<u>on track</u>" to be completed by October, and that GTT expected a lot of cross-sell opportunities because GTT and Interoute "<u>sell the same thing</u>" and "<u>Interoute did was exactly what we did</u>":

> [E]very rep in the company is interested in cross-selling and getting access to not only the services, the service portfolio, but really the reach and depth of the suppliers and systems infrastructure, which we have planned now for the 1st of October.  We believe <u>we're on track towards that to allow the company to operate in one global system with access to the full reach of the network everywhere in the world</u> . . . one consolidated service platform across the world.  So there's only a couple of months before that, right"  So we think we're there . . . but the key focus on the cross-sell is to get the systems integrated, and then we think that

we'll see real upside opportunity in terms of productivity and sales, even above the records levels that we've been at today.  In terms of depth of services, to your other question, <u>generally we sell the same thing.  So we think 95% of what Interoute did was exactly what we did.  There's a little bit of overlap in cloud services or additional business.</u>  It's sold to some really great marquee clients, and we want to continue to grow that part of the advanced solutions business.  So we see some opportunity to cross-sell and upsell there.  <u>However, we think the core business that we're in, cloud networking services, is very similar across the two platforms, which is why we thought it was a fantastic deal for us.</u>

145.    The statements identified above in ¶¶143-144 were materially false and misleading, and omitted material facts when made. By this time, Defendant Calder—who was spending several weeks in Europe, and who several former Interoute employees stated was directly involved in executing the integration—knew that the integration was not "on track," and that the businesses were not "put together' and remained two very separate entities.   As numerous former Interoute and GTT employees unanimously attested, and as Defendants' own admissions at the end of the Class Period would confirm, the Interoute integration was an unmitigated disaster from day one.   Indeed, there were a host of issues with the Interoute integration, including Interoute's "strategic priority shift" to selling cloud services, serious difficulties with the migration of Interoute's incompatible legacy systems onto CMD, and serious discrepancies with Interoute's billing systems.   Moreover, CW 10 stated that, only two months prior, he had a "one-on-one" "skip" meeting with Calder in Interoute's Geneva office, during which CW 10 told Calder point blank that <u>the two organizations were still "completely separate" and "as you know, Rick, right now we are two separate organizations and it is very difficult.</u>"

146.    Additionally, GTT and Interoute did <u>not</u> "<u>sell the same thing</u>" and Interoute <u>did not</u> do "<u>exactly what [GTT] did</u>," nor was there only a "<u>little bit of overlap in cloud services</u>" that GTT was interested in maintaining.  To the contrary, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking—meaning the two companies

were fundamentally different businesses, with different strategies, systems and customers.   As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT.   Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

### H.    August 2018 Oppenheimer Technology, Internet & Communications Conference and KeyBanc Capital Markets Technology Leadership Forum

147.    On August 7, 2018, GTT participated at the Oppenheimer Technology, Internet & Communications Conference.   In response to an analyst question about "where you're at right now [with the Interoute integration] versus all the due diligence you've done the last six months," McKee represented that GTT knew "a lot more now than we knew then and we're more confident than we were then" about the integration, and "in terms of facts on the ground, they haven't changed or as we've learned more, it's just reinforced our opinion and our optimism about being able to get every single number that we forecast and then some."

148.    On August 13, 2018, GTT participated at the KeyBanc Capital Markets Technology Leadership Forum where Brandon Nispel from KeyBanc asked Defendant McKee: "So what gives you the confidence and how do you sort of give investors your conviction around being able to integrate Interoute?"   McKee responded by confirming the Integration was going remarkably well, as Interoute was "not as complex as many business we've integrated":

> The complexity of Interoute business is actually not as much as – not as complex as many business we've integrated.
>
> So, we have high confidence.   When you look at Interoute, the thing we keep coming back to is, it's a European version of GTT.   It really just looks just like us, with sort of easy mapping between, this is the service that they do that maps nicely to a service that GTT does or this customer base sort of fits hand in glove with that.

149.    The statements identified above in ¶¶147-148 were materially false and misleading, and omitted material facts when made.  First, Interoute was not "the European version of GTT" that "fits hand in glove."  Indeed, Interoute did not "really just look just like" GTT, as numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not cloud networking—meaning the two companies were fundamentally different businesses, with different strategies, systems and customers.  As Defendants themselves admitted toward the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT.  Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

150.    Second, Defendant McKee's statement regarding GTT not being "as complex as many business[es] we've integrated," was clearly false. As revealed at the end of the Class Period, there were a host of issues with the Interoute integration, including Interoute's shift to cloud services, migrating Interoute's legacy systems onto CMD, and discrepancies with Interoute's billing systems.  Indeed, as McKee admitted in May 2019 that "a deal the size of Interoute, can be challenging."

151.    Third, the "facts on the ground" Defendants had learned about Interoute could not have "reinforced our opinion and our optimism about being able to get every single number that we forecast and then some."  As attested to by numerous former GTT and Interoute employees, nearly all of the "facts on the ground" led to the opposite conclusion:  that Interoute and GTT were fundamentally different businesses with incompatible business models and internal systems that would be impossible to integrate on the accelerated timelines GTT had announced.

Moreover, CW 14 stated that Defendant McKee had direct knowledge of the Interoute integration issues, as evidenced by Defendant McKee's visit to Access Point with Defendant Calder in October 2018, during which they told the Access Point staff that the Interoute integration was not going to plan.

## I.      October 2018 Capacity Europe 2018 Conference and *Capacity* Article

152.    On October 23, 2018, Defendant Nomellini participated in a Capacity Europe 2018 panel where she discussed how the Interoute Integration was a "short and compressed integration" and "the latest fit" with the Company's "two to four quarter" integration timeframe, stating:[5]

> When we're looking at these assets to buy typically we're looking at them holistically… it needs to fit in our standard model to be financially accretive, expand our backbone, add to our product capabilities, our client base, and our management talent but for us we really look at a very short and compressed integration timeframe for them so we typically work on a two to four quarter type of model.  Interoute being the latest fit within that time frame with a lot of blood sweat and tears but we're there and you know so as we as we look at it we take quite a different view I think than some do in the market.

153.    On October 24, 2018, *Capacity* published an interview with Defendant Nomellini entitled "GTT just keeps on growing."[6]  The article stated that Nomellini represented that "the Integration of Interoute is 'on-track' in all aspects."  Nomellini stated that "We have completed the organisational integration and have announced our leadership teams across each of the divisions and support organisations."  Further, Nomellini added: "We have integrated our networks and will continue to rationalise PoPs in the core IP network to realise further synergies. We have also loaded Interoute client data onto the GTT client management database system [CMD], a key milestone for any of our integrations."

---

[5] Video of the panel is available at: https://www.youtube.com/watch?v=RQ4-PqqN2No
[6] Available on GTT's website at  https://www.gtt.net/us-en/news/news-coverage/?q=&page=4  and at: https://www.capacitymedia.com/articles/3822566/gtt-just-keeps-on-growing

154.   The statements identified above in ¶¶152-153 were materially false and misleading, and omitted material facts when made.  First, Defendant Nomellini's statement that the Interoute integration had completed the "key milestone" of it systems being loaded onto GTT's CMD system was patently false, as attested to by numerous former GTT and Interoute employees.  Indeed, CW 3 stated that the integration problems were "not solved when I stopped working [at Interoute] in January [2019]," and there was "no way" everything was sorted out even by the end of the year, let alone October—such that any statement to the contrary was "not a true statement."   CW 1 similarly stated that Defendants' announcement that the CMD migration had been completed in October 2018 was "not at all" true, as even through October 2019, Interoute was still having issues filling orders using CMD.  CW 9 similarly stated that GTT's public "broadcastings" that the CMD transition was complete in October 2018 were false.  CW 10 also stated that by October 2018, the attempted CMD migration "had not been successful," and that it was still not completed when he left the Company in December 2018.  Similarly, CW 2 stated that the Interoute billing migration to CMD was not competed by the time he left the Company in December 2018, and persisted for at least a year after that.  Moreover, Defendants themselves later admitted this statement was false, stating at the end of the Class Period that the "real" CMD migration had not occurred until the first quarter of 2019— and was still not complete.  Finally, Defendant Nomellini, who CW 5 said was "the one on point" with respect to the Interoute integration on the GTT side, was directly involved in weekly calls with Defendant Sicoli during the integration that "absolutely" included discussion of "the problems we had with CMD."

155.   Second, Defendant Nomellini's statements regarding completion of the Integration and "Interoute being the latest fit within" GTT's "two to four quarter type of model"

were materially false.   Indeed, the Interoute integration was <u>not</u> a "<u>short and compressed</u>

<u>integration</u>," nor was it "<u>on track in all respects</u>."   As numerous former Interoute and GTT

employees attested, and as Defendants were forced to reveal at the end of the Class Period, there

were a host of issues with the Interoute integration from day one, including Interoute's shift to

cloud services, migrating Interoute's incompatible legacy systems onto CMD, and serious

discrepancies with Interoute's billing systems—to the extent that the companies were <u>never</u> fully

integrated.

**J.      GTT's 3Q 2018 Investor Call**

156.   On November 8, 2018, GTT conducted an investor conference call to discuss its

financial results for the third quarter ended September 30, 2018.   During the call, Calder

proclaimed that the Interoute integration had achieved every pre-announced milestone, including

what Defendants had called the "key" milestone of "consolidate[ing] all [of Interoute's] core

business support systems to our Client Management Database, CMD, in October":

> <u>We completed the organization integration in September</u> and we expect the
> majority of those employees currently on transition to leave the company by year-
> end with the remainder leaving throughout the first half of 2019. <u>The systems</u>
> <u>integration is also well underway as we consolidated all core business support</u>
> <u>systems to our Client Management Database, CMD, in October</u>. <u>Network</u>
> <u>integration is also on track for substantial completion in the next few months</u>. <u>We</u>
> <u>expect to complete the Interoute integration in early 2019 consistent with our</u>
> <u>prior estimate of 3 to 4 quarters post close</u> and continue to expect to achieve at
> least $100 million in run rate cost synergies once the integration is complete. It is
> important to note that our $100 million target remains unchanged, despite the
> recent weakness in the euro and the pound as we expect to outperform our initial
> estimates on a constant-currency basis.

157.   The statements identified above in ¶156 were materially false and misleading, and

omitted material facts when made. Contrary to what Defendants stated, Defendants had not

successfully "<u>consolidated all core business support systems</u>" to [CMD] as of October 2018."

Indeed, CW 3 stated that the integration problems were "not solved when I stopped working [at

Interoute] in January [2019]," and there was "no way" everything was sorted out even by the end of the year, let alone October—such that any statement to the contrary was "not a true statement." CW 1 similarly stated that Defendants' announcement that the CMD migration had been completed in October 2018 was "not at all" true, as even through October 2019, Interoute was still having issues filling orders using CMD. CW 9 similarly stated that GTT's public "broadcastings" that the CMD transition was complete in October 2018 were false. CW 10 also stated that by October 2018, the attempted CMD migration "had not been successful," and that it was still not completed when he left the Company in December 2018. CW 14 stated that in October 2018, he was told by GTT senior management, including Defendants Calder and McKee, that the Interoute integration was not going to plan, and further stated that Interoute integration issues persisted through at least March 2019 when he left the Company. CW 2 stated that the Interoute billing migration to CMD was not competed by the time he left the Company in December 2018, and persisted for at least a year after that. Moreover, Defendants themselves later admitted this statement was false, stating at the end of the Class Period that the "real" CMD migration had not occurred until May 2019—and, as Defendants would admit in August 2019, it was still not complete.

158.    Additionally, Defendants had no basis to expect that the Interoute integration would be completed by "early 2019." Indeed, numerous CWs stated this timeline was not feasible, and that they had directly told Defendant Calder so. CW 7 stated he had numerous face-to-face meetings and phone conversations with Defendant Calder both at the time of acquisition and during the Interoute integration in which CW 7 told Calder that GTT's timeline for the integration was unrealistic and unworkable. Other CWs uniformly stated that GTT's timeline for the integration was "crazy," "completely unrealistic," and "total bollocks," as

Interoute and GTT were two fundamentally different businesses with "simply incompatible" internal systems—meaning the integration was "easily a two-year job," and was "never going to be done in months."

**K.   December 4, 2018 UBS Global Media and Communications Conference**

159.   On December 4, 2018, GTT participated at the UBS Global Media and Communications Conference.  At the conference, Calder announced that GTT's "cut over" of Interoute's legacy systems to CMD was "now completed":

> [I]t is critically important to us that we run our business on one database of record.  There are even the businesses we buy sometimes have not integrated completely.  Interoute was one of those where [it] had not completely integrated across three different customer relationship management systems or business support systems, and we just now completed the complete integration of Interoute onto GTT's business so that we can achieve what you just asked William, those synergies within those quarters, in just a few quarters. For the larger deals, we look at, as we said, with Interoute, maybe 3 to 4 quarters, not 3 to 4 years, 3 to 4 quarters.

160.   Calder also represented that "the first and foremost proof point of the [Interoute] integration is the fact that we had started our acquisitions again.  So, had we not felt really comfortable with where we stood with Interoute, we would not have done the Access Point integration."  Indeed, Calder represented the following:

> While we had a lot in our funnel, we didn't do anything in the third quarter simply because we wanted to make sure that we had everything right with Interoute, and we feel very comfortable with it.  Exactly, we have made all of the organizational integration and have been very clear with the entire organization about who is part of the go forward, who is on transition as we put one company together with one organizational structure across all of our offices throughout the world.
>
> Two, we've completed, … all of the integration into our core Client Management Database [CMD] and that is effectively complete, a little bit of cleanup activity as we continue to go but are starting the first billing out of our system and not out of any of the legacy systems.  And most of the major network integration is complete . . .

161.    Likewise, in response to the analyst question requesting an "update" of how the Integration was going, Sicoli stated that it was "on track":

> Even though Interoute was a significantly larger transaction than we've done before. <u>There really wasn't anything new that we found when we went through the integration</u>. It was just a little bit larger, a little bit more time involved because of that size in the fact that there's a lot of employees spread out throughout Europe, which takes a bit longer as well.  But they were in our business already. . . So it was bigger, but <u>there were no new issues compared to what we've seen before, which is why it's not a surprise that it's on track.</u>

162.    The statements identified above in ¶¶159-161 were materially false and misleading, and omitted material facts when made."  First, the CMD migration was not "<u>effectively complete</u>" by December 2018 with only "<u>[a] little bit of cleanup activity</u>" remaining. Indeed, CW 3 stated that the integration problems were "not solved when I stopped working [at Interoute] in January [2019]," and there was "no way" everything was sorted out even by the end of the year—such that any statement to the contrary was "not a true statement."  CW 1 similarly stated that Defendants' announcement that the CMD migration had been completed in October 2018 was "not at all" true, as even through October <u>2019</u>, Interoute was still having issues filling orders using CMD.  CW 10 also stated that by October 2018, the attempted CMD migration "had not been successful," and that it was still not completed when he left the Company in December 2018.  CW 14 stated that in October 2018, he was told by GTT senior management, including Defendants Calder and McKee, that the Interoute integration was not going to plan, and further stated that integration issues persisted through at least March 2019 when he left the Company. CW 2 stated that the Interoute billing migration to CMD was not competed by the time he left the Company in December 2018, and persisted for at least a year after that.  Moreover, Defendants themselves later admitted this statement was false, stating at the end of the Class Period that the "real" CMD migration had not occurred until May 2019—and then admitted in August 2019 that it was <u>still</u> not complete.

163.    Second, Defendant Sicoli's statement that there "were no new issues" with the Interoute integration, and that it was "no surprise that it's on track," were clearly false.  As attested to by numerous former GTT and Interoute employees, numerous contemporaneous facts led to the opposite conclusion.  Indeed, former GTT and Interoute employees unanimously stated that the integration was suffering from a host of issues, including delays, serious issues with the CMD migration, and billing discrepancies.  Moreover, Defendant Sicoli had direct knowledge of these issues, as CW 5 stated that Defendant Sicoli participated on weekly calls during which the "problems we had with CMD" were "absolutely" discussed.  Finally, Defendant Sicoli would himself be forced to admit at the end of the Class Period that in fact there were "new issues," and the Interoute integration was not "on track," due to significant problems with the CMD migration and Interoute's "strategic priority shift" to selling cloud services.

**L.    GTT's 4Q and FY 2018 Investor Call**

164.    On February 28, 2019, the Company reported financial results for its fourth quarter and year ended December 31, 2018, and conducted an investor conference call.  During the call, Calder represented that the "integration of Interoute is on track" with organization integration "completed back in September" and network integration "well underway":

> Our integration of Interoute is on track, and we are past the halfway point at this stage and expect to complete all remaining activities by the end of the second quarter, consistent with the expectation we set when we announced the deal last year. Organization integration was completed back in September, and most of the employee -- associated employee reductions are now done.
>
> Systems integration is nearly complete with all ordering, installation, billing and financial transactions now in GTT's systems. Network integration is also on track as the core network has been consolidated and point of presence consolidation is well underway.

165.    The statements identified above in ¶164 were materially false and misleading, and omitted material facts when made.  First, Defendants were not "on track" the Company was

not "doing exactly as [it] projected it would in terms of the integration," nor was the "[s]ystems integration [] nearly complete with all ordering, installation, billing and financial transactions now in GTT's systems."  As numerous former GTT and Interoute employees attested, and as Defendants would themselves be forced to admit at the end of the Class Period, there were a host of issues with the Interoute integration, including Interoute's shift to cloud services, serious issues with migrating Interoute's "incompatible" legacy systems onto CMD, and discrepancies with Interoute's billing systems—such that the Interoute integration and CMD migration were never completed.

**M.     April 29, 2019 *The Wall Street Transcript* Article**

166.    On April 29, 2019, *The Wall Street Transcript* released a company interview on GTT.[7]  In the article, Calder touted the similarities between the companies, stating:  "Interoute, a company which is very complementary to our business. Interoute was similar in scope and longevity to GTT, about a 20-year-old company that had been very focused in Europe."  Calder added that Interoute was "the most strategic acquisition we've done to date, and it closely mirrors our business, just in a slightly different geography…Interoute had a similar strategy to ours; that is, cloud networking services to larger multinational clients."

167.    The statements identified above in ¶166 were materially false and misleading, and omitted material facts when made.  Interoute did not "ha[ve] a similar strategy to [GTT's]," as by the time of the acquisition, Interoute had made a "strategic priority shift" to selling cloud services—a business Defendants admitted was not compatible with GTT's business.  Indeed, numerous former GTT and Interoute employees attested to the fact that, by the time of acquisition, the "vast majority" of Interoute's business consisted of selling cloud services, not

---

[7]  Available on GTT's website at:  https://www.gtt.net/us-en/news/news-coverage/?q=&page=2  and at https://www.gtt.net/media/1967/gtt-communications.pdf

cloud networking—meaning the two companies were fundamentally different businesses, with different strategies, systems and customers. As Defendants themselves admitted at the end of the Class Period, Interoute had made a "strategic priority shift" to being a provider of cloud services at least two years before the acquisition—what Defendants themselves stated was a "different business" that GTT was "not trying to get into" because it was not strategic to GTT. Moreover, Defendants later admitted they "knew [about Interoute's strategy shift] going in."

**N.      May 2, 2019 Bloomberg Appearance**

168.    On May 2, 2019, Calder appeared on Bloomberg Surveillance with Francine Lacqua to discuss the Company's acquisition and growth plans where he touted that GTT had a "tremendous year" and "doubled the size of the business."   Additionally, he stressed the success of the Integration, stating:

> We expect to achieve and continue to achieve first and foremost our synergy plan we're one year through into the Interoute integration. It's been a fantastic year for us.   We've created one organization. One mission. We're now 3,000 people across the organization, 60 offices, 30 countries, and we absolutely are right on track with what we announced when we were here a year ago and we feel very comfortable with our business plan at this stage.

169.    The statements identified above in ¶168 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding creating "one organization" and "absolutely" being "right on track" are materially false.  A mere week later, Defendants announced a host of issues with the Interoute integration, including Interoute's shift to cloud services, serious issues with migrating Interoute's legacy systems onto CMD, and numerous discrepancies with Interoute's billing systems—such that the Interoute integration was never completed.

O.     **GTT's Q1 2019 Investor Call**

170.   On May 8, 2019, GTT reported financial results for its first quarter ended March 31, 2019, and conducted an investor conference call.  During the earnings call, GTT reported a larger than expected decline in revenue for Q1 2019, which Defendants blamed on a host of issues with the Interoute integration.  Defendant Calder claimed, however, that the Company's integration issues were over, as GTT was "in the final stages of the Interoute integration" since the Company was now "past the training effort [for CMD], and everyone is now fully aligned into one system, which is generally a huge victory for GTT."

171.   Defendant Sicoli further stated that while "December and January were sort of the low points [from] a productivity perspective" as a result of the Interoute integration issues, in "April, certainly by sitting here in May, we're back to normal."

172.   The statements identified above in ¶¶170-171 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding the Company being "in the final stages of the Interoute integration" because the "overwhelming majority of [the] Interoute integration [was] complete" and "everyone is now full aligned into one system" were false.  As Defendants would be forced to admit only three months later, numerous issues with the integration continued unabated, and specifically serious issues relating to the CMD migration causing installation delays and billing discrepancies that would result in continuing and significant declines in Company revenue.

P.     **Cohen TMT Conference**

173.   On May 30, 2019, GTT participated in the Cowen TMT Conference 2019. Defendant McKee stated that Defendants "are effectively done with all the integration.  So as

you look forward over the second half of the year, it's a fully integrated company and when we

say that I mean this is when we buy something small and we buy something large."

174.    The statements identified above in ¶173 were materially false and misleading, and

omitted material facts when made.  Specifically, the statements set forth above regarding the

Company being "effectively done with all the integration" and GTT being a "fully integrated

company" were false.  As Defendants would be forced to admit less than three months later, the

Interoute integration was not "effectively done" at this time—to the contrary, numerous issues

with the integration continued unabated, and specifically serious issues relating to the CMD

migration causing installation delays and billing discrepancies that would result in continuing

and significant declines in Company revenue.

## VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

175.    The facts set forth herein, viewed collectively, give rise to a strong inference that

the Individual Defendants acted knowingly, or severely recklessly, when they concealed from the

market the material negative information that, inter alia: (1) rather than being a "mirror

business," or the "European version of GTT," Interoute was in fact fundamentally different from

GTT due to its "strategic priority shift" to selling cloud services; and (2) the Interoute integration

was not "right on track," meeting every milestone, or going exactly as planned—to the contrary,

it was an unmitigated disaster from day one.

176.    ***Defendants' own admissions that they knew Interoute had made a "strategic***

***priority shift" to selling cloud services "going in" to the Interoute transaction, and that they***

***had fired 1,000 Interoute employees as a result of the "cloud services pivot," are probative of***

***scienter.***  Throughout the Class Period, Defendants repeatedly described Interoute as a "mirror

business" that "fit hand in glove" with GTT, such that it was "essentially the European version of

GTT," and not least because "the core business that we're in, cloud networking services, is very

70

similar across the 2 platforms."  However, as Plaintiffs' numerous CWs would uniformly attest, the opposite was true—Interoute's strategic focus was in fact on selling cloud services, a business Defendants themselves had stated was not strategic to GTT.  Defendants were forced to admit this fact during the May 8, 2019 first quarter earnings call, when they revealed that a year or two prior to the Interoute acquisition, Interoute had made a "strategic priority shift" to selling cloud services.  Indeed, Defendant Sicoli later revealed that as a result of Interoute's "cloud services pivot," GTT had been forced to fire 1,000 Interoute employees, or one half of Interoute's total 2,000 employees and one third of the entire combined organization of 3,000 employees.  Defendants also further admitted that they knew about Interoute's non-strategic shift "going in."  Defendants' admission that they knew about Interoute's "strategic priority shift" to selling cloud services—which sharply conflicted with GTT's exclusive cloud networking focus, and Defendants' repeated statements to investors about how the two companies fit "hand in glove"—is highly probative of scienter, particularly in light of their numerous statements during the Class Period assuring investors that Interoute could be integrated seamlessly and quickly due to its identical business model.

177.    ***By their own admissions, and as numerous CWs confirmed, the Individual Defendants directly monitored and participated in all aspects of the Interoute acquisition and integration—including face-to-face meetings and weekly phone calls with Interoute employees directly involved in executing the integration—and thus were fully aware of integration problems as they occurred.***  During the Class Period, the Individual Defendants made a point of emphasizing to investors that they were personally involved in both the due diligence that was conducted for the Interoute acquisition and the process of the integration itself.  For example, Defendant Calder reassured investors that, prior to the transaction closing, he had spent 6 weeks

in Europe and "came away with an even deeper level of . . . appreciation for . . . the strategic fit [of Interoute] combined with GTT."   Calder further assured investors that he would be personally involved in the integration, stating he would spend the "bulk" of his time in Europe "basically executing on the integration of the two companies."   Defendants McKee and Sicoli similarly referenced their direct involvement in the due diligence process with respect to the acquisition and integration of Interoute.   Defendant McKee routinely responded to analyst questions with full knowledge about what GTT"s diligence on Interoute had revealed, stating "we had done a lot of diligence on it," and asserting that "in terms of facts on the ground, they haven't changed or as we've learned more, it's just reinforced our opinion and our optimism." Defendant Sicoli described management's "really, really heavy focus" on integrating Interoute, stating that it was "priority number one" for the Company.

178.    Plaintiffs' CWs confirmed Calder's heavy hands-on involvement in the Interoute integration.   CW 5 stated that Calder "[h]ad his fingers in everything" and spent "weeks in the Interoute office[s]" during the integration.   CW 5 further described how Calder had regular "skip meetings" at Interoute by having "one to ones" with lower-level employees closer to the facts on the ground.   Indeed, among these "skip meetings" was Calder's meeting with CW 10 in June 2018, during which CW 10 directly told Calder that the integration was not going to plan, as the two companies were "still completely separate organizations" and "it is very difficult."   CW 4 likewise stated that Calder was a "micromanager," and his "sticky fingers were involved in every single hiring and firing, all the pay increases . . . [e]verything had to be personally approved by him."

179.    Plaintiffs' CWs described the direct involvement of the other Individual Defendants in monitoring and executing the integration as well.   For example, CW 5 described

how he himself had "very forthright conversations" with Defendant Sicoli in an effort to help him understand that there was a lot Interoute did that "[GTT] had never done before."  CW 5 also described weekly calls regarding the integration with Defendants Sicoli and Nomellini, who CW 5 stated was the "one on point" on the GTT side in charge of overseeing the integration, which "absolutely" included discussion of the Interoute integration problems, including "the problems we had with CMD, how things were misaligned, how processing was incorrect."

180.    Finally, CW 14 described how a week after the acquisition of Access Point, which occurred during the Interoute integration on October 1, 2018—the same day Defendants publicly announced that the "key milestone" of the CMD migration was successfully completed—Defendants Calder and McKee personally visited Access Point and explained that, despite GTT's contemporaneous public announcements to the contrary, GTT was still working through the Interoute integration which was not going to plan.

181.    ***Defendants knew the timelines proposed for the Integration were not feasible, as the two companies had "completely different" business models and systems—indeed, Defendant Calder was directly told this in numerous face-to-face meetings and phone conversations with the former CEO of Interoute Italia.***  Plaintiffs CWs unanimously stated that the accelerated timeline GTT had announced for the integration was not at all feasible, for two main reasons that were fully known to Defendants:  (i) Interoute had a "totally different" business model from GTT, because it primarily focused on selling cloud services and not cloud networking; and (ii) Interoute's internal systems were completely incompatible with GTT's proprietary CMD system.  Indeed, CW 7—who was the former CEO of Interoute Italia and in charge of 30% of Interoute's business—stated that GTT's timeline for the integration was "absolutely ridiculous" and "completely unrealistic," and further stated that he directly told

73

Calder this during numerous face-to-face meetings and phone conversations both at the time of acquisition and during the integration. Specifically, CW 7 stated that he attempted to explain to Calder that the CMD migration would not go as expected because Interoute was "a bit more complicated than what he thought," and CW 7 did not think that the Interoute "integration can be done in a short time." CW 7 also stated that Interoute's business model was clearly different from GTT's, as it was oriented around Interoute's ownership of a huge physical network (which GTT had never owned) and the "vast majority" of its business consisted of selling "cloud services"—a business Defendants had explicitly stated was non-strategic for GTT.

182.     Numerous other CWs likewise stated that the two companies' business models and internal systems were too different to be integrated on an accelerated timeline. Indeed, CWs uniformly stated that GTT's announced timeline for the integration was "totally crazy," "total bollocks," "ridiculous," and "completely unrealistic"—especially because the companies' internal systems were "simply not compatible." For example, CW 1 stated that because Interoute used entirely different internal systems, any integration would take at least two years to implement. CW 3 similarly stated that Interoute's systems were fundamentally different, forcing GTT to build an entirely new CMD—meaning the systems migration would have to take at least over a year, not a few months. CW 15 explained that, based on his knowledge of Interoute's systems as a former Technical Specialist, a complete systems integration would take as long as five years, particularly since Interoute had itself not yet fully completed the systems integration of two companies it acquired before being acquired by GTT—meaning GTT would have to integrate four systems, not two.

183.     ***Plaintiffs' CWs uniformly described how the Interoute integration was an unmitigated disaster from day one—giving rise to a strong inference of scienter.*** Plaintiffs'

CWs—who consisted of high-level former employees of GTT and Interoute across multiple offices over two continents, including former CEOs, Executive Vice Presidents, and Regional Vice Presidents, and nearly all of whom were directly involved in the Interoute acquisition and/or integration—uniformly stated that, contrary to Defendants' public statements, the Interoute integration was an unmitigated disaster from day one.  For example, CW 2 stated that the Interoute integration was not "smooth by any stretch of the imagination," and an "absolute nightmare," as the internal deadlines for the integration kept being pushed back and several processes that should have been automated had to be done manually.  CW 3 described how, "[n]ine times out of ten, [CMD] was not reachable," leaving Interoute employees with no way to conduct their business "for months."  CW 4 stated that, as soon as Interoute was acquired, "it was like driving a car into mud," and "[t]he whole office slowed to a sludge."  CW 9 stated that GTT "kept missing" the deadlines it had set for the Interoute integration, as it "kept saying 'soon, soon, soon,' and giving dates," but internally, the deadlines kept being moved back.  CW 11 described how one colleague had to fly from Paris to Interoute's headquarters in Sofia just to complete a purchase order due to the failure of the CMD migration.  CW 12 stated that once GTT bought Interoute, he "couldn't price" any products, and his customers routinely received the "wrong bills."  CW 13 stated that all of the internal correspondence about the Interoute integration made clear that it was "very challenging to say the least," and "very problematic." CW 14 stated that senior GTT management—including a Senior Executive Vice President—told Access Point staff upon GTT's acquisition of that company that the Interoute integration was a "shit show," as significant problems with the integration dramatically pushed back the integration timeline for Access Point.  Finally, CW 7, former CEO of Interoute Italia, stated that when he spoke with Interoute customers, it was clear the integration was a "disaster," and the

integration was "still ongoing today and it is not yet complete and there are a lot of problems in the billing area especially."

184.   ***Defendants' own admissions that, contrary to their exclusively positive statements about the Interoute integration for over a year, the integration had in fact faced significant "challenges" are probative of scienter.***   From the day the Interoute acquisition was announced on February 26, 2018 through the day the truth began to be revealed on May 8, 2019—a timespan of over a year—Defendants never once breathed a word to investors of any issues with the Interoute integration.   To the contrary, they asserted the exact opposite, stating over and over again that the integration was "right on track" in "all aspects."   When Defendants were ultimately forced to reveal the truth, it was clear that the reality was starkly different, as in truth, the Interoute integration had been plagued with a host of "challenges" related to never achieving milestones Defendants had previously unequivocally asserted the integration had timely met.

185.   ***Defendants' own admissions that, contrary to their prior public statements, the CMD migration milestone was not met is highly probative of scienter.***   As set forth above, Defendants repeatedly stressed to investors that the "key milestone" of the CMD migration had occurred in October 2018—and then during GTT's May 8, 2019 first quarter earnings call, Defendants were forced to admit that their prior public statements asserting that GTT had "consolidated all core business support systems" to CMD in October of 2018, and that the CMD migration was "effectively complete" by early December 2018 with only "[a] little bit of clean-up activity" left, were completely false.   In truth, and as Defendants were forced to reveal, the "real" cut over did not occur until May 2019, such that rather than only "[a] little bit of clean-up activity" remaining in December, in fact the entire organization was being "retrain[ed]" on CMD

during November, December, and through the first quarter of 2019. Defendants' own admissions that their prior public statements were false are highly probative of scienter.

186. ***Interoute was GTT's largest acquisition by far.*** As set forth above, Interoute was the largest acquisition in GTT's history, dwarfing its prior largest acquisition of $600 million. Defendants also described Interoute as "transformative" for the Company, and a "major milestone for GTT," since it would catapult GTT into becoming a bi-continental global contender in the crowded incumbent market of large entities like Verizon and AT&T vying for multinational clients. This meant that the seamless and quick integration of Interoute on the accelerated timeline that Defendants had announced was critical to GTT's success. Indeed, this is underscored by management's explicit exclusive focus on the Interoute integration for the majority of 2018 as "priority number one" for the Company. The criticality of the success of the Interoute acquisition to GTT"s long-term viability as a contender in the global market is probative of Defendants' scienter regarding their public statements about the acquisition and integration of Interoute.

187. ***Defendant Sicoli and Nomellini's resignations, which were abrupt and suspicious in timing, are probative of Defendants' scienter***. Defendant Sicoli, GTT's CFO, and Defendant Nomellini, GTT's CMO, were both directly involved in executing the Interoute integration. Indeed, CW 5 described weekly calls with both Defendants in which a host of issues regarding the integration were discussed, including serious issues in connection with the CMD migration. Both Defendants abruptly left GTT with little explanation, and almost immediately after the full truth about the botched Interoute integration emerged on August 8, 2019. Specifically, Defendant Sicoli abruptly left GTT on August 27, 2019, only three weeks after the August 8, 2019 disclosures. As one analyst commented, Defendant Sicoli's departure was

"sudden," and the fact that he left for a much smaller company with a market cap of only $70 million "dr[ew] more reason for concern." Only two months later in October 2019, Defendant Nomellini went on an unexplained "career break," with GTT offering no explanation for her departure. The abruptness of these Defendants' departures, and the suspiciousness of the timing of their departures in light of their heavy involvement in the Interoute integration, gives rise to a strong inference of scienter.

## IX.    LOSS CAUSATION

188.    During the Class Period, shares of GTT's publicly traded common stock traded on the NYSE. The market for shares of GTT's common stock was open, well-developed, and efficient at all relevant times.

189.    Throughout the Class Period, the price of GTT common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of GTT common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of GTT common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of GTT common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

190.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of GTT's business. Defendants' false and misleading statements had the intended effect and caused GTT common stock to trade at artificially inflated levels throughout the Class Period, with GTT common stock reaching as high as $61.85 per share on March 20, 2018.

191.    On May 8, 2019, GTT announced its first quarter results for 2019 and held a conference call with analysts and investors to discuss the Company's Q1 2019 results. For the first time during the Class Period, Defendants admitted to significant issues with the Interoute integration, including Interoute's "strategic priority shift" to cloud services, serious issues with migrating Interoute's legacy systems into GTT's CMD, and discrepancies with Interoute's billing systems.

192.    On this news, GTT's stock price dropped $7.04 per share, or 17.5%, from $40.29 per share on May 7, 2019 to $33.25 per share on May 8, 2019, on unusually heavy volume.  On May 9, 2019, GTT's stock price fell an additional $3.34 per share, or 10%, as the market continued to digest the news.  In total, this news caused a 25.8% decline in GTT's stock price over two trading days.

193.    On June 24, 2019, Craig-Hallum reduced their price target on GTT because the Company "is in the midst of altering its DNA, which had been largely built of growth via acquisitions, a process that has been challenged by debt levels and recent integration issues."  On this news, GTT stock price plummeted 14%, or $2.87 per share, on unusually high trading volume, from $22.84 on June 21, 2019 to $19.97 per share on June 24, 2019.

194.    On August 8, 2019, GTT disclosed that "post integration challenges with our billing and collections" led to continuing unexpected revenue declines. GTT admitted taking a $12 million charge for negative net installations and customer billing credits that resulted in "100% margin reductions to revenue in period"—and that negative net installs and billing credits were of a "magnitude … larger and the time frame is longer than we normally see" and were likely to continue in the third quarter.  On this news, GTT's stock price fell $5.26 per share, or 46.3%, from $11.35 per share on August 7, 2019 to $6.09 per share on August 8, 2019.

195.    All told, from its Class Period closing high of $61.85 per share on March 20, 2018 to its closing price of $6.09 per share on August 8, 2019, GTT's stock price dropped $55.76 per share, or 90%, wiping out roughly $2 billion in market capitalization.

196.    The drastic and continuing decline in GTT's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.    CLASS ACTION ALLEGATIONS

197.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of GTT between February 26, 2018 through August 7, 2019, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of GTT at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

198.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GTT shares were actively traded on the New York Stock Exchange.  As of August 6, 2019, there were over 56 million shares of GTT common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least tens-of-thousands of members of the proposed Class.  Class members who

purchased shares of GTT common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

199.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

200.   Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

201.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

   a.      whether the federal securities laws were violated by Defendants' acts, as alleged herein;

   b.      whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

   c.      whether Defendants acted with scienter; and

   d.      the proper way to measure damages.

202.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

XI.   **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

203.   At all relevant times, the market for GTT's common stock was efficient for the following reasons, among others:

  a.   GTT's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

  b.   As a regulated issuer, GTT filed periodic reports with the SEC and the New York Stock Exchange;

  c.   GTT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

  d.   GTT was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

204.   As a result of the foregoing, the market for GTT's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of GTT's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of GTT stock at artificially inflated prices, and a presumption of reliance applies.

205.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding GTT's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be

material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

206.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about GTT's present business and operations, its present financial condition, and its internal controls, among others.

207.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding GTT's operations and the integration of Interoute, among other issues. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by GTT were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

208.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was

authorized and approved by an executive officer of GTT who knew that the statement was false when made.

## XIII.   COUNTS

### Count I

#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
#### (Against All Defendants)

209.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

210.    This Count is asserted on behalf of all members of the Class against GTT and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

211.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

212.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of GTT common stock during the Class Period.

213.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of GTT common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, GTT's business and operations; (b) artificially inflate and maintain the market price of GTT common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

214.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

215.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of GTT common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

216.    Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for GTT common stock, which inflation was removed from its price when the true facts became known.

85

Lead Plaintiff and the other members of the Class would not have purchased GTT common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

217.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of GTT common stock during the Class Period.

## Count II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

218.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

219.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

220.    During their tenures as officers and/or directors of GTT, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶23-32.  By reason of their positions of control and authority as officers and/or directors of GTT, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by GTT during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

221.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by GTT during the Class Period.   The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by GTT during the Class Period.   As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of GTT within the meaning of Section 20(a) of the Exchange Act.

222.    As set forth above, GTT violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

223.    By virtue of their positions as controlling persons of GTT, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class, who purchased or otherwise acquired shares of GTT common stock.   As detailed above in ¶¶23-32, during the respective times these Individual Defendants served as officers and/or directors of GTT, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

224.    As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of GTT common stock.

## XIV.   PRAYER FOR RELIEF

225.   Wherefore, Lead Plaintiff prays for relief and judgment as follows:

    a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b.    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

    c.    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    d.    Such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMAND

226.   Lead Plaintiff hereby demands a trial by jury.

Dated: February 28, 2020        Respectfully submitted,

                            */s/ Steven J. Toll*
                            Steven J. Toll
                            Va. Bar No. 15300
                            stoll@cohenmilstein.com
                            Daniel S. Sommers
                            dsommers@cohenmilstein.com
                            **COHEN MILSTEIN SELLERS & TOLL PLLC**
                            1100 New York Avenue, Suite 500
                            Washington, D.C. 20005
                            Tel: (202) 408-4600
                            Fax: (202) 408-4699

                            *Liaison Counsel for Lead Plaintiff*

                            **SAXENA WHITE P.A.**
                            Joseph E. White III
                            Lester R. Hooker (*pro hac vice*)
                            Dianne M. Pitre (*pro hac vice*)
                            7777 Glades Road, Suite 300
                            Boca Raton, FL 33434
                            Tel: (561) 206-6708

jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

Steven B. Singer
Kyla Grant (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
dkaplan@saxenawhite.com

*Lead Counsel for Lead Plaintiff*