**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, and GINA NOMELLINI, <br><br> Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

TABLE OF ABBREVIATIONS .................................................................................................v

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

      A.    GTT Announces the Acquisition of Interoute and Predicts How Long the
            Integration Process Will Take...................................................................................3

      B.    GTT Discloses Interoute's Overlapping Business....................................................4

      C.    GTT Cautioned Investors Against Relying on Forward-Looking
            Statements and Disclosed Specific Risks Associated with Acquisitions and
            Integration.................................................................................................................5

      D.    GTT Provided Investors with Consistent Status Updates on the Integration
            Process.......................................................................................................................6

      E.    GTT Completed Its Integration Process as Expected—Within Three to
            Four Quarters Post-Close...........................................................................................8

      F.    Plaintiff's Claims. ......................................................................................................8

ARGUMENT.................................................................................................................................9

I.      APPLICABLE LEGAL STANDARDS ..........................................................................9

II.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR
      OMISSION .....................................................................................................................12

      A.    Plaintiff's Claim that Defendants Misstated the Overlap Between GTT's
            Business and Interoute's Business Fails as a Matter of Law. ...............................12

      B.    Plaintiff's Claim that Defendants Misstated When the Interoute Integration
            Would Be Completed Fails as a Matter of Law.....................................................16

      C.    Plaintiff's Claim that Defendants Misrepresented the Integration as Being
            "On Track" Fails as a Matter of Law....................................................................18

III.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ....................................................28

IV.   PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATIONS OF SECTION 20(a). .30

CONCLUSION............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................10

*Augenstein v. McCormick & Co.*, 581 F. Supp. 452 (D. Md. 1984)...........................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................................10

*Borow v. nVIEW Corp.*, 829 F. Supp. 828 (E.D. Va. 1993) .................................................24, 25

*Carlucci v. Han*, 886 F. Supp. 2d 497 (E.D. Va. 1993).........................................................16, 18

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x.
    83 (2d Cir. 2010).........................................................................................................15

*Combe Inc. v. Dr. Aug. Wolff GmbH & Co. KG Arzneimittel*, 309 F. Supp. 3d 414
    (E.D. Va. 2018)...........................................................................................................4

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................................24

*Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189
    (S.D.N.Y. Jan. 16, 2018), *aff'd sub nom. Steamfitters' Indus. Pension Fund v.
    Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).........................................................24, 26

*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) ..........................................4, 22

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994)............................ passim

*Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992)......................................................................19

*In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749 (E.D. Va. 2004) ....................................11, 19

*In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW,
    2011 WL 1230998 (D. Md. Mar. 30, 2011)................................................................27

*In re Donald J. Trump Casino Sec. Lit.*, 7 F.3d 357 (3d Cir. 1993) ...........................................23

*In re Lab. Corp.*, No. 1:03CV591, 2006 WL 1367428 (M.D.N.C. May 18, 2006)......................20

*In re Maximus, Inc. Sec. Litig.*, No. 117CV0884AJTIDD, 2018 WL 4076359
    (E.D. Va. Aug. 27, 2018) .......................................................................................19, 20

*In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671 (E.D. Va. 2015) ............................................ passim

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)........................................................22

*In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) ............................15, 26, 27

*In re Williams Sec. Litig.*, 558 F.3d 1130 (10th Cir. 2009) ............................................................30

*Kas v. First Union Corp.*, 857 F. Supp. 481 (E.D. Va. 1994) ................................................ passim

*Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011)................................11, 28, 29, 30

*Kemp v. Universal Am. Fin. Corp.*, No. 05-CV-9883, 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007)..........................................................................................................15

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ....................................................14

*Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621 (M.D.N.C. 1998), *aff'd*, 201 F.3d 436 (4th Cir. 1999) ......................................................................................12, 14

*Longman v. Food Lion*, 197 F.3d 675 (4th Cir. 1999)............................................................ 11, 16

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541 (4th Cir. 2017) ..................................10

*Nolte v. Capital One Fin. Corp.*, 390 F.3d 311 (4th Cir. 2004)......................................................12

*Oklahoma Firefighters Pension & Ret. Sys.*, 66 F. Supp. 3d 711 (E.D. Va. 2014) .......................17

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019)...........................................................................................................17

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525 (M.D.N.C. 2013) .......................................................................................................20, 21

*Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993) ....................................................11, 18, 25

*Safecard Servs., Inc. v. Dow Jones & Co.*, 537 F. Supp. 1137 (E.D. Va. 1982), *aff'd*, 705 F.2d 445 (4th Cir. 1983)..........................................................................................17

*Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003) .................................13, 21

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ...........................10

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) .................................10, 14, 28

*Walker v. Action Indus., Inc.*, 802 F.2d 703 (4th Cir. 1986).........................................................22

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989).........................................25

iii

**Statutes & Rules**

15 U.S.C. § 77z-2(c)(1)(A) ....................................................................................................11

15 U.S.C. § 78u-5(c)(1) .......................................................................................................17

15 U.S.C. § 78u-5(i)(1)(A) ...................................................................................................20

Federal Rule of Civil Procedure Rule 9(b) .................................................................10, 11

Federal Rule of Civil Procedure Rule 12(b)(6)...............................................................9

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4............................... passim

Rule 10b-5............................................................................................................... passim

**Other Authorities**

Oxford English Dictionary.....................................................................................................22

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Class period | February 26, 2018 through August 7, 2019 |
| Ex. __ | Exhibit to Defendants' Motion to Dismiss Plaintiff's Amended Complaint |
| Plaintiff | Lead Plaintiff City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund |
| Section 10(b) | Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 |
| Section 20(a) | Securities Exchange Act, 15 U.S.C. § 78t(a) |

GTT Communications, Inc. ("GTT" or "the Company"), Richard D. Calder, Jr., Chris McKee, Michael Sicoli and Gina Nomellini (collectively, "Defendants") hereby move to dismiss Plaintiff's Amended Class Action Complaint (the "Complaint"), dated February 28, 2020, in its entirety.

### PRELIMINARY STATEMENT

GTT is one of the world's leading telecommunications companies. It owns and operates a global physical internet network and also provides comprehensive cloud networking services to its customers. On February 26, 2018, GTT announced that it would acquire Interoute Communications, Ltd. ("Interoute"). Interoute was one of Europe's leading telecommunications companies. Like GTT, it owned and operated a physical internet network (one of the largest in Europe) and, like GTT, it also provided comprehensive cloud networking services to its customers. In announcing its acquisition of Interoute, GTT told investors that the companies operated similar businesses, albeit in different geographies, and predicted that it would take three or four quarters *after the deal had closed* to integrate Interoute into GTT.

Contrary to Plaintiff's claims—but as confirmed by Plaintiff's own fact allegations—those statements were true. It is undisputed that 95% of Interoute's revenues came from products and services that overlapped with GTT products and services. And not only did GTT management *believe* that GTT would integrate Interoute within three or four quarters, it is undisputed that the integration *actually was completed* four quarters after the closing.

After the integration, the combined companies did not work together as well as management had hoped, at least initially. Some customers experienced delays with installations after the companies were integrated, which contributed to GTT suffering delayed revenue, which caused some investors to sell GTT stock. Those were real and serious business problems.

But business problems—even bad business—is not securities fraud. Plaintiff

seeks to capitalize on GTT's business misfortunes by attempting to manufacture a claim for securities fraud where none exists. To plead a claim for securities fraud, Plaintiff must allege with specificity that Defendants made false or misleading statements to investors that, when corrected, caused the company's stock price to drop. Plaintiff alleges no such thing.

Most fundamentally, Plaintiff fails to plead a single actionable misstatement or omission. Plaintiff challenges three categories of purported misstatements by Defendants.

*(1)  Similarities Between GTT and Interoute.* Plaintiff alleges that statements identifying similarities between Interoute and GTT were false and misleading. But Plaintiff is forced to admit that there was, in fact, a *95% overlap* between GTT's business and Interoute's business, which is exactly what GTT told investors at the beginning of the class period, meaning that Defendants' statements were entirely accurate and not misleading. Defendants also described the 5% of the businesses that did not overlap saying, for example, that there was only "a little bit of overlap in cloud services or additional services in cloud services". (Ex. 12 at 10.) There can be no securities fraud where Defendants disclosed the true facts to investors. To the extent Plaintiff challenges the precise words used by Defendants—*e.g.*, "mirror companies", "parallel businesses" or "hand in glove"—those claims fail as inactionable puffery, especially in light of the hard facts already disclosed. (Section I.A.)

*(2)  Timing To Integrate GTT and Interoute.* Plaintiff challenges Defendants' prediction that it would take three or four quarters post-close to integrate Interoute with GTT. This challenge would fail even if Defendants' prediction turned out to be wrong—statements predicting future events are inactionable under the securities laws. But here, Defendants' predictions did *not* turn out to be wrong—the GTT/Interoute integration *was* completed within four quarters. Again, there can be no securities fraud without a false statement. (Section I.B.)

2

*(3)  Status of the Interoute Integration.*  Plaintiff challenges Defendants' statements during the class period that the Interoute integration was "on-track" (and similar statements regarding the integration progress).  That challenge fails for at least three reasons. *First*, as numerous courts have held, vague statements such as an initiative being "on track" are inactionable puffery as a matter of law.  *Second*, the integration was in fact "on track" during the class period—it was completed within the timeframe predicted.  *Third*, Plaintiff misconstrues post-integration problems as integration issues that rendered Defendants' "on track" statements misleading.  But that fails as a matter of law and logic.  GTT successfully integrated Interoute's operations into its own, but it still experienced problems as a combined company.  That cannot call into question the veracity of Defendants' statements concerning the progress of the integration itself.  Under Plaintiff's theory, anytime a company integrated a new acquisition, told investors that the integration was completed, but then suffered post-integration difficulties, investors would have an action for securities fraud.  That is not the law.  (Section I.C.)

Plaintiff also fails to plead loss causation.  Plaintiff's fraud claims are premised on Defendants making misstatements or omissions concerning (i) similarities between GTT and Interoute and (ii) GTT's integration of Interoute.  But Plaintiff's alleged corrective disclosures did not reveal any new material information about either of those subjects, let alone information that "corrected" previous misstatements of material fact.  (Section II.)

Because Plaintiff fails to plead a predicate violation of Section 10(b), its claim under Section 20(a) must also be dismissed.  (Section III.)

## STATEMENT OF FACTS

A.  **GTT Announces the Acquisition of Interoute and Predicts How Long the Integration Process Will Take.**

On February 26, 2018, GTT announced its acquisition of Interoute, telling

3

investors that it "expect[ed] to complete this integration within three to four quarters post-close".

(Ex. 2 at 1.)  GTT confirmed that it was planning to take "an extra quarter or 2" for the Interoute

integration as compared to prior acquisitions to account for the added complexities of size and

geography.  (Compl. ¶ 128.)  Specifically, on March 2, 2018, Calder disclosed to investors that

"we want to be more measured, make sure we get this right, so instead of our usual one to two

quarters to integrate, here we are planning to take three to four quarters, after closing."[1]  (Ex. 5 at

1.)  The acquisition closed on May 31, 2018.  (*See* Ex. 10.)

### B.      GTT Discloses Interoute's Overlapping Business.

At the time of the acquisition, GTT's core business was cloud networking

services.  (*See* Ex. 7.)  "Cloud networking services" refers to the services required to connect

each employee in each office of a large multinational corporation to every other office, as well as

to each of the company's cloud applications and service providers, and includes, *inter alia*,

private networking, internet, optical transport, SD-WAN, managed services, voice and unified

communications, video transport services and access services.  (*Id.* at 8, 28-29; Ex. 20 at 1-2.)

Cloud networking services is different from "cloud services".  "Cloud services" refers to

services, such as software, made available to users through the internet for use on cloud-based

networks.  (Ex. 20 at 4.)

At the time of the acquisition, Interoute was "the owner-operator of one of

Europe's largest networks and a global cloud services platform"; it also provided "solutions for

---

[1] The Court may take judicial notice of the "documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely."  *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656-57 (4th Cir. 2004) (citation omitted); *see also Combe Inc. v. Dr. Aug. Wolff GmbH & Co. KG Arzneimittel*, 309 F. Supp. 3d 414, 416 n.1 (E.D. Va. 2018) (recognizing that in deciding motions to dismiss courts may consider "documents incorporated into the complaint by reference, and matters of public record of which a court may take judicial notice").

enterprises seeking connectivity and a scalable, secure advanced platform on which they can build their voice, video, computing and data services". (Ex. 2 at 3.) Like GTT, Interoute's core business was cloud networking services; cloud networking services accounted for 95% of Interoute's total revenue. (Compl. ¶ 49.) Cloud services and other products accounted for the other 5%. (*See* Ex. 17 at 7-8.)

GTT disclosed the similarities (and differences) between Interoute and GTT during the class period. For example, during GTT's second quarter 2018 earnings call (the first earnings call after the Interoute acquisition closed), Calder told investors that "95% of what Interoute did was exactly what we did"—"the core business that we're in, cloud networking services, is very similar across the 2 platforms." (Compl. ¶ 49.) Because GTT disclosed that 95% of the businesses overlapped, investors also understood that 5% of the businesses did not overlap. In fact, GTT made clear to investors during the class period that there was only "a little bit of overlap in cloud services or additional services in cloud services". (Ex. 12 at 10.)

## C. GTT Cautioned Investors Against Relying on Forward-Looking Statements and Disclosed Specific Risks Associated with Acquisitions and Integration.

Acquisitions have been a key part of GTT's corporate strategy and GTT has consistently warned investors of the inherent risks of that strategy, including risks associated with integrating new companies. For example, GTT's 2017 Annual Report, dated March 8, 2018, specifically disclosed the risk that "[f]uture acquisitions are a component of our strategic plan, and will include integration and other risks that could harm our business". (Ex. 6 at 8.) GTT informed investors that it intended "to continue to acquire complementary businesses and assets" and that it "cannot be certain that [it] will be able to successfully integrate acquired assets or the operations of the acquired entity with our existing operations". (*Id.* at 9.) GTT further warned that "[d]ifficulties with integration could cause material customer disruption and

5

dissatisfaction, which could in turn increase churn and reduce new sales". (*Id.*) These disclosures were also included in GTT's 2018 Annual Report, which was released while GTT was in the midst of its Interoute integration. (Ex. 16 at 8-9.)

GTT referred investors back to these risks each time it held an earnings call discussing the Interoute acquisition during the class period. Each press release published in connection with those calls also warned investors that GTT's "ability to complete acquisitions or divestitures and to integrate any business or operation acquired" was one factor that "could cause GTT's actual results to differ materially" from any forward-looking statements the Company made. (*See, e.g.*, Ex. 2 at 4; Ex. 4 at 3; Ex. 9 at 2; Ex. 13 at 2.) Each quarterly earnings call included cautionary language and referred investors to GTT's risk disclosures in SEC filings.[2] (*See, e.g.*, Ex. 3 at 4.)

In addition to the risk disclosures made in GTT's SEC filings and company statements, the Individual Defendants made cautionary statements concerning risks associated with the Interoute transaction during public appearances and interviews. For example, McKee acknowledged that "the size of [the Interoute transaction] and the debt and the number of employees involved, those are all bigger numbers than we've dealt with". (Ex. 14 at 5.)

**D.      GTT Provided Investors with Consistent Status Updates on the Integration Process.**

Shortly after the acquisition, GTT explained that Interoute would be integrated in

---

[2] For example, the following language was provided at the start of the March 1, 2018 earnings call: "[D]uring today's call, we will be making forward-looking statements regarding future events and financial performance made under the safe harbor provision of the U.S. securities laws, including revenue and margin expectations, projections and references to trends in the industry and GTT's business. We caution you that such statements reflect our best judgment as of today, March 1, based on factors that are currently known to us and that actual future events or results could differ materially due to a number of factors, many of which are beyond our control. For a more detailed discussion of the risks and uncertainties affecting our future results, we refer you to our SEC filings. GTT disclaims any obligation to update or revise these forward-looking statements to reflect future events or circumstances." (Ex. 3 at 4.)

three phases:  (1) GTT first would integrate the organizations by identifying the employees who would remain part of the GTT team; then (2) GTT would integrate the companies' systems (including migrating Interoute's data onto GTT's central database); and, finally (3) GTT would integrate network operations.  (Ex. 11 at 7.)  It is important to read GTT's disclosures with the contextual understanding that the integration of Interoute would proceed from "organization" to "system" to "network operations", as GTT made clear to investors during the class period.

For example, during GTT's third quarter 2018 earnings call on November 8, 2018, GTT stated that it had "completed the *organization* integration in September and we expect the majority of those employees currently on transition to leave the company by year-end".  (Compl. ¶ 156 (emphasis added).)  It further stated that "*systems* integration is also well underway" including "consolidat[ion of] all core business support systems to our Client Management Database, CMD, in October", and that "*[n]etwork* integration is also on track for substantial completion *in the next few months*".  (*Id.* (emphasis added).)

In December 2018, GTT again stated that integration was "on track", with the "integration into our core Client Management Database . . . effectively complete", although there would still be "a little bit of clean up activity as we continue to go".  (*Id.* ¶¶ 160-61.)

On February 29, 2019, during the fourth quarter earnings call for 2018, GTT announced that the Company was "past the halfway point at this stage and expect[ed] to complete all remaining activities by the end of the second quarter, consistent with the expectation we set when we announced the deal last year".  (*Id.* ¶ 164.)  GTT reiterated that "*[o]rganization* integration was completed back in September, and most of the employee-associated employee reductions are now done.  *Systems* integration is nearly complete with all ordering, installation, billing and financial transactions now in GTT's systems.  *Network*

7

integration is also on track as the core network has been consolidated and point of presence consolidation is well underway." (*Id.* (emphasis added).)

Read in context, it is clear that GTT used the words "on track" to refer to timing—that the phases of the integration were being completed on schedule—not as a guarantee that each part of the integration was proceeding smoothly or that the combined company would run well. For example, GTT stated on August 3, 2018, that it was "on track towards" "cutting over to one systems infrastructure, which we have planned now for the 1st of October"; it never represented that systems integration would be without issue. (*Id.* ¶ 144; Ex. 12 at 10.)

**E.      GTT Completed Its Integration Process as Expected—Within Three to Four Quarters Post-Close.**

On May 8, 2019, GTT informed investors that it was "in the final stages of the Interoute integration", which was "[o]n track with our original time line of completing all remaining activities by the end of the second quarter". (Ex. 17 at 5.) While reporting on activities and earnings for the second quarter of 2019, on August 8, 2019, Calder confirmed that "the Interoute integration is now substantially complete". (Ex. 19 at 5.) The acquisition closed during the second quarter of 2018, and integration was complete during the second quarter of 2019—within four quarters of the closing, as predicted. (Compl. ¶¶ 6, 45, 112.) Although the integration was completed on time, the Company announced a 3% decline in revenues due to "post integration challenges". (*Id.* ¶ 14.)

**F.      Plaintiff's Claims.**

On February 28, 2020, Plaintiff filed its Complaint purportedly on behalf of itself and all other persons or entities who acquired GTT stock from February 26, 2018 through August 7, 2019. (*Id.* ¶ 1.) Plaintiff alleges that GTT and the Individual Defendants made false or misleading statements throughout that period concerning three issues: (1) the similarity of

8

GTT and Interoute; (2) that the integration of Interoute into GTT's business would be completed in three to four quarters post close; and (3) that the integration was "on track" towards meeting that goal throughout the class period.  (*Id.* ¶¶ 6, 7.)[3]

According to Plaintiff, Defendants' statements were revealed as false or misleading through three purported corrective disclosures.  *First*, Plaintiff alleges that GTT revealed for the first time on its May 8, 2019 earnings call that Interoute and GTT were not "mirror businesses" because, on that date, GTT allegedly disclosed that while only 5% of its revenue was in cloud services, Interoute had made a "strategic priority shift" to providing cloud services before the integration.  (*Id.* ¶ 191.)  On the same date, GTT disclosed that the Company reported a decrease in revenues due to billing delays, which Plaintiff misinterprets as allegedly contradicting prior statements about the timing of the integration process.  (*Id.*)  *Second*, Plaintiff alleges that on June 24, 2019, Craig-Hallum, a third-party analyst, reduced its price target for GTT stock because with the Interoute integration, GTT was "in the midst of altering its DNA", "a process that has been challenged by debt levels and recent integration issues".  (*Id.* ¶ 193.)  *Third*, Plaintiff alleges that GTT's August 8, 2019 earnings call disclosure that "post-integration challenges with [] billing and collections" led to revenue declines revealed that the Interoute integration had not proceeded "on track".  (*Id.* ¶ 194.)

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'".

---

[3] (*See also* Compl. ¶¶ 123, 124, 125, 128, 131, 134, 136, 137, 139, 140, 143, 144, 147, 148, 152, 153, 156, 159, 160, 161, 164, 166, 168, 170, 171, 172, 173.)

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Mere "labels and conclusions" are to be disregarded.  *Twombly*, 550 U.S. at 555.  Only well-pleaded factual allegations must be accepted as true, and those factual allegations "must be enough to raise a right to relief above the speculative level".  *Id.*

Because Plaintiff alleges Defendants committed securities fraud, its claims are also subject to the heightened pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 and Federal Rule of Civil Procedure 9(b).  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017) ("The PSLRA clarifies the heightened pleading standard that applies to securities fraud actions.").  Thus, in addition to pleading the other elements of its claim, Plaintiff must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (stating that the PSLRA requires pleadings to demonstrate, *inter alia*, "*the reason* or reasons why [each alleged] statement is misleading").

A claim for securities fraud under Section 10(b) requires that Plaintiff allege six elements:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The most basic requirements are "(a) a false statement or omission of a fact (b) that is material".  *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir.

10

1994); *Longman v. Food Lion*, 197 F.3d 675, 683 (4th Cir. 1999) ("These components—a *factual* statement or omission that is *false* or *misleading* and that is *material*—interact to provide a core requirement for a securities fraud claim."). It is Plaintiff's burden to show that the challenged statements are false or misleading; "a true statement does not fall within the ambit of Rule 10b-5." *Kas v. First Union Corp.*, 857 F. Supp. 481, 488 (E.D. Va. 1994). To be material, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman*, 197 F.3d at 683.

The Fourth Circuit has held that certain categories of statements are immaterial as a matter of law, including "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available". *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004). Likewise, forward-looking statements are not actionable if they are "accompanied by meaningful cautionary" language. 15 U.S.C. § 77z-2(c)(1)(A); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (stating that predictive statements "not worded as guarantees are generally not actionable under the federal securities laws").

To plead loss causation, Plaintiff must allege that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages". 15 U.S.C. § 78u-4(b)(4). Allegations of loss causation must be pled with "'sufficient specificity', a standard largely consonant with Fed. R. Civ. P. 9(b)'s requirements that averments of fraud be pled with particularity". *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).

11

## II.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR OMISSION

### A.   **Plaintiff's Claim that Defendants Misstated the Overlap Between GTT's Business and Interoute's Business Fails as a Matter of Law.**

#### i.   The Challenged Statements Were Accurate and Not Misleading.

Plaintiff alleges that 13 of Defendants' statements were misleading because they described GTT and Interoute as operating similar businesses when, according to Plaintiff, "the exact opposite was true".[4]  (*See, e.g.*, Compl. ¶¶ 6, 9, 41.)  Plaintiff's argument strains credulity.

Plaintiff concedes, as it must, that there was a ***95% overlap*** in GTT's and Interoute's businesses, and that Defendants disclosed this "hard fact" to investors.  (*See id.* ¶ 49.) That alone renders the challenged statements inactionable:  "a true statement does not fall within the ambit of Rule 10b-5."  *Kas*, 857 F. Supp. at 488 (holding that if a plaintiff "is unable to prove that the defendants made any false statement", plaintiff's claims are without merit ); s*ee also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) (affirming dismissal because plaintiffs "failed to plead falsity with particularity as required by the PSLRA"); *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998), *aff'd*, 201 F.3d 436 (4th Cir. 1999) ("Investors concern themselves primarily with facts, not with opinions or characterizations of facts.").

Plaintiff relies on one allegation—that Interoute sold some cloud services and was focused on selling more—in an attempt to allege that Defendants' comparisons were false.  (*See, e.g.*, Compl. ¶ 126.)  But with 95% of the companies' products overlapping, the portion of Interoute's business in the non-overlapping cloud services sector was *at most* 5% of its total business.  Numerous courts have found such small percentages to be immaterial as a matter of

---

[4] These statements are listed in rows 2, 4-7, 9-13, 16, 18 and 26 of Exhibit 21.

12

law.  *See Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. 2003) (collecting cases finding statements relating to single-digit percentages of revenue immaterial).

But, even if the companies' differences were not immaterial as a matter of law, it still would not help Plaintiff because Defendants actually disclosed the differences during the class period.  Interoute's cloud services were no secret.  GTT's Press Release announcing the acquisition described Interoute's assets as including "a global cloud services platform".  (Ex. 2 at 3.)  Just over six months before GTT announced the acquisition of Interoute, Interoute issued a press release with a cloud-services company, Cloudian, announcing that Interoute had "rolled out a cloud-based storage service based on Cloudian's HyperStore object storage technology".  (Ex. 1 at 1.)  And, as Plaintiff is forced to admit, in August 2018, GTT told investors that Interoute sold cloud services that GTT did not sell, stating that "[t]here's a little bit of overlap in cloud services or additional business. . . . However, we think the core business that we're in, cloud networking services, is very similar across the two platforms."  (Compl. ¶ 144.)  Investors were aware during the class period that 5% of Interoute's business did not overlap with GTT's *and* that the non-overlap included Interoute's cloud services offerings.

Plaintiff overreaches regarding the significance of Interoute's supposed "strategic shift" to cloud services.  (*Id.* ¶ 71.)  Even if Interoute had implemented a shift to encourage the sale of cloud services before the acquisition, Plaintiff cannot dispute that cloud services still comprised, at most, 5% of Interoute's revenue at the time of the acquisition.  (*See id.* ¶ 106 (acknowledging that "Interoute's strategy shift . . . amounted to 'roughly 5% of revenue'").)[5]  So

---

[5] Plaintiff alleges that Interoute had policies "whereby its salespeople would only get commissions for the products they sold if they included an element of cloud services" according to CW 10.  (Compl. ¶ 70.)  But this policy—if true—would only support that cloud services were an add-on service to the other products Interoute sold, such as the cloud networking services that formed the core of GTT's business.

13

long as material facts are disclosed to or already known by investors—here, that Interoute sold cloud services and that such services constituted no more than 5% of its business—GTT had no obligation to characterize those facts as a "strategic shift" or to disclose all potential adverse inferences, such as a potential loss of sales momentum. *See Augenstein v. McCormick & Co.*, 581 F. Supp. 452, 458 (D. Md. 1984) ("When the nature and scope of a transaction are clear, it is not necessary . . . to characterize the various effects of the transaction as favorable or unfavorable or to evaluate its overall effect; such characterization is a matter of judgment, not fact."); *Krim*, 81 F. Supp. 2d at 629 ("When issuers accurately and completely disclose their operating expenses and net losses . . . pejorative descriptions of these factors are not required."); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (holding that mere pejorative characterizations of disclosed factual matters "will not alter the total mix of information available to the investing public" and as such "are immaterial as a matter of law").

Plaintiff's reliance on confidential witnesses ("CWs") also fails to show that the statements were false or misleading. (Compl. ¶¶ 62-71.)  "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." *Teachers' Ret. Sys.*, 477 F.3d at 174 (citations and internal quotations omitted). The CWs Plaintiff relies on, however, lack a broad enough perspective of the industry or of GTT's business to evaluate whether GTT's and Interoute's businesses were similar.  The majority of the CWs are alleged to have had low-level positions that would not provide visibility into the companies' broader business models.  For example, Plaintiff has not alleged how CW 4, "a former Interoute Sales Operations and Systems Training Manager in Prague", would have

14

known that "Interoute had a fundamentally different business model from GTT."  (Compl. ¶ 67.)

In any event, the CWs' statements cannot be "based on speculation and opinion and [Plaintiff must] provide the information and belief necessary to support pleadings".  *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) (rejecting confidential witnesses' statements "because the plaintiffs do not sufficiently allege that the confidential witnesses were in a position to personally know the information they conveyed").  Here, the CWs cannot contradict the undeniable *fact* that 95% of GTT's and Interoute's businesses overlapped.  What the CWs offer instead are *opinions* regarding subjects like cultural fit.  For example, Plaintiff refers to CW 1's statement that the two companies "were in fact 'right hand into left glove,' because the companies' culture, mission and strategy were 'totally different'".  (Compl. ¶ 66.)  But that is simply CW 1's opinion.  Likewise, CW 7's statement that the "vast majority" of Interoute's business was selling cloud services because "all the biggest companies were buying cloud services from us" is pure speculation that is at odds with the fact that only 5% of Interoute's revenue was from cloud services.  (*Id.* ¶ 64.)  Opinions and speculation, like those offered by Plaintiff's CWs, cannot support a claim for securities fraud.  *See City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x. 83, 85 (2d Cir. 2010) (dismissing claims where plaintiffs relied "on opinions of confidential witnesses to support their allegations, but they fail[ed] to offer any factual underpinnings for those opinions"); *Kemp v. Universal Am. Fin. Corp.*, No. 05-CV-9883, 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007) (stating the "mere opinions of confidential witnesses . . . are not actionable" in securities fraud cases).

ii.    The Challenged Statements Are Puffery or Opinion.

Even if the challenged statements were false (and they are not), the majority of the statements would be inactionable statements of corporate optimism and opinion.  For example, Plaintiff challenges the statement that "[w]e have an almost parallel business in the

15

United States and the combination of one plus one we think will be absolutely be three, four or even five." (Compl. ¶ 124.) The Complaint lists other similar examples. (*See id.* ¶¶ 125, 128, 131, 134, 136, 137, 144, 148, 166.) Such statements are classic examples of "[i]ndefinite statements of corporate optimism, also known as puffery, [which] are generally non-actionable, as they do not demonstrate falsity." *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015) (citation omitted). Courts routinely dismiss allegations of securities fraud predicated on these types of vague statements of corporate optimism.[6] *See Carlucci v. Han*, 886 F. Supp. 2d 497, 524 (E.D. Va. 1993) (dismissing statements that defendant would "provide [plaintiff] with the best return he had ever received, possibly up to 50 times his investment" as "non-actionable puffery" that no reasonable investor would rely on); *Longman*, 197 F.3d at 684 & n.2 (statements that "Food Lion is one of the best-managed high growth operators in the food retailing industry" and that the company provided its employees with "some of the best benefits in the supermarket industry" were "immaterial puffery"). The same result should obtain here. Defendants disclosed the true underlying facts to investors; the particular words used to accompany those facts are immaterial as a matter of law.

**B.** **Plaintiff's Claim that Defendants Misstated When the Interoute Integration Would Be Completed Fails as a Matter of Law.**

Plaintiff alleges that Defendants' statements that the Company expected to

---

[6] Certain other statements comparing the similarities of the two companies are taken out of context to fit Plaintiff's narrative. For example, Plaintiff alleges that Nomellini made statements that "the two companies take the same approach, focusing on 'breadth and depth of access technologies'", but the first part of the statement was not a quote from Nomellini at all, and in the article, it is clear she was discussing the breadth of products that both companies offer—a fact that Plaintiff has not alleged is false. (Compl. ¶ 125.) Likewise, Plaintiff alleges that Calder's statement describing the pairing of "two incredibly like-minded companies that live similar values" was false but, in context, Calder's statement discussed that the two companies shared the "anti-incumbent values of simplicity, speed, agility". (*Id.* ¶ 134.) Plaintiff has made no allegations that would suggest Interoute did not value simplicity, speed and agility.

16

integrate Interoute "within three to four quarters post-close" were false because Plaintiff's CWs allege that this timeline was "totally unrealistic".[7]  (Compl. ¶¶ 123, 127.)  But Plaintiff's own allegations confirm that GTT's statements were true.  When GTT closed the Interoute acquisition in the second quarter of 2018, Defendants stated that they expected the integration to be completed within "three to four quarters", *i.e.*, by the second quarter of 2019.  (*Id.* ¶ 6.)  And, as Plaintiff concedes, GTT announced—in the same disclosure that Plaintiff alleges was a corrective disclosure—that "the Interoute integration [was] substantially complete" in the second quarter of 2019.  (*Id.* ¶ 112; Ex 19 at 5.)  Thus, Plaintiff's allegations show that GTT's estimated timeline for completing the integration was correct.  Securities fraud claims cannot be based on accurate statements.  Again, "[a] true statement does not fall within the ambit of Rule 10b-5." *Safecard Servs., Inc. v. Dow Jones & Co.*, 537 F. Supp. 1137, 1143 (E.D. Va. 1982), *aff'd*, 705 F.2d 445 (4th Cir. 1983); *see also Kas*, 857 F. Supp. at 488 (same).

Moreover, predictions of future events, such as when an integration will be complete, are inactionable under the securities laws as a matter of law.  "'Forward-looking statements' that are either accompanied by cautionary language, immaterial, or made without actual knowledge of their falsity are statutorily protected under the PSLRA's safe harbor provision."  *Oklahoma Firefighters Pension & Ret. Sys.*, 66 F. Supp. 3d 711, 714 (E.D. Va. 2014) (citing 15 U.S.C. § 78u-5(c)(1)).  They also are immaterial as a matter of law under the bespeaks caution doctrine, which requires dismissal of securities fraud claims "if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions".  *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 319 (4th Cir. 2019) (citation omitted); *see also In re Neustar Sec.*, 83 F. Supp. 3d at 683-84 (holding

---

[7] These statements are listed in rows 1, 3, 6, 8, 14 and 21 of Exhibit 21.

that statements of confidence about the company's future performance were immaterial under the bespeaks caution doctrine and the PSLRA safe harbor).  Thus, even if Defendants' prediction had turned out to be wrong (and it did not), Plaintiff's claims based on the predicted timing of the integration still must be dismissed because each such prediction was accompanied by meaningful cautionary language.

**C.**      **Plaintiff's Claim that Defendants Misrepresented the Integration as Being "On Track" Fails as a Matter of Law.**

Plaintiff challenges multiple statements that concern the progress of the integration, including 17 statements describing the integration as "on track" and other statements predicting optimistic future achievements, because, according to Plaintiff, "in reality, [the integration] was an utter 'disaster' from day one".[8]  (Compl. ¶¶ 10, 147, 168.)  These challenges fail for at least three reasons.

i.      Defendants' Statements Are Inactionable Puffery and/or Forward-Looking Statements.

Each of the statements Plaintiff challenges is inactionable as a matter of law because it is either puffery, a forward-looking statement, or both.

*Puffery.*  Many of the challenged statements are puffery.  "Indefinite statements of corporate optimism, also known as 'puffery,' are generally non-actionable as they 'do not demonstrate falsity'."  *Carlucci*, 886 F. Supp. 2d at 522.  "Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen"; "[s]oft" or "puffing statements" are immaterial because "the market price of a share is not inflated by vague statements predicting growth."  *Raab*, 4 F.3d 289-90.  This includes statements characterizing events as "good", "doing well" or "growing" because those statements

_____

[8] These statements are listed in rows 15-17, 19-25, 27-32 of Exhibit 21.

18

"lack[] the materiality essential to a securities fraud allegation". *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992) (dismissing statements that a bank was a "good investment"); *In re Cable & Wireless, PLC*, 321 F. Supp. 2d at 767 (dismissing statements that "these results demonstrate healthy growth and exceptionally strong finances" and "results are in line with our expectations"). Puffery also includes "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available". *In re Neustar Sec.*, 83 F. Supp. 3d at 680 (citations omitted). Plaintiff challenges 14 statements describing the integration in various forms as "on track"—all of which are inactionable puffery. (Compl. ¶¶ 143-44, 147, 152-53, 156, 160-61, 164, 168, 170-73.) For example, Plaintiff challenges the statement that "we absolutely are right on track with what we announced when we were here a year ago and we feel very comfortable with our business plan at this stage." (*Id.* ¶ 168.) These statements are precisely the sort of "soft", puffing statements that are not actionable as a matter of law because no investor would be misled by vague statements projecting that GTT executives are generally comfortable with the business plan. *See Hillson*, 42 F.3d at 212 (dismissing as puffery the statement that the company is "on target toward achieving the most profitable year in its history").

Likewise, Plaintiff's challenge to statements describing the integration as "'on-track' in all aspects" are vague statements of immaterial corporate optimism. *Hillson*, 42 F.3d at 213-15 (affirming dismissal of defendant's statements about being "on schedule" and "on track" as not material). The Court's opinion in *In re Maximus*, *Inc. Securities Litigation* is particularly instructive. No. 117CV0884AJTIDD, 2018 WL 4076359 (E.D. Va. Aug. 27, 2018). There, plaintiffs challenged defendants' statements that they were "on track to meet . . . requirements"

19

and that defendants' performance on the contract was "going as expected".  *Id.* at \*7.  The Court dismissed the complaint, holding that statements that the company was "on track" were not material because the "on track" language "reflected a subjective, less than certain assessment" and, thus, constituted puffery.  *Id.* at \*13.  The "on track" statements that Plaintiff challenges here are nearly identical to the statements found to be inactionable by the *Maximus* court, and should be dismissed for the same reasons.

The following paragraphs of the Complaint challenge statements that are inactionable puffery:  Compl. ¶¶ 143-44, 147, 152-53, 156, 160-61, 164, 168, 170-73.

***Forward Looking Statements.***  Other challenged statements are forward-looking statements that are inactionable under the PSLRA's safe harbor and the bespeaks caution doctrine.  Under either doctrine, statements concerning "future plans, expectations and financial projections" "are immune from liability if they are forward-looking statements that are accompanied by meaningful cautionary language."  *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 549, 556 (M.D.N.C. 2013); *see* 15 U.S.C. § 78u-5(i)(1)(A).  Sufficient cautionary language need only "identif[y] 'meaningful and important factors that could affect future performance'" to activate the PSLRA's safe harbor.  *Id.* at 551 (sufficient cautionary statements included:  "we cannot provide any assurance of any future sales" and "[w]e may not be able to introduce or sell products to be developed . . . within the anticipated timeframe or at all"); *see also In re Lab. Corp.*, No. 1:03CV591, 2006 WL 1367428, at \*5-6 (M.D.N.C. May 18, 2006) (finding that even less specific cautionary language was sufficient to bring forward-looking statements within the PSLRA safe harbor).

Plaintiff challenges forward-looking statements such as "[w]e believe we're on track towards [allowing] the company to operate in one global system with access to the full

20

reach of the network" and "we expect to outperform our initial estimates on a constant-currency basis." (Compl. ¶¶ 144, 156.) Those statements are "necessarily forward-looking" because they concern the completion of a future event and thus constitute "statement[s] . . . whose truth or falsity is discernible only after it is made". *Smith*, 286 F. Supp. 2d at 722; *see Plymouth Cty. Ret. Ass'n*, 966 F. Supp. 2d at 551 (dismissing forward-looking statements that the company "expects" to meet a projected launch date and predicted "long-term growth prospects"); *see also Hillson*, 42 F.3d at 213-15 (affirming dismissal of statements that project was "on schedule" and company was "on track" for increased earnings estimate as forward-looking). GTT provided the necessary cautionary language by warning investors that GTT's "ability to complete acquisitions or divestitures and to integrate any business or operation acquired" "could cause GTT's actual results to differ materially." (Ex. 2 at 4; *see also* Ex. 4 at 3 (same); Ex. 9 at 2 (same); Ex. 13 at 2 (same).) As a result, the challenged statements fall within the safe harbor and are immune from liability. *See Smith*, 286 F. Supp. 2d at 722 (finding defendant's caution that "undue reliance should not be placed on any forward-looking statements, which are based on current expectations" merits safe harbor); *In re Neustar Sec.*, 83 F. Supp. 3d at 682 (disclosures that "the Company cannot assure you that its expectations will be achieved or that any deviations will not be material" were sufficient to warn investors of risks related to a contract bid).

The following paragraphs of the Complaint challenge statements that are inactionable forward-looking statements: Compl. ¶¶ 144, 147, 156, 164, 173.

ii.     Defendants' Statements Were Not False or Misleading.

Defendants' statements that the integration was "on track" are also inactionable because they were true.

Plaintiff argues that Defendants' statements were overly optimistic because they failed to disclose various issues that arose throughout the integration process. (*See, e.g.,*

21

Compl. ¶¶ 142, 145.)  But the law does not require Defendants to "bury the shareholders in an avalanche of trivial information" by disclosing every minor update or bump along the road.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (requiring the disclosure of anything less than the disclosure of *material* information "would lead corporations to" overwhelm investors with "trivial information, a result that is hardly conducive to informed decisionmaking").  Such a requirement would be "impractical, if not unreasonable" and may conversely mislead investors with too much information.  *See Walker v. Action Indus., Inc.*, 802 F.2d 703, 710 (4th Cir. 1986) (refusing to require that defendants disclose more frequent projections because it would require "virtually constant statements by [defendant] in order not to mislead investors").

Here, Defendants met their obligation by providing accurate statements about the general integration process; no further disclosure was needed.  Defendants disclosed that integration would proceed along three stages (operations, systems and network integration) and then provided periodic updates on the various stages as the integration process proceeded "on track" towards its projected integration completion date in the second quarter of 2019.  (Compl. ¶¶ 143-44, 152-53, 156, 159-61, 164, 168, 170-73.)  These statements were demonstrably true because, as Plaintiff's allegations concede, the Company did, in fact, complete each phase of the integration within the predicted time period.  (Compl. ¶ 112.)  Completing the integration within the predicted time period is the definition of "on track".  *On Track, Oxford English Dictionary* (3d ed. 2020), www.oed.com/view/Entry/204216 (last visited Mar. 18, 2020) (defining "on-track" as "on course; achieving or doing what is required").  Plaintiff cannot allege securities fraud based on facts that are true.  *Greenhouse*, 392 F.3d at 656 ("[t]he plain language of Rule 10b-5 and Section 11(a) requires any successful securities-fraud suit to allege a fact that is

22

both untrue *and* material"); *Kas*, 857 F. Supp. at 488 ("a true statement does not fall within the ambit of Rule 10b-5").

As its primary example that the integration was not "on track", Plaintiff alleges that statements concerning GTT achieving the "key milestone" of cutting over Interoute's systems in GTT's CMD system were false because the "'real' cut over did not occur until May 2019". (Compl. ¶ 185.) But Plaintiff is confused. The "cutover" of Interoute's *systems* into GTT's Customer Management Database—*i.e.*, the import of Interoute's data—indisputably occurred in October 2018, consistent with Defendants' disclosures. (*See id.* ¶ 153 (in October 2018, Nomellini disclosed that GTT had "loaded Interoute client data onto the GTT client management database"); ¶ 156 (in November 2018, Calder reiterated that GTT had "consolidated all core business support systems" to CMD in October).) The cutover of data was a single step in the multi-step systems integration process and Defendants' statements accurately reflected that process. Once the "cutover" occurred, GTT still required further "cleanup activity" in December 2018 and needed additional employee training in "November, December and through the first quarter of 2019". (*Id.* ¶ 185.) Plaintiff has not identified any statement by Defendants that contradicts this process.

In the context of Defendants' prior statements about GTT's multi-step integration process, no investor would have confused a statement that the "CMD cutover had occurred" with the idea that integration was completed at that point. It is a "well-established principle that a statement or omission must be considered in context". *Hillson*, 42 F.3d at 219 (citing *In re Donald J. Trump Casino Sec. Lit.*, 7 F.3d 357, 364 (3d Cir. 1993)). Properly reviewed in context, Defendants' statements only make sense as updates concerning a process that continued from October through the first quarter of 2019. (*See, e.g.*, Compl. ¶ 160 (sharing in December

23

2018 that "the integration into our core" business support systems was "effectively complete", but there was a "little bit of cleanup activity as we continue to go"); *id.* ¶ 164 (disclosing in February 2019 that the "[s]ystems integration [was] nearly complete with all ordering, installation, billing and financial transactions now in GTT's systems"); *id.* ¶ 170 (announcing in May 2019 that GTT was "past the training effort" for CMD with GTT and former Interoute employees "fully aligned" in that system and that the Interoute integration as a whole was "in the final stages").)

iii.     Defendants' Never Stated the Integration Would Be Without Challenges.

Plaintiff asserts that statements concerning the integration being "on track" were false or misleading because the Company experienced challenges during and post-integration. (*See* Compl. ¶¶ 145, 154-55, 157, 162-163, 165, 169, 172, 174.)  That claim fails as a matter of law.

The securities laws "do not provide remedies for bad business decisions; they provide remedies only for fraud." *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *7 (S.D.N.Y. Jan. 16, 2018), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).  Were the rule otherwise, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (citations omitted); *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993) (recognizing that "only a fraction of financial deteriorations are the result of fraud" and therefore "plaintiffs must allege facts indicating that the change in circumstances resulted from defendants' fraudulent scheme").

Defendants' statements that the integration was "on track" to be completed were not guarantees that the combined company would not experience challenges, and Plaintiff cites

24

no statements in which a Defendant guaranteed a successful or smooth acquisition or integration. The problems Plaintiff identifies largely occurred *after* the integration process was completed. (Compl. ¶ 194 (GTT "disclosed that '*post integration* challenges with our billing and collections' led to continuing unexpected revenue declines") (emphasis added).)  The fact that a company experiences unexpected post integration challenges does not mean that the company's pre-integration statements concerning the integration process constituted securities fraud.  Courts have long recognized that plaintiffs cannot allege securities fraud based on "fraud by hindsight". *Kas*, 857 F. Supp. at 488 ("It is well-settled that 'fraud by hindsight' is not actionable under Section 10(b) or Rule 10b-5.").  Where outcomes do not align with expectations, "plaintiffs must point in the complaint to some reason that the difference between the rosy projections and later results is attributable to fraud." *Borow*, 829 F. Supp. at 833.  Plaintiff has not done so here.

Moreover, no reasonable investor would have interpreted Defendants' statements as guarantees of a successful combined company.  "The role of the materiality requirement is not to 'attribute to investors a childlike simplicity' but rather to determine whether a 'reasonable investor' would have considered the omitted information significant at the time." *See Hillson*, 42 F.3d at 213.  "It is not a violation of any securities law to fail to disclose a result that is obvious." *Id.* at 213-14.  Reasonable investors understand that projects "may run into unforeseen problems and delays". *Id.* at 213; *see also Raab*, 4 F.3d at 291 (holding that there is no duty to disclose information of common knowledge); *Wielgos v. Commonwealth Edison Co*., 892 F.2d 509, 515 (7th Cir. 1989) (holding that there is no duty to disclose Murphy's Law or Peter Principle).  Here, GTT did more than what was required because it actually disclosed in SEC filings that there was a risk that issues could arise as GTT combined the two companies.  (*See, e.g.*, Ex. 2 at 4 (disclosing that GTT's "ability to . . . integrate any business or operation

25

acquired" "could cause GTT's actual results to differ materially" from predictions); Ex. 4 at 3 (same); Ex. 9 at 2 (same); Ex. 13 at 2 (same).)

To the extent Plaintiff cites CW statements in an attempt to contradict Defendants' statements, this also fails as a matter of law. Confidential witness statements "based on speculation and opinion . . . do not provide the information and belief necessary to support pleadings under the PSLRA." *In re Trex Co.*, 454 F. Supp. 2d at 573. The CW statements Plaintiff relies on are largely statements of opinion describing challenges that the CWs experienced during integration or statements that call into question the functionality of certain GTT systems—not statements that contradict GTT's public announcements regarding the timeline of the integration process. (Compl. ¶¶ 80, 82, 83, 87, 89, 183.) For example, CW 5's statement that "CMD was very clunky—'[i]t was a very old database, incredibly old,' and had not been built with Interoute cloud services products in mind" does not contradict any of Defendants' statements about the progress of the integration. (*Id.* ¶ 89.) In fact, some CW statements *confirm* Defendants' timeline, sharing, for example, that Interoute client data was loaded onto CMD in October. (*Id.* ¶ 87 ("[W]hen GTT first attempted to migrate everything onto CMD in October 2018, the problems were instantaneous.").)

Plaintiff's allegation that, according to CW 1, the integration was not complete because "as of October 2019, Interoute was still having problems fulfilling orders using CMD, and information had to be converted into the old system in order for Interoute to fulfill those orders" fails for two reasons. (Compl. ¶ 100.) *First*, CW 1's statement is merely describing issues with the system itself; he does not contract the timing of when the integration process occurred or that it occurred. Again, bad business is not securities fraud. *Friedman*, 2018 WL 446189, at *7 (holding that the securities laws "do not provide remedies for bad business

26

decisions; they provide remedies only for fraud").  *Second*, Plaintiff fails to establish how CW 1 would have sufficient personal knowledge of GTT's integration process to provide such a statement.  "A confidential witness' testimony can be used in pleading under the PSLRA *so long as* the testimony involves facts of which the witness had personal knowledge."  *In re Trex Co.*, 454 F. Supp. 2d at 573 (emphasis added); *see also In re Neustar Sec.*, 83 F. Supp. 3d at 686 (declining to credit confidential witnesses where it was not clear "whether the sources have personal knowledge of the events described, and whether the sources were in a position to learn of such events personally").  CW 1 is identified as a "former Executive Vice President Service Provider at Interoute" who left Interoute in "December 2016"—over a year *before* GTT acquired Interoute.  (Compl. ¶ 66.)  Plaintiff alleges that CW 1 then acted as a "former consultant to an American fund interested in purchasing Interoute in October 2017" but, again, this occurred nearly a year *before* the integration process started, let alone when it was completed in August 2019.  (*Id.*)

Plaintiff's allegations that according to CW 7 the "integration is still ongoing today and it is not yet complete and there are a lot of problems in the billing area especially" fail for the same reasons.  (*Id.* ¶ 101.)  CW 7 is identified as the "former CEO of Interoute Italia" who left the company in July 2018 and was no longer employed by the company at the time integration was completed.  (*Id.*)  Plaintiff's allegation that CW 7 received calls from angry Interoute customers "even after he had left the company", *id.*, is insufficient to bolster his claim because Plaintiff does not specify when those calls were received or how those customers would know whether the integration was completed.  *See In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *5 (D. Md. Mar. 30, 2011) (rejecting confidential witness statements where plaintiffs provided "no indication of when or how

27

frequently CW2 attended the executive review meetings" to have had personal knowledge).

### III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiffs may allege loss causation either by alleging that a company disclosure "publicly revealed for the first time" that the company perpetrated a fraud on the market by way of a material misrepresentation or omission, *Katyle*, 637 F.3d at 473, or that news of a materialized risk "reve[aled] the fraud that caused plaintiffs' loss". *Id.* at 477 n.10.

Here, Plaintiff alleges that Defendants and others revealed purported corrective disclosures on three separate dates causing Plaintiff's purported harm. (*See* Compl. ¶¶ 191-195.) But Plaintiff cannot plead loss causation where none of the alleged disclosures revealed new, material information sufficient to correct a prior misstatement; in other words, the alleged corrective disclosures must disclose new information that matches (and corrects) the fraud Plaintiff alleges. *See Katyle*, 637 F.3d at 478; *see also Teachers' Ret. Sys.*, 477 F.3d at 187-88 (dismissing for failure to plead loss causation where an alleged corrective disclosure reported facts that had already been disclosed in public filings).

*First*, none of the alleged disclosures revealed new information regarding the similarities between GTT and Interoute. Plaintiff points to GTT's May 8, 2019 earnings call as the "first time" that Defendants disclosed that Interoute earned "roughly 5%" of its revenue from cloud services. (Compl. ¶¶ 105, 106.) But "[c]orrective disclosures must present facts to the market that are new" because "if investors already know the truth, [even] false statements won't affect the price". *Katyle*, 637 F.3d at 473 (citation omitted). GTT disclosed that Interoute had 5% of its business in cloud services nearly *a year before* the alleged corrective disclosure. (Compl. ¶ 49; Ex. 12 at 10.) And the market was aware of Interoute's cloud services business even prior to GTT announcing the acquisition. (Ex. 1 at 2.)

To the extent Plaintiff alleges that the "corrective disclosure" was that Interoute

28

had made a "strategic shift" towards cloud services sales before the integration, that characterization still fails to present any new *facts* to the market. Investors already knew the underlying facts—a portion of Interoute's business was in cloud services, the percentage of revenue Interoute derived from that segment, and that GTT did not have a similar segment. (Compl. ¶ 49; Ex. 1 at 2; Ex. 12 at 10.) The added color GTT provided was not material, *see, e.g.*, *Hillson*, 42 F.3d at 209, and to plead loss causation, Plaintiff must point to a "*material* misrepresentation or omission" that "caused the loss for which the plaintiff seeks to recover". *Katyle*, 637 at 465 (citing 15 U.S.C. § 78u-4(b)(4)) (emphasis added).

*Second*, none of the alleged corrective disclosures revealed any new information about the overall timing of the integration. Plaintiff points to the portion of GTT's May 8, 2019 disclosure in which it disclosed a 1% revenue decline that the Company attributed to customer installation delays related to Interoute integration activities and training. (Compl. ¶ 191.) Plaintiff also points to GTT's August 8, 2019 earnings call in which GTT disclosed a further revenue decline that the Company attributed to "post integration challenges with our billings and collections". (*Id.* ¶ 194.) But neither of these statements contradict GTT's statements that the integration would be completed within three to four quarters post-close. In fact, the information Plaintiff points to as the alleged corrective disclosure made on August 8, 2019 *confirms* that GTT had in fact completed its integration within the predicted "three to four quarter post close"—GTT disclosed "*post* integration challenges", meaning that the integration was complete. (Ex. 19 at 5 (emphasis added).)

*Third*, to the extent the May 8, 2019 and August 8, 2019 earnings calls disclosed challenges, those were issues related to network installations, billing and collections; they did not reveal that previous statements about the integration had been a lie. (*See* Compl. ¶¶ 191, 194.)

29

Those issues might represent bad news, but they are not corrective news. Similarly, an analyst report reducing its price target because GTT "is in the midst of altering its DNA, which had been largely built of growth via acquisitions, a process that has been challenged by debt levels and recent integration issues", (*id*. ¶ 193; Ex. 18 at 1), discloses bad news for the Company but fails to disclose "corrective" information "reve[aling] the fraud that caused plaintiffs' loss". *Katyle*, 637 F.3d at 477 n.10. The report revealed no new information concerning whether GTT was similar to Interoute, whether the Interoute integration would be completed in time, or about how the integration was going. "In a financial market wrought with turmoil across the spectrum, '[t]he standard cannot be so lax that every announcement of negative news becomes a potential 'corrective' disclosure.'" *Katyle*, 637 F.3d at 476 n.9 (citing *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009)).

## IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATIONS OF SECTION 20(a).

Because Plaintiff fails to state a claim for a primary violation of Section 10(b), its Section 20(a) claim should also be dismissed. The law is clear that "Section 20(a) liability is derivative of [Section] 10(b)." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). Thus, if "the complaint is legally insufficient with respect to the [Section] 10(b) claim, the [Section] 20(a) claim must also fail." *Id.*

## CONCLUSION

For the reasons stated above, Defendants respectfully submit that the Court should dismiss Plaintiff's Complaint in its entirety, with prejudice and without leave to amend.

30

April 17, 2020

| | |
|---|---|
| | **GTT COMMUNICATIONS, INC.,**<br>**RICHARD D. CALDER, JR.,**<br>**CHRIS MCKEE**<br>**MICHAEL SICOLI and**<br>**GINA NOMELLINI,**<br><br><br>By: _____**/s/**_____<br>     Of Counsel<br><br>Dabney J. Carr, IV<br>VSB No. 28679<br>**TROUTMAN SANDERS LLP**<br>1001 Haxall Point<br>Richmond, VA 23219<br>Tel.: (804) 697-1200<br>Fax: (804) 697-1339<br>dabney.carr@troutman.com<br><br>J. Wesley Earnhardt<br>**CRAVATH, SWAINE & MOORE LLP**<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel.: (212) 474-1000<br>wearnhardt@cravath.com<br><br>*Counsel for Defendants GTT*<br>*Communications, Inc., Richard D. Calder,*<br>*Jr., Chris McKee, Michael Sicoli and Gina*<br>*Nomellini* |