UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI and GINA NOMELLINI,<br><br>Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
LEAD PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     THE COMPLAINT'S ALLEGATIONS ........................................................................ 1

        A.      GTT Stated It Ensured "Seamless" Integrations By Acquiring Companies
                With The Exact Same Strategy As GTT:  Cloud Networking ............................... 6

        B.      Defendants Repeatedly and Falsely Told Investors That Interoute Was A
                "Mirror" Business That Fit GTT "Hand In Glove" ............................................... 6

        C.      Defendants' Statements About Interoute "Mirroring" GTT Were False—
                In Reality, The Two Companies Were "Totally Different" ................................... 7

        D.      Defendants Falsely Assured Investors That The Interoute Integration Was
                "On Track" And Timely Met The "Key Milestone" Of The CMD "Cut
                Over" ..................................................................................................................... 8

        E.      Plaintiff's CWs Uniformly Stated That The Interoute Integration Was An
                "Absolute Nightmare" And The CMD "Cut Over" Was Never Completed .......... 9

        F.      The Truth Emerges, And GTT's Stock Plummets 85% ...................................... 12

III.    ARGUMENT ................................................................................................................. 14

        A.      Defendants Made False And Misleading Statements .......................................... 14

                1.      Defendants Falsely Stated GTT And Interoute Were "Mirror"
                        Businesses With The Same Core Strategy:  Cloud Networking ............... 14

                2.      Defendants Falsely Stated The Integration Was "On Track" And
                        Achieved Its "Key Milestone" Of The CMD "Cut Over" ........................ 20

        B.      The Complaint Pleads A Strong Inference Of Scienter ...................................... 27

        C.      The Complaint Adequately Pleads Loss Causation ............................................ 28

IV.     CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Augenstein v. McCormick & Co.*,
  581 F. Supp. 452 (D. Md. 1984) ................................................................................. 17

*Black v. Martek Biosciences Corp.*,
  2006 WL 8435572 (D. Md. June 14, 2006) ............................................................... 18

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012) ........................................................................ 14

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*,
  374 F. Appx 83 (2d Cir. 2010) ................................................................................... 19

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................................... 28

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016) ............................................................................ 19

*Galestan v. Onemain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................................... 20, 24

*In re Akorn Secs. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ......................................................................... 25

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ................................................. 22, 24, 25

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) .................................................................................. 25

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D.W.V. 2012) ....................................................................... 19

*In re Maximus, Inc. Sec. Litig.*,
  2018 WL 4076359 (E.D. Va. Aug. 27, 2018) ............................................................ 24

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) ........................................................................ 25

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ............................................................... 26

ii

*KBC Asset Management NV v. 3D Systems Corp.*,
  2016 WL 3981236 (D.S.C. July 25, 2016) ......................................................... 17, 24, 26, 27

*Kemp v. Universal Am. Fin. Corp.*,
  2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .............................................................................. 19

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) .................................................................... 27, 28, 29, 30

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ................................................................................................. 17

*Krim v. Coastal Physician Grp., Inc.*,
  81 F. Supp. 2d 621 (M.D.N.C. 1998) ...................................................................................... 17

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ................................................................................................... 20

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) .................................................................................................... 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
  135 S. Ct. 1318 (2015) ............................................................................................................ 17

*Public Employees' Ret. Sys. Of Miss. v. Treehouse Foods, Inc.*,
  2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ............................................................................ 24

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018) ......................................................................... 23, 25

*S.E.C. v. Staples*,
  55 F. Supp. 3d 831 (D.S.C. 2014) ........................................................................................... 16

*SEC v. Pirate Inv'r, LLC*,
  580 F.3d 233 (4th Cir. 2009) ................................................................................................... 27

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ............................................................................................ *passim*

*Teachers' Ret. Sys. Of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .............................................................................................. 14, 18

Lead Plaintiff respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint (the "Complaint").

## I. INTRODUCTION[1]

Defendants' motion to dismiss is more remarkable for what it admits than what it denies: in a rarity for a securities fraud case, Defendants do not even bother to challenge scienter, thereby conceding that the Complaint adequately alleges that they acted with fraudulent intent. And while Defendants half-heartedly challenge loss causation, their argument is easily discarded, as GTT's stock price collapsed by a staggering 85%—from $40.29 to $6.09—when the truth emerged about GTT's failed integration of Interoute Communications, Ltd. ("Interoute"). Thus, the only real issue that Defendants raise in their motion is whether they made false and misleading statements about the Interoute integration. In that regard, Defendants ask the Court to believe that every statement they made was true, and every misstatement was immaterial puffery, while rewriting history to say that the Interoute integration was timely completed and a resounding success. However, Defendants' contentions are directly belied by the near total destruction of the Company's stock price, Defendants' own admissions, analysts' reactions, detailed accounts of fifteen former senior-level employees of both GTT and Interoute who were directly involved in the integration, and the fact that the Company has now been forced to sell the key asset it acquired from Interoute because it was "non-strategic" to GTT.

Contrary to Defendants' assertions, the Complaint adequately pleads a plethora of false statements. During the Class Period, Defendants specifically assured investors that GTT was only interested in acquiring companies "that [were] strategic and [] doing exactly what we do"—

---

[1] This action is against GTT Communications, Inc. ("GTT" or the "Company"), its CEO Rick Calder, its former CFO Michael Sicoli, its General Counsel Chris McKee, and its former CMO Gina Nomellini (together, the "Individual Defendants"). All emphasis is added unless specified otherwise, and all "¶__" citations are to the Complaint (ECF No. 42).

namely, "providing cloud networking services to large multinational clients."  ¶35.  Accordingly, when the Company announced the Interoute acquisition—by far the largest and most significant acquisition in GTT's history, and one which Defendants proclaimed was "transformative" (¶38)—Defendants repeatedly stressed that the transaction would be successful precisely because the two companies were essentially identical businesses that "follow[ed] the same strategy" and "s[old] the same services to the same types of customers."  ¶¶125, 128.  In Defendants' own words, Interoute was "a strong strategic fit"; "the European version of GTT"; a "mirror business" that fit with GTT "hand in glove"; and "very complementary to [GTT's] strategy"—it was so similar, in fact, that "95% of what Interoute did was exactly what [GTT] did."  *See* ¶¶124-144.

However, as was ultimately revealed, Interoute was not "the European version of GTT," nor was it "a strong strategic fit."  To the contrary, Interoute's "strategic priority" was selling cloud services—the exact business that GTT had expressly told investors conflicted with GTT's strategy of cloud networking.  ¶35.  Indeed, although Defendants conveniently ignore it, at the end of the Class Period, GTT's own CFO—Defendant Michael Sicoli—expressly admitted that, for two full years leading up to the Interoute acquisition, Interoute had made what he called a "strategic priority shift" to make cloud services its primary business.  As a result, cloud services "was a much higher percentage [than 5%] of Interoute's sales in the year or two leading up to the acquisition," significantly disrupting the integration.  *Id.*  Defendant Sicoli's admissions were corroborated by Plaintiff's CWs—including the former CEO of Interoute Italia in charge of 30% of Interoute's business—who uniformly confirmed that the "vast majority" of Interoute's business at the time of the acquisition was devoted to cloud services and not cloud networking.

The Complaint also adequately pleads that Defendants' statements about the progress of the Interoute integration were false.  During the Class Period, Defendants stressed to investors

2

that the integration was "right on track" and meeting every preannounced milestone. ¶¶45-58. Indeed, in October 2018, Defendants proclaimed that GTT had timely achieved the "key milestone" of "cutting over" Interoute's internal sales and billing systems to GTT's proprietary Client Management Database, or "CMD," and by early December 2018, Defendants unequivocally confirmed that GTT had "completed . . . all of the integration into [CMD] and that is effectively complete." ¶160. As late as May 2, 2019, Defendants asserted that the Interoute integration was "absolutely . . . right on track with what we announced . . . a year ago." ¶58.

Just six days later, on May 8, 2019, the Company stunned the market by disclosing that "delays related to [Interoute] integration activities" had led to a dramatic revenue decline, and admitted that, in truth, the CMD "cut over" had not occurred in October 2018, nor was it "completed" in December 2018. Rather, the "real" cut over had barely just occurred in May 2019, such that GTT had only "now formally retired the major client management system that existed in Interoute." ¶¶102, 104. In direct response to these disclosures, GTT's stock price plummeted 25%, from $40.29 per share to $29.91. ¶107.

But even these disclosures concealed the full truth. Although Defendants proclaimed in May that the CMD issues were now "behind us," just three months later on August 8, 2019, Defendants again shocked investors by revealing even worse financial results that were directly attributable to significant and continuing "post-integration challenges." ¶112. Specifically, a host of CMD billing errors had forced the Company to issue millions of dollars in credits—meaning that the CMD "cut over" had still not been successfully completed. ¶¶112-13. In response, GTT's stock price collapsed, falling from $11.35 per share to $6.09 per share, a drop of almost 50%. Analysts excoriated management and their credibility, commenting that GTT's "disappointing" results were "marred by continued difficulties integrating Interoute," and that

3

management should have been "more forthcoming" about the "magnitude" of these issues. ¶115. Three months later, Defendants effectively conceded that the Interoute integration was a complete disaster: after announcing another significant revenue decline due to continuing CMD issues, Defendants stated that they had decided to sell off Interoute's huge fiber network—the key asset of the Interoute acquisition—because it was "non-strategic" to GTT. ¶120.

In their motion, Defendants ask this Court to conclude as a matter of law at the pleading stage that the Interoute integration was a stunning success, and that it proceeded on time and exactly as Defendants had said it would. Mtn. at 1, 3. Their arguments are contradicted by the facts, and utterly ignore reality. For example, Defendants' contention that their statements that cloud services comprised only 5% of Interoute's business are true is directly contradicted by: (1) the detailed accounts of over a dozen CWs; (2) the admissions by GTT's own CFO that Interoute had made a "strategic priority shift" to make cloud services Interoute's "priority" business; (3) the admissions by the same CFO that, as a result of this "strategic priority shift," cloud services was a "much higher percentage [than 5%] of Interoute's sales in the year or two leading up to the acquisition"; and (4) the fact that GTT was forced to fire no less than half of Interoute's 2,000-person workforce because they were "focused on cloud services." ¶111.

Similarly, Defendants try to rewrite their statements about the "critically important" CMD "cut over," claiming that when they said GTT had "consolidated all [of Interoute's] core business support systems to [CMD] in October," and "completed . . . all of the integration into our core [CMD] and that is effectively complete" in December, what they really meant was that the cut over was just a "single step" in a "multi-step systems integration process." Mtn. at 23. Significantly, however, one can scour the 21 exhibits Defendants attached to their motion and never find where Defendants said anything remotely like that. And Defendants' assertion

4

that the integration was completed successfully by the end of Q219 is remarkable, given that on August 9, 2019, when the Company announced its second quarter results, the Company actually announced extremely poor results that were "marred by continued difficulties integrating Interoute"; analysts attacked management's credibility, stating bluntly that Defendants "should have been more forthcoming" about those integration difficulties; the stock price was cut in half, and the Company soon was forced to sell Interoute's most valuable asset because it was not a strategic fit.  Those are not facts which scream "success."

Defendants' other arguments can be swiftly dismissed.  Predictably, Defendants contend that their misstatements were mere "puffery" (Mtn. at 3), but Interoute was by far the largest and most significant acquisition in the Company's history—indeed, Defendants themselves called it "transformative."  Defendants reinforced the significance of the Interoute transaction by specifically touting the exclusively positive integration progress, including that the integration's "critically important" milestone had been met when in reality it was not.  Rather than "puffery," Defendants' constant statements about a subject that they said was "transformative" for the Company were highly material and relied on by analysts and investors alike—as shown by the precipitous stock price decline when the truth came out.

Finally, in implicit recognition of the degree to which the Interoute integration was a disaster, Defendants argue that the Complaint alleges nothing more than "bad business," and that "real and serious business problems" are not securities fraud.  *Id.* at 1-2.  However, the Complaint specifically alleges that Defendants knew full well that the Company was plagued by these "real and serious business problems" throughout the Class Period, and that instead of disclosing this material information to investors, Defendants intentionally concealed it while publicly claiming the opposite.  This is the very definition of securities fraud.

5

## II.   THE COMPLAINT'S ALLEGATIONS

### A.   GTT Stated It Ensured "Seamless" Integrations By Acquiring Companies With The Exact Same Strategy As GTT:  Cloud Networking

GTT provides cloud networking services to multinational clients.  ¶33.  GTT's primary competitors include AT&T and Verizon, with whom it purported to compete through an aggressive "roll-up" acquisition strategy.  ¶34.  GTT touted to the market that the success of this strategy was attributable to its unique ability to "seamlessly" and "very quickly" integrate the companies it acquired—what GTT called its "core competency" that was "second to none."  *Id.*

GTT stated that this unique ability was due to two key reasons.  First, GTT would only "buy businesses that [were] strategic and [] doing exactly what we do"—*i.e.*, "providing cloud networking services to large multinational clients."  ¶35.  Indeed, GTT was crystal clear that it was "not trying to get into [selling] cloud services"—which Defendants explained were entirely "different businesses."  *Id.*  Second, Defendants stated that they would "look in diligence as to whether we can integrate [the new business] into what we call our Client Management Database," or "CMD," which was GTT's internal proprietary system that handled all customer sales and billing—what Defendants called GTT's "secret sauce."  ¶36.

### B.   Defendants Repeatedly and Falsely Told Investors That Interoute Was A "Mirror" Business That Fit GTT "Hand In Glove"

On February 26, 2018, the first day of the Class Period, GTT announced its acquisition of Interoute, a privately-held European-based telecommunications company, for $2.3 billion.  ¶38.  This acquisition was the largest and most significant in GTT's history by far.  ¶39.  Indeed, Defendants called it "transformative," as it would virtually double the Company's size and cause it to become a global market leader in the U.S. and Europe.  ¶38.

Recognizing how critical this acquisition was to GTT's long-term success, Defendants were quick to reassure investors that, despite Interoute's size, GTT's "successful, proven

integration model" would ensure the seamless integration of Interoute "within three to four quarters post-close" (or by the second quarter of 2019, the end of the Class Period)—because Interoute's business was virtually identical to GTT's. ¶¶38, 41. Indeed, throughout the Class Period, Defendants repeatedly assured investors that, as their own extensive diligence had confirmed, Interoute was a "strong strategic fit" for GTT; a "mirror business" that "fit together hand in glove" with the Company; a "highly complementary platform" that was "essentially the European version of GTT"; and a "parallel business" that did "the same thing that we do, providing cloud networking services." ¶¶124-44. As Defendant Calder explained, "[w]e sell the same services to the same type of customers," and "95% of what Interoute did was exactly what [GTT] did," *i.e.*, "the core business that we're in, cloud networking services, is very similar across the two platforms." ¶49. Analysts took great comfort in Defendants' statements, parroting Defendants' averments that "Interoute [was] a strong strategic fit" that would add to GTT's "nearly flawless [integration] record." ¶44.

### C.    Defendants' Statements About Interoute "Mirroring" GTT Were False—In Reality, The Two Companies Were "Totally Different"

Contrary to Defendants' public statements, Plaintiff's CWs uniformly stated that Interoute and GTT were fundamentally different because Interoute's primary strategy was selling cloud services—the exact business Defendants had expressly stated was non-strategic to GTT.

For example, CW 7—who served as the CEO of Interoute Italia from March 2010 to July 2018 and was in charge of 30% of Interoute's business—stated that Interoute was "completely different" from GTT because the "vast majority" of Interoute's business prior to and at the time of acquisition was selling cloud services. ¶64. CW 7 stated that, as a result, "it was completely clear from the beginning" that the "synergies" GTT had promised investors due to the businesses' purported similarities "were not reachable." *Id.* Other CWs uniformly corroborated

CW 7's description of Interoute's business. ¶¶65-71. For example, CW 15, a former Technical Specialist at Interoute and GTT, stated that the Interoute acquisition did not make sense because GTT sold cloud networking while Interoute had always sold cloud services. ¶65. Similarly, CW 10, a former Lead Solutions Consultant for Interoute and GTT, stated that contrary to Defendants' statements that "95%" of Interoute's business was cloud networking, in reality, "90 percent of [Interoute's] activity" at the time of acquisition was devoted to cloud services. ¶70.

Defendants' stunning admissions at the end of the Class Period confirmed the veracity of the CWs' statements. During the May 8, 2019 earnings call, Defendants admitted that a key reason why the Interoute integration had encountered problems was because, in the years leading up to the acquisition, Interoute had made a "strategic priority shift" to selling cloud services. ¶106. Thus, despite previously asserting that 95% of Interoute's business was "exactly" the same as GTT's—such that, at most, only 5% of Interoute's business was devoted to cloud services—Defendant Sicoli admitted that, "importantly, [cloud services] was a much higher percentage of [Interoute's] sales [than 5%] in the year or two leading up to the acquisition." *Id.*; Def. Ex. 17 at 8. Indeed, Defendants further stated on an investor call a month later that Interoute's "strategic priority shift" to cloud services had been so significant that GTT had been forced to fire 1,000 Interoute employees, or half of its total workforce. ¶111.

### D.    Defendants Falsely Assured Investors That The Interoute Integration Was "On Track" And Timely Met The "Key Milestone" Of The CMD "Cut Over"

Once the Interoute integration began, Defendants repeatedly assured investors that, based on their own personal oversight of the integration, it was "right on track" and meeting every pre-announced milestone—including the "key milestone" of the "cut over" from Interoute's legacy systems to GTT's CMD system, which meant that Interoute's legacy systems would be fully shut down and all of its billing and sales would be run out of CMD. *See* ¶¶45-58. Indeed,

8

Defendants stressed that the CMD "cut over" was "critically important" because it would allow GTT to integrate Interoute within "3 to 4 quarters, not 3 to 4 years." ¶159. Defendant Calder stated that the "cut over" would occur on October 1, 2018—and that GTT was "on track" to meet that deadline because "95%" of Interoute's business was "exactly" the same as GTT's. ¶49.

After the October 1 deadline passed, Defendants repeatedly and triumphantly affirmed that the "cut over" had been successfully achieved exactly as planned. For example, on November 8, 2018, Defendant Calder proclaimed that GTT had "consolidated all core business support systems to [CMD] in October," exactly as GTT had announced it would. ¶156. On December 4, 2018, Defendant Calder confirmed again that GTT had "completed . . . all of the integration into our core [CMD] and that is effectively complete" with "only a little bit of cleanup activity remaining"—such that Interoute's billing was now run out of CMD exclusively "and not out of any of the legacy systems." ¶160.

Defendants also stressed to investors that there had been no "surprises" with the Interoute integration. For example, at the December 4, 2018 investor conference—during which Defendants asserted that the CMD integration was "effectively complete"—Defendant Sicoli unequivocally stated that "[t]here really wasn't anything new that we found when we went through the integration," and thus it was "not a surprise that it's on track." ¶161.

E.     **Plaintiff's CWs Uniformly Stated That The Interoute Integration Was An "Absolute Nightmare" And The CMD "Cut Over" Was <u>Never</u> Completed**

Contrary to Defendants' public statements exclusively touting that the Interoute integration was going exactly to plan, Plaintiff's CWs uniformly stated that, in reality, it was an "absolute nightmare" from day one—such that the "key milestone" of the CMD "cut over" was <u>never</u> completed even months after the Class Period ended.

Plaintiff's CWs stated that GTT's pre-announced timeline for the Interoute integration

9

was clearly unrealistic from the outset.  For example CW 7, the former CEO of Interoute Italia, stated that GTT's timeline was "<u>absolutely ridiculous</u>" due to the significant differences between GTT and Interoute—and that he had directly told Calder so during a series of in-person meetings and phone conversations that took place when the acquisition was announced in February 2018 and at the outset of the integration.  ¶¶73, 74.  Other CWs confirmed that GTT's timeline was not feasible, particularly with respect to the CMD "cut over," which due to the businesses' incompatibilities "<u>wouldn't be possible to do within five years,</u>" and "<u>a six month timetable [was] absolutely impossible</u>."  ¶¶75-83.

Indeed, Plaintiff's CWs—each of whom were former Interoute or GTT employees directly involved in the Interoute integration—uniformly stated that, contrary to Defendants' public statements, the "critically important" milestone of the CMD "cut over" <u>never</u> occurred.  ¶¶84-101.  For example, CW 2, a former Regional Vice President for Strategic Accounts at GTT, stated that the Interoute integration was a "living hell" due to GTT's botched CMD "cut over," and particularly the billing component, which was an "absolute nightmare."  According to CW 2, rather than the "cut over" being completed in the fall, "[g]etting valid price quotes out the door was impossible because they were not on the CMD platforms yet"; in fact, Interoute and GTT's billing was <u>never</u> consolidated, as CW 2 fielded calls from Fortune 500 clients for a year after he left the Company in December 2018 regarding ongoing issues.  ¶85.  Similarly, CW 3, a former Interoute Field Engineering Manager, stated that when GTT attempted the "cut over" in October 2018, the problems were instantaneous— "[n]ine times out of ten [CMD] was not reachable," to the extent that "[Interoute] changed back to [its] own system to move back later on because [CMD] was not working."  CW 3 stated that, as a result, GTT's November 8, 2018 announcement that the Company had "consolidated all [of

Interoute's] core business support systems" onto CMD in October was "not a true statement," as the issues were "not solved when I stopped working [at GTT] in January [2019]." ¶87.

CW 5, a former Interoute Vice President of Commercial Operations, stated that he had weekly calls with Defendants Nomellini and Sicoli about "the problems we had with CMD, how things were misaligned, how processing was incorrect," such that when Defendant Calder told the public "[w]e have done it," CW 5 thought: "[n]o, you haven't." ¶90. CW 10, a former Lead Solutions Consultant for Interoute and GTT, similarly stated that Defendants' announcement that the CMD "cut over" was completed in the fall was not true—in reality, the cut over "had not been successful." ¶91. Finally, CW 14, a former Sales Manager for Access Point (acquired by GTT on October 1, 2018, the same day the cutover was purportedly complete), stated that senior GTT executives—including Senior VP Rob Westervelt—expressly stated during in-person meetings at Access Point in October 2018 that the Interoute integration was a "shit show," and that the Individual Defendants themselves admitted it was not going to plan, causing the Access Point integration to be put off indefinitely. ¶¶94, 95. When CW 14 read Defendants' November and December 2018 statements that the CMD "cut over" was "effectively complete" as proven by GTT's acquisition of Access Point (*see* ¶160), CW 14 laughed and said that Access Point was not integrated by even March 2019 "because of the Interoute integration issues." ¶96.

Significantly, at the end of the Class Period, Defendants themselves confirmed that their earlier statements were false. On the May 8, 2019 earnings call, Defendants admitted that, directly contrary to their prior statements, the "real" CMD "cut over" had not been completed in October 2018, nor was it "effectively complete" by December 2018—rather, it had only just occurred in May 2019, as GTT had only "now formally retired the major client management system that existed in Interoute." ¶104. Thus, rather than "a little bit of cleanup activity"

11

remaining as of December 2018, in reality, "most of the retraining of the organization [on CMD] was occurring in November, December and through the first quarter." *Id.* Moreover, on GTT's August 8, 2019 second quarter earnings call three months later, Defendants revealed that the CMD integration was <u>still</u> not complete, as significant billing issues persisted. ¶¶112, 113.

### F.      The Truth Emerges, And GTT's Stock Plummets 85%

Defendants continued to assert that GTT and Interoute were virtually identical, and that the Interoute integration was "right on track," until days before the truth was revealed. On April 29, 2019, Defendant Calder told *The Wall Street Journal* that Interoute "closely mirrors [GTT's] business" and "had a similar strategy to ours; that is, cloud networking services." ¶57. On May 2, 2019, Defendant Calder proclaimed to *Bloomberg* that the integration was "absolutely . . . right on track with what we announced when we were here a year ago." ¶58.

However, only six days later on May 8, 2019, during the Company's first quarter earnings call, Defendants revealed that the exact opposite was true. That day, Defendants announced that GTT had experienced a surprising 1% sequential revenue decline—the first since its acquisition strategy began in 2015—that was attributable to installation delays that were "related to [Interoute] integration activities." ¶102. The Interoute integration was thus not "right on track," but had proven "challenging" for the Company. ¶103. Defendants then made two stunning admissions. First, Defendants admitted that, contrary to their prior public statements, GTT had not achieved the "key milestone" of the CMD "cut over." Indeed, the "real" cut over had only just occurred—such that GTT had only "now formally retired" Interoute's systems, with employees being retrained on the new CMD system Company-wide through the first quarter. ¶104. Second, Defendants admitted that Interoute did <u>not</u> have the same "core business" strategy as GTT—instead, it had made a "<u>strategic priority shift</u>" to "selling cloud services" two years prior to the acquisition, such that <u>cloud services was "a much higher</u>

percentage" of Interoute's sales than 5% at the time of acquisition, which had severely disrupted the integration.  ¶¶105-06.  As Defendants would reveal a month later, Interoute's "strategic priority shift"—which Defendants "knew going in"—was so significant that GTT was forced to fire no less than half of Interoute's workforce, and a third of the combined entity.  ¶¶110, 111.

In response to these disclosures, GTT's stock price plunged 25%, from $40.29 to $29.91.  Analysts were shocked and commented that GTT's financial results were "disappointing given the optimistic comments made by management over the past three quarters."  ¶¶107-108.

Desperate to stem the stock price collapse, Defendants falsely claimed during the May 8, 2019 earnings call that the CMD migration was "now complete," marking "a huge victory for GTT."  ¶109.  However, on August 8, 2019, the full truth emerged.  Defendants revealed that, rather than being "complete," significant CMD billing errors had persisted unabated, causing another 3% decline in earnings.  These billing errors—the "magnitude" of which was "larger" than Defendants would "normally see"—had forced the Company to issue millions of dollars in billing credits that were "essentially 100% margin reductions to revenue in period."  ¶113.

In response to this news, GTT's stock price collapsed from $11.35 per share to $6.09 per share.  Analysts were again stunned, commenting that GTT's financial results were "marred by continued difficulties integrating Interoute" and GTT's strategy "just isn't working right now"— and that GTT "should have been more forthcoming about the impact from such issues."  ¶115.  All told, GTT's stock price fell over 85% in only three months.  ¶116.

On November 8, 2019, Defendants effectively admitted that GTT was never able to integrate Interoute.  That day, Defendants announced another significant earnings decline due to significant CMD billing issues, meaning the "cut over" was still not successful.  ¶120.  Moreover, significantly, Defendants revealed that, in order to pay down the $3.2 billion in debt

13

they had incurred from a series of unprofitable acquisitions (including Interoute), they would sell

off Interoute's huge fiber network (which GTT had spent $2.3 billion to acquire) as a "non-

strategic asset"— confirming that the Interoute integration had essentially failed.   *Id*.

## III.   ARGUMENT

### A.   Defendants Made False And Misleading Statements[2]

To allege falsity, a plaintiff need only plead "*sufficient facts* to support a *reasonable*

*belief* in the allegation that a defendant's statement was misleading." *Carlucci v. Han*, 907 F.

Supp. 2d 709, 727 (E.D. Va. 2012) (emphasis in original) (quoting *Teachers' Ret. Sys. Of La. v.*

*Hunter*, 477 F.3d 162 at 174 (4th Cir. 2007)).  The Complaint easily meets this standard here.

#### 1.   Defendants Falsely Stated GTT And Interoute Were "Mirror" Businesses With The Same Core Strategy:  Cloud Networking

During the Class Period, Defendants repeatedly and falsely represented that GTT would

seamlessly integrate Interoute despite its size because Interoute's strategy was virtually identical

to GTT's:  cloud networking.  Indeed, Defendants consistently averred that Interoute was "a

strong strategic fit"; "essentially the European version of GTT"; a "mirror business"; "very

complementary to [GTT's] strategy"'; and that the companies fit together "hand in glove"—to

the extent that "95% of what Interoute did was exactly what [GTT] did," *i.e.*, its "core business"

was "cloud networking."  ¶¶124-25, 128, 131, 134, 136, 139, 148, 166.

These statements were patently false, based on Defendants' own admissions.

Specifically, Defendants admitted at the end of the Class Period that, in truth, Interoute's "core

business" was not "exactly what [GTT] did"—to the contrary, its "strategic priority" was selling

cloud services, what Defendants themselves had called a "different business" that was not

---

[2] The Court should disregard Defendants' Exhibit 21 (ECF No. 47-21), which is a 32-page chart that makes arguments in addition to those in their brief about why Defendants believe their statements are not materially false.  Not only is this an end-run around the Court's page limitations, but Defendants' additional arguments are so vague as to be meaningless.

14

strategic to GTT. ¶¶35, 105, 106.  Moreover, while Defendant Sicoli attempted to downplay Interoute's "strategic priority shift" by claiming that cloud services was "roughly 5% of Interoute's revenue," in the next breath, he admitted that—unbeknownst to investors— "importantly, [cloud services] was a much higher percentage of [Interoute's] sales [than 5%] in the year or two leading up to the acquisition."  ¶106; Def. Ex. 17 at 8.  Indeed, Defendant Sicoli later stated that Interoute's "cloud services pivot"—which Defendants had known about "going in" (¶110)—was so significant that GTT had been forced to fire a staggering 1,000 Interoute employees, or half of Interoute's total workforce and a third of the combined entity.  ¶111.

Plaintiff's CWs uniformly confirmed that, in reality, Interoute's primary strategy was cloud services, not cloud networking.  For example, CW 7—the former CEO of 30% of Interoute's business—stated that the "vast majority" of Interoute's business prior to and at the time of acquisition was focused on cloud services, dooming the integration from the start.  ¶64. CW 10 similarly stated that the two companies sold "very different product sets"—akin to one selling "ice cream" and the other selling "trains"—because, at the time of the acquisition, Interoute had shifted "90% of [its] activity" to selling cloud services.  ¶70; *see also* ¶¶65-69.

Defendants' principal argument as to why Plaintiff has failed to plead falsity despite these damning facts is that their statements that "95%" of GTT and Interoute's businesses were "exactly" the same were "undeniably" true.  Mtn. at 12-16.  However, Defendants' sole basis for this assertion is the content of the challenged statements themselves.  Indeed, Defendants wrongly assert that Plaintiff has "conced[ed]" that "there was a 95% overlap in GTT's and Interoute's businesses," *Id.* at 12, but Plaintiff has done nothing of the sort.  To the contrary, the Complaint expressly alleges, based on Defendants' own admissions, that cloud services was in truth a "much higher percentage" than 5% of Interoute's business at the time of the acquisition—

so much higher that it forced GTT to fire half of Interoute's total workforce and significantly derailed the integration. *See* ¶¶105, 106; 110, 111. Former high-level CWs—including the former CEO of 30% of Interoute's business—confirmed that Interoute's business was "completely different" because the "vast majority" was devoted to cloud services. ¶64.

Defendants' argument that Interoute's "strategic priority shift" to cloud services was "immaterial" as a matter of law because it only impacted 5% of Interoute's business fails for similar reasons. Mtn. 13-14. First, "[m]ateriality is ordinarily a question of fact for the jury." *S.E.C. v. Staples*, 55 F. Supp. 3d 831, 837 n.6 (D.S.C. 2014). Moreover, as set forth above, the Complaint clearly alleges that Defendants' statement that only 5% of Interoute's business was devoted to cloud services was demonstrably false, based in large part on Defendants' own admissions at the end of the Class Period. Indeed, Defendants fail to explain why—if cloud services was such a *de minimis* portion of Interoute's business—they characterized it as a "strategic priority shift" that caused cloud services to be a "much higher percentage" of Interoute's sales at the time of the acquisition, or why it would have forced GTT to fire half of Interoute's 2,000-person workforce and completely derailed the integration. These facts strongly belie any notion that Interoute's "strategic priority shift" was immaterial to GTT.

Nor is it of any moment, as Defendants argue, that certain public disclosures—including the challenged "95%" disclosure—mentioned that Interoute offered some cloud services. Mtn. at 13-14. Indeed, this argument misapprehends the Complaint. Plaintiff does not allege that investors were misled because they were unaware that Interoute offered some cloud services. Rather, Plaintiff alleges that Defendants misled investors by averring that "95%" of the two businesses had the "exact" same "core business" of cloud networking when. in reality, Interoute had made a "strategic priority shift" to selling cloud services such that it was a "much higher

16

percentage" of its sales [than 5%] at the time of acquisition—a fact Defendants do not dispute they failed to disclose.[3]   Mtn. at 14.   Having chosen to repeatedly speak about Interoute's strategic similarities to GTT, Defendants were obligated to tell the whole truth, including that for years prior to the acquisition, Interoute's "strategic priority" was completely antithetical to GTT's. *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 135 S. Ct. 1318, 1331 (2015) ("[L]iteral accuracy is not enough:  an issuer must as well desist from misleading investors by saying one thing and holding back another"); *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.") (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)).

Defendants attempt to sidestep this issue by asserting that the securities laws do not require them to "pejoratively characterize" Interoute's focus on cloud services as a "strategic priority shift."   Mtn. at 14.   However, Defendants ignore that it was Defendants who expressly did characterize Interoute's business that way at the end of the Class Period, based on the fact that, as Defendants admitted, cloud services was a "much higher percentage" than 5% of Interoute's sales at the time of acquisition—a fact that they never told investors.[4]

---

[3] Defendants' attempt to assert a "truth on the market" defense fails.  Defendants cannot claim that they "convey[ed] [the] corrective information to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements" because they never disclosed that Interoute had made a "strategic priority shift" to cloud services or that it was a "much higher percentage" of its sales at the time of acquisition.  *KBC Asset Management NV v. 3D Systems Corp.*, 2016 WL 3981236, *11 (D.S.C. July 25, 2016).  Moreover, "the truth on the market defense is intensely fact-specific and is rarely an appropriate basis" for dismissing a securities fraud complaint.  *Id.*

[4] Defendants' cases are distinguishable for this reason.  Mtn. at 14.  In each of *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998), *Augenstein v. McCormick & Co.*, 581 F. Supp. 452, 458 (D. Md. 1984) and *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994), the court found that defendants had accurately disclosed all relevant facts and were not obligated to "pejorative[ly] characterize" them.  The Complaint here alleges that

17

Defendants' attempt to undermine Plaintiff's CWs, who uniformly attested to Interoute's strategic focus on cloud services, is also without basis. Defendants assert that "the majority" of Plaintiff's CWs are insufficient because they were "low level" employees that "lack a broad enough perspective of the industry or of GTT's business to evaluate whether GTT's and Interoute's businesses were similar."[5] Mtn. at 14. This is nonsense. Rather than "low level," the "majority" of Plaintiff's CWs held unquestionably high-level positions, as they include former Executive Vice Presidents, Vice Presidents, Regional Vice Presidents and Senior Directors of GTT and Interoute (*see* ¶60)—in addition to CW 7, who was the former CEO of 30% of Interoute's business and also in charge of Interoute's prior customer relationship with GTT. ¶63. It is hard to imagine a CW who could have had a "broad[er] perspective of the industry or of GTT's business," or who would have been in a better position to know the differences between the two entities. Moreover, CW 7's description of Interoute's business was uniformly corroborated by numerous other CWs—and by Defendants' own admissions. ¶¶65-71, 105-106. *See Martek*, 2006 WL 8435572, at *5 n.13 ("the witnesses' interlocking and corroborating accounts add support to the reliability of the statements").

Defendants' assertion that Plaintiff's CWs' statements were mere "opinions" because the CWs held positions that would give them only limited knowledge of Interoute's business

---

Defendants failed to disclose the fact that Interoute made a "strategic priority shift" to cloud services such that it was "a much higher percentage" than 5% at the time of acquisition.

[5] Plaintiff's CWs easily meet the pleading standard prescribed in *Teaches' Ret. Sys. Of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007). Mtn. at 14. The Complaint alleges in detail each CW's position as a former employee of Interoute or GTT during the Class Period, which unquestionably "support[s] the probability that the [CWs] would possess the information alleged." *See id*; *see also Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 n.13 (D. Md. June 14, 2006) ("[e]ach witness statement is pled with the requisite particularity as each witness's position with the Company, location and duration of employment" was alleged).

18

therefore falls flat. Mtn. at 15. Again, CW 7 was the CEO of 30% of Interoute's business. Rather than "speculation" or "opinion," CW 7 unquestionably had direct factual knowledge of what the "vast majority" of Interoute's business consisted of.[6] ¶64, Mtn. at 15. Furthermore, as stated above, Plaintiff's CWs—regardless of their position or whether they had worked for GTT or Interoute—uniformly stated that Interoute was primarily a "cloud services" company, which was confirmed by Defendants themselves at the end of the Class Period. Tellingly, Defendants' sole basis for disputing the CWs' accounts is again their own Class Period assertion that only 5% of Interoute's business was devoted to cloud services, which they claim is an "undeniable fact" simply because they said so. Aside from the fact that the Complaint clearly adequately alleges that this statement was false, Defendants' attempts to factually dispute the CWs' detailed accounts should not be credited by this Court on a motion to dismiss. *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 669 (D.S.C. 2016) (rejecting Defendants' disputes of CW accounts on a motion to dismiss because "all that is necessary at this stage is whether Plaintiff has alleged sufficient facts that, if true, would form a basis for relief").

Finally, Defendants' statements asserting that Interoute and GTT were "parallel" businesses that "mirrored" each other were not, as Defendants contend, immaterial puffery. Mtn. at 15-16. The Fourth Circuit has instructed that when determining whether a statement is "puffery," the "context" of the statement matters—and if the statement is "both factual and material," it is actionable. *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618

---

[6] Defendants' cases are distinguishable. Mtn. at 15. In *City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. Appx 83, 85 (2d Cir. 2010), the court discounted CW "opinion" statements about defects in a clinical trial because plaintiffs provided no "factual underpinnings," and in *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007), the court discounted the CWs' speculation about what management knew. Here, the Complaint clearly alleges the "factual underpinnings" of CW 7's statements about Interoute's business.

(S.D.W.V. 2012) (citing *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).   Here, Interoute was indisputably the largest and most critical acquisition in GTT's history.   In recognition of this, Defendants repeatedly reassured investors that GTT's integration of Interoute would be quick and seamless <u>because</u> Interoute and GTT "mirrored" each other and fit together "hand in glove." *See* ¶¶41, 42.  Moreover, Defendants specifically explained what they meant by these statements:  that Interoute and GTT sold "the same services to the same type of customers" (¶41) and had the "exact" same strategy, such that 95% of their respective "core businesses" focused on cloud networking.  ¶49.  These were factual and material statements relied upon by investors—*see* ¶44 (analysts parroted Defendants' statements about the companies' "strong strategic fit")—that were shown to be objectively false when Defendants revealed that, in truth, Interoute had made a "strategic priority shift" to selling cloud services.  Under these circumstances, Defendants' statements cannot be characterized as mere puffery. *See Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (statement that "the combined companies fit perfectly together" was not puffery where analysts relied on it).

### 2.   Defendants Falsely Stated The Integration Was "On Track" And Achieved Its "Key Milestone" Of The CMD "Cut Over"

Throughout the Class Period, Defendants repeatedly claimed that the Interoute integration was "on track" and meeting every pre-announced milestone (¶¶45-58)—including the "key milestone" of the CMD "cut over," which was scheduled for October 1, 2018, ¶¶49, 153, and which Defendants had stressed to investors was "critically important" because it would allow GTT to integrate Interoute in "3 to 4 quarters, not 3 to 4 years." ¶159.  Once the October 1, 2018 deadline passed, Defendants triumphantly proclaimed that the CMD "cut over" had been achieved exactly as planned, with no "surprises"—such that by December 4, 2018, <u>GTT had</u> <u>"completed . . . all of the integration into [CMD] and that was effectively complete."</u>  ¶¶152-165.

20

In February 2019, Defendants unequivocally confirmed again that "all [of Interoute's] ordering, installation, billing and financial transactions [were] now in GTT's systems." ¶164.

The truth was exactly the opposite. As Defendants admitted on May 8, 2019, the CMD "cut over" was not achieved by October 2018, nor was "all of the [CMD] integration" complete by December 2018—to the contrary, the "real" cut over had just occurred that month, such that GTT had only "now formally retired" Interoute's legacy systems and employees were still being "retrained" on the combined system "in November, December and through the first quarter." ¶¶102-104. Moreover, despite unequivocally claiming on May 8 that the CMD integration was "now complete" (¶109), three months later on August 8, 2019, Defendants admitted that, in truth, it still was not complete and was causing a host of persistent billing issues. ¶¶112-113. Indeed, even months after the Class Period on November 8, 2019, Defendants announced that numerous issues with the CMD "cut over" continued unabated—and significantly, that GTT had decided to sell off Interoute's huge fiber network, the main asset of the acquisition, which Defendants now called "non-strategic" to GTT. ¶120. In other words, the Interoute integration had failed.

Plaintiff's CWs—all of whom were high-level former employees of GTT or Interoute with direct knowledge of the Interoute integration—unanimously confirmed that, contrary to Defendants' public statements, the integration was not "on track" at any point, and that the "key milestone" of the CMD "cut over" was never met. For example, at the exact same time Defendants were proclaiming that the CMD "cut over" had been achieved in October 2018 and was "effectively complete" in early December 2018, Plaintiff's CWs stated that, in reality, the botched CMD "cut over" had created a "living hell" at Interoute because it was "impossible" to get valid price quotes, a problem that was not resolved even by December 2019 (¶85); "[n]ine times out of ten, [CMD] was not reachable," and as a result Interoute gave up on CMD

21

altogether and went back to its old system (¶87); and that, during in-person meetings in October 2018, high-ranking GTT executives called the Interoute integration a "shit show," while the Individual Defendants themselves directly admitted it was not going to plan. ¶¶94, 95.

Defendants' main argument in the face of these compelling allegations is again that their statements that the Interoute integration was "right on track"—and that the critical CMD "cut over" was achieved in October 2018—were true. This argument fails. *First*, Defendants' assertion that the integration was "on track" because it was successfully completed on time by the second quarter of 2019 (Mtn. at 17, 22) is demonstrably false. On August 8, 2019, the Company announced exactly the opposite—namely, poor results that were directly caused by continuing CMD integration issues, with analysts specifically noting that GTT's financial results were "marred by continuing difficulties integrating Interoute" and that GTT "should have been more forthcoming" about the impact of such issues on the Company. Moreover, as the Complaint clearly alleges, the Interoute integration was never completed—to the extent that Defendants were forced to sell off Interoute's main asset shortly after the Class Period because it was "non-strategic" to GTT. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129 at *20 (N.D. Cal. Mar. 21, 2018) ("[p]laintiffs have shown through [d]efendants' admissions and the accounts of their CWs that any such plan was not 'complete' and the company was not 'fully integrated'").

*Second*, Defendants wrongly assert that their statements about the CMD "cut over" were true because they never told investors that it was a "key milestone" at all. Defendants defy reality and claim that, instead, they told investors that the cut over was merely an inconsequential "single step" in a "multi-step" process that referred to nothing more than the "import of Interoute data" into CMD—regardless of whether that "import" was successful or resulted in a functioning

22

combined system—which Defendants say "indisputably occurred in October 2018." Mtn. at 23. This argument fails because that is not anything close to what Defendants actually said. Indeed, one could scour Defendants' SEC filings for days and never find where Defendants said that the "critically important" CMD "cut over" was nothing more than a "single step" in a "multi-step" process, nor where they even specified what the other purported "steps" would involve. To the contrary, Defendants expressly represented that the CMD "cut over" was a "key milestone" that, after it had been purportedly achieved, resulted in "all [of Interoute's] ordering, installation, billing and financial transactions" being successfully run out of CMD. ¶164.

Moreover, Defendants' assertion that they fully disclosed the significant problems with the CMD "cut over" because they stated on December 4, 2018 that it was "effectively complete" with "a little bit of cleanup activity remaining" borders on the absurd. Mtn. at 23. Not only does this disclosure fail to counteract Defendants' unequivocal averment hat GTT had "completed . . . all of the integration into [CMD]" such that Interoute's billing was being exclusively and successfully operated out of CMD (¶160), it is false. Defendants admitted at the end of the Class Period that, in truth, the "real" cut over had barely occurred in May 2019, such that a massive retraining of the organization was still ongoing through the first quarter. ¶104.[7]

Nor can Defendants claim with a straight face that such information was "trivial" to investors, amounting to a "minor bump along the road." Mtn. at 22. To the contrary, Defendants expressly instructed investors that the CMD cutover was a crucial integration milestone. Thus, any significant challenges Defendants faced with regard to reaching that milestone—including failing to reach it at all—were unquestionably material to investors. *Roofer's Pension Fund v.*

---

[7] Defendants misleadingly suggest that they disclosed in December 2018 that this "cleanup activity" would involve employee retraining in "November, December and through the first quarter of 2019." *See* Mtn. at 23. Not so. Defendants did not disclose that this massive retraining effort had been necessary until the truth began to emerge in May 2019. ¶104.

*Papa*, 2018 WL 3601229, at \*14 (D.N.J. July 27, 2018) ("disclosure of the known impediments to successful integration would have significantly altered the mix of information available to a reasonable investor").  Moreover, Defendants, having chosen to speak about the progress of the CMD "cut over," were obligated to tell the whole truth:  that, in reality, the "cut over" was impeded by significant challenges and not yet complete.  *Singer*, 883 F.3d at 440.

Defendants' argument that their statements about the integration being "on track" amounted to immaterial "puffery" fails for similar reasons.  Mtn. at 18-20.  The $2.3 billion acquisition of Interoute was, by Defendants' own description, "transformative"—meaning that "[r]epresentations about the integration efforts and performance would therefore have a profound significance to investors."  *Public Employees' Ret. Sys. Of Miss. v. Treehouse Foods, Inc.*, 2018 WL 844420, at \*2 (N.D. Ill. Feb. 12, 2018).  Moreover, this is not a case where, as in *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359 (E.D. Va. Aug. 27, 2018) (cited at Mtn. 19-20), Defendants' "on track" statements "reflected a subjective, less than certain assessment."  *Id.* at \*13.  To the contrary, Defendants told investors exactly what they meant by "on track":  that the "critically important" CMD "cut over" had timely occurred in October 2018, such that the integration would be fully completed by the second quarter of 2019.  In reality, however, the exact opposite was true:  the CMD "cut over" had failed, turning the integration into an "absolute nightmare" where nothing was going to plan.  In these circumstances, courts have uniformly held that defendants' statements that an integration is "on track" are actionable.  *KBC*, 2016 WL 3981236, at \*8 (statement that "[t]he integration is going extremely well" was false); *Extreme Networks*, 2018 WL 1411129, at \*\*17-18 (statement that integration was "exactly where [defendants] planned to be" actionable where it was "directly at odds with the accounts of the CWs"); *Galestan*, 348 F. Supp. 3d at 303 ("Defendants offered more than 'rosy predictions'

24

because they stated that integration was going smoothly" while being aware of information "that contradicted their public representations").[8]

Additionally, Defendants' "on track" statements are not "forward-looking" statements protected by the PSLRA safe harbor. Mtn. at 16, 20-21. To the contrary, and as courts have consistently held, such statements are actionable because they convey information about "the current state of the integration efforts." *In re Akorn Secs. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017); *see also Extreme Networks*, 2018 WL 1411129, at \*18 ("'on track' statements are not forward-looking because they convey the current state of affairs"); *Papa*, 2018 WL 3601229, \*15 ("[d]efendants cannot rely on safe harbor to shield themselves from liability for statements such as . . . 'we . . . are in line with our going online integration process' [and] 'Perrigo has delivered on our integration plans'").

Even if Defendants' statements were forward-looking, Defendants cannot credibly claim to have provided any "meaningful cautionary language" because, as Plaintiff's CWs uniformly stated, the Interoute integration was an "absolute nightmare" from day one—*i.e.*, any warned-of risks had already transpired. Indeed, nowhere did Defendants warn of the significant challenges they were currently facing, or that the "key milestone" of the CMD "cut over" had not in fact occurred. *E.g.*, *Nash*, 502 F. Supp. 2d at 873 (no "meaningful cautionary language" where "defendants [knew] that the potential risks they [had] identified in connection with integration had "in fact already occurred"); *Singer*, 883 F.3d at 442 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's

---

[8] *See also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (statement that "a majority of the physical network interconnections are completed" "cross[ed] the line" from puffery to "objectively verifiable matters of fact"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 878-79 (D. Minn. 2007) ("[o]ur integration plan is proceeding on schedule" not puffery because defendants made "specific representations about the procession of the integration").

calculations of probability.").[9]

Defendants' assertion that Plaintiff alleges nothing more than "mismanagement" is also without merit, and fundamentally misapprehends the Complaint. Mtn. at 24-25. The crux of the Complaint is not that Defendants mishandled the Interoute integration, but that Defendants made false and misleading statements claiming that the Interoute integration was going exactly to plan when they knew the opposite was true. This is fraud. *KBC*, 2016 WL 3981236, at *7 (securities fraud alleged where "3D Systems allegedly mismanaged things like inventory control and product quality," but "then purportedly misrepresented the state of those affairs to investors").

Defendants' argument that Plaintiff has pleaded nothing more than "fraud by hindsight" fares no better. Mtn. at 25-26. Defendants' reliance on their self-serving characterization of their revelations at the end of the Class Period as "post-integration issues" to support this argument is sorely misplaced. *Id.* Defendants did not reveal that they had run into new and unforeseen "post-integration" problems at the end of the Class Period. To the contrary, they revealed that the integration had been "challenging" due to Interoute's "strategic priority shift" to cloud services that occurred two years prior to the acquisition, and that the "key milestone" of the CMD "cut over" that Defendants previously claimed had been met in October 2018 was in fact never achieved. In other words, Defendants admitted that the true state of affairs at the time of their public statements was materially different from what they had represented.

Moreover, contrary to Defendants' assertions, it was not at all "obvious" to investors that

---

[9] Even "forward-looking" statements are not protected by the safe harbor when they are made with actual knowledge of falsity. Mtn. at 17; *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *7 (D.S.C. Mar. 29, 2019). Defendants had actual knowledge of the falsity of their statements here, even those pertaining to their statements that the integration would be complete by the second quarter of 2019 (which was another way of saying it was "on track"). Indeed, CW 7, the former CEO of 30% of Interoute's business, directly told Defendant Calder that the integration timelines GTT had announced were "absolutely ridiculous" in a series of in-person and phone conversations. ¶¶73-74. Other CWs uniformly confirmed this was the case. ¶¶75-83.

26

the Interoute integration would fail. *See* Mtn. at 25. Indeed, due to Defendants' representations about the integration's "critically important" milestone being timely met, investors had the exact opposite impression—that the integration had been "seamless." This was borne out by GTT's precipitous stock price decline and analysts' expressions of utter shock when the truth came out. *KBC*, 2016 WL 3981236, at *6 ("the negative market reaction to the disclosures made by 3D Systems . . . supports the conclusion that these misrepresentations were material").

Finally, Defendant' desperate attempt to undermine Plaintiff's CWs' detailed accounts of the failure of the Interoute integration is ineffective. Defendants cherry-pick a few statements from three out of fifteen CWs to argue that Plaintiff's CWs expressed nothing more than mere "opinions" about the failure of the CMD "cut over."[10] Mtn. at 26-27. In so doing, Defendants effectively concede that Plaintiff's remaining CWs—who unquestionably had direct, firsthand knowledge of the CMD integration due to their high-level positions at either GTT or Interoute during the Class Period—were well-pled and should be credited by the Court.

### B.     The Complaint Pleads A Strong Inference Of Scienter

A complaint pleads scienter by alleging "facts that constitute circumstantial evidence of either reckless or conscious behavior." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *SEC v. Pirate Inv'r, LLC*, 580 F.3d 233, 243 (4th Cir. 2009).

---

[10] Even these attacks are without merit. Defendants fault CW 5 for calling CMD "clunky," but ignore CW 5's detailed account of significant CMD issues that he directly discussed with Defendants Nomellini and Sicoli. ¶90. CW 1's statements were based on his conversations with former Interoute colleagues who described significant CMD billing issues through October 2019 (¶100)—a fact Defendants themselves confirmed during the November 8, 2019 earnings call. Finally, CW 7 left Interoute in the midst of the integration, but still received calls from Interoute customers about persistent CMD billing issues that Defendants themselves admitted to. ¶101.

27

Remarkably, <u>Defendants do not challenge scienter in their motion</u>, thereby conceding that the Complaint adequately alleges that Defendants made their public statements about the strategic similarities between GTT and Interoute and the progress of the Interoute integration with reckless disregard of their falsity. Indeed, the Complaint is replete with facts raising a strong inference of scienter, including Defendants' own admissions of their direct involvement in the Interoute integration. ¶¶175-187. For example, Defendants admitted at the end of the Class Period that they "knew going in" about Interoute's "strategic priority shift" to cloud services, ¶177, and repeatedly emphasized that they personally conducted due diligence on Interoute and were spending weeks at time at Interoute's offices to personally oversee the integration. ¶178. Plaintiff's CWs confirmed Defendants' intimate knowledge of problems with the integration, describing numerous in-person and phone conversations with the Individual Defendants during which they were either directly told or themselves expressed knowledge that the integration was not going to plan. ¶¶178-181. The Complaint adequately pleads Defendants' scienter.

### C. The Complaint Adequately Pleads Loss Causation

To plead loss causation, a complaint need provide only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The key inquiry is "whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Singer*, 883 F.3d at 446. So long as a complaint's allegations are not "facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *Kiken*, 155 F. Supp. 3d at 609.

The Complaint adequately pleads loss causation here. The Complaint alleges that on May 8, 2019, Defendants revealed, for the first time, that rather than being exactly "on track," the Interoute integration had proven "challenging" for the Company—such that the "critically important" CMD "cut over" was not achieved in October 2018, nor was it "effectively complete"

28

by December 2018.  ¶¶102-104.  Rather, the "real" cut over had only barely occurred, causing significant "installation delays" and an unexpected revenue decline.  *See id.*  Defendants also admitted that rather than Interoute having the same "core business" as GTT, in reality, Interoute had made a "strategic priority shift" to cloud services such that it was a "much higher percentage" than 5% of Interoute's sales at the time of the acquisition.  ¶¶105-106.  In response, GTT's stock plummeted 25%, from $40.29 to $29.91 per share.  ¶107.  Analysts were shocked by this "surprising" and "unexpected" news, commenting that it was particularly "disappointing given the optimistic comments made by management over the past three quarters."  ¶108.

While Defendants claimed during the May 8 earnings call that the CMD issues were now "behind us," ¶109, on August 8, 2019, the full truth emerged.  Defendants reported another unexpected revenue decline due to a host of continuing issues with the botched CMD migration, which forced GTT to issue millions of dollars in billing credits.  ¶113.  In response, GTT's stock price was practically halved, collapsing from $11.35 per share to $6.09 per share.  ¶114. Analysts were again stunned, lamenting that GTT's results were "marred by continued difficulties integrating Interoute" and that management had not been "more forthcoming about the anticipated impact from such issues"—and concluding that GTT's acquisition strategy "just isn't working."  ¶115.  All told, GTT's stock price lost 85% of its value in only three months.

Defendants' main argument as to why these allegations fail to plead loss causation is that GTT revealed no "new news" in these disclosures because investors already knew that 5% of Interoute's business was devoted to cloud services.  Mtn. at 28.  Defendants' argument misses the mark.  The Complaint clearly alleges that Defendants' statement that "95%" of the two businesses overlapped was false.  In reality, Interoute had made a "strategic priority shift" to cloud services such that it was a "much higher percentage" than 5% of Interoute's business at the

29

time of the acquisition—and that is precisely what GTT's own CFO admitted on May 8, 2019. ¶106, Def. Ex. 17 at 8 (stating that "<u>today</u>" cloud services was "roughly 5%" of Interoute's revenue "<u>but importantly, it was a much higher percentage</u>" at the time of the acquisition).

Defendants also revealed that the "key milestone" of the CMD "cut over" had never actually occurred, followed by Defendants' admission on August 8, 2019 that the CMD issues were not "behind us" and had continued unabated. While Defendants assert that the Interoute integration had nonetheless been successfully completed because they said so on the August 8, 2019 call, Mtn. at 29, by this point, investors understood the truth: <u>the Interoute integration was failing</u>. Indeed, Defendants' assertions that these disclosures revealed nothing new or material is directly belied by analysts' utter shock and GTT's 85% stock price decline. *Singer*, 883 F.3d at 447 (40% stock price decline was "wholly adequate to demonstrate that the exposure of the Company's fraud was at least one substantial cause of the investment's decline in value").

Defendants further assert that to the extent the corrective disclosures revealed any "challenges," they were "related to network installations, billings and collections" and not the Interoute integration. Mtn. at 29-30. This is flatly contradicted by the content of the corrective disclosures themselves, in which Defendants expressly stated that these issues were directly attributable to the botched Interoute integration. ¶¶102, 113. Analysts understood as much, as they specifically called out "difficulties integrating Interoute" and management's failure to be "more forthcoming" about those difficulties. ¶¶108, 115.

IV.    **CONCLUSION**[11]

For all of these reasons, Defendants' motion should be denied in its entirety.

---

[11]  Plaintiff's Section 20(a) claim also survives, as "a Section 20(a) claim will . . . stand or fall based on the court's decision regarding the Section 10(b) claim." *Kiken*, 155 F. Supp. 3d at 609. Because "Plaintiff[] [has] adequately pled that a primary violation exists under §10(b), Plaintiff['s] claim under §20(a) stands as well." *Id.*

Dated: May 22, 2020

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Lester R. Hooker (*pro hac vice*)
Dianne M. Pitre (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel: (561) 206-6708
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

Steven B. Singer (*pro hac vice*)
Kyla Grant (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Lead Counsel for Lead Plaintiff*

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
*Liaison Counsel for Lead Plaintiffs*

32