## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, and GINA NOMELLINI,<br><br>Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
## MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................3

I.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR
     OMISSION ..................................................................................................................3

     A.   Plaintiff Fails to Respond to Defendants' Showing That GTT Integrated
          Interoute Within Three to Four Quarters Post-Close. ..........................................3

     B.   Defendants' Statements Concerning Whether the Integration Was "On
          Track" Are Not Actionable. ..................................................................................4

     C.   Defendants' Statements Concerning Similarities Between GTT and
          Interoute Are Not Actionable. .............................................................................10

II.  PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ..................................................16

CONCLUSION.......................................................................................................................19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561
F. Appx. 598 (9th Cir. 2014) ..................................................................................10

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................15

*Borow v. nVIEW Corp.*, 829 F. Supp. 828 (E.D. Va. 1993)..........................................19

*Carlucci v. Han*, 886 F. Supp. 2d 497 (E.D. Va. 1993) ................................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d
Cir. 2014)..................................................................................................................18

*Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope,
Inc.*, No. 5:10-CV-00062-RLV, 2013 WL 4014978 (W.D.N.C. Aug. 6, 2013)......9

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772 (D. Md. 2010) .........4

*Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........6, 15

*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) ................................4

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994) ........ 5, 12, 15

*In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749 (E.D.Va. 2004) ...........................14

*In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670 (C.D.
Cal. Aug. 21, 2009) ................................................................................................10

*In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL
1411129 (N.D. Cal. Mar. 21, 2018) .........................................................................6

*In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597 (S.D.W. Va. 2012)...........15

*In re Maximus, Inc. Sec. Litig.*, 117CV0884AJTIDD, 2018 WL 4076359 (E.D.
Va. Aug. 27, 2018) ................................................................................................5, 6

*In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007) ............18

*In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) ......................13

*Kas v. First Union Corp.*, 857 F. Supp. 481 (E.D. Va. 1994) ........................................9

*Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011)............................. 8, 16, 17, 18

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 0:15-CV-02393-MGL, 2016 WL 3981236
(D.S.C. July 25, 2016) ...................................................................................................6

*Kemp v. Universal Am. Fin. Corp.*, No. 05-CV-9883, 2007 WL 86942 (S.D.N.Y.
Jan. 10, 2007) ...............................................................................................................10

*Kissi v. Panzer*, 664 F. Supp. 2d 120 (D.D.C. 2009) .....................................................4

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) .....................................5, 15

*Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2012 WL 259951 (M.D.N.C.
Jan. 27, 2012) .................................................................................................................3

*Pub. Emps.' Ret. Sys. Of Miss. v. Treehouse Foods, Inc.*, No. 16 C 10632, 2018
WL 844420 (N.D. Ill. Feb. 12, 2018) ............................................................................6

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ................... 3, 13, 18

**Other Authorities**

*Integrate*, *Oxford English Dictionary* (3d ed. 2020),
www.oed.com/view/Entry/97353 (last visited May 28, 2020) ..................................7

*On Track*, *Collins English Thesaurus* (2016),
https://www.collinsdictionary.com/us/dictionary/english-thesaurus/on-track
(last visited Jun. 2, 2020) ...............................................................................................4

## PRELIMINARY STATEMENT

Plaintiff's opposition brief ("Pl. Br.") confirms that the Complaint should be dismissed in its entirety as a matter of law:

*First*, Defendants showed in their Opening Brief ("MTD") that GTT integrated Interoute within four quarters after the acquisition closed, rendering true (and not misleading) GTT's prediction that it would integrate Interoute within three to four quarters post-close. Plaintiff does not respond to that showing. As a result, any claim based on statements predicting the duration of the Interoute integration must be dismissed. (Part I.A.)

*Second*, after tacitly conceding that the Interoute integration was completed on time, Plaintiff claims that GTT misled investors when it said that the integration was "on track". But that fails as a matter of logic: an integration that finishes on time was, in fact, "on track". To the extent Defendants' "on track" statements could be read to mean something more than "on time", they were inactionable puffery, as courts in this Circuit have previously found.

Recognizing the problems with the theory espoused in the Complaint, Plaintiff shifts course, arguing that the "on track" statements were misleading because a "CMD cutover" did not take place in October 2018 as announced, but rather was not completed until May 2019. Plaintiff's new argument fails for many reasons, including that (i) the majority of Defendants' "on track" statements were not about the CMD cutover at all, but instead expressed Defendants' views only on the Interoute integration as a whole; (ii) Plaintiff is simply confused—the CMD cutover *did* take place in October 2018, but other parts of the integration continued into 2019, as Defendants consistently disclosed, and as Plaintiff's own confidential witnesses ("CWs") confirmed; and (iii) the status of a single discrete interim initiative conducted as part of the larger integration is immaterial as a matter of law. Plaintiff's CWs cannot create a fact issue here

because, among other reasons, ***they confirm that the CMD cutover happened in October***, as disclosed.  (Part I.B.)

*Third*, Plaintiff argues that Defendants misdescribed similarities between Interoute and GTT.  But, as Plaintiff's own alleged corrective disclosure makes clear, 95% of the companies' revenues came from overlapping products at the time of the acquisition, making GTT's statement that the companies operated mirror businesses entirely accurate.  Plaintiff resorts to mischaracterization—going so far as to use brackets to rewrite what Defendants actually said—in an attempt to manufacture a misstatement where none exists.  Specifically, Defendant Sicoli never made the statement, repeated five times in Plaintiff's brief, that cloud services "was a much higher percentage [than 5%] of Interoute's sales in the year or two leading up to the acquisition".  The bracketed language was invented by Plaintiff and dramatically changes the meaning of the sentence.  Mr. Sicoli actually said that cloud services comprised "***roughly 5% of revenue—of their revenue***.  So it's less than 5% of our combined revenue today.  But importantly, it was a much higher percentage ***of their sales*** in the year or 2 leading up to the acquisition".  The actual quote, which, again, is Plaintiff's alleged corrective disclosure, demonstrates that GTT and Interoute earned 95% of their revenue from the same business lines, *even despite* Interoute's recent strategic shift to focusing on selling cloud services.  Defendants' statements were not false or misleading.  The precise words Defendants used to describe the facts—such as "mirror businesses" and "hand in glove"—are immaterial puffery.  (Part I.C.)

*Fourth*, Plaintiff's misstatement theory forecloses loss causation as a matter of law.  Loss causation requires a disclosure of new information that corrects ***the statements alleged to be fraudulent***; here, Plaintiff alleges misstatements concerning the date the CMD cutover occurred, and the similarity (or lack thereof) between GTT and Interoute.  But the

2

alleged May 8, 2019 corrective disclosure did not reveal that the CMD cutover had not in fact occurred in October, and it *affirmed*, rather than corrected, the Company's prior statement that 95% of the companies' revenues overlapped.  The alleged August 8, 2019 corrective disclosure said nothing at all about the CMD cutover, or the similarities between the companies at the time of the acquisition.  The August disclosure concerned *post-integration* issues that the combined company had experienced, which does not match (let alone correct) the fraud alleged in the Complaint.  A fully integrated company can still experience business problems and, contrary to Plaintiff's theory, Defendants do not need to show that the acquisition of Interoute was a "stunning success" to avoid liability for securities fraud.  (Part II.)

## ARGUMENT

## I.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR OMISSION

In their Opening Brief, Defendants explained how each of the alleged misstatements across three categories—(i) predictions that the Interoute integration would be completed in three to four quarters post-close; (ii) descriptions of the integration timing as "on track" towards completion and (iii) descriptions of the similarities between GTT and Interoute— were inactionable.  Plaintiff's opposition fails to show otherwise.[1]

### A.   Plaintiff Fails to Respond to Defendants' Showing That GTT Integrated Interoute Within Three to Four Quarters Post-Close.

In their Opening Brief, Defendants demonstrated that statements predicting the completion of the Interoute integration within "three to four quarters post-close" are not

---

[1] Plaintiff's argument regarding scienter is a red herring.  Because Plaintiff has not alleged any actionable misstatement or omissions, the Court need not reach scienter to dismiss the Complaint at the pleading stage; indeed, "[i]f there were no false statements, there can be no scienter." *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2012 WL 259951, at *5-*6 (M.D.N.C. Jan. 27, 2012) (citing *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).)

3

actionable because GTT did, in fact, complete the Interoute integration within the time period predicted.  (MTD 16-18.)  Plaintiff never responds to those arguments, thus conceding them.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (holding that, by failing to respond to defendant's argument that her claim should be dismissed, plaintiff abandoned her claim); *Kissi v. Panzer*, 664 F. Supp. 2d 120, 123 (D.D.C. 2009) ("Because the plaintiff's opposition fails to address the defendants' arguments, the Court may treat the defendants' motion as conceded.").  All claims based on statements predicting the timing to complete the Interoute integration must be dismissed.  (Compl. ¶¶ 123, 124, 128, 131, 140, 156.)

**B.      Defendants' Statements Concerning Whether the Integration Was "On Track" Are Not Actionable.**

While conceding that the Interoute integration process was completed on schedule, Plaintiff nonetheless attempts to salvage its claim that GTT misled investors by describing the integration as "on track".  But "on track" means "on schedule" or "on time".  To the extent any of the "on track" statements could have been interpreted as suggesting the integration was "going well", those statements are inactionable puffery, as this court has held.

i.      Defendants' Statements Describing the Integration as "On Track" Are Not False or Misleading.

Defendants' statements that the integration was proceeding "on track" are inactionable because they were true—the integration did proceed "on track" and, in fact, was completed on schedule.  "On track" is synonymous with "on schedule" or "on time".  *On Track*, *Collins English Thesaurus* (2016), https://www.collinsdictionary.com/us/dictionary/english-thesaurus/on-track (last visited Jun. 2, 2020).  Defendants' "on track" statements cannot be a basis for a securities fraud claim because they were true.  *Greenhouse v. MCG Capital Corp.*,

392 F.3d 650, 656 (4th Cir. 2004) ("[t]he plain language of Rule 10b-5 and Section 11(a) requires any successful securities-fraud suit to allege a fact that is both untrue *and* material").

To the extent Defendants' "on track" statements could be understood as suggesting that the integration was "going well", this court, and others in the Fourth Circuit, have found identical statements to be inactionable puffery.  *In re Maximus, Inc. Sec. Litig.*, 117CV0884AJTIDD, 2018 WL 4076359, at *9, *13 (E.D. Va. Aug. 27, 2018) (dismissing plaintiffs' allegations that defendants made a material misstatement in announcing that they were "on track to meet . . . requirements" and that defendants' performance on the contract was "going as expected"); *see also Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994) (finding that defendants' statements that a project was "on schedule" were not material because "[a] 'reasonable investor' knows that a capital improvement project may run into unforeseen problems and delays").  As in *Maximus*, where the court held the statement that the company was "on track to meet our requirements for assessment volumes" to be immaterial puffery, the statements Plaintiff challenges here reflect a "subjective, less than certain assessment" that cannot be actionable.  *Id.* at *13.

Plaintiff's argument that these "on track" statements are material because they concerned an acquisition that was "transformative" fails.  Materiality does not turn on the importance of the underlying transaction, it turns on the significance of the statement that Plaintiff alleges to have been false or misleading.  *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (holding that a statement is material when a reasonable investor "(1) would consider *the fact* important in deciding whether to buy or sell the security or (2) would have viewed the *total mix of information* made available to be significantly altered by disclosure of the

fact.") (emphasis added).  Courts in this Circuit are clear that "on track" statements do not rise to the level of materiality.  *See, e.g., Maximus*, 2018 WL 4076359, at *13.

The cases Plaintiff relies upon are distinguishable.  In *Public Employees' Retirement System of Mississippi*, for example, defendants had described the acquisition at issue as successful and analysts had repeated defendants' very words in their analyst reports; no such thing is alleged here.  *See Pub. Emps.' Ret. Sys. Of Miss. v. Treehouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018) (finding statements describing the integration as successful were actionable only where multiple sophisticated analysts "reported on Defendant's statements . . . and often used the same wording as Defendants").

In fact, nearly all of the cases Plaintiff cites concerning puffery are nonprecedential, and all are distinguishable on the facts, many concerning statements by defendants promising current or future success.  This is true of *Public Employees' Retirement System of Mississippi*, where the court found statements reassuring investors that the integration was "good" and "great" were actionable.  2018 WL 844420, at *2.  Likewise, in *KBC Asset Management NV v. 3D Systems Corporation*, the plaintiff challenged specific statements by defendants describing the integration as likely to succeed, such as defendants stating that they "fully expect operating leverage to return in 2015" and they "don't see any obstacles to success".  No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016).[2]  But Defendants'

---

[2] The other out-of-circuit cases Plaintiff cites are also distinguishable on their facts.  In the unpublished *Extreme Networks* case, the defendants consistently made statements reassuring investors while omitting disappointing financial information.  *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *20 (N.D. Cal. Mar. 21, 2018).  And in *Galestan*, the plaintiffs supported their allegations of false or misleading statements with the sort of contemporaneous hard data that showed "the negative effects of [the] integration activities"; Plaintiff offers no such support here.  *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 299, 303 (S.D.N.Y. 2018).

statements that the Interoute integration was "on track" referred only to the timing of integration not the likelihood (or lack thereof) that it would be successful.

Plaintiff's reliance on these cases highlights a fundamental flaw in Plaintiff's theory of the case—Plaintiff repeatedly suggests that statements describing the integration as occurring "on track" should be understood as promises that the integration would be a "stunning success". (Pl. Br. 4.) Plaintiff is conflating two different concepts. To "integrate" just means to "combine"—it is not a guarantee of success. *Integrate*, *Oxford English Dictionary* (3d ed. 2020), www.oed.com/view/Entry/97353 (last visited May 28, 2020) (defining "integrate" as "to render entire or complete"). GTT never promised investors that the Interoute integration would be successful. To the contrary, GTT warned investors that it might not be. (*See* MTD Ex. 2 at 4 (cautioning investors that GTT's "ability to complete acquisitions or divestitures and to integrate any business or operation acquired" was one factor that "could cause GTT's actual results to differ materially" from any forward-looking statements the Company made).)

For the same reason, Plaintiff's reliance on "post-integration" challenges and the decision to sell non-strategic fiber assets after the Class Period cannot show that Defendants' "on track" statements were false or misleading. (Pl. Br. 22.) An integration can be completed "on track"—on time or on schedule—and the combined companies can then be unsuccessful. Plaintiff is comparing apples and oranges.

      ii.    <u>Plaintiff's Arguments About the CMD Cutover Fail to Show That Any of Defendants' Statements Describing the Integration as "On Track" Are False or Misleading.</u>

Apparently recognizing the problems with the claim it actually pled, Plaintiff attempts to recast its "on track" claims as concerning only the timing of Defendants' "cutover" of Interoute's information into GTT's CMD system. Plaintiff's new claim also fails.

7

As an initial matter, the majority of Defendants' "on track" statements were not referring to the CMD cutover, but instead were referring to the integration as a whole.  (Compl. ¶¶ 143, 147, 152, 160, 161, 164, 168, 170, 171, 172.)  The CMD cutover was only one step in that multi-step integration process.  (*Id*. ¶ 164.)  Thus, Plaintiff's new argument simply does not reach the vast majority of the "on track" statements, and any claims based on them must be dismissed.  *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (stating that disclosures must "relate back to the misrepresentation and not to some other negative information about the company") (citation omitted).

Plaintiff claims that "one could scour Defendants' SEC filings for days" and never find a disclosure stating that CMD migration was one of multiple steps in the integration process.  (Pl. Br. 23.)  That is incorrect.  Defendants repeatedly disclosed that the Interoute integration would proceed in three phases—organization, systems, and network—and that the CMD cutover was only one part of the systems phase.  For example, on November 8, 2018, Defendant Calder explained that GTT had "completed the organization integration in September", that "systems integration is also well underway as we consolidated all core business support systems to our client management database, CMD, in October", and that "[n]etwork integration is also on track for substantial completion in the next few months".  (Compl. ¶ 156.)  In fact, Defendants consistently communicated to investors that full systems integration—of which the CMD cutover was one part—was not a single step but rather a process.  For example, during the November 8, 2018 earnings call referenced above, Defendant Calder stated that "we consolidated all *core* business support systems to our Client Management Database, CMD, in October" (*id*. (emphasis added)), communicating that GTT would still have to consolidate "non-core" business support systems.  Defendant Calder announced that GTT had completed this next

8

step—consolidating "non-core" systems into CMD—during a December 4, 2018 conference, announcing that GTT had "just now completed the complete integration of Interoute onto GTT's business". (*Id.* ¶ 159.) But even in December 2018, Defendant Calder clearly informed investors that the CMD integration was not fully complete—he acknowledged that there would still be "a little bit of cleanup activity" as the integration continued. (*Id.* ¶ 160.)

Thus, as Defendants' explained in their Opening Brief, the CMD "cutover"—*i.e.* the "load[ing of] Interoute client data onto the GTT client management database system"—was described accurately by Defendants during statements made in October and November 2018. (MTD 23.) Plaintiff's own confidential witnesses confirm that the initial CMD cutover happened in October 2018, as disclosed. CW 3 confirms that "GTT first attempted to migrate everything onto CMD in October 2018". (Compl. ¶ 87.) CW 4 similarly pegs the date of CMD cutover at October 2018. (Compl. ¶ 88.) Plaintiff cannot base a securities fraud claim on statements that were true. *Kas v. First Union Corp.*, 857 F. Supp. 481, 488 (E.D. Va. 1994) ("[A] true statement does not fall within the ambit of Rule 10b-5").

Plaintiff's argument that the CW's "uniformly stated that" the CMD cutover "never occurred" is not credible in light of the statements of CWs 3 and 4 confirming the October 2018 cutover date. (Pl. Br. 10.) Plaintiff cannot manufacture a fact dispute by putting in contradictory CW statements. Rather, "[b]ecause an opposing inference, coupled with compelling evidence, suggests that Defendants' statements were not false or misleading", Plaintiff here "has not carr[ied] its burden of alleging facts with particularity adequate to state a claim upon which relief can be granted." *Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc.*, No. 5:10-CV-00062-RLV, 2013 WL 4014978, at *18 (W.D.N.C. Aug. 6, 2013) (dismissing securities fraud complaint for failure to sufficiently plead an

9

actionable false or misleading statement). The inconsistency of Plaintiff's CW statements undermine the reliability of *all* the CW statements, and the Court should disregard them. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012), *aff'd*, 561 F. Appx. 598 (9th Cir. 2014) ("[T]he confidential witness statements in the TAC are unreliable because they contradict statements made by the same group of witnesses in the SAC."); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (finding that, because "the confidential witness statements conflict with one another", those "contradictions severely undermine the reliability of the confidential witnesses").

Moreover, the majority of the CW statements that Plaintiff relies upon are opinions and complaints about the system itself—none of which contradict Defendants' statements concerning the timing of when the cutover occurred. For example, Plaintiff relies on CW 2's description of the integration and the cutover as a "living hell" and an "absolute nightmare" to suggest the cutover never occurred. (Compl. ¶ 85.) But that makes no sense; those statements confirm that GTT *had migrated the data over* and that employees were using the integrated system—albeit with over-the-top complaints about how the system worked. (*Id.*) Put differently, disgruntled employees' complaints about having to use a new system undermine, rather than support, Plaintiff's assertion that the new system was not up and running (even if it was running poorly, in their opinion). *Kemp v. Universal Am. Fin. Corp.*, No. 05-CV-9883, 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007) (stating the "mere opinions of confidential witnesses . . . are not actionable" in securities fraud cases).

### C. Defendants' Statements Concerning Similarities Between GTT and Interoute Are Not Actionable.

Plaintiff argues that Defendants misdescribed similarities between Interoute and GTT. That is not true. Plaintiff's argument relies on a mischaracterization of Defendant Sicoli's

statement at the end of the Class Period.  Defendants' actual statements were not false or

misleading.  And the precise words Defendants used to describe the facts—such as "mirror

businesses" and "hand in glove"—are immaterial puffery.

> i.  The Challenged Statement That There Was a 95% Overlap Between GTT's and Interoute's Business Is Not False or Misleading.

Plaintiff argues that Defendants' statements comparing the similarities between

GTT and Interoute's business were "patently false" because Plaintiff alleges that while GTT

primarily sold cloud networking, Interoute's primary business was selling cloud services.  (Pl.

Br. 14.)  But as Defendants' Opening Brief explains, it is indisputable that cloud services

constituted only 5% of Interoute's revenue at the time of the acquisition.  (MTD at 12-15.)

Plaintiff's argument fails to show otherwise.

*First*, Plaintiff repeatedly argues that "Defendants' own admissions" show that

Interoute's core business was selling cloud services.  (Pl. Br. 14-16.)  But Plaintiff supports this

claim by rewriting and misinterpreting Defendants' actual words.  Specifically, Plaintiff claims

that Defendants' revealed on May 8, 2019 that "importantly, [cloud services] was a much higher

percentage of [Interoute's] sales [than 5%] in the year or two leading up to the acquisition."  (Pl.

Br. 15.)  Plaintiff repeats that quotation—with the alterations in brackets—*five times* in its brief.

(Pl. Br. 2, 4, 8, 15, 17.)  But that is not what Defendant Sicoli said.  Defendant Sicoli's actual

quote was:

> "[I]n the case of Interoute, that product that Rick was talking about, *was roughly 5% of revenue—of their revenue*.  So it's less than 5% of our combined revenue today.  But importantly, it was a much higher percentage of their sales in the year or 2 leading up to the acquisition because Interoute had made a strategic priority shift that we did not maintain."

(MTD Ex. 17 at 8.)  The full statement makes clear that Mr. Sicoli reaffirmed that cloud services

were roughly 5% of Interoute's revenue at the time of the acquisition, *even though* Interoute had

11

more cloud services sales in the two years before the acquisition than it had in the past. Plaintiff cannot misquote Defendants to manufacture a false statement where none exists.[3] *See Hillson Partners*, 42 F.3d at 219 (reaffirming the well-established principle that a statement or omission must be considered in context).

*Second*, Plaintiff is engaging in attempted sleight of hand. He is comparing one fact that Defendants disclosed (Interoute's total revenue from non-cloud services) with a different fact (Interoute's increased sales of cloud services in the two years prior to the acquisition) and arguing that, because sales of cloud services were higher during the last two years, Defendants must have lied. But both facts can be (and are) true. Cloud services constituted only 5% of Interoute's overall revenues at the time of the acquisition—there can be no debate about that fact and Plaintiff's own corrective disclosure makes that clear—even though Interoute had made a strategic shift to selling more cloud services in the years leading up to the acquisition.

*Third*, Plaintiff has not alleged that any of the CWs would have had the visibility into Interoute's overall corporate revenue to contradict that 95% of its revenue was derived from products that overlapped with GTT's. (Pl. Br. 15.) "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the

---

[3] Plaintiff's allegation that GTT "had been forced to fire a staggering 1,000 Interoute employees" because these employees were involved in cloud services is also a mischaracterization. (Pl. Br. 15.) While GTT did let go of Interoute employees, Defendants never stated that these employees were let go solely because all 1,000 were involved in selling cloud services. Rather, Defendant Sicoli explained that while there were more Interoute "reps focused on cloud services than we initially thought, . . . they also hadn't been culling the bottom 10% of their population aggressively at all. And so there were more people at the end of the day that we ended up terminating or who left than we'd initially thought". (Compl. ¶ 111.)

12

information alleged or in the alternative provide other evidence to support their allegations." *Teachers' Ret. Sys.*, 477 F.3d at 174 (citations and internal quotations omitted). Plaintiff must do more than allege each CW's position and duration of employment—Plaintiff must "sufficiently allege that the confidential witnesses were in a position to personally know the information they conveyed". *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006). It is not enough to allege that a CW was a high-ranking executive. Plaintiff must sufficiently allege that the specific CW had personal knowledge of the information that the CW conveyed.

Plaintiff has not alleged that any CWs had entity-wide responsibility such that he or she would have been in a position to opine on the percentage of Interoute's overall revenue that was derived from cloud services. CW 7, who Plaintiff alleges was the former CEO of Interoute's Italian division, is only alleged to have insight into 30% of Interoute's business. (Compl. ¶ 142.) With visibility into only a portion of Interoute's business, Plaintiff has not pleaded sufficient facts to show that CW 7 would have had knowledge about the company-wide revenues so as to make a statement about what portion of Interoute's entire business was comprised of cloud services. *See In re Trex Co.*, 454 F. Supp. 2d at 584 (finding CW statement did not render defendants' statement false because the witness's statement about pricing for one supplier was not sufficient to contradict projections of profits for the entire year).

Plaintiff has the same problem with its other CWs. For example, CW 10, who left Interoute in December 2018 before the integration was completed, is alleged to have claimed that at the time of the acquisition Interoute had shifted "90% of [its] activity' to selling cloud services". (Pl. Br. 15; *see also* Compl. ¶ 70.) But even if CW 10 had insight into the sales focus at Interoute's Geneva office where he worked, that focus would not be a reliable reflection of Interoute's actual company-wide sales focus at the time, let alone the revenue the company was

13

able to achieve from its various segments through that change in focus. (Compl. ¶ 70, 71.) Likewise, Plaintiff has not alleged how CW 15's position as a "Technical Specialist at Interoute and GTT" would have given him enough information to assess, on a company-wide level, whether the companies derived their revenue from similar sources. (*See* Pl. Br. 8, Compl. ¶ 65.) Moreover, CW 15's alleged statement that "he would be 'very surprised if someone from GTT could put their hand on their heart and say that they didn't know that cloud services were a big part of [Interoute's] product portfolio" (Compl. ¶ 65) is beside the point; GTT *informed investors* that Interoute had "additional services in cloud services" and that it would be "setting up an advance solutions group to continue to support the cloud service business". (MTD Ex. 12 at 10.) To be clear, GTT is not alleged to have claimed that Interoute had no cloud services. In fact, it disclosed that Interoute did. But that does not render false GTT's disclosure that the companies operated similar businesses. That statement is true and not misleading because the undeniable fact is that they received 95% of their revenues from the same product lines.

ii.  The Remaining Statements Describing Similarities Between the Companies Are Inactionable.

Statements describing Interoute as a "parallel business", a "mirror business", "in alignment", "complementary", fitting together "hand in glove" with GTT, or a "strategic fit", are inactionable puffery. (Compl. ¶¶ 124, 128, 131, 134, 136, 137, 148, 166.) Those are exactly the types of statements that no investor would find misleading, as numerous courts in this circuit have found. *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766-67 (E.D.Va. 2004) (statements are immaterial as a matter of law when they are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available".); *see also Carlucci v. Han*, 886 F. Supp. 2d 497, 524 (E.D. Va. 1993) (dismissing statements that defendant would "provide [plaintiff] with

14

the best return he had ever received, possibly up to 50 times his investment" as "non-actionable puffery" that no reasonable investor would rely on); *Longman*, 197 F.3d at 684 & n.2 (statements that "Food Lion is one of the best-managed high growth operators in the food retailing industry" and that the company provided its employees with "some of the best benefits in the supermarket industry" were "immaterial puffery"); *see also Hillson Partners*, 42 F.3d at 216 ("A statement is only material when there is a substantial likelihood that a reasonable investor would consider it 'significant'") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). [4]

Plaintiff argues that because Interoute was the "largest and most critical acquisition in GTT's history" any statement concerning the integration was material. (Pl. Br. 19-20.) That is not the law. Even the case that Plaintiff cites in support of its argument clearly establishes that materiality turns on whether a reasonable investor "(1) would consider *the fact* important in deciding whether to buy or sell the security or (2) would have viewed the *total mix of information* made available to be significantly altered by disclosure of the fact." *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 613-14 (S.D.W. Va. 2012) (emphasis added) (quoting *Longman*, 197 F.3d at 683 (finding alleged omissions immaterial as a matter of law)). In other words, the question is not whether investors considered GTT's acquisition of Interoute a material event but rather whether investors would have viewed Defendants' statements describing the two companies as likely to fit together "hand in glove" to be material in light of the already-disclosed 95% overlap in their business.

---

[4] The case Plaintiff relies on for its argument that Defendants' statements about the similarities between the companies cannot be characterized as puffery, *Galestan*, 348 F. Supp. 3d at 303, is not controlling and is distinguishable. A critical fact in that case was that the defendant went beyond making general optimistic misrepresentations and made specific positive statements about new loan offerings that were directly contradicted by hard data showing productivity and delinquency concerns related to those new loans. Plaintiff makes no such allegations here. *Id.*

15

## II.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

To sufficiently plead loss causation, Plaintiff must identify the disclosure of new information that corrects the statements alleged to be fraudulent.  *Katyle*, 637 F.3d at 473 ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, 'if investors already know the truth, false statements won't affect the price.'") (citation omitted).  Here, based on its misstatement theories, Plaintiff is required to identify alleged disclosures that "publicly revealed for the first time" (i) that the CMD cutover did not occur in October as Defendants stated and (ii) that the companies could not, in fact, be described as similar.  Neither type of corrective disclosure exists.

### *May 8, 2019.*

Plaintiff argues that during a May 8, 2019 earnings call, the Company revealed "for the first time, that rather than being exactly 'on track', . . . the 'real' CMD cutover 'had only barely occurred'".  (Pl. Br. 28-29.)  Not true.  Defendants stated:

> [W]e generally have cutover to our client management database as we said in the prepared remarks, and we did that in December of last year.  So first quarter of '19 was the real sort of cutover for all the employees.  We now formally retired the major client relationship management system that existed in Interoute and so we had all of our employees trained and up to speed, but it was a natural slowdown.

(MTD Ex. 17 at 7.)  Defendants' statements are entirely consistent with Defendants' prior disclosures:  the CMD cutover (the "consolidat[ion of] all *core* business support systems to [CMD]") occurred in October 2018 (Compl. ¶ 50), but additional migration and "cleanup" would be required to integrate other systems (such as billing) through December (*id.* ¶ 52).  Employee training on CMD was not part of the cutover of core systems and Defendants never stated that employee training would be completed before first quarter 2019, so this disclosure could not have "corrected" any prior statement.  In fact, in the May 8, 2019 disclosure, Defendants'

16

*repeated* that the integration is "[o]n track with [Defendants'] original timeline of completing all remaining activities by the end of the second quarter".  (MTD Ex. 17 at 5.)  Nothing in the May 8 disclosure *corrected* an earlier statement by Defendants.

Likewise, the May 8 disclosure *confirmed*, rather that contradicted, Defendants' position that Interoute and GTT had operated similar businesses at the time of the acquisition.  Specifically, Defendant Sicoli stated that Interoute's cloud services "was roughly 5% of revenue—of their revenue" at the time of the acquisition (MTD Ex. 17 at 8), which is exactly what Defendants had disclosed at the very beginning of the Class Period.  (MTD Ex. 12 at 10 ("So we think 95% of what Interoute did was exactly what we did.  There's a little bit of overlap in cloud services or additional services in cloud services."))  Loss causation requires a mismatch between defendants' statements early in the class period (which plaintiff alleges to be false) and defendants' statements at the end of the class period (which plaintiff alleges to be true and corrective).  Here, Defendants' statements are virtually identical at the beginning and ending of the Class Period.  The confirmation of previously disclosed facts is neither corrective nor new, which forecloses loss causation as a matter of law.  *Katyle*, 637 F.3d at 473.

> *August 8, 2019.*

The August 8, 2019 disclosure says nothing about when the CMD cutover occurred.  It also says nothing about the similarities (or lack thereof) between the two companies.  In fact, there is no reference to either cloud services or the CMD cutover in the August 8 disclosure *at all*.  Instead, that disclosure discussed "some *post integration* challenges with our billing and collections function in Europe", and stated that "the Interoute integration is now substantially complete" (MTD Ex. 19 at 5) (emphasis added), which confirms that the integration

17

had been completed on time. [5]  Without a disclosure "correcting" either of the categories of alleged fraudulent misstatements, Plaintiff cannot sufficiently plead loss causation.  *Katyle*, 637 F.3d at 473 (holding that alleged corrective disclosures "must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains" and "[t]he disclosure must '*at least relate back to the misrepresentation . . .*'") (citation omitted); *see also Teachers' Ret. Sys.*, 477 F.3d at 187-88 (dismissing for failure to plead loss causation where an alleged corrective disclosure reported facts that had already been disclosed in public filings).

Plaintiff's loss causation arguments are telling.  Plaintiff's actual theory seems to be that Defendants are liable for securities fraud because they cannot prove that the Interoute acquisition was a "stunning success".  (Pl. Br. 4.)  But that is not the law.  The securities laws are not bad business insurance.  And a company can successfully integrate a similarly-situated company on time, but the combined businesses still might experience financial difficulties.  That does not give rise to a viable claim for fraud.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 n.68 (2d Cir. 2014) ("Generally, poor business judgment is not actionable under section 10(b).") (citation omitted); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 379 (S.D.N.Y. 2007) (holding that even "ill-advised" or "bad business decisions are not actionable under the securities laws").

Here, GTT's stock price fell because the public learned that the combined GTT/Interoute business was having financial problems.  Because Defendants made no misstatements or omissions, and instead warned investors about the inherent risks of large scale acquisitions (*see, e.g.*, MTD Ex. 2 at 4; MTD Ex. 4 at 3; MTD Ex. 6 at 9; MTD Ex. 9 at 2; MTD

---

[5] Plaintiff's claim that the Company disclosed that GTT's financial results were "marred by continuing difficulties integrating Interoute" is not true; Plaintiff quotes *an unnamed analyst*, not any Defendant.  (Pl. Br. 22.)

Ex. 13 at 2), Plaintiff has no claim for securities fraud.  *See Borow v. nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993) ("Because only a fraction of financial deteriorations are the result of fraud, plaintiffs must allege facts indicating that the change in circumstances resulted from defendants' fraudulent scheme.").

## CONCLUSION

For the reasons stated above, Defendants respectfully submit that the Court should dismiss Plaintiff's Amended Complaint in its entirety, with prejudice and without leave to amend.

June 5, 2020

**GTT COMMUNICATIONS, INC.,**
**RICHARD D. CALDER, JR.,**
**CHRIS MCKEE**
**MICHAEL SICOLI and**
**GINA NOMELLINI,**

By: _____/s/_____
       Of Counsel

Dabney J. Carr, IV
VSB No. 28679
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Tel.:  (804) 697-1200
Fax:  (804) 697-1339
dabney.carr@troutman.com

J. Wesley Earnhardt
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel.:  (212) 474-1000
wearnhardt@cravath.com

*Counsel for Defendants GTT*
*Communications, Inc., Richard D. Calder,*
*Jr., Chris McKee, Michael Sicoli and Gina*
*Nomellini*