UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI and GINA NOMELLINI, <br><br> Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL AND LIAISON COUNSEL**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    STATEMENT OF FACTS .................................................................................. 3

III.   PROCEDURAL HISTORY.................................................................................. 7

IV.    LEGAL ARGUMENT......................................................................................... 7

       A.    Courts Favor Class Treatment in Securities Actions ............................. 7

       B.    The Requirements of Rule 23(a) Are Satisfied...................................... 8

             1.    Numerosity Is Established ........................................................... 8

             2.    Commonality Is Established ......................................................... 9

             3.    Typicality Is Established.............................................................. 10

             4.    Adequacy Is Established .............................................................. 10

             5.    The Proposed Class Is Ascertainable.......................................... 12

       C.    The Requirements of Rule 23(b)(3) Are Satisfied................................. 13

             1.    Common Issues of Law and Fact Predominate........................... 13

             2.    Lead Plaintiff and the Class Are Entitled to a Presumption of
                   Reliance under *Basic*................................................................. 15

             3.    The *Krogman* Factors and other Additional Factors Support
                   Market Efficiency ....................................................................... 21

             4.    Lead Plaintiff Is Entitled to an *Affiliated Ute* Presumption of
                   Reliance....................................................................................... 22

             5.    There Are No Damages Issues That Predominate ...................... 23

             6.    A Class Action Is a Superior Method of Adjudicating Plaintiff's
                   Claims ......................................................................................... 25

V.     CONCLUSION.................................................................................................. 26

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)..................................................................................................... 14, 22

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................................... 7, 13, 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).................................................................................................. 8, 14, 16, 23

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988)...................................................................................................... 14, 15

*Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*,
   2016 WL 4098741 (D. Minn. July 28, 2016) ............................................................ 17

*Billhofer v. Flamel Techs., S.A.*,
   281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................................... 21

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ............................................................................. 16, 18, 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................. 17, 19, 21, 22

*Cheney v. Cyberguard Corp.,*
   213 F.R.D. 484 (S.D. Fla. 2003).............................................................................. 21

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
   270 F.R.D. 247 (D.S.C. 2010) ................................................................................ 18, 21

*Di Donato v. Insys Therapeutics, Inc.*,
   333 F.R.D. 427 (D. Ariz. 2019) ............................................................................... 24

*Dougherty, et al. v. Esperion Therapeutics, Inc., et al.,*
   2020 WL 3481322 (E.D. Mich. June 19, 2020)....................................................... 24

*Droste v. Vert Capital Corp.,*
   2015 WL 1526432 (E.D. Va. Apr. 2, 2015) ........................................................... 13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011)............................................................................................... 14, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ................................................................................................ 15

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................... 11, 14, 17, 23

*In re BearingPoint, Inc. Sec. Litig.*,
  232 F.R.D. 534 (E.D. Va. 2006) ............................................................................. *passim*

*In re Computer Sci. Corp. Sec. Litig.*,
  288 F.R.D. 112 (E.D. Va. 2012) ................................................................... 8, 10, 11, 17

*In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013) ......................................................................... 23

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................................. 13

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Al. 2009) ................................................................................. 21

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) ......................................................................... 8, 9, 13

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) ............................................................................ *passim*

*In re Red Hat, Inc. Sec. Litig.*,
  261 F.R.D. 83 (E.D.N.C. 2009) ..................................................................................... 7

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................... 23

*Jeffreys v. Commc'ns Workers of Am., AFL-CIO*,
  212 F.R.D. 320 (E.D. Va. 2003) ............................................................................ *passim*

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2017 WL 4297450 (D.S.C. Sept. 28, 2017) ................................................................ 16

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................... 16, 21

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................................. 17

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ................................................................................... 21

*Milbeck v. TrueCar, Inc., et al.*,
  2019 WL 2353010 (C.D. Cal. May 24, 2019) .......................................................... 17

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ............................................................................... 19

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ............................................................................... 22

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................................. 24

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
  2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ................................................... 3, 5, 6, 16

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ...................................................................................... 23

*Soutter v. Equifax Info. Servs., LLC*,
  307 F.R.D. 183 (E.D. Va. 2015) ................................................................................... 8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ................................................................................................... 22

*Takiguchi v. MRI Int'l, Inc.*,
  2016 WL 1091090 (D. Nev. Mar. 21, 2016) ............................................................ 14

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................. 18

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ........................................................................................ 20

*Weiner v. Tivity Health, Inc.*,
  334 F.R.D. 123 (M.D. Tenn. 2020) ........................................................................... 16

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) .......................................................... 18

**RULES**

Fed. R. Civ. P.
  23(a) .................................................................................................................. *passim*
  23(b) .................................................................................................................. *passim*

iv

23(g) ................................................................................................................ 12, 26

**REGULATIONS**

17 C.F.R. § 239.13 ................................................................................................ 19

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995) ...................................................................... 2, 11

Pursuant to Rules 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure, Lead Plaintiff respectfully moves to certify this Action as a class action, appoint Lead Plaintiff as Class Representative, and appoint Saxena White P.A. ("Saxena White") as Class Counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel for the Class.[1]

## I.    **<u>PRELIMINARY STATEMENT</u>**

This is a proposed securities fraud class action in which Plaintiff alleges that Defendants made a series of materially false and misleading statements concerning GTT's failed $2.3 billion acquisition and integration of Interoute Communications Holdings S.A. ("Interoute")—an acquisition which Defendants represented would be the largest and most important transaction in the Company's history, and "transformational" for GTT's business prospects.  On April 17, 2020, Defendants moved to dismiss the Complaint, contending that Plaintiff had failed to adequately allege the falsity of their statements and had failed to plead loss causation.  On June 22, 2020, the Court entered an Order (the "Order," ECF No. 53) denying Defendants' motion in its entirety, and subsequently set a case schedule closing all discovery on November 13, 2020 (ECF No. 60).

Lead Plaintiff now seeks to certify a class pursuant to Rules 23(a) and (b)(3) on behalf of itself and those persons or entities who purchased or otherwise acquired the publicly traded common stock of GTT from February 26, 2018 through August 7, 2019, inclusive (the "Class

---

[1] Lead Plaintiff is City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund ("Atlanta P&F," "Lead Plaintiff" or "Plaintiff").  This action (the "Action") asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants GTT Communications, Inc. ("GTT" or the "Company"), Rick Calder, Michael Sicoli, Chris McKee, and Gina Nomellini (collectively, "Defendants").  Unless otherwise noted herein: (i) capitalized terms and abbreviations have the same meanings as in the Amended Class Action Complaint (the "Complaint," ECF No. 42); (ii) references to "¶__" refer to paragraphs of the Complaint; (iii) all emphasis is added; (iv) internal citations and quotation marks are omitted; and (v) cites to "Ex.__" are to exhibits to the Declaration of Steven J. Toll ("Toll Decl.") filed herewith.

Period"), and were damaged thereby (the "Class").[2]  As set forth below, this is a straightforward securities class action that is ideally suited for class treatment under Rule 23.  Indeed, courts in this District have explicitly held that securities fraud cases such as this one "are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006) (certifying class).

The proposed Class here easily satisfies each of the requirements of Rule 23(a).  Not only are numerosity, commonality and typicality easily satisfied, but Lead Plaintiff also is clearly adequate, as Atlanta P&F is precisely the type of sophisticated institutional investor that Congress sought to lead securities class actions when enacting the PSLRA, (*see* H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733), and Plaintiff has selected Saxena White and Cohen Milstein—both highly experienced securities litigation firms—as their Class Counsel and Liaison Counsel, respectively.  Moreover, the requirements of Rule 23(b)(3) also are satisfied as courts routinely find that predominance is met in securities class actions alleging that defendants defrauded investors by engaging in a common course of conduct, as the Complaint alleges here, and the pursuit of claims as a class action is superior to other methods for prosecuting this Action.

Finally, Lead Plaintiff's motion is supported by the Expert Report of Chad Coffman, CFA ("Coffman Rpt.") (Ex. A), a highly respected expert whose opinions have been relied upon to

---

[2] Excluded from the Class are Defendants, the officers and directors of GTT at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.  ¶197.

certify classes in numerous federal securities class actions around the country.  *See, e.g., Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc*., 2020 WL 919249, at \*9 (N.D. Ill. Feb. 26, 2020) (noting "dozens of cases in which Coffman's expert opinions have supported the certification of a class" in federal securities class actions). The Coffman Report unequivocally demonstrates that the market for GTT common stock was efficient during the Class Period—entitling Plaintiff to a presumption of reliance.  In addition, the Coffman Report establishes that damages can be calculated on a class-wide basis in this Action, using the standard out-of-pocket methodology,  which "is widely considered an accepted method for the evaluation of [ ] damages to a class of stockholders in a defendant corporation[.]"  *Id.* (collecting cases certifying classes and relying upon Coffman's proposed "out-of-pocket" methodology to calculate class-wide damages).

Thus, as discussed herein, there can be no credible dispute that this is the paradigmatic Action for class treatment.  Lead Plaintiff's motion should be granted in its entirety.

## II.     <u>STATEMENT OF FACTS</u>

GTT is a cloud networking provider that relied upon an aggressive growth-through-acquisition strategy to compete against major industry rivals like AT&T and Verizon.  ¶¶33-34. Indeed, according to Defendants, successfully integrating acquired companies was GTT's "core competency."  ¶34.  At the start of the Class Period, on February 26, 2018, Defendants announced that GTT was acquiring Interoute—a major European telecommunications company that was by far the largest and most significant acquisition in GTT's history, and one which Defendants proclaimed was "transformational" because it would significantly bolster GTT's upward trajectory and catapult it to a global operational level.  ¶¶4-6, 38.  Defendants repeatedly represented to investors that GTT would seamlessly integrate Interoute despite its size and complexity because Interoute's business was "<u>a strong strategic fit</u>" that was "essentially the European version of GTT"

and "very complementary to [GTT's] strategy"—to the extent that "95% of what Interoute did was exactly what [GTT] did," *i.e.*, providing customers with "cloud networking" connectivity. ¶¶124-25, 128, 131, 134, 136, 139, 148, 166.

Once the deal closed and the integration of Interoute was underway, Defendants also frequently claimed that the Interoute integration was "on track" and meeting every pre-announced milestone (¶¶45-58)—including the "key milestone" of "cutting over" Interoute's internal sales and billing systems to GTT's proprietary Client Management Database, or "CMD." ¶¶49, 153, 159. In October 2018, Defendants emphatically claimed that the CMD "cut over" had been successfully achieved with no "surprises," and by December 4, 2018, Defendants proclaimed that the integration of Interoute's systems into CMD was "effectively complete." ¶¶152-65. In February 2019, Defendants confirmed again that "all [of Interoute's] ordering, installation, billing and financial transactions [were] now in GTT's systems." ¶164.

As the Complaint makes clear, Defendants' Class Period representations were materially false and misleading. Indeed, a plethora of detailed accounts by *fifteen* former senior-level employees ("CWs") of both GTT and Interoute—each of whom were directly involved in the integration—uniformly confirmed that the integration was a "disaster" from day one precisely because Interoute and GTT were two fundamentally different companies with different strategic priorities. These former executives confirmed that Interoute's primary business strategy was selling cloud services—the exact business that Defendants had repeatedly stated was incompatible with GTT's cloud networking focus. ¶¶35, 62-71. Moreover, in contrast to Defendants' repeated public assurances that the Interoute integration was proceeding exactly according to plan, the CWs confirmed that the integration was an "absolute nightmare" throughout the Class Period—to the point where the "key milestone" of the CMD "cut over" in fact was never completed even months

4

after the Class Period had ended.  ¶¶72-101.

Defendants' fraud was revealed through a series of corrective disclosures beginning in May 2019, through which Defendants themselves were forced to admit that their prior representations about Interoute being a "mirror business" to GTT, and that the integration of Interoute was "on track" and meeting the "key milestone" of the CMD "cut over," were completely false when made. ¶59.  Specifically, on May 8, 2019, GTT released its financial results for the first quarter of 2019 and held an earnings call with investors during which the Company announced a surprising 1% sequential revenue decline that Defendants directly attributed to "<u>delays related to [Interoute] integration activities</u>," including continuing problems related to the transitioning of Interoute's accounts receivables onto GTT's CMD system. ¶¶102-11.  In other words, the CMD "cut over" did not actually occur in October 2018, nor was it "effectively completed" by December 2018— in reality, the CMD transition was still experiencing severe problems in May 2019.

Furthermore, Defendants also disclosed that, contrary to their prior assurances, Interoute did <u>not</u> have the same "core business" strategy as GTT.  *Id.*  Rather, the Company admitted that, years before the acquisition, Interoute had made a "<u>strategic priority shift</u>" to "<u>selling cloud services,</u>" which were "non-strategic products" the Company now needed to "de-emphasize." *Id*. Significantly, Defendants explicitly tied Interoute's "strategic priority shift" to the Company's sequential revenue decline.  Indeed, Defendant Sicoli specifically stated that cloud services "<u>was a much higher percentage of [Interoute's] sales in the year or 2 leading up to the acquisition because Interoute had made a strategic priority shift that we did not maintain.  So, there's a little bit of sales momentum that you lose when you shift strategy, like we did, and that's part of the equation in terms of why organic growth [was challenging this quarter]</u>." ¶106.

5

Numerous analysts subsequently issued scathing reports with titles such as "Integration Woes Weigh on Results," discussing their shock and disappointment with GTT's financial results and reducing future GTT revenue and EBITDA estimates.  In direct response to the Company's disclosures, GTT's stock price plummeted 25%, from $40.29 per share to $29.91 per share.  ¶107.

While Defendants downplayed the May 2019 earnings results by claiming that the CMD issues were now "behind us," on August 8, 2019,  Defendants again shocked investors by reporting yet another quarter of disappointing financial results directly attributable to significant and continuing "post-integration challenges" with Interoute, including a host of CMD billing errors that confirmed the CMD "cut over" and the Interoute integration had still not been successfully completed.  ¶¶112-13.  In response, GTT's stock price collapsed, falling from $11.35 to $6.09 per share—a drop of almost 50%— with analysts again excoriating GTT's management for not being "more forthcoming" about the integration issues.  ¶¶114, 115, 194. All told, GTT's stock lost roughly $2 billion in market capitalization as a direct result of the revelation of Defendants' fraud, plummeting 90% from its Class Period high of $61.85 per share on March 20, 2018, to $6.09 per share on August 8, 2019, causing substantial harm to Lead Plaintiff and the putative Class.  ¶116.

Although fact discovery in this Action currently is in its infancy, post-Class Period events also further corroborated Plaintiff's allegations.  Indeed, during GTT's very next earnings call on November 12, 2019, Defendants effectively conceded that the Interoute integration was still not complete by reporting another significant revenue decline due to continuing issues transitioning Interoute's clients onto GTT's CMD system, and other integration-related issues.  ¶120. Significantly, Defendants also disclosed during this call that the integration, in fact, never would be completed because GTT had decided to sell off Interoute's huge fiber network—the same fiber network GTT had spent $2.3 billion to acquire—because it was "non-strategic." *Id.*

### III.    **PROCEDURAL HISTORY**

On July 30, 2019, the initial complaint was filed.  ECF No. 1.  On January 7, 2020, the Court appointed Atlanta P&F as Lead Plaintiff in this Action and appointed Saxena White as Lead Counsel and Cohen Milstein as Liaison Counsel.  ECF No. 35.  On February 28, 2020, Lead Plaintiff filed the Complaint.  ECF No. 42.  On April 17, 2020, Defendants moved to dismiss the Complaint (ECF No. 46); Plaintiff filed its opposition brief on May 22, 2020 (ECF No. 50); and on June 5, 2020, Defendants filed their reply (ECF No. 52).  On June 22, 2020, the Court issued the Order denying Defendants' motions to dismiss in full.  ECF No. 53.

On June 26, 2020, the Court entered a scheduling order setting the final pre-trial conference in this Action for November 19, 2020, with a trial date to be set thereafter.  ECF No. 54. Additionally, the Court entered a Rule 16(b) Scheduling Order on July 22, 2020, which set the close of all discovery, both fact and expert, for November 13, 2020.  ECF Nos. 55; 60.

### IV.    **LEGAL ARGUMENT**

#### A.    **Courts Favor Class Treatment in Securities Actions**

Courts in this District and around the country have consistently held that "[s]ecurities fraud cases are particularly appropriate candidates" for class certification because "the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006); *see also In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009) ("Securities litigation is particularly well suited to class action treatment.").  Indeed, the Supreme Court has recognized that the class action device is particularly appropriate in securities fraud cases.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Because "of the importance of the class action device in securities fraud suits, the requirements of Rule 23 are to be construed liberally" and "any doubts about the propriety of

certification should be resolved in favor of certification." *BearingPoint*, 232 F.R.D. at 538; *see also Jeffreys v. Commc'ns Workers of Am., AFL-CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003) (Hilton, J.) ("[t]hese requirements are construed liberally").

In deciding whether to certify a class, a plaintiff must demonstrate that it meets Rule 23's prerequisites merely by a preponderance of the evidence. *See, e.g., In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009). Courts should otherwise avoid evaluating the merits at the class certification stage, as "the likelihood of the plaintiffs' success on the merits [] is not relevant to the issue of whether certification is proper." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 195 (E.D. Va. 2015); *see also Mills*, 257 F.R.D. at 108; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

### B.    The Requirements of Rule 23(a) Are Satisfied

Rule 23(a) requires parties seeking class certification to demonstrate that the proposed class meets the following prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a); *Jeffreys,* 212 F.R.D. at 322. Here, the proposed Class readily satisfies each Rule 23(a) prerequisite.

#### 1.    Numerosity Is Established

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The numerosity requirement is "seldom disputed in securities fraud cases" where, as here, the defendant corporation's common stock is publicly traded on the New York Stock Exchange ("NYSE"). *BearingPoint*, 232 F.R.D. at 538; *see also Computer Sci.*, 288 F.R.D. at 117 (there was "no doubt" that a class of shareholders of a NYSE-

8

traded company was "so numerous that joinder of all members would be impracticable"). Here, GTT's common stock actively traded on the NYSE, and between 44.5 million and 56.4 million shares of GTT common stock were outstanding throughout the Class Period. Coffman Rpt. ¶¶11; 66; *see also Mills*, 257 F.R.D. at 105 (numerosity established where company "had millions of shares outstanding during the Class Period"). Thus, numerosity is easily established here.

### 2.   Commonality Is Established

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not mean that members of the class must have identical factual and legal claims in all respects." *Mills*, 257 F.R.D. at 105. Rather, "[c]ommonality is satisfied where there is one question of law or fact common to the class and a class action will not be defeated solely because of some factual variances in individual grievances." *Jeffreys*, 212 F.R.D. at 322. "The commonality requirement is permissively applied in the context of securities fraud litigation" because "[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses." *BearingPoint*, 232 F.R.D. at 539.

Here, numerous questions of law and fact are common among Plaintiff and the putative Class, including: (1) whether Defendants violated the federal securities laws; (2) whether Defendants misrepresented or omitted material facts; (3) whether Defendants acted with scienter; (4) whether the Individual Defendants controlled GTT and its violations of the federal securities laws; (5) whether Defendants' misrepresentations and omissions caused Class members to suffer a compensable loss; and (6) whether Class members have sustained damages, and the proper measure of damages. ¶201. These are the exact types of issues that regularly satisfy the commonality requirement in federal securities cases. *See, e.g., In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015). Commonality is established.

9

### 3.     Typicality Is Established

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). The "commonality and typicality requirements of Rule 23(a) tend to merge" into one another as "[b]oth serve as guideposts for determining whether. . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *BearingPoint*, 232 F.R.D. at 538. "Factual variances . . . do[] not prohibit a finding of typicality as long as the claims are based on the same legal or remedial theory." *Jeffreys*, 212 F.R.D. at 322.

As with commonality, here the typicality requirement is easily established as "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Computer Sci.,* 288 F.R.D. at 117. Specifically, Lead Plaintiff's claims are typical of the claims of the Class because they all arise from Defendants' false and misleading statements and omissions regarding the Interoute acquisition and integration, and like other members of the Class, Lead Plaintiff alleges that it purchased or acquired GTT common stock at artificially inflated prices due to Defendants' materially false and misleading statements and was damaged when the truth emerged. Further, there are no unique defenses that threaten to become the focus of the litigation. Plaintiff's claims are typical of those of the Class because "as goes the claim of the named plaintiff, so go the claims of the class." *NII Holdings*, 311 F.R.D. at 407; *see also BearingPoint*, 232 F.RD. at 539 (typicality satisfied where the plaintiff's claims "represent the essential claims of the proposed plaintiff class").

### 4.     Adequacy Is Established

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The primary purpose of the adequacy requirement

10

"is to detect and avoid potential conflicts between lead plaintiffs and other class members." *Computer Sci.*, 288 F.R.D. at 118. Here, there is no evidence of any conflict—let alone a disqualifying one—between Lead Plaintiff and the Class.  *See, e.g., In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 (S.D.N.Y. 2016) ("Lead plaintiffs are institutional shareholders whose interests are aligned with those of the Class.").  Indeed, as a public pension fund with experience serving in a leadership capacity in securities class actions, substantial assets under management and significant financial interests in the Action, Atlanta P&F is precisely the type of institutional investor that Congress sought to ensure is given a leadership role in securities class actions when enacting the PSLRA. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733; *NII Holdings*, 311 F.R.D. at 407 (adequacy established when plaintiffs were "sizeable pension funds that have a strong incentive to seek the largest possible recovery on behalf of their beneficiaries").

Further, Lead Plaintiff has set forth a robust record demonstrating its adequacy by, among other things, actively seeking appointment as Lead Plaintiff, conducting an extensive investigation of its claims, filing the highly detailed Complaint, defeating Defendants' motion to dismiss, and actively pursuing fact discovery and responding to Defendants' discovery requests. *See Jeffreys*, 212 F.R.D. at 323 (adequacy established where "the class Plaintiffs accept and understand their responsibilities as class representatives and have displayed appropriate interest in both the litigation and the outcome").  In short, Lead Plaintiff has and will continue to vigorously prosecute its claims on behalf of the Class.

In assessing the adequacy of counsel, the Court should consider: (i) the work counsel has done in identifying or investigating potential claims in the Action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the Action; (iii)

11

counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the Class. *See* Fed. R. Civ. P. 23(g)(1)(A). Lead Plaintiff is therefore also adequate because it has selected counsel with considerable experience in securities class actions and complex litigation to represent the Class.

Indeed, as demonstrated by its extensive experience in prosecuting and resolving complex securities class actions in courts throughout the United States, Saxena White is well-qualified to prosecute this Action on behalf of Plaintiff and the Class. *See* Ex. B (Firm Resume). As Court-appointed Lead Counsel, Saxena White also has demonstrated its willingness to commit substantial time and resources to representing the Class, including by preparing the detailed Complaint that was sufficient to withstand Defendants' motion to dismiss; pursuing extensive discovery from Defendants; retaining experts in market efficiency; and assembling a qualified team of attorneys and staff to prosecute the claims in this Action on behalf of Plaintiff and the Class. Moreover, as an experienced securities class action litigation firm with substantial experience litigating in this District (*see* Ex. C (Firm Resume)), Cohen Milstein is well-qualified to serve as Liaison Counsel.

Given Plaintiff's significant interest in the outcome of this case, its supervision of the litigation, its experience in overseeing similar actions, the lack of any conflict between Lead Plaintiff and other members of the proposed Class, and the demonstrated adequacy of proposed Class Counsel and Liaison Counsel, the requirements of Rules 23(a)(4) and (g) are satisfied.

### 5. The Proposed Class Is Ascertainable

The "implicit" ascertainability requirement of Rule 23 necessitates only that a class be defined using objective criteria that establish a membership with definite boundaries and Plaintiff need only "demonstrate that class members will be identifiable without extensive and individualized fact-finding or mini-trials." *Soutter*, 307 F.R.D. at 196. Indeed, the "standard for

12

ascertainability is not demanding.  It is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015).  Here, the requirement is easily met, because "the proposed class"—all persons or entities who purchased or otherwise acquired the publicly traded common stock of GTT from February 26, 2018 through August 7, 2019, and were damaged thereby—"is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Droste v. Vert Capital Corp.,* 2015 WL 1526432, at *4 (E.D. Va. Apr. 2, 2015).  Accordingly, the proposed Class satisfies the ascertainability requirement.

**C.      The Requirements of Rule 23(b)(3) Are Satisfied**

This Action also satisfies the requirements of Rule 23(b)(3), which authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see also Jeffreys*, 212 F.R.D. at 323.  Courts in this District have explained that "[s]ecurities fraud actions typically meet the Rule 23(b)(3) requirement because the claims relate to acts or omissions of the same defendants and damages of individual class members might be too small to provide incentive for the individuals to sue." *Mills*, 257 F.R.D. at 109.  This case is no different.

**1.      Common Issues of Law and Fact Predominate**

Predominance under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "The inquiry with respect to the predominance standard focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *BearingPoint*, 232 F.R.D. at 542.  As the Supreme Court has held, "[p]redominance is a test readily

13

met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 625; *see also, generally, Basic Inc. v. Levinson,* 485 U.S. 224 (1988). Indeed, as the above analysis of Plaintiff's allegations under Rule 23(a)(2)'s commonality standard demonstrates, there are an overwhelming number of questions of law and fact common to Plaintiff and the proposed Class. This showing demonstrates that the predominance standard of Rule 23(b)(3) is satisfied as these numerous common questions predominate over any perceived or potential individual issues. *See Amchem*, 521 U.S. at 625.

To recover under Section 10(b) of the Exchange Act, all Class members must establish: "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection . . . [with] the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61. It is axiomatic that "most of these elements are clearly susceptible to classwide proof." *Takiguchi v. MRI Int'l, Inc.*, 2016 WL 1091090, at *7 (D. Nev. Mar. 21, 2016); *accord Amgen*, 568 U.S. at 475 (same). For instance, "[t]he same evidence will be used to prove the existence of [Defendants' fraud], the falsity of the representations, [and] each defendant's role and knowledge in the scheme." *Takiguchi*, 2016 WL 1091090, at *4. Moreover, a plaintiff is not required to prove materiality or loss causation at the class certification stage. *See Amgen*, 568 U.S. at 469-70 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184-87 (2011) ("*Halliburton I*") (loss causation). Thus, "[w]hether common questions of law or fact predominate [] often turns on the element of reliance." *Halliburton I*, 131 S. Ct. at 2181.

Here, common questions of law and fact predominate because Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). ¶¶203-05. Therefore, individual reliance issues will not predominate over issues common to the Class. *See Barrick Gold*, 314 F.R.D. at 101 ("plaintiffs can meet their burden of proving predominance by

14

establishing their entitlement to the *Basic* presumption").

> **2.     Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance under *Basic***

Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed so long as the stock traded in an efficient market. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407-08 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 247. This is because an efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. By purchasing a security at the price set by an efficient market, an investor is therefore constructively relying upon all of the public information about the company.[3] *Basic*, 485 U.S. at 241-42; *accord Halliburton I*, 131 S. Ct. at 2185.

Investors clearly relied on the integrity of the market price for GTT common stock when making their transactions. Indeed, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47. Under the fraud-on-the-market theory, a plaintiff can satisfy the reliance element of a Rule 10b–5 claim by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the [security] traded in an efficient market, and (4) that the plaintiff traded the [security] between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408.[4]

---

[3]  When a company publishes false information about its business (or fails to disclose negative information), the price of its securities traded in an efficient market will be higher than if a truthful disclosure had been made. Thus, an investor that purchases at the inflated price is constructively relying upon the false information, whether that investor personally read or knew anything about the falsehoods. *See Basic*, 485 U.S. at 241-42 ("Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.").

[4]  This Action satisfies these factors. Each misrepresentation alleged in the Complaint was a public statement addressed to the marketplace, and Plaintiff and Class members purchased GTT common stock after Defendants' misrepresentations were made and before full disclosure of the relevant

15

Here, the evidence indisputably demonstrates that there was an efficient market for GTT common stock during the Class Period.  To determine whether a stock traded in an efficient market, courts in this District and elsewhere routinely apply a non-exhaustive list of factors that were first adopted in *Cammer v. Bloom*, specifically: (1) the weekly trading volume; (2) the amount of analyst coverage; (3) the existence of market makers and arbitrageurs; (4) the eligibility of the company to file a Form S-3 registration statement; and (5) the stock prices' historic reaction to unexpected corporate events. *Id.*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

While courts in this Circuit have found the *Cammer* factors instructive, under Fourth Circuit law there is no specific factor that is dispositive.  *See NII Holdings,* 311 F.R.D. at 409 ("[I]n the Fourth Circuit, no one factor is more important than another when [. . .] determining whether a market is efficient.").  Courts have also considered the factors discussed in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), to be relevant to the determination of efficiency, including: (1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders. *Id.* at 477-78. Here, each of these factors supports efficiency.

In support of market efficiency, Plaintiff submits the accompanying Coffman Report.  Mr. Coffman is a highly respected and experienced expert whose opinions have been relied on in "dozens of cases" certifying classes under the federal securities laws in this District and around the country.  *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.,* 2020 WL 919249, at \*9 (N.D. Ill. Feb. 26, 2020); *see also NII Holdings*, 311 F.R.D. at 413; *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at \*7 (D.S.C. Sept. 28, 2017); *Weiner v. Tivity Health, Inc.*,

---

truth concealed by Defendants.  ¶21; ECF Nos. 43; 44 (stating Lead Plaintiff's transactions in GTT common stock).  As discussed above, materiality need not be established at the class certification stage, since it is a question common to the Class.  *See Amgen*, 568 U.S. at 469-70.

16

334 F.R.D. 123, 132-36 (M.D. Tenn. 2020) (crediting Coffman's findings on efficiency and rejecting all of defendants' expert's criticisms), *petition to appeal denied sub nom., In re Tivity Health Inc., et al.,* 2020 WL 4218743 (6th Cir. July 23, 2020); *Milbeck v. TrueCar, Inc., et al.,* 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (certifying class and finding "[v]arious courts have considered the same Coffman report as that offered in this case and have found it sufficient"); *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.,* 2016 WL 4098741, at *8-11 (D. Minn. July 28, 2016) (discussing Coffman's report at length and rejecting defendants' arguments against efficiency); *Barrick Gold,* 314 F.R.D. at 104-05.

Here, the fact that GTT's stock trades on a major national stock exchange and otherwise satisfies the first and second *Cammer* factors, even without more, is sufficient to support a finding of market efficiency.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification."); *see also Computer Sci.,* 288 F.R.D. at 119-20 ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the New York Stock Exchange is not an efficient market.").

As set forth below and in the Coffman Report, *all* of the *Cammer* and *Krogman* factors favor a finding of market efficiency, entitling Plaintiff to a presumption of reliance under *Basic*.

### a.      *Cammer* Factor 1: Weekly Trading Volume

During the Class Period, GTT common stock had an average weekly volume of 4.90% of the Company's outstanding stock—roughly 2.61 million shares—compared to 1.90% for the

17

average weekly trading volume on both the NYSE and NASDAQ exchanges.  Coffman Rpt. ¶¶11; 28.  GTT's Class Period trading volume thus far exceeds the 1-2% *Cammer* threshold, supporting a finding of efficiency. Coffman Rpt. ¶28; *see, e.g. NII Holdings,* 311 F.R.D. at 410 ("average weekly turnover percentages surpass the benchmark set down by *Cammer* of 2% for a 'strong presumption' that the market was efficient"); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 52 (S.D.N.Y. 2019) (4.4% weekly trading volume supported efficiency).[5]

### b.   *Cammer* Factor 2: Analyst Coverage

During the Class Period, at least 143 analyst reports were issued by at least 27 separate firms, including major firms such as Oppenheimer and Co., Cowen and Company, and Jeffries (Coffman Rpt. ¶33), which is another indicator of an efficient market as it shows that new information was rapidly being disseminated and acted upon by investors.  *See Cammer*, 711 F. Supp. at 1286.  This demonstrates that there was "an active market for information regarding the company and its securities, and that [such] information was widely distributed."  *NII Holdings*, 311 F.R.D. at 410.  The second *Cammer* factor is thus easily satisfied, strongly supporting a finding of efficiency.  *See, e.g., City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (coverage by six analysts sufficient); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (five analysts supported market efficiency).[6]

---

[5] Mr. Coffman also determined that GTT's "annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms," supports efficiency.  Coffman Rpt. ¶29. Specifically, GTT common stock's turnover velocity ratio during the Class Period was 245% vs. the NYSE and NASDAQ average of 99.18%.  *Id.*

[6] Mr. Coffman also notes that there was substantial public press coverage of GTT—for example, a search of the database Factiva for articles relating to GTT resulted in 450 unique articles during the Class Period and 650 for the broader "Analysis Period" he used.  Coffman Rpt. ¶35.

c.        *Cammer* Factor 3: Market Makers

A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis. Where, as here, a stock trades on a major national exchange such as the NYSE with reporting on trades and trade volume and generally high liquidity, the number of market makers is not especially significant to a finding of efficiency. Coffman Rpt. ¶¶37-40; *see Monroe Cty. Employees' Ret. Sys. v. S. Co.,* 332 F.R.D. 370, 383–84 (N.D. Ga. 2019) (finding that trading on the NYSE satisfies *Cammer* factor 3 because "[t]he NYSE – one of the most renowned and liquid stock exchanges in the world – employs a Designated Market Maker ("DMM") for each listed stock…[and] DMMs are responsible for maintaining a fair and orderly market for registered securities"). Nonetheless, according to Bloomberg, there were 87 market makers for GTT common stock during the Class Period, thus supporting market efficiency. Coffman Rpt. ¶41; *see Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 92 ("anywhere between six and twenty market makers is sufficient to support a finding of market efficiency").

d.        *Cammer* Factor 4: S-3 Eligibility

A company is eligible to file a Form S-3 registration statement if it possesses a market capitalization of at least $75 million and has filed SEC reports for twelve consecutive months. 17 C.F.R. § 239.13. Courts treat eligibility to file a Form S-3 as evidence of market efficiency because of the SEC's statement that eligibility is "predicated on the Commission's belief that the market operates efficiently for these companies [that file Form S–3s], *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the marketplace." *Cammer*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41, 902 (1981)). "In other words, when an issuer of securities meets Form S-3's requirements, the market for its securities is likely one that quickly

19

assimilates material public information into the price because the market is well developed and trading is robust." *NII Holdings*, 311 F.R.D. at 411.

Throughout the Class Period, GTT met all of the requirements to file a Form S-3. Coffman Rpt. ¶¶42-44. Moreover, prior to the Class Period, GTT had filed an S-3 on April 1, 2014 and an S-3/A on April 25, 2014. Coffman Rpt. ¶44. Accordingly, this factor supports a finding of market efficiency. *NII Holdings*, 311 F.R.D. at 411 ("This *Cammer* factor accordingly weighs in favor of a finding that the market for NII common stock was efficient.").

### e.    *Cammer* Factor 5: Price Reaction to New Information

The fifth *Cammer* factor—whether a company's stock price reacts to new information—is typically demonstrated through an event study—i.e., a "regression analys[i]s that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). There is no requirement that a plaintiff satisfy the fifth *Cammer* factor to demonstrate market efficiency. *Id.* at 97. Indeed, event studies are typically more critical where—unlike here—"the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market." *Id.* at 97-98; *NII Holdings,* 311 F.R.D. at 413 ("even if the fifth *Cammer* factor were considered weak, the evidence offered in support of the other *Cammer* factors as well as the non-*Cammer* factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market").

Nonetheless, Mr. Coffman's event study clearly demonstrates statistically significant price reactions to GTT-specific news both during the Class Period and during a broader "Analysis Period." Coffman Rpt. ¶¶45-64. Accordingly, this factor supports a finding of market efficiency.

20

### 3.      The *Krogman* Factors and other Additional Factors Support Market Efficiency

Additional factors also support a finding of market efficiency.

*First*, GTT's market capitalization averaged $1.94 billion during the Class Period—a larger market capitalization than 47% of the firms on the combined NYSE and NASDAQ exchanges. Coffman Rpt. ¶67; *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 79 (citing *Krogman*, 202 F.R.D. at 478) ("investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency"); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154 (S.D.N.Y. 2012) (market capitalization ranged from $288 to $717 million).

*Second*, GTT's stock had an average bid-ask spread of 0.216% in March 2019—a substantially lower bid-ask spread than a random sample of similar stocks during the Class Period. Coffman Rpt. ¶70; *see Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (citing *Krogman*, 202 F.R.D. at 478) (efficiency supported by fact that "the average and median bid/ask spreads on Och-Ziff stock during the Class Period were comparable to those of a random sample of stocks listed on the [NYSE]"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (2.44% average daily relative bid-ask spread supported market efficiency).

*Third*, during the Class Period, approximately 63% of all GTT shares were held by non-insiders. Coffman Rpt. ¶71. Institutional ownership of GTT stock was also robust, as institutions held 82% of the public float. *Id*. at ¶72.[7] This factor supports a finding of efficiency.

*Fourth*, Mr. Coffman found no evidence of serial correlation, or "autocorrelation"—essentially, the ability of past price movements to predict future price movements—in GTT's stock

---

[7] "The fact that a large number of institutions actively traded [Company stock] demonstrates an efficient market throughout the class period." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 637 (N.D. Al. 2009); *see also City of Ann Arbor*, 270 F.R.D. at 256 ("high level of institutional ownership and active trading by these holders" supported market efficiency).

prices. Coffman Rpt. ¶76. A lack of autocorrelation supports market efficiency, as "[t]he more likely past price movement is to predict future price movement, the less efficient a market is likely to be because an efficient market incorporates information quickly into the first day's price, whereas an inefficient market would not fully digest the information until later." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015); *see also Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 93 (lack of serial correlation supported market efficiency).

*Fifth*, Mr. Coffman found evidence of considerable option trading in GTT common stock, another factor that supports market efficiency, because, as Mr. Coffman explains: "Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks." Coffman Rpt. ¶77.

In sum, for all of the reasons discussed above, the evidence set forth in the Coffman Report shows that the market for GTT common stock was efficient throughout the Class Period. Accordingly, the *Basic* presumption of reliance applies; common issues will predominate; and the Action properly can and should proceed as a class action.

### 4.     Lead Plaintiff Is Entitled to an *Affiliated Ute* Presumption of Reliance

Lead Plaintiff is also entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption applies to claims involving a failure to disclose. *See id.* 406 U.S. at 153; *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). In such circumstances, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* The presumption reflects the reality that where information is omitted,

22

"reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013); *see also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).[8]

Here, the Complaint alleges Defendants made material omissions and that Defendants engaged in a fraudulent scheme. ¶205. Because the Complaint alleges actionable omissions, Plaintiff is also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### 5.     There Are No Damages Issues that Predominate

The predominance inquiry "focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *BearingPoint*, 232 F.R.D. at 542. Damages are less relevant, and any "differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *Id.*; *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) (holding Rule 23(b)(3) "does not mandate . . . a finding that damages are capable of measurement on a classwide basis"). As explained above, common issues of liability predominate, making class certification appropriate. Any consideration of damages at this stage only bolsters this conclusion.

Mr. Coffman has explained how the "out-of-pocket method" could be used to calculate damages equal to the artificial inflation in GTT's share price at the time of each putative Class member's purchase minus the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, artificial inflation at the time of purchase subject to the PSLRA's "90-day lookback" provision). Coffman Rpt. ¶¶78-83. *See Barrick Gold*, 314 F.R.D. at 106

---

[8] Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 467 ("[B]ecause [t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class.").

(accepting Mr. Coffman's proposed damages methodology and noting that "securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations," and that this "oft-used remedy does not create individualized damages issues that defeat predominance" because it "calls for the application of a damages model across the entire class").

Mr. Coffman has further explained how he could use an event study methodology to quantify the artificial inflation on each day of the Class Period (*see* Coffman Rpt. ¶¶78-83), which numerous courts have recognized as "the standard method for calculating damages in virtually every Section 10(b) class action." *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 446 (D. Ariz. 2019) (crediting Coffman's proposed damages methodology, noting: "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act."); *see also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018) (plaintiffs' expert's proposed damages model was sufficient where it involved "determining the change in a security's price caused by a corrective disclosure by isolating price movements specific to [the defendant company] through an event study; analyzing, for each day of the Class Period, the amount of inflation in the stock price due to the alleged fraud and then mechanically calculat[ing] damages on an individual basis by analyzing a class member's actual trading activity"); *Dougherty, et al. v. Esperion Therapeutics, Inc., et al.,* 2020 WL 3481322, at *8 (E.D. Mich. June 19, 2020) (accepting Mr. Coffman's proposed event study damages methodology and citing other cases where Mr. Coffman's methodology had been credited).

Accordingly, Plaintiff has sufficiently demonstrated that damages are calculable on a class-wide basis, and that individualized damages issues will not predominate.

6.      **A Class Action Is a Superior Method of Adjudicating Plaintiff's Claims**

In addition to predominance, Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors relevant to this inquiry: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." *Jeffreys*, 212 F.R.D at 323.

Here, each factor weighs strongly in favor of class certification. First, "[a]ny interest individual members of the class may have in controlling the litigation is far outweighed by the benefit of distributing the financial burden of the litigation among the class." *BearingPoint*, 232 F.R.D. at 544.  Second, Plaintiff is not aware of any other litigation "commenced by members of the class against these defendants alleging these claims." *Id.* Third, this forum "is particularly appropriate as it is closest to defendant [GTT's] corporate headquarters and therefore many of the witnesses." *Id.* And fourth, "management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members." *Id.* at 544-45. Thus, "because class actions are a particularly appropriate and desirable means to resolve claims based on alleged violations of the securities laws, the plaintiff's proposed class is the superior method for adjudicating this dispute." *Id.* at 545; *see also Jeffreys*, 212 F.R.D at 323 (because "class members have little incentive and few resources to pursue litigation on their own, the class members are dispersed over several states, and there are few manageability concerns, the class action is the best method of resolving the matter").

Accordingly, Plaintiff has demonstrated that a class action is a superior means of resolving the claims in this Action.

## V.    **CONCLUSION**

This Action satisfies all of the requirements of Rule 23(a) and (b)(3), and counsel satisfy the requirements of Rule 23(g).  Accordingly, Plaintiff respectfully requests that the Court: (1) certify this Action pursuant to Rule 23(a) and (b)(3) as a class action on behalf of the Class, as defined herein; (2) appoint Plaintiff as Class Representative; and (3) appoint Saxena White as Class Counsel and Cohen Milstein as Liaison Counsel for the Class.

Dated: August 7, 2020                    Respectfully submitted,


                                         */s/ Steven J. Toll*
                                         Steven J. Toll
                                         Va. Bar No. 15300
                                         stoll@cohenmilstein.com
                                         Daniel S. Sommers
                                         dsommers@cohenmilstein.com
                                         **COHEN MILSTEIN SELLERS
                                         & TOLL PLLC**
                                         1100 New York Avenue, Suite 500
                                         Washington, D.C. 20005
                                         Tel: (202) 408-4600
                                         Fax: (202) 408-4699

                                         *Liaison Counsel for Lead Plaintiff and the Proposed
                                         Class*

                                         **SAXENA WHITE P.A.**
                                         Maya Saxena
                                         Joseph E. White III
                                         Lester R. Hooker
                                         Dianne M. Pitre
                                         Scott Guarcello
                                         7777 Glades Road, Suite 300
                                         Boca Raton, FL 33434
                                         Tel: (561) 206-6708
                                         msaxena@saxenawhite.com
                                         jwhite@saxenawhite.com

26

lhooker@saxenawhite.com
dpitre@saxenawhite.com
sguarcello@saxenawhite.com

Steven B. Singer
Kyla Grant
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com
sdileo@saxenawhite.com


*Lead Counsel for Lead Plaintiff and the Proposed Class*

27

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2020, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiff and the Proposed Class*