UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, and GINA NOMELLINI,<br><br>Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION AND REQUEST FOR ATTORNEYS' FEES AND EXPENSES**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 1

II.    THE TERMS OF THE PROPOSED SETTLEMENT ...................................... 4

III.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ........................ 4

    A.    Legal Standard ................................................................................ 4

    B.    The Settlement is Fair and Reasonable and Should be Approved ........................ 5

        1.    The Settlement was Reached after Extensive Litigation ........................ 5

        2.    The Settlement Negotiations were Conducted at Arm's Length, with Experienced Mediators ........................ 6

        3.    The Action was Litigated and Settled by Counsel with Significant Experience in Securities Class Action Litigation ........................ 7

    C.    The Settlement is Adequate and Should be Approved ........................ 8

        1.    The Strength of Plaintiff's Case and the Difficulties of Proof and Defenses Lead Plaintiff Would Encounter at Trial Support Settlement ........................ 8

        2.    The Costs and Delay of Continued Litigation ........................ 10

        3.    Defendant's Financial Condition and the Likelihood of Recovery on a Litigated Judgment Support the Adequacy of the Settlement ........................ 11

        4.    The Positive Reaction of the Settlement Class to the Settlement ........................ 12

    D.    Additional Factors Support Final Approval of the Settlement ........................ 13

IV.    THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................ 14

V.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ........................ 15

VI.    PLAINTIFF'S FEE AND EXPENSE REQUEST IS FAIR AND REASONABLE ........................ 15

    A.    In the Fourth Circuit, a Reasonable Percentage of the Recovery is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases ........................ 16

    B.    Lead Counsel's Fee Request is Reasonable under Fourth Circuit Criteria ........................ 17

        1.    The Results Obtained for the Class Support the Fee Award ........................ 17

i

2.     The Positive Reaction of the Class Supports the Requested Award......... 18

3.     The Skill, Experience and Reputation of the Attorneys Involved ............ 19

4.     The Complexity and Duration of the Action and Litigation Efforts......... 20

5.     The Contingent Nature of the Fee and Risk of Nonpayment................... 22

6.     The Amount of Time Devoted to the Case by Plaintiff's Counsel ........... 24

7.     A One-Third Fee is Customary and in Accordance with Other Similar Cases in this District and the Fourth Circuit ................................ 25

C.     The Requested Fee is Reasonable Under a Lodestar Cross-Check ..................... 26

D.     Plaintiff's Counsel's Litigation Expenses, and Lead Plaintiff's Reimbursement Award Are Reasonable and Should Be Granted ....................... 28

VII.     CONCLUSION.............................................................................................. 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ..................................................................... 10

*Barber v. Kimbrell's, Inc.*,
   577 F.2d 216 (4th Cir. 1978) ...................................................................... 17

*Bloom v. Anderson*,
   2020 WL 6710429 (S.D. Ohio Nov. 16, 2020) ......................................... 8

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ................................................................................... 16

*Brown v. Transurban USA, Inc.*,
   318 F.R.D. 560 (E.D. Va. 2016) .......................................................... 5, 10

*Cheng Jiangchen v. Rentech, Inc.*,
   2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ......................................... 13

*Chrismon v. Pizza*,
   2020 WL 3790866 (E.D.N.C. July 7, 2020) ............................................ 10

*City of Providence v Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................ 7

*Clark v. Duke University*,
   2019 WL 2579201 (M.D.N.C. June 24, 2019) ................................... 26, 27

*Decohen v. Abbasi, LLC*,
   299 F.R.D. 469 (D. Md. 2014) ................................................................. 25

*Deem v. Ames True Temper, Inc.*,
   2013 WL 2285972 (S.D.W. Va. May 23, 2013) ......................... 7, 12, 16

*DeLoach v. Phillip Morris Co.*,
   2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) ...................................... 26

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ................................................................................... 17

*Herrera v. Charlotte School of Law, LLC*,
   818 F. Appx. 165 (4th Cir. 2020) ............................................. 5, 6, 11, 12

*In re Abrams & Abrams, P.A.*,
  605 F.3d 238 (4th Cir. 2010) ............................................................... 16, 17, 18

*In re Celebrex (Celecoxib) Antitrust Litig.*,
  2018 WL 2382091 (E.D. Va. Apr. 18, 2018) ................................................ *passim*

*In re Cendant Corp. PRIDES Litig.*,
  243 F.3d 722 (3d Cir. 2001)............................................................................ 17

*In re Constellation Energy Grp. Inc. Sec. Litig.*,
  2013 WL 12461134 (D. Md. Nov. 4, 2013) ........................................... 18, 25, 26

*In re Flowers Foods Inc. Sec. Litig.*,
  2019 WL 6771749 (M.D. Ga. Dec. 11, 2019) ............................................... 24

*In re Genworth Fin. Sec. Litig.*,
  210 F. Supp. 3d 837 (E.D. Va. 2016) ......................................................... *passim*

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  2020 WL 8572953 (N.D. Ga. July 21, 2020)..................................................... 8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ............................................... 20

*In re Ikon Off. Sols., Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000).................................................................. 20

*In re Jiffy Lube Sec. Litig.*,
  927 F.2d 155 (4th Cir. 1991) .................................................................. 4, 5

*In re Priceline.com, Inc. Sec. Litig.*,
  2007 WL 2115592 (D. Conn. July 20, 2007) ............................................... 16

*In re Rayonier Inc. Sec. Litig.*,
  2017 WL 4542852 (M.D. Fla. Oct. 5, 2017) ................................................. 8

*In re Star Sci., Inc. Sec. Litig.*,
  2015 WL 12866962 (E.D. Va. June 26, 2015) ............................................. 13

*In re Star Sci., Inc. Sec. Litig.*,
  2015 WL 13821326 (E.D. Va. June 26, 2015) ....................................... 25, 26

*In re Titanium Dioxide Antitrust Litig.*,
  2013 WL 6577029 (D. Md. Dec. 13, 2013) ................................................. 26

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ................................................................ 19

*In re Wilmington Tr. Sec. Litig.*,
    2018 WL 6046452 (D. Del. Nov. 19, 2018) ................................................................... 7

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...................................................................................... 17

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2018 WL 3105072 (D.S.C. June 25, 2018) ................................................................ 28

*Kelly v. Johns Hopkins Univ.*,
    2020 WL 434473 (D. Md. Jan. 28, 2020) ............................................................ 25, 26

*Knurr v. Orbital ATK, Inc.*,
    2019 WL 3317976 (E.D. Va. June 7, 2019) ....................................................... *passim*

*Krakauer v. Dish Network*,
    2019 WL 7066834 (M.D.N.C. Dec. 23, 2019) ........................................................... 26

*Kruger v. Novant Health, Inc.*,
    2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) ................................................ 26, 27, 28

*Phillips v. Triad Guar. Inc.*,
    2016 WL 1175152 (M.D.N.C. Mar. 23, 2016) ..................................................... 7, 9, 14, 15

*Phillips v. Triad Guar. Inc.*,
    2016 WL 2636289 (M.D.N.C. May 9, 2016) ........................................................ 17, 23

*Robinson v. Carolina First Bank NA*,
    2019 WL 2591153 (D.S.C. June 21, 2019) ........................................................ *passim*

*Roman Zak v. Pedder*,
    2016 WL 5109167 (W.D.N.C. Sept. 19, 2016) ..................................................... 26, 28

*Schwartz v. Urban Outfitters, Inc.*,
    2016 WL 7626720 (E.D. Pa. Oct. 31, 2016) ............................................................... 7

*Scott v. Clarke*,
    2016 WL 452164 (W.D. Va. Feb. 5, 2016) ................................................................ 11

*Scott v. Family Dollar Stores, Inc.*,
    2018 WL 1321048 (W.D.N.C. Mar. 14, 2018) ........................................................... 26

*Seaman v. Duke Univ.*,
    2019 WL 4674758 (M.D.N.C. Sept. 25, 2019)..................................................................*passim*

*Sims v. BB&T Corp.*,
    2019 WL 1995314 (M.D.N.C. May 6, 2019) .......................................................................... 4

*Sims v. BB&T Corporation*,
    2019 WL 1993519 (M.D.N.C. May 6, 2019) ........................................................................ 26

*Smith v. Res-Care, Inc.*,
    2015 WL 6479658 (S.D.W Va. Oct. 27, 2015) ............................................................. 5, 7, 13

*Sponn v. Emergent Biosolutions Inc.*,
    2019 WL 11731087 (D. Md. Jan. 25, 2019)...................................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................... 16

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
    2012 WL 4061537 (D.S.C. Sept. 14, 2012)...................................................................... 22, 25

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)............................................................. 18, 19, 20

**STATUTES**

15 U.S.C. § 78u-4(a) ....................................................................................................... 1, 13, 28

**RULES**

Fed. R. Civ. P. 23.................................................................................................................. 1, 4, 5

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995).......................................................................................... 19

Lead Plaintiff respectfully moves pursuant to Fed. R. Civ. P. 23 for final approval of (i) the proposed Settlement of the above-captioned securities class action (the "Action"); (ii) the proposed Plan of Allocation; and (iii) request for attorneys' fees and reimbursement of litigation expenses, as well as Lead Plaintiff's Representative Reimbursement pursuant to 15 U.S.C. § 78u-4(a)(4).[1]   Pursuant to Local Civil Rule 7, Lead Counsel has conferred with Defendants' Counsel and certifies that Defendants do not oppose final approval of the Settlement, and take no position as to the Plan of Allocation and the attorneys' fees and litigation reimbursement request.

## I.    PRELIMINARY STATEMENT

After two years of hard-fought litigation, Lead Plaintiff and Lead Counsel have achieved an outstanding result for the Settlement Class—a $25 million Settlement that represents a recovery of as much as 31% of the Class's likely maximum estimated damages available at trial, which is up to eight times greater than the 4.2% median recovery achieved in similarly-sized settlements. Moreover, the Settlement is exceptional when considering the very real risk that the Settlement Class would have obtained a far inferior recovery, or no recovery at all, had the litigation continued.

Indeed, establishing liability was by no means assured, as Defendants continued to dispute the pivotal issues of falsity, scienter, loss causation and damages.  Plaintiff faced the considerable risk and expense of years of protracted litigation, including the inevitable appellate practice, all of which could have resulted in the Class recovering substantially less than the Settlement Amount—or nothing at all.  Moreover, Plaintiff faced considerable risk of a lesser

---

[1] Lead Plaintiff is the City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund ("Lead Plaintiff" or "Plaintiff").  Unless otherwise indicated, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated December 14, 2020 (the "Stipulation") (ECF No. 84-1) or in the Declaration of Lester R. Hooker in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, the Plan of Allocation and Request for Attorneys' Fees and Expenses (the "Hooker Declaration" or "Hooker Decl."), filed herewith. Citations to "¶" and "Ex." are to paragraphs in, and exhibits to, the Hooker Declaration.  All citations and internal quotations are omitted; and all emphasis is added.

1

recovery given GTT's current financial condition.  For example, GTT has been unable to file with the SEC its quarterly financial results for an entire year; GTT's stock is currently trading at around $2 per share, down 95% from its Class Period high of over $61 per share; and the remaining proceeds of Defendants' Directors' and Officers' insurance were rapidly wasting. Accordingly, the risk of no recovery is especially salient here, as there are legitimate concerns with Defendants' ability to satisfy a judgment in excess of the Settlement Amount, which weighs heavily in favor of final approval.

In the face of these considerable challenges, and as detailed in the Hooker Declaration,[2] Lead Plaintiff and Lead Counsel achieved this result through extensive litigation efforts, including an exhaustive investigation, involving consultation with multiple experts and interviewing over a dozen confidential witnesses from across the globe, whose statements were critical to pleading Plaintiff's claims.  The culmination of those efforts was a detailed 88-page Amended Complaint that was sufficiently particularized to withstanding Defendants' motion to dismiss.  After successfully opposing that motion, Plaintiff completed comprehensive fact discovery, including reviewing approximately 415,000 pages of documents produced by Defendants and third parties, and engaged in extensive class certification-briefing and discovery, including the submission of a detailed report by Plaintiff's expert on loss causation and damages, leading to the successful certification of the Class. Plaintiff also researched, drafted and filed a detailed 115-page Second Amended Complaint incorporating newly uncovered accounting fraud claims, and prepared for eleven fact and expert witness depositions.  Finally, Plaintiff engaged in extensive settlement negotiations, including two mediation sessions before two nationally

---

[2] The Hooker Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of the litigation, *inter alia*: the history of the Action (¶¶17-50); the nature of the claims asserted (¶¶21-24); the negotiations leading to the Settlement (¶¶51-55); the risks and uncertainties of continued litigation (¶¶58-63); and the terms of the Plan of Allocation (¶¶69-70).

acclaimed mediators—the Honorable Daniel Weinstein (Ret.), a highly accomplished former State of California Judge and founder of JAMS, and Mr. Jed Melnick, the Managing Mediator for the Weinstein Melnick Team. Accordingly, by the time the Settlement was reached, Plaintiff had a complete understanding of the strengths and weaknesses of their claims.

In light of the outstanding recovery, and the significant efforts undertaken in achieving it, Lead Counsel respectfully requests a fee award of one-third of the Settlement, which is well in-line with fee awards in this District, the Fourth Circuit, and around the country in securities and complex class actions. *See, e.g., In re Celebrex (Celecoxib) Antitrust Litig.*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (awarding one-third of $94 million settlement); *Seaman v. Duke Univ.*, 2019 WL 4674758, at *3 (M.D.N.C. Sept. 25, 2019) (awarding a one-third fee in a $54.5 million recovery, noting that awards of one-third are "common" in complex class actions in the Fourth Circuit). Additionally, a lodestar "cross-check" fully supports this award, as the requested fee equates to a "multiplier" of just 1.54, which is well below the typical lodestar multiples awarded. *In re Genworth Fin. Sec. Litig.,* 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers"); *Seaman,* 2019 WL 4674758, at *6 (multipliers in "large and complicated class actions have ranged from at least 2.26 to 4.5").

In addition, Lead Plaintiff—a sophisticated institutional investor who has actively supervised this Action—fully endorses Lead Counsel's fee request. Furthermore, while the deadline for objections has not passed, not a single objection or exclusion request has been filed, which is particularly significant given that 82% of the Class consists of institutional investors with the resources to object or opt-out, if warranted.

3

Finally, Lead Plaintiff requests reimbursement of $453,866.36 in litigation expenses—a reasonable amount that is well in-line with what is typically expended in similar cases. *See, e.g., Knurr v. Orbital ATK, Inc.,* 2019 WL 3317976, at *1 (E.D. Va. June 7, 2019) (awarding over $1.1 million in expenses). Similarly, Lead Plaintiff's $7,500 Representative Reimbursement is fair and reasonable, as it is expressly contemplated by the PSLRA and routinely awarded in securities class actions. *See Sponn v. Emergent Biosolutions Inc.,* 2019 WL 11731087, at *2 (D. Md. Jan. 25, 2019).

Accordingly, Lead Plaintiff respectfully asks this Court to approve the Settlement, the Plan of Allocation, and Lead Plaintiff's request for attorneys' fees and expenses.

## II.    THE TERMS OF THE PROPOSED SETTLEMENT

Pursuant to ¶2.1 of the Stipulation, Defendants paid $25 million into an Escrow Account for the benefit of the Settlement Class. The full terms and conditions are found in the Stipulation.

## III.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

### A.    Legal Standard

Courts in the Fourth Circuit have long recognized a strong public policy and presumption favoring settlement. *E.g., Robinson v. Carolina First Bank NA*, 2019 WL 2591153, at *8 (D.S.C. June 21, 2019) (court's discretion in approving a settlement "should be exercised in light of the general judicial policy favoring settlement"). Indeed, "[i]t has long been clear that the law favors settlement" and "this is particularly true in class actions." *Sims v. BB&T Corp.*, 2019 WL 1995314, at *3 (M.D.N.C. May 6, 2019).

Pursuant to Rule 23(e)(2), a class action settlement should be approved if the Court finds it "fair, reasonable, and adequate." Traditionally, the Fourth Circuit has instructed courts to analyze the "fairness" and "adequacy" factors set forth in *In re Jiffy Lube Sec. Litig.*, 927 F.2d

155 (4th Cir. 1991) ("*Jiffy Lube*") when making this determination.[3]  Rule 23(e) was amended in 2018, and these amendments gave new factors "for the district court to assess in evaluating fairness, reasonableness, and adequacy." *Herrera v. Charlotte School of Law, LLC*, 818 F. Appx. 165, 176, n.4 (4th Cir. 2020).[4]  The "goal of this amendment is not to displace any [circuit's unique] factor[s]." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendment. Accordingly, the Fourth Circuit "continues to apply its own standards as they 'almost completely overlap with the new Rule 23(e)(2) factors,' rendering the analysis the same." *Herrera*, 818 F. Appx. at 176, n.4.  The Settlement easily satisfies each of these factors.

### B.     The Settlement is Fair and Reasonable and Should be Approved

### 1.     The Settlement was Reached after Extensive Litigation

The first and second *Jiffy Lube* factors evaluate how far the case has come from inception to ensure that the "parties did not settle prematurely" and that all parties were apprised of the "strengths and weaknesses of their own and their adversaries' claims and defenses." *Smith v. Res-Care, Inc.*, 2015 WL 6479658, at **5-6 (S.D.W Va. Oct. 27, 2015). These factors are easily satisfied here as the Parties agreed to settle only after extensive discovery had taken place, and the Class had been certified. *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 572 (E.D. Va.

---

[3] The fairness *Jiffy Lube* factors are: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of law." *Genworth*, 210 F. Supp.3d at 839-40 (E.D. Va. 2016) (quoting *Jiffy Lube*, 927 F.2d at 159). The adequacy *Jiffy Lube* factors are: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.* at 841 (quoting *Jiffy Lube*, 927 F.2d at 159).

[4] The amendment requires consideration of whether: (A) plaintiffs and counsel have adequately represented the class; (B) the settlement was negotiated at arm's-length; (C) the relief for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed fee award, including timing of payment, and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. *See* Fed. R. Civ. P. 23(e)(2).

2016) ("it is clear that plaintiffs have conducted sufficient discovery and investigation to...evaluate the merits of Defendants' positions during settlement negotiations").

At the time the Parties reached an agreement-in-principle, Lead Counsel had completed extensive litigation efforts, including conducting an exhaustive investigation that included locating and interviewing dozens of former employees of GTT and Interoute located in both the United States and throughout Europe, whose statements were critical in enabling Plaintiff to file a highly detailed amended complaint sufficient to withstand Defendants' motion to dismiss; moving for class certification, including submitting an opening expert report evidencing market efficiency, and negotiating a stipulation providing for certification; issuing and responding to numerous discovery requests, producing over 9,000 pages of documents in response to Defendants' requests, and obtaining and reviewing approximately 413,000 pages from Defendants in just 3 months; exchanging detailed privilege logs; noticing and preparing for eleven fact and expert witness depositions; and in-depth consultation with several experts on complex factual issues.  ¶¶17-50.

Thus, the litigation had progressed materially and rapidly from its inception, and the merits of the Parties' claims and defenses had been thoroughly vetted through the discovery process, demonstrating the fairness of the proposed Settlement. *See e.g., Genworth*, 210 F. Supp. 3d at 840 (approving settlement following "extensive and hard-fought" process); *Herrera*, 818 Fed.Appx. at 177 (affirming fairness of settlement where the parties had engaged in "a year and a half of litigation involving significant motions practice and discovery").

### 2.    The Settlement Negotiations were Conducted at Arm's Length, with Experienced Mediators

Courts consider the nature of the settlement negotiations in evaluating the settlement, and "[a]bsent evidence to the contrary, the Court should presume that settlement negotiations were

conducted in good faith and that the resulting agreement was reached without collusion." *Deem v. Ames True Temper, Inc*., 2013 WL 2285972, at *2 (S.D.W. Va. May 23, 2013).

Here, the Settlement negotiations involved an intensive mediation process, including the Parties' multiple detailed written submissions and presentations addressing hotly contested issues concerning liability and damages, conducted during two separate mediation sessions overseen by two experienced, widely respected mediators, Judge Weinstein and Mr. Melnick, who have mediated hundreds of complex disputes with aggregate values in the billions of dollars.   Such extensive efforts demonstrate that the Settlement is fair and reasonable.  *See City of Providence v Aeropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014) (hailing Judge Weinstein as "one of the nation's premier mediators in complex, multi-party, high stakes litigation, and one in whom this court reposes considerable confidence"); *Schwartz v. Urban Outfitters, Inc.,* 2016 WL 7626720, at *3 (E.D. Pa. Oct. 31, 2016) (approving settlement given "intensive, arms-length negotiations, including mediation managed by Jed Melnick").

### 3.   The Action was Litigated and Settled by Counsel with Significant Experience in Securities Class Action Litigation

The fourth *Jiffy Lube* fairness factor weighs the experience of counsel in the particular field of law.   *See Smith*, 2015 WL 6479658, at *6.   Indeed, "concerns of collusion" are minimized where counsel for both sides are "nationally recognized members of the securities litigation bar." *Phillips v. Triad Guar. Inc.*, 2016 WL 1175152, at *3 (M.D.N.C. Mar. 23, 2016).

Here, Lead Counsel is highly experienced and well-respected in the field of securities class action litigation and has an extensive track record in numerous large cash recoveries on behalf of classes it has represented. *See, e.g., In re Wilmington Tr. Sec. Litig*., 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) (approving $210 million settlement, noting Saxena White was "highly experienced" and that "the significant amount of recovery in the settlement

agreements attests to their efficiency"); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *1 (M.D. Fla. Oct. 5, 2017) ($73 million recovery); *In re HD Supply Holdings, Inc. Sec. Litig.,* 2020 WL 8572953, at *2 (N.D. Ga. July 21, 2020) (approving $50 million settlement and noting that Saxena White "conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy"). Moreover, Saxena White has been recognized not only for its major successes, but also because it is a "federally-certified minority and woman-owned firm"—the only such firm representing institutional investors in the securities class action litigation industry. *Bloom v. Anderson*, 2020 WL 6710429, at *9 (S.D. Ohio Nov. 16, 2020) (finding Saxena White as "best suited" to represent "a large and heterogeneous group of investors").

Additionally, Cravath, Swaine & Moore LLP ("Cravath") is one of the most preeminent defense firms in the nation, with highly skilled attorneys that zealously represented Defendants. Notwithstanding this experienced and formidable opposition, Plaintiff was able to develop its case to resolve the litigation on terms highly favorable to the Class, demonstrating that the Settlement is fair and reasonable, and should be approved. *Genworth,* 210 F. Supp. 3d at 841.

### C.     The Settlement is Adequate and Should be Approved

#### 1.     The Strength of Plaintiff's Case and the Difficulties of Proof and Defenses Lead Plaintiff Would Encounter at Trial Support Settlement

The first and second *Jiffy Lube* adequacy factors "require the Court to examine how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *Robinson,* 2019 WL 2591153, at *10. As detailed in the Hooker Declaration (¶¶7-8), while Plaintiff believes that its claims have merit, Defendants lodged multiple credible defenses, each of which presented grave risks and easily could have resulted in either a substantially lower or no recovery.

Indeed, as an initial matter, securities cases, like the present one, are "notably difficult and notoriously uncertain." *Phillips*, 2016 WL 1175152, at \*4. The complexities of this Action—and the ensuing risks therefrom—were even more pronounced here, especially in light of the risk that sources of settlement funding would be depleted, as detailed below.

Critically, Defendants have vehemently denied all of Plaintiff's allegations. Defendants presented strong and credible arguments as to falsity, materiality, and loss causation in their motion to dismiss the Amended Complaint and were on the eve of filing a motion to dismiss the SAC at the time settlement was reached. For example, Defendants maintained throughout the litigation that their statements that the Interoute integration was "on track" were either immaterial to investors or were accurate as Defendants completed each phase of the integration within the predicted time period. *See* ECF No. 47. Similarly, Defendants argued that they fully informed investors of Interoute's significant cloud services business. *See Id*. Moreover, with respect to scienter, Defendants argued that they believed their statements concerning Interoute's strategic fit with GTT were accurate at all times, and that the lack of insider selling weighed against any finding of scienter. Although Plaintiff believed that it had strong arguments in response, Plaintiff also recognized that there was a real risk that the Court on summary judgment or a jury after trial could have found no violations of the securities laws. *See Genworth,* 210 F. Supp. 3d at 841 ("plaintiffs would also need to prove that the statements made were in fact false, as opposed to mere projections not subject to liability…Even with a strong case, the plaintiffs nonetheless face a large risk before a jury").

Furthermore, Defendants argued that Plaintiff could not establish loss causation for their claims because: (i) none of the alleged disclosures revealed new information regarding the similarities (or lack thereof) between GTT and Interoute; (ii) none of the alleged corrective

disclosures revealed new information about the timing of the integration; and (iii) to the extent the May 8, 2019 and August 8, 2019 earnings calls disclosed integration challenges, those were issues representing bad news, not corrective information. *See* ECF No. 47. Had Defendants prevailed on these arguments, the Class's recovery would have been severely limited, or eliminated altogether. *See Genworth,* 210 F. Supp. 3d at 841-42 ("plaintiffs at trial would bear the burden of conveying complex information to a jury using financial records, complicated accounting principles, and expert testimony…The high risk faced by taking the case to a jury verdict demonstrates the adequacy of this [] settlement").

Taken collectively, Defendants' arguments threatened the viability of the entire Action— risks that would have persisted throughout the litigation and inevitable appeals.  Thus, the Settlement ensures the Class Members will receive reasonable compensation considering the uncertainties of litigating to a judgment.  *See, e.g., Brown,* 318 F.R.D. at 573 ("[i]n light of the risks inherent in proceeding to trial, the Court agrees that the first two factors weigh in favor of the adequacy of the proposed Settlement"); *Chrisman v. Pizza*, 2020 WL 3790866, at *5 (E.D.N.C. July 7, 2020) ("[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome").[5]

### 2.      The Costs and Delay of Continued Litigation

The third *Jiffy Lube* adequacy factor "examines the anticipated duration and expense of additional litigation." *Robinson*, 2019 WL 2591153, at *10.  "In a case such as this, a fully contested class action lawsuit would be expected to take significant time to resolve at the District Court level and additional time would result from any appeals." *Id*.  Significantly, continued prosecution of this Action would run up significant litigation costs, drastically reducing the

---

[5] *See also Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1233 (10th Cir. 1996) (court overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion).

proceeds remaining in Defendants' wasting D&O insurance coverage.

Indeed, if not for this Settlement, the Action would have continued to be fiercely contested. A full briefing of Defendants' anticipated motion to dismiss the SAC, followed by continued extensive fact and expert discovery would be required. Further, taking into account the costs of briefing summary judgment and conducting a trial, the expenditures would become even more substantial, to the point of potentially exhausting any and all funds available to Defendants to settle this case. *See, e.g., Herrera*, 818 Fed. Appx. at 177 (adequacy where "ensuing litigation would quickly deplete the limited settlement fund, thereby dramatically reducing and potential recovery"); *Scott v. Clarke*, 2016 WL 452164, at *13, n.7 (W.D. Va. Feb. 5, 2016) ("Plaintiffs understandably abided by the aphorism that a bird in the hand is worth two in the bush" by settling and foregoing "the opportunity for some marginally-increased, costly, and uncertain relief in exchange for a substantial, guaranteed, and immediate quarry").

The Settlement represents an extraordinary result for the Class. Indeed, the $25 million recovery represents between 7.6% and 31% of the Class's likely recoverable damages, which Plaintiff's expert calculated could range between $80 million and $329 million. Accordingly, the Settlement Amount represents a recovery that is up to ***eight*** times the typical securities class action recovery, which between 2010 and 2019 was just 4.2% for similarly-sized settlements.[6]

### 3. Defendant's Financial Condition and the Likelihood of Recovery on a Litigated Judgment Support the Adequacy of the Settlement

Plaintiff recognizes the significant risk posed by GTT's current financial condition. As detailed in the SAC and the Company's SEC filings, in September 2020 GTT disclosed, among other things, that it was undertaking a review of accounting and internal control issues; the

---

[6] *See* Cornerstone Research, Securities Class Action Settlements—2020 Review and Analysis, at 6 (Mar. 17, 2021), https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis.

Company has not filed any financial statements with the SEC in one year; and GTT had been informed by the NYSE that GTT's stock might be delisted if the Company does not comply with its reporting requirements by August 2021.  Furthermore, GTT's stock price has recently traded below $2, with a current market capitalization of approximately $120 million, and its D&O insurance policy was rapidly wasting.  Thus, had litigation continued, there was a very real risk (if not likelihood), that the Settlement Class would recover less than the $25 million settlement amount, or even nothing at all.

In light of these considerations, the Settlement represents an exceptional recovery for the Class. *See*, *e.g.*, *Herrera*, 818 Fed. Appx. at 177 (affirming adequacy of settlement where, "Defendants' liabilities far exceed their assets"); *Genworth*, 210 F. Supp. 3d at 842 (given company's share price decline and financial condition, the settlement "protects the plaintiffs from non-recovery in the chance of a large jury verdict rendering [the company] insolvent").

### 4.    The Positive Reaction of the Settlement Class to the Settlement

"The lack of objections and opt-out requests are important factors contributing to a conclusion that the settlement is fair and reasonable." *Deem*, 2013 WL 2285972, at *2.  In this case 19,586 Notice Packets were mailed to potential Settlement Class Members and nominees. Ex. B to Hooker Decl. at ¶¶4-10.  Additionally, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *Id.,* ¶11. While the time period for objecting to the Settlement – April 2, 2021 – has not yet passed, as of the date of this filing, Lead Counsel have received no objections to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fees and expense request. Importantly, Lead Plaintiff is a "sophisticated institutional investor" who has actively participated in the litigation and endorsed the Settlement and the attorneys' fee request, which weighs in favor of approving the Settlement. *See Orbital*, 2019 WL 3317976, at *2.  The overwhelming approval by Settlement Class Members is an

important factor in evaluating the Settlement and supports final approval by the Court.

      **D.**    **Additional Factors Support Final Approval of the Settlement**

With respect to the manner in which the Settlement will be distributed, the proposed Plan of Allocation easily satisfies Rule 23(e)(2)(D) because it treats all Settlement Class Members equally. As set forth in Section IV below, the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

Further, the Settlement readily meets the requirements of Rule 23(e)(2)(C).[7] The Notice complied in all respects with the requirements set forth in the Stipulation and the Preliminary Approval Order. ¶¶64-68. Indeed, the Court-approved Notice contained all the information required by Rule 23(c)(2)(B), the PSLRA, 15 U.S.C. §78u-4(a)(7), and due process because it sufficiently apprised the Class of "the nature of the action, the definition of the Class, the Class's claims [], the Settlement's terms, how Class Members could receive a payment, how to opt out of the Settlement, how to object to the Settlement, details of the fairness hearing, the binding effect of the judgment," and other information. *See Robinson*, 2019 WL 2591153, at *3; *see also In re Star Sci., Inc. Sec. Litig.*, 2015 WL 12866962, at *3 (E.D. Va. June 26, 2015) (approving similar notice program in securities class action). The Notice also provided information on how to submit a Claim Form and informed potential Class Members of the avenues available to them to obtain additional information necessary to make an informed decision, including by contacting Lead Counsel or visiting the Settlement Website. *See Smith*, 2015 WL 6479658, at *3-4 (approving notice providing a toll-free number for inquiries, counsel's contact information, and

---

[7] With respect to Rule 23(e)(2)(C)(iv), the Parties entered into a Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Settlement Class reach a certain threshold—generally called a "blow provision"—that is standard in securities class actions. *See Cheng Jiangchen v. Rentech, Inc*., 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019) ("This type of agreement is common in securities fraud actions and does not weigh against [settlement] approval.").

instructions on how to file a claim).

Further, the Court-appointed Claims Administrator has mailed 19,586 copies of the Notice Packet, published the Summary Notice and maintains a website dedicated to the Action, which provides all information and documentation pertinent to the Settlement. Ex. B at ¶10; *see also Phillips*, 2016 WL 1175152, at *1, *5 (publication of summary notice in *Investor's Business Daily* and via *PR Newswire*, establishment of website, and mailing notice to thousands of potential class members constituted sufficient notice).[8]

## IV.  THE PLAN OF ALLOCATION SHOULD BE APPROVED

The objective of a plan of allocation is to provide an equitable method for distributing a settlement fund among eligible class members.  A plan of allocation should be approved when it "accounts for when claimants purchased their securities and for how long they held the stock, considerations that have been approved by courts in this district." *Genworth,* 210 F.Supp.3d at 843. The Plan of Allocation, which is set forth in the Notice disseminated to the Settlement Class pursuant to the Preliminary Approval Order, also warrants the Court's approval.

Here, the Plan of Allocation was developed by Plaintiff in consultation with its damages expert after careful consideration of Plaintiff's theories of liability and alleged damages under the Exchange Act. In developing the Plan, Plaintiff's expert calculated the estimated amount of artificial inflation in the price of GTT's common stock during the Settlement Class Period by considering how the stock price changed after the announcement of each alleged corrective disclosure and adjusting for price changes that were attributable to market or industry forces, or otherwise unrelated to the alleged fraud.  *See* Notice at ¶54. Under the Plan of Allocation, a Recognized Loss Amount will be calculated for each purchase or acquisition of GTT common

---

[8] With respect to Rule 23(e)(2)(C)(iii), the terms of the proposed award of attorneys' fees were fully disclosed in the Notice and are highly reasonable in light of the work performed and the results obtained, as set forth below in Section VI.

stock by an eligible Class Member in order to derive the amount of each Authorized Claimant's Recognized Claim, and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their respective Recognized Claims. *See* Notice at ¶¶57-70. Courts routinely approve substantially similar methods of distributing recoveries in securities class actions such as this one, and Plaintiff respectfully submits that this Court should approve the Plan of Allocation submitted here. *See, e.g., Phillips,* 2016 WL 1175152, at *4.

## V.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Court previously granted certification to the Settlement Class. ECF No. 89 at 4. Nothing has occurred since then to cast doubt on the propriety of class certification for settlement purposes, and no objections to certification have been received. For the reasons stated in the Preliminary Approval Order, Plaintiff's unopposed motion for preliminary approval of the Settlement (ECF No. 84), and motion for class certification (ECF Nos. 66, 67), Plaintiff respectfully requests that the Court grant final certification under Rule 23.

## VI.    PLAINTIFF'S FEE AND EXPENSE REQUEST IS FAIR AND REASONABLE

In undertaking this difficult and costly litigation on a fully contingent basis, Lead Counsel faced many challenges to proving both liability and damages that raised serious risks of no recovery, or a significantly lesser recovery. The prosecution and settlement of this Action required extensive efforts on the part of Lead Counsel, particularly given the complexity of the legal and factual issues and the vigorous defense by Defendants and their formidable counsel. The risk of no recovery was very real here especially given GTT's financial situation, and there was no guarantee that the claims would survive summary judgment, much less succeed at trial.

Despite these significant risks, Plaintiff's Counsel collectively worked more than 11,000 hours, representing a total lodestar of $5,396,627.50, and incurred unreimbursed expenses of $453,866.36, over the course of nearly two years to achieve the Settlement, all on a contingent-

15

fee basis with no assurance of ever being paid. In light of the recovery obtained, the time and effort involved, the complexity and amount of work performed, the skill and expertise of counsel, and the risks, Lead Counsel respectfully submit that a one-third fee award and reimbursement of litigation expenses in the amount of $453,866.36, is fair and reasonable, and well within the range of attorneys' fees awarded in this Circuit and throughout the nation in similar complex cases.  To date, no Settlement Class member has objected to the fee and expense request, and Lead Plaintiff supports the request as fair and reasonable. *See* Ex. A to Hooker Decl. at ¶¶14-15.

   **A.    In the Fourth Circuit, a Reasonable Percentage of the Recovery is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases**

       Courts have long recognized that attorneys who obtain a recovery for a class in the form of a common fund are entitled to an award of fees and expenses from that fund.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).[9] "District courts in the Fourth Circuit 'overwhelmingly' prefer the percentage method in common-fund cases." *Seaman*, 2019 WL 4674758, at *2; *see Deem,* 2013 WL 2285972, at *4 (same).  Indeed, the Fourth Circuit has held that fee awards based on the percentage method "align the interests of lawyer and client" because they "reward[] exceptional success, and penalize[] failure." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 246 (4th Cir. 2010). Thus, the percentage method applies here.  *See Sponn*, 2019 WL 11731087, at *1.

---

[9] Securities class actions such as this one are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007).  In addition to providing just compensation, fee awards serve to "encourage enforcement of the securities laws and support attorneys' decisions to take these types of cases on a contingent fee basis" and "perpetuate the availability of skilled counsel for future cases of this nature." *In re Priceline.com, Inc. Sec. Litig.,* 2007 WL 2115592, at *5 (D. Conn. July 20, 2007).

**B.      Lead Counsel's Fee Request is Reasonable under Fourth Circuit Criteria**

In determining a reasonable fee, courts in the Fourth Circuit apply the factors articulated

by the Third Circuit in *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 733 (3d Cir. 2001):

> (1) the results obtained for the class; (2) the presence or absence of substantial
> objections by members of the class to the fees counsel requested; (3) the skill and
> efficiency of attorneys involved; (4) the complexity and duration of the litigation;
> (5) the risk of nonpayment; (6) the amount of time plaintiffs' counsel devoted to
> the case; and (7) awards in similar cases.[10]

When awarding attorneys' fees, district courts also review the factors set forth in *Johnson*

*v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974), and adopted by the

Fourth Circuit in *Barber v. Kimbrell's, Inc*., 577 F.2d 216, 226 n.28 (4th Cir. 1978):[11]

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4)
> attorneys' opportunity costs in pressing the litigation; (5) customary fee for like
> work; (6) attorneys' expectations at the outset of the litigation; (7) time limitations
> imposed by the client or the circumstances; (8) the amount in controversy and
> results obtained; (9) the experience, reputation, and ability of the attorneys; (10)
> the undesirability of the case within the legal community in which the suit arose;
> (11) the nature and length of the professional relationship between the attorneys
> and client; and (12) fee awards in similar cases.

All of these considerations warrant an award of the requested fees and costs in this case.

**1.      The Results Obtained for the Class Support the Fee Award**

Courts have consistently recognized that the results achieved is one of the most important

factors to be considered in making a fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 436

(1983) ("most critical factor is the degree of success obtained"); *Abrams*, 605 F.3d at 247 (same).

---

[10] *See Genworth*, 210 F. Supp. 3d at 843; *Robinson*, 2019 WL 2591153, at *14.

[11] The *Barber* factors are used to assess the reasonableness of a lodestar fee, which is used as a
"cross-check" in PSLRA cases in this District.  Because the *Barber* factors overlap with the
*Cendant* factors, Plaintiff addresses all factors concurrently. *See Genworth*, 210 F. Supp. 3d at
843; *Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *4 (M.D.N.C. May 9, 2016) (noting that
the *Barber* factors "incorporate and recognize most of the *In re Cendant* factors"). Courts need
not mechanically list or comment on each factor, only those that are applicable. *See id.* Here,
Lead Counsel respectfully submits that two *Barber* factors—the time limitations imposed by the
client or circumstances and the nature and length of the professional relationship between
attorney and client—are not relevant in this securities class action, and therefore not addressed
herein. *See id.*

As noted above, the excellent result obtained here was accomplished despite the substantial difficulties of proving liability for securities fraud and the risks of establishing loss causation and damages in this case. It was only through the extensive efforts of Lead Counsel that allowed Lead Plaintiff to achieve the $25 million Settlement.  ¶¶17-50. Moreover, the Settlement far exceeds the inflation-adjusted, 24-year median of $9.0 million, and represents between 7.6 and 31% of estimated aggregate damages, well above the 4.2% median.  *See* ¶5; *Thorpe v. Walter Inv. Mgmt. Corp.,* 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (awarding fees of one-third of $24 million, where result was "an excellent 5.5% of maximum damages").

Further, as discussed in Section C.2, *supra*, the costs of further litigation created a substantial risk that the Company would exhaust its insurance, leaving nothing left to fund a settlement or judgment.  ¶6. GTT's inability to timely file its SEC filings for a year, and its current financial condition—including a stock price that has fallen to $2 per share—confirm that GTT has questionable resources to fund a judgment greater than the Settlement Amount. ¶80. The Settlement will provide immediate compensation to the Class and will avoid the substantial risks of lesser or no recovery from continued litigation.  *See In re Constellation Energy Grp. Inc. Sec. Litig.,* 2013 WL 12461134, at *1 (D. Md. Nov. 4, 2013) (awarding one-third "given the substantial risks of non-recovery, the time and effort involved, and the result obtained for the Class"); *Abrams*, 605 F.3d at 247 ("$18 million settlement served the client well by any standard and [] in light of $21 million policy limit").

### 2.    The Positive Reaction of the Class Supports the Requested Award

Courts around the country, including this Court, routinely find that "a lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees." *Genworth*, 210 F. Supp. 3d at 844; *see also Seaman*, 2019 WL 4674758, at *3.  The fact

that there have been no objections to date is significant, particularly given that approximately 82% of GTT's shares were held by institutional investors with the resources and motivation to object, if warranted. ¶15. Significantly, Lead Plaintiff is precisely the type of sophisticated institutional investor Congress had envisioned would "participate in the litigation and exercise control over" Lead Counsel (H.R. Conf. Rep. no. 104-369, at *32 (1995), reprinted in 1995 U.S.C.C.A.N. 730-731), and its endorsement heavily supports the requested fee. Ex. A, ¶¶11-14; *see also Orbital*, 2019 WL 3317976, at *2 ("the requested attorneys' fees and litigation expenses have been reviewed and approved by Lead Plaintiff and Named Plaintiff, sophisticated institutional investors who were involved with and oversaw the Action"); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007).

### 3. The Skill, Experience and Reputation of the Attorneys Involved

Lead Counsel has extensive experience prosecuting securities class actions and other complex litigation. ¶¶81-84; Ex. D at Ex. 3. As set forth in the declarations supporting this fee application, and as addressed above, Lead Counsel marshaled their considerable experience and skill in successfully prosecuting and resolving this Action. Ex. D; *Genworth*, 210 F. Supp. 3d at 844 ("The skill required in complex cases such as this involving massive discovery efforts and complicated issues of fact and law also weighs in favor of supporting the substantial attorneys' fees award in this case"). Indeed, Lead Counsel's reputation as attorneys who will zealously prosecute a meritorious case enabled them to negotiate the outstanding recovery for the benefit of the Settlement Class. Additionally, the fact that Cravath—"known as one of the premier U.S. law firms for two centuries"—served as Defendants' counsel in the Action provides further support for Lead Counsel's requested fee award.[12] *See* ¶84; *Thorpe*, 2016 WL 10518902, at *9

---

[12] Indeed, Cravath "has a fine reputation" and shown "great skill in defending this complex class action. Their opposition to plaintiff[] has been anything but token, and many of the battles on

(finding fact that "Defense counsel have reputations for vigorous advocacy in the defense of complex civil cases such as this" favored approval of one-third fee award).

### 4.      The Complexity and Duration of the Action and Litigation Efforts

"[S]ecurities fraud cases require significant showings of fact in order to prevail before a jury, and elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish." *Genworth*, 210 F. Supp. 3d at 844; *see also Thorpe*, 2016 WL 10518902 at *3 ("[a] securities case, by its very nature, is a complex animal"). These observations were even more pronounced here, as the novelty and difficulty of the legal and factual questions at issue in this Action were exceedingly complex.

Indeed, Lead Counsel spent substantial hours researching the details of GTT's acquisitions of Interoute and several other companies; the software systems and technical aspects of GTT's and Interoute's systems operations; the cloud networking and cloud services industries, including various technologies and business lines; and accounting rules related to acquisitions, goodwill, and off-balance sheet assets. This knowledge was crucial in pleading Defendants' alleged fraud with the requisite specificity and required frequent consultation with several experts. ¶¶19-28. Lead Counsel also contacted and interviewed numerous witnesses from multiple countries, including former high-ranking employees of GTT, Interoute and other related companies who provided information critical to supporting Plaintiff's allegations. ¶¶19-20.

Merely investigating and drafting a sufficient amended complaint to survive a motion to dismiss required considerable skill and effort here. Indeed, Lead Counsel developed the allegations in the Action without the benefit of a pending regulatory action or publicly disclosed Company internal review that provided a roadmap for Plaintiff's claims. *See* ¶19-20; *In re Hi-*

---

crucial issues were hard fought." *In re Ikon Off. Sols., Inc., Sec. Litig.,* 194 F.R.D. 166, 195 (E.D. Pa. 2000).

*Crush Partners L.P. Sec. Litig.,* 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("Lead Counsel did not have the benefit of a 'road map' established by a government investigation off which they could 'piggy back', but instead independently developed factual allegations and legal theories sufficient to survive the PSLRA's heightened pleading standards"); *Seaman*, 2019 WL 4674758, at *4 ("this case did not follow a government investigation [] that might have given some confirmation of the scope of misconduct").

Additionally, the complex issues in this case quickly became a serious and uncertain point of contention. As discussed in Section C.1, Plaintiff faced highly contentious loss causation issues that further threatened the viability of their claims.  Defendants had credible arguments that Plaintiff could not establish loss causation for the alleged corrective disclosures because such disclosures did not contain new information, and argued that the resulting stock price declines were attributable to non-fraudulent, confounding information. Absent the Settlement, these loss causation disputes would have remained at issue throughout the litigation and could have resulted in a far inferior recovery for the Class, or no recovery at all.  *See Sponn,* 2019 WL 11731087, at *2 (awarding 33% in securities action due to "complex factual and legal issues that "absen[t] settlement, would involve lengthy proceedings whose resolution would be uncertain").

Furthermore, during the course of litigating this Action, GTT made additional filings with the SEC that Lead Plaintiff relied upon as the basis for new allegations in the SAC.  Specifically, on August 10, 2020, GTT filed a Form 8-K with the SEC disclosing that it had uncovered certain issues with its reporting of financial results and internal controls; that it had commenced an internal audit; and that it would be unable to timely file its Form 10-Q.  Thereafter, on September 15, 2020, GTT filed a Form 8-K disclosing that the accounting review had "identified a number of issues in connection with the Company's previously issued financial statements," including

issues that impacted the financial statements issued during the Settlement Class Period, and that it was "reassessing its previous conclusions regarding the effectiveness of its internal control over financial reporting" for more than three reported years and expected "to identify material weaknesses in the Company's internal control over financial reporting."  *See* ¶49.

These new developments caused Lead Counsel to further investigate accounting issues at GTT and utilize documents they had identified through their discovery efforts to form the basis of the SAC, which they submitted to the Court less than a month after GTT's September 15 Form 8-K.  *See* ¶50. In drafting the SAC, Lead Counsel also consulted extensively with corporate accounting experts. The SAC contained allegations of additional false and misleading statements by Defendants concerning the effectiveness of GTT's internal controls and the accuracy and completeness of the quarterly and annual financial results reported by the Company during the Settlement Class Period.  The Court permitted the SAC to be filed on October 16, 2020.

Lead Counsel thus clearly "undertook significant efforts in this case through every stage of the litigation, including discovery concerning [the PSLRA] elements, consultation with necessary experts, briefing issues before the Court, and preparing for trial."  *Genworth*, 210 F. Supp. 3d at 844 (E.D. Va. 2016).  Accordingly, Lead Counsel's ability to successfully navigate these and other complex legal and factual obstacles fully supports the requested fee award.

### 5.     The Contingent Nature of the Fee and Risk of Nonpayment

From the outset, Lead Counsel "undertook this action on a contingent fee basis, funding the costs and devoting significant time to prosecute this action without any assurance of being compensated for their efforts."  *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.,* 2012 WL 4061537, at

*9 (D.S.C. Sept. 14, 2012).  Lead Counsel "undertook numerous significant risks of nonpayment in connection with the prosecution of this action." *Celebrex,* 2018 WL 2382091, at *4.

Indeed, courts in this Circuit recognize, "prosecuting a securities fraud action is not only complex, but is also fraught with risk." *Phillips,* 2016 WL 2636289, at *8; *see also Genworth,* 210 F. Supp. 3d at 844 ("[e]ven before trial, as the plaintiffs' analysis shows, 54% of securities class actions cases are dismissed"). Not only did Lead Counsel have to contend with the heavy burden of the PSLRA's heightened pleading standard and Defendants' defenses to liability and damages, but GTT's financial situation posed substantial risk to securing a meaningful recovery for the Class at every stage of the litigation.  Further, any victory at trial in this case would have to withstand appeals which could reverse or limit any award by a jury. Lead Counsel took on a risky, complex, and protracted litigation requiring the expenditure of extensive resources against formidable opposition with no guarantee of success, which heavily supports the requested fee. *See Seaman*, 2019 WL 4674758, at *4 (approving one-third fee as "the number of firms willing to take-on a complex and time-consuming case such as this which posed significant risks—and on a contingent basis no less—is no doubt small").

To date, Lead Counsel has received no compensation for its prosecution of this case, and since the extensive commitment of time and resources devoted here necessarily entailed the preclusion of other projects, the primary focus of this factor is to acknowledge this incongruence by permitting a higher recovery to compensate for the risk of recovering nothing.  Consequently, this weighs in favor of the requested award. *See Robinson*, 2019 WL 2591153, at *16 ("Contingency fee arrangements…are usually one-third or higher" because "payment [is] entirely dependent upon achieving a good result for Plaintiff and the Class, and Counsel face[] significant risk of nonpayment").

23

###### 6.      The Amount of Time Devoted to the Case by Plaintiff's Counsel

The time and labor expended by Lead Counsel in prosecuting this Action firmly supports the requested fee.  As described in the Hooker Declaration (¶¶17-50), these efforts included an extensive and extremely comprehensive investigation, which included locating numerous confidential witnesses that proved critical in drafting a highly-detailed complaint sufficient to defeat Defendants' motion to dismiss and subsequently drafting the SAC. Furthermore, Lead Counsel engaged in comprehensive discovery, including consulting with various economic and industry experts; reviewing approximately 415,000 pages of documents produced by Defendants and third parties; collecting and producing over 9,000 pages in response to Defendants' document requests in less than three months; extensive class certification-related briefing and discovery; and preparing for depositions. In addition, the extensive settlement negotiations were substantially time-consuming, including submitting detailed mediation statements and presentations over the course of two formal mediations that culminated in the Settlement. In total, prosecuting this Action necessitated Plaintiff's Counsel to expend more than 11,000 hours, equivalent to nearly $5.4 million in attorney and staff time, over the course of nearly two years of vigorous litigation.[13]

Accordingly, Lead Counsel's extensive litigation efforts were reasonable and necessary to secure a significant monetary recovery on behalf of the Settlement Class, and fully support the requested fee award.  *See In re Flowers Foods Inc. Sec. Litig.*, 2019 WL 6771749, at *2 (M.D. Ga. Dec. 11, 2019) (over 13,800 hours reasonable in $21 million securities settlement); *Orbital,* 2019 WL 3317976, at *2 (over 29,000 hours reasonable).

---

[13]  Lead Counsel will continue to expend additional time and out-of-pocket expenses in connection with the settlement administration process, the fairness hearing, and, if the Settlement is approved, assisting with implementation of the Settlement.

7.     **A One-Third Fee is Customary and in Accordance with Other Similar Cases in this District and the Fourth Circuit**

Lead Counsel's one-third fee request is eminently reasonable when considering the customary awards in similar cases in this District and the Fourth Circuit. *See e.g. Kelly v. Johns Hopkins Univ.,* 2020 WL 434473, at *3 (D. Md. Jan. 28, 2020) (finding that a "great weight of authority more than demonstrates that a one-third fee is justified in this case"); *Temp. Serv., Inc.*, 2012 WL 4061537, at *8 (a "total fee of one-third of the class settlement for all work performed and to be performed in this case is well within the range of what is customarily awarded in settlement class actions"); *Celebrex,* 2018 WL 2382091, at *5 ("Fee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one").  Indeed, in securities class actions, courts in this Circuit often award one-third.  *See e.g*., *In re Star Sci., Inc. Sec. Litig.,* 2015 WL 13821326, at *1 (E.D. Va. June 26, 2015) (awarding one-third of recovery in securities class action); *In re Constellation Energy Grp. Inc. Sec. Litig.,* 2013 WL 12461134, at *1 (D. Md. Nov. 4, 2013) (attorneys' fees of 33-1/3% of the Settlement Fund in securities class action "is fair and reasonable under the 'percentage-of-recovery' method").

A one-third award is particularly appropriate here because of the highly complex issues involved, the extraordinary investment of time and resources, the result achieved, the approval of Lead Plaintiff and the Settlement Class, the risks in the litigation, and the absence of any government action. *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 481 (D. Md. 2014) (attorney fee award of one-third of settlement fund was proper, given "superior result" obtained in complex litigation).  Indeed, as demonstrated below and in the Hooker Declaration (¶¶95-97), numerous courts in the Fourth Circuit have consistently awarded one-third or higher fees in similar securities and other large complex class actions[14]:

---

[14] The requested fee award is also reasonable when compared to nationwide cases. *See* ¶98.

| Comparable Cases Within the Fourth Circuit | Settlement Amount | Fee Award |
|---|---|---|
| *DeLoach v. Phillip Morris Co*., 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) | $211,800,000 | 33.3% |
| *In re Titanium Dioxide Antitrust Litig*., 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) | $163,500,000 | 33.3% |
| *In Re Celebrex (Celecoxib) Antitrust Litigation*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) | $94,000,000 | 33.3% |
| *Krakauer v. Dish Network*, 2019 WL 7066834, at *7 (M.D.N.C. Dec. 23, 2019) | $61,342,800 | 33.3% |
| *Seaman v. Duke University*, 2019 WL 4674758, at *3 (M.D.N.C. Sept. 25, 2019) | $54,500,000 | 33.3% |
| *Scott v. Family Dollar Stores, Inc*., 2018 WL 1321048, at *5 (W.D.N.C. Mar. 14, 2018) | $45,000,000 | 33.3% |
| *Kruger v. Novant Health, Inc*., 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) | $32,000,000 | 33.3% |
| *Sims v. BB&T Corporation*, 2019 WL 1993519, at *5 (M.D.N.C. May 6, 2019) | $24,000,000 | 33.3% |
| *Kelly v. Johns Hopkins University*, 2020 WL 434473, at *7 (D. Md. Jan. 28, 2020) | $14,000,000 | 33.3% |
| *Clark v. Duke University*, 2019 WL 2579201, at *5 (M.D.N.C. June 24, 2019) | $10,650,000 | 33.3% |
| *In re BearingPoint, Inc. Sec. Litig*., No. 1:05-CV-00454, ECF No. 200 at 8 (E.D. Va. Sept. 28, 2010) | $7,500,000 | 33.3% |
| *In re Star Scientific, Inc. Sec. Litig.,* 2015 WL 13821326, at *1 (E.D. Va. June 26, 2015) | $5,900,000 | 33.3% |
| *Roman Zak v. Pedder*, 2016 WL 5109167, at *1 (W.D.N.C. Sept. 19, 2016) | $5,500,000 | 33.3% |
| *In re Constellation Energy Group, Inc. Securities Litigation*, 2013 WL 12461134, at *1 (D. Md. Nov. 4, 2013) | $4,000,000 | 33.3% |
| *Sponn v. Emergent Biosolutions, Inc.*, 2019 WL 11731087, at *2(D. Md. Jan. 25, 2019) | $6,500,000 | 33% |

**C.     The Requested Fee is Reasonable Under a Lodestar Cross-Check**

A lodestar "cross-check" also wholly supports the fee request. Here, Plaintiff's Counsel's total lodestar is $5,396,627.50, and the requested $33^{1/3}$% fee equates to a multiplier of 1.54, which is substantially lower than the typical range of multipliers routinely approved by courts in this District, the Fourth Circuit and across the country. *See, e.g., Seaman,* 2019 WL 4674758, at *6 ("lodestar multipliers 'on large and complicated class actions have ranged from at least 2.26

to 4.5'"); *Kruger v. Novant Health Inc.*, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) (referencing cases and approving one-third fee where multiplier was 3.69); *Celebrex*, 2018 WL 2382091, at *5 (1.94 multiplier "is a reasonable multiplier in this Circuit").

Moreover, Lead Counsel's hourly rates—ranging from $365 to $895 for attorneys and partners, and $250 to $275 for paralegals—are lower than hourly rates approved by this District, the Fourth Circuit and nationwide.[15] *See, e.g., Seaman*, 2019 WL 4674758, at *5 (approving hourly rates of between $590 and $900 for partners, between $395 and $510 for attorneys, and between $280 and $390 for paralegals and other support staff, because "[t]hese rates are in line with hourly rates used for Class Counsel in other cases"); *Orbital,* 2019 WL 3317976, at *2 and ECF. No. 453 at 9-10 (approving rates of $780-$1,250 for partners, $360-$600 for attorneys, and $225-$375 for litigation support in a securities class action). Indeed, Plaintiff's Counsel's blended hourly rate of $488 underscores the reasonableness of the fee request and is well in-line with blended hourly rates approved in this Circuit. *See Sponn*, 2019 WL 11731087, at *2 (awarding 33% in a securities settlement where counsel had a blended rate of approximately $646); *Celebrex*, 2018 WL 2382091, at *5 (awarding one-third fee in $94 million settlement where counsel had a blended rate of approximately $500).

Further, courts in this Circuit have recognized that while a "reasonable rate is usually calculated by looking at the local market, [] a national market rate is appropriate for matters involving complex issues requiring specialized expertise[.]" *Clark*, 2019 WL 2579201, at *2; s*ee*

---

[15] The accompanying declarations of counsel include descriptions of the legal background and experience of the firms that worked on this case, which support the hourly rates submitted. Lead Counsel's rates are fair and reasonable for this legal market. For example, Defendants' counsel, Cravath, has submitted a sworn declaration of its market rates that had partners between $1,100 and $1,500 per hour and associate attorneys between $415 and $1,240 per hour. *See PG&E Corporation and Pacific Gas and Electric Company*, No. 19-30088, ECF No. 6310-2 (N.D. Cal. Mar. 16, 2020) (Darin McAtee billed at $1,500 and J. Wesley Earnhardt billed at $1,350). These rates far exceed Lead Counsel's rates.

*also Kruger*, 2016 WL 6769066, at \*4 (finding in complex class action, "the relevant market rate for cases such as the present case [is] a nationwide market rate").

### D. Plaintiff's Counsel's Litigation Expenses, and Lead Plaintiff's Reimbursement Award Are Reasonable and Should Be Granted

Plaintiff's Counsel seek reimbursement of $453,866.36 in litigation expenses reasonably incurred in litigating the Action, which expenses are routinely awarded in similar actions, including expert fees, mediation expenses, discovery-related costs, and investigation expenses. *E.g., Orbital*, 2019 WL 3317976, at \*1 (approving over $1.1 million in securities class action); *KBC Asset Mgmt. NV v. 3D Sys. Corp*., 2018 WL 3105072, at \*1 (D.S.C. June 25, 2018) (awarding over $467,000 in expenses in securities class action). The Hooker Declaration contains a full breakdown of the litigation expenses. *See* Exs. D and E. Notably, the requested expenses are significantly less than the $600,000 amount set forth in the Notice, and no objections have been lodged thereto—further supporting Plaintiff's request. ¶104.

Lastly, Lead Plaintiff also seeks a Representative Reimbursement of $7,500 as an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class"—awards that are specifically envisioned in the PSLRA and routinely awarded by courts nationwide. *See* 15 U.S.C. §78u-4(a)(4); *Roman Zak v. Pedder,* 2016 WL 5109167, at \*1 (W.D.N.C. Sept. 19, 2016) (awarding $10,000 for plaintiff's participation in the case); Ex. A (detailing Lead Plaintiff's approximate time spent in the Action).

## VII. <u>CONCLUSION</u>

For the reasons discussed above and in the Hooker Declaration, Plaintiff respectfully requests that the Court grant final approval of: (i) the Settlement; (ii) the Plan of Allocation; and (iii) Lead Counsel's fee and expense award and Lead Plaintiff's reimbursement award.

Dated: March 19, 2021

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers (*pro hac vice*)
1100 New York Avenue, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

-and-

Steven B. Singer
Kyla Grant
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com
sdileo@saxenawhite.com

*Lead Counsel for Lead Plaintiff and the proposed Settlement Class*

29

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 19, 2021, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all of the registered participants.

*/s/ Steven J. Toll*
Steven J. Toll
