UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GTT COMMUNICATIONS, INC., RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, and GINA NOMELLINI,<br><br>        Defendants. | Case No. 1:19-cv-00982-CMH-MSN |

**DECLARATION OF LESTER R. HOOKER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION AND REQUEST FOR ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     PROSECUTION OF THE ACTION .......................................................................... 6

        A.      The Commencement of the Action, Lead Plaintiff Appointment and Filing
                of the Amended Complaint ........................................................................... 6

        B.      The Pleading Stage ...................................................................................... 9

        C.      Lead Plaintiff's and Lead Counsel's Extensive Discovery Efforts ..................... 10

        D.      Class Certification........................................................................................ 15

        E.      The Filing of the Second Amended Complaint ...................................................... 15

III.    THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE ............................ 17

        A.      The Parties' Mediation Sessions................................................................... 17

        B.      The Settlement Agreement and Preliminary Approval........................................ 18

        C.      Reasons for the Settlement............................................................................ 19

        D.      Lead Plaintiff's Compliance with the Court's Preliminary Approval Order
                Requiring Issuance of Notice......................................................................... 21

        E.      The Plan of Allocation ................................................................................. 22

IV.     LEAD PLAINTIFF'S APPLICATION FOR PLAINTIFF'S ATTORNEYS'
        FEES AND REIMBURSEMENT OF LITIGATION EXPENSES................................. 23

        A.      Lead Counsel's Application for Attorneys' Fees................................................. 23

                1.      The Outstanding Results Obtained for the Class Support the Fee
                        Award................................................................................................. 26

                2.      The Positive Reaction of the Settlement Class ....................................... 26

                3.      The Skill Required and the Experience, Reputation and Ability of
                        the Attorneys Involved......................................................................... 27

                4.      The Complexity and Duration of the Litigation ...................................... 28

                5.      The Contingent Nature of the Fee, the Risk of Nonpayment and
                        Preclusion of Other Employment............................................................. 29

                6.      The Amount of Time Devoted to the Case by Plaintiff's Counsel .......... 30

7.     A One-Third Fee Award is Customary and in Accordance with Other Similar Cases in this District, the Fourth Circuit and Nationwide ............................................................................................... 31

B.     Lead Counsel's Request for Reimbursement of Litigation Expenses .................. 36

C.     Lead Plaintiff's Representative Reimbursement Request..................................... 37

V.     CONCLUSION.............................................................................................................. 38

## EXHIBIT LIST

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of Brent Hullender in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Plan of Allocation and Request for Attorneys' Fees and Expenses |
| B | Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; (C) Call Center Services; (D) the Settlement Website; and (E) Report on Objections or Requests for Exclusion Received |
| C | Summary of Plaintiff's Counsel's Lodestar and Expenses |
| D | Declaration of Lester R. Hooker on behalf of Saxena White P.A. |
| E | Declaration of Daniel S. Sommers on behalf of Cohen Milstein Sellers & Toll PLLC |

I, Lester R. Hooker of Saxena White P.A., respectfully submit this declaration in support of Lead Plaintiff's Motion for Final Approval of the Proposed Settlement, the Plan of Allocation, and Request for Attorneys' Fees and Expenses (the "Motion").[1]

## I.      PRELIMINARY STATEMENT

1.      Saxena White is Lead Counsel for Lead Plaintiff City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund.  I am a Director of my firm and have actively supervised and participated in the prosecution of the Action.

2.      On January 28, 2021, the Court granted preliminary approval of the proposed $25 million cash settlement with Defendants. ECF No. 89.  Since then, the Court-approved Claims Administrator has notified potential members of the Settlement Class of the Settlement by mail in accordance with the Preliminary Approval Order. Summary Notice was also published through *Investor's Business Daily* and over *PR Newswire*.  *See* Ex. B.

3.      On or about March 12, 2021, Defendants caused the $25,000,000 cash settlement to be deposited into an escrow account for the benefit of the Settlement Class.

4.      The Court, having presided over this complex securities class action for nearly two years, is familiar with the claims and defenses asserted. Accordingly, this declaration does not seek to detail each and every event that has occurred so far in the litigation. Rather, it highlights certain pertinent events leading to the Settlement, and the basis upon which Lead Plaintiff and Lead Counsel recommend its approval.

5.      The Settlement Amount, when viewed in the context of the challenges and risks in this litigation, is the best possible result that could have been achieved for the Settlement Class.

---

[1] Unless otherwise indicated, all capitalized terms herein have the meanings as in the Stipulation and Agreement of Settlement, dated December 14, 2020 (the "Stipulation") (ECF No. 84-1).  All citations and internal quotations are omitted; and all emphasis is added.  All exhibit ("Ex_) references are to the exhibits submitted with this declaration.

If approved, a settlement of $25 million is well above the inflation-adjusted median of $9.0 million in securities class actions from 1996 through 2019.[2]  In 2020, the median securities class action settlement was $10.1 million.[3] Significantly, the Settlement recovers between 7.6% to 31% of the Class's likely maximum damages at trial—up to eight times the typical securities class action recovery, which between 2010 and 2019 was 4.2% for similarly-sized settlements and 4% for all securities class action settlements in the Fourth Circuit.[4]  Thus, by any measure, the proposed Settlement provides an outstanding benefit for the Settlement Class that outpaces the normal range of recoveries in complex securities class actions.

6.      Although Lead Plaintiff and Lead Counsel believe that the claims asserted are meritorious, continued litigation through trial—and likely appeals—posed significant risks that made any recovery uncertain. This uncertainty was even more pronounced here given GTT's current financial situation.  As of March 19, 2021, the Company's stock price is trading at approximately $2 per share—95% below the Class Period high of over $61 per share—and GTT's market capitalization is down to $120 million.  Moreover, GTT has not filed its quarterly financial filings with the SEC for almost a year after disclosing significant issues with its reporting of financial results and internal controls during the Settlement Class Period. Additionally, the proceeds available under Defendants' Directors' and Officers' liability insurance were rapidly wasting at the time the Parties agreed to the Settlement.  Thus, had the litigation continued, it is not clear that GTT could fund a judgment greater than the $25 million

---

[2]  *See* Securities Class Action Settlements 2020 Review and Analysis (Cornerstone 2021) at p. 1, Fig. 1, available at https://www.cornerstone.com/Publications/Reports/Securities-Class-ActionSettlements-2020-Review-and-Analysis.

[3]  *Id.*

[4]  *Id.* at p. 6 (noting 4.2% median recovery in cases from 2010 through 2019 where the potential damages reached as high as $250 million) and p. 20 (4% median settlement in the Fourth Circuit).

Settlement Amount.  Absent Lead Counsel's efforts in achieving the Settlement, Settlement Class Members would have likely recovered substantially less, or nothing, for their claims.

7.     The recovery is also noteworthy when weighed against the risks of continued litigation.  Defendants had credible arguments that their statements accurately described the state of the Interoute integration, were forward-looking statements protected by the PSLRA Safe Harbor, and/or fully informed investors of the risks of which Plaintiff complained. Furthermore, Defendants argued that the stock price declines following Plaintiff's alleged corrective disclosures were caused by factors other than Defendants' fraud, and therefore the Class could not recover damages for such disclosures.

8.     While Plaintiff believed that it had strong responses to these points, there is no question that Defendants' arguments could have been accepted by this Court on Defendants' motion to dismiss the SAC, at summary judgment or by a jury at trial. And if the Court or jury ultimately concluded that Defendants' statements regarding the Interoute integration were not material or otherwise actionable, or that all (or a large portion) of the stock price decline that occurred at the end of the Class Period was not attributable to the alleged fraud, the potential recovery would be reduced dramatically—and potentially to zero. Even a favorable jury verdict would have been subjected to an inevitable appeals process, the conclusion of which would have been uncertain. If Plaintiff had prevailed at trial, it is highly questionable as to whether Plaintiff would have recovered more than (or even as much as) the substantial Settlement Amount.

9.     The Settlement is thus a highly beneficial result for the Settlement Class, and is the result of Lead Plaintiff's and Lead Counsel's extensive litigation efforts, including:

(i)     investigating and preparing the initial and amended complaints to satisfy the heightened pleading standards of the PSLRA;

(ii)    conducting an extensive factual investigation, including identifying and contacting witnesses from around the globe with direct knowledge of the facts;

3

(iii)    successfully opposing Defendants' motion to dismiss the Amended Complaint;

(iv)    drafting the comprehensive papers in support of Lead Plaintiff's motion for class certification;

(v)     conducting intensive fact, expert and class certification discovery, which included a protocol for obtaining electronically-stored documents, participating in numerous meet-and-confer calls, drafting meet-and-confer correspondence, and analyzing 415,000 pages of documents from Defendants and third parties, as well as preparing for eleven fact and expert witness depositions;

(vi)    filing a detailed 115-page Second Amended Complaint incorporating additional accounting fraud claims;

(vii)   submitting detailed mediation statements setting forth Lead Plaintiff's positions on the hotly disputed issues in the case; and

(viii)  attending two formal day-long mediation sessions before well-respected mediators involving rigorous negotiations.

10.    By the time of the Settlement, Lead Plaintiff and Lead Counsel had a thorough and complete understanding of the strengths and weaknesses of the Parties' positions concerning liability and damages, their respective abilities to prove or defend the claims at trial, and Defendants' ability to pay a substantial judgment.

11.    As set forth in the Motion, Plaintiff respectfully submits that the Settlement represents an outstanding recovery for the Class that is supported by each of the factors that the Fourth Circuit advises courts to consider in the final approval process, as set forth in Federal Rule of Civil Procedure 23(e)(2) and *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).

12.    In addition to seeking the Court's final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation, Lead Plaintiff engaged Global Economics Group, a well-recognized firm of economic and financial experts with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their

"Recognized Loss" amount as calculated pursuant to the Plan—a methodology that is standard in securities fraud class action settlements and has been approved by courts nationwide.

13.    Lead Counsel also requests an award of attorneys' fees for its efforts, and for reimbursement of its litigation expenses. Specifically, Lead Counsel is applying for an attorneys' fee award of one-third of the Settlement Fund (*i.e.*, 33⅓% of the Settlement Amount, plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $453,866.36 to be paid from the Settlement Fund.  Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit and around the country in comparable securities or complex class actions, and is amply supported by each of the relevant factors set forth in *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 733 (3d Cir. 2001) and *Barber v. Kimbrell's, Inc.*, 577 F.2d. 216, 226 n.28 (4th Cir. 1978). *See, e.g., In re Celebrex (Celecoxib) Antitrust Litig.*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (awarding one-third of $94 million settlement as "[f]ee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one"); *Thorpe v. Walter Investment Management Corp.*, 2016 WL 10518902, at *11 (S.D. Fla. Oct. 17, 2016) (awarding fees of one-third of $24 million recovery in a securities class action).

14.    The reasonableness of Lead Counsel's requested one-third fee is also confirmed by a lodestar cross-check, which yields a multiplier of 1.54, which is well below the range of multipliers routinely awarded in the Fourth Circuit.  *See, e.g., In re Genworth Fin. Sec. Litig.,* 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers"); *Seaman v. Duke Univ.*, 2019 WL 4674758, at *6 (M.D.N.C. Sept. 25, 2019) ("lodestar multipliers 'on large and complicated class actions have ranged from at least 2.26 to 4.5'").

15.    Significantly, although the deadline for objections and exclusions has not passed, to date, no members of the Class have objected to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fee and expense request, and no investors have requested exclusion. This reaction of the Settlement Class is significant given that approximately 82% of the Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted. Moreover, Lead Plaintiff—a sophisticated institutional investor who has actively overseen the prosecution of this Action and who fully understand its fiduciary duty to act in the best interest of the Settlement Class—wholly endorses the Settlement and Lead Counsel's requested fee award.

16.    For all of the reasons discussed in this Declaration, its attached exhibits and in the accompanying memorandum, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Plaintiff respectfully submits that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    The Commencement of the Action, Lead Plaintiff Appointment and Filing of the Amended Complaint

17.    On July 30, 2019, Saxena White filed the original securities class action complaint, thereby commencing this Action.  ECF No. 1.  Prior to filing the complaint, Saxena White reviewed and analyzed publicly available information concerning GTT, including (a) the Company's public filings with the SEC; (b) press releases and other publications disseminated by Defendants and other related non-parties; (c) news articles, shareholder communications, conference call transcripts, videos and postings on GTT's website; and (d) other publicly available information concerning GTT and the Individual Defendants.

6

18.     On September 30, 2019, Atlanta P&F moved the Court for appointment as Lead Plaintiff and approval of its selection of Saxena White as Lead Counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel.  ECF No. 10.  On January 7, 2020, the Court granted Atlanta P&F's motion.  ECF No. 35.

19.     Prior to filing the amended complaint, Lead Counsel launched a comprehensive investigation of Plaintiff's claims.  In addition to expanding upon its initial review and analysis of publicly available information regarding GTT and Interoute, Lead Counsel's multi-faceted investigation included: (i) locating and interviewing numerous, high-level former employees of GTT and/or Interoute ("CWs") who were directly involved in the acquisition and integration of Interoute during the Class Period, including the former CEO of Interoute Italia who was responsible for 30% of Interoute's business; (ii) reviewing additional research reports by securities and financial analysts concerning GTT and Interoute; (iii) analysis of data reflecting the pricing of GTT stock; and (iv) consultations with relevant experts.

20.     Lead Counsel's investigation significantly bolstered the strength of Plaintiff's claims.  For instance, the CWs located by the investigation provided significant information about the facts of the case, thereby bolstering Plaintiff's particularized allegations. Furthermore, by continuing to investigate Plaintiff's claims between filing the original complaint in July 2019 and filing the amended complaint in February 2020, Lead Counsel expanded the Class Period by three months to capture relevant disclosures and potential damages in the Action. Thus, Lead Counsel's comprehensive investigation provided highly valuable benefits to the Class.

21.     On February 28, 2020, Plaintiff filed an 88-page Amended Complaint alleging that Defendants violated the securities laws.  ECF No. 42.  The Amended Complaint alleged that throughout the Class Period, Defendants made several false and misleading statements regarding

7

GTT's $2.3 billion acquisition and integration of Interoute, the largest and most important in GTT's history. Specifically, Plaintiff alleged that Defendants represented that GTT's "seamless" acquisition and integration strategy—purportedly designed to ensure that GTT only "bought businesses that are strategic and that are doing exactly what we do," *i.e.,* "cloud networking"— would work just as effectively with respect to Interoute because Interoute's business was nearly identical to GTT's. Plaintiff alleged that, once the integration started, Defendants reassured investors that the integration was progressing "on track" and every pre-announced milestone had been met, including that the "key" "cut over" of Interoute's legacy billing and sales systems onto GTT's Client Management Database ("CMD") was implemented in October 2018 and "effectively complete" by December 2018, with only a "little bit of cleanup activity" remaining.

22.    Plaintiff alleged that unbeknownst to investors, Defendants' representations were false, and that the accounts of fifteen CWs, as well as Defendants' own admissions at the end of the Class Period, confirmed that Defendants knew before the time of the acquisition that Interoute had implemented a "strategic priority shift" to selling cloud services—a "different business" than GTT's business of selling cloud networking connectivity. Moreover, Plaintiff alleged that the CWs stated that the integration was a "disaster" from day one, that Defendants' representations to the contrary were "not at all" true, and that the integration was so deficient that Interoute was not fully integrated even by the end of the Class Period.

23.    The Amended Complaint stated that the truth regarding Defendants' fraud began to emerge on May 8, 2019, when GTT announced its first revenue decline in four years, which Defendants directly attributed to "delays related to [Interoute] integration activities." Plaintiff alleged that Defendants admitted that the cut over from Interoute's legacy systems to GTT's CMD was not "effectively complete" in December 2018 as previously represented, but had been

delayed by several months. Furthermore, Plaintiff alleged that Defendants admitted that, rather than fitting "hand in glove" with GTT, Interoute had made a "strategic priority shift" years before the acquisition to selling cloud services—a shift that Defendants admitted they did not maintain post-acquisition and which they directly tied to GTT's revenue decline and loss in "sales momentum." Plaintiff alleged that analysts found these disclosures "disappointing given the optimistic comments made by management over the past three quarters," and in response to these revelations, GTT's stock price plummeted more than 25%, from $40.29 to $29.91.

24.     Finally, Plaintiff asserted that while Defendants downplayed these revelations and assured investors that the issues were now "behind us," the truth regarding Defendants' fraud was not revealed until August 8, 2019, when GTT announced another unexpected decline in revenue that Defendants directly attributed to Interoute "integration challenges," particularly with respect to the CMD cut-over. Plaintiff alleged that, according to analysts, Defendants "should have been more forthcoming about the anticipated impact from such issues on [near term] results." Plaintiff alleged that, on this news, GTT's stock price collapsed, falling 46% from $11.35 per share on August 7, 2019 to close at just $6.09 per share on August 8, 2019.

### B.    The Pleading Stage

25.     On April 17, 2020, Defendants filed their motion to dismiss. ECF No. 46. Defendants challenged the elements of falsity, materiality, and loss causation. For example, Defendants argued their statements regarding how the Interoute integration was "on track" were either immaterial to investors or were accurate as Defendants completed each phase of the integration within the predicted time period.  *See* ECF No. 47 at 18-27.  Similarly, Defendants maintained that they fully informed investors of Interoute's nominal cloud services business of which Plaintiff complained.  *See Id.* at 28.

26.     Furthermore, Defendants argued that Plaintiff could not establish loss causation for its claims because: (i) none of the alleged disclosures revealed new information regarding the similarities (or lack thereof) between GTT and Interoute; (ii) none of the alleged corrective disclosures revealed new information about the timing of the integration; and (iii) to the extent the May 8, 2019 and August 8, 2019 earnings calls disclosed integration challenges, those were issues representing bad news, not corrective news. *See* ECF No. 47 at 29-30.

27.     Lead Plaintiff filed its opposition on May 22, 2020, and on June 5, 2020, Defendants filed their reply.  ECF Nos. 50, 52.

28.     On June 22, 2020, the Court issued an Order denying Defendants' motion to dismiss in its entirety.  ECF No. 53.

### C.     Lead Plaintiff's and Lead Counsel's Extensive Discovery Efforts

29.     Discovery commenced immediately after the Court's denial of Defendants' motion to dismiss.  Given the scope of Lead Plaintiff's claims, the complex subject matter at issue in this Action, and the limited timeframe for discovery, factual discovery was an enormous undertaking. Plaintiff sought discovery from GTT, each of the Individual Defendants, and a third-party valuation expert called CBIZ Inc.  Defendants sought discovery from Lead Plaintiff; Mr. Chad Coffman, CFA, Lead Plaintiff's expert on market efficiency, damages, and loss causation; and Lead Plaintiff's third-party investment advisors, LMCG Investments, LLC ("LMCG"), Consequent Capital Management, and Marquette Associates.  Additionally, Defendants noticed depositions of Lead Plaintiff, LMCG, and Mr. Coffman; and Plaintiff preliminary noticed the depositions of eight fact witnesses. In sum, Lead Plaintiff obtained and reviewed approximately 415,000 pages of documents from Defendants and third parties, and examined, reviewed, and produced over 9,000 pages of Lead Plaintiff's documents to

Defendants. The amount of work done by Lead Plaintiff during this time period is extraordinarily compelling evidence of Lead Plaintiff's vigorous prosecution of and commitment to this Action.

30.    Specifically, Lead Plaintiff served all Defendants with the First Set of Requests for Production of Documents on July 1, 2020.  These 38 requests sought, among other things, documents concerning: (i) the Interoute acquisition, (ii) the Interoute integration timeline, (iii) GTT's CMD System, (iv) GTT's cloud service business, (v) GTT's plans to sell off the fiber network and other assets, (vi) and the Company's due diligence process.  Defendants served their responses and objections to the First Request for Production of Documents on July 16, 2020.

31.    On July 1, 2020, Defendants served their First Set of Requests for Production of Documents and Electronically Stored Information, which included information relevant to issues of class certification, including information concerning: (i) Plaintiff's purchases and sales of GTT securities, and their decisions to buy, sell, or hold the same; (ii) any research, due diligence, investigation, analysis, or evaluation of GTT; (iii) internal investment approval processes, policies, and guidelines; (iv) Plaintiff's investigation of the Amended Complaint's allegations; (v) communications with GTT and Interoute employees; and (vi) Plaintiff's decision to serve as Lead Plaintiff.  Defendants also served their First Set of Interrogatories on Plaintiff on July 1, 2020, which sought information regarding the identities of confidential witnesses, communications with former GTT and Interoute employees, and factual support for allegations relating to scienter, damages and loss causation.  Plaintiff served its responses and objections to those discovery requests on Defendants on July 16, 2020, and Lead Plaintiff served Defendants with a supplemental interrogatory response on August 19, 2020.

32.    Defendants served document subpoenas on Plaintiff's investment advisors on July 24, 2020, to which Plaintiff served responses and objections on August 7, 2020.

11

33.     Plaintiff served its Second Set of Requests for Production of Documents to All Defendants on July 27, 2020, which included requests regarding confidential witness communications, and Defendants served their responses and objections to these requests on August 12, 2020.  On September 8, 2020, Defendants noticed the deposition of LMCG.

34.     Plaintiff served its Third Set of Requests for Production of Documents to All Defendants on September 15, 2020, which included requests regarding Defendants' financial status, condition, and assets, and Defendants responded on September 30, 2020.

35.     Plaintiff served its document subpoena on CBIZ on September 16, 2020, and CBIZ served responses and objections on September 30, 2020.

36.     Plaintiff served its Fourth Set of Requests for Production of Documents to All Defendants on October 13, 2020, which included requests regarding GTT's accounting practices.

37.     During the course of negotiating the appropriate scope of discovery, the Parties exchanged approximately fifteen letters concerning their document productions and engaged in numerous meet and confer conferences, during which the Parties conferred about significant and disputed discovery-related issues.  Some of the issues disputed between the Parties included:  the relevant time period and scope of discovery, Defendants' Technology Assisted Review ("TAR") methods, Plaintiff's position on the production of information related to CWs, Plaintiff's document collection, and other miscellaneous disputes like the timing of the Parties' respective privilege logs.  Notwithstanding, the Parties successfully cooperated with each other on several of these key issues to comply with the Court's discovery schedule.

38.     Ultimately, Defendants produced, and Lead Plaintiff reviewed, approximately 412,938 pages of documents in eight separate productions over the course of three months.  The Parties also reviewed approximately 1,906 pages of documents produced by LMCG.  Finally,

Lead Plaintiff collected, reviewed, and produced approximately 9,271 pages on behalf of Plaintiff and Mr. Coffman. Lead Counsel and their experts devoted substantial time to reviewing and analyzing these documents and organizing them for depositions. Specifically, Plaintiff's Counsel prepared for eleven fact or expert witness depositions, which the Parties had either scheduled or were in the process of scheduling at the time that they agreed to the Settlement.

39. To that end, Lead Counsel generated an effective and efficient discovery plan and took significant steps designed to quickly identify the custodians and documents most important to uncovering the facts at the heart of the Action. As a result of these efforts, Lead Counsel was able to utilize this discovery in connection with class certification, drafting the SAC and during the Parties' settlement negotiations. Accordingly, the discovery work conducted by Lead Counsel was critically important to achieving the Settlement.

40. Lead Counsel's discovery plan leveraged a sophisticated electronic document hosting system, and a dedicated team of attorneys with substantial experience in electronic document discovery, deposition and trial preparation. Attorneys on the litigation team for the Action prepared and continuously updated a highly detailed document review coding manual and protocol, which included detailed case information as well as instructions on coding documents. Document reviewers were trained to code documents for level of responsiveness or importance to the case (e.g. "Hot," "Warm," "Not Relevant"), for case issues (e.g. "System Integration," "'Strategic' Products and Assets," and "Accounting and Financial Reporting/Policy"), and for deposition of specified deponents.

41. Additionally, senior attorneys in the litigation team met regularly with staff attorneys to discuss key facts uncovered by the review, and staff attorneys prepared memoranda on subject matters of importance to assist senior attorneys in their understanding of the case.

42.    Many of the documents produced to Plaintiff were complex and comprised of technology and accounting terms of art. Lead Counsel developed and continuously updated a set of reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, and a glossary of technical terms and acronyms utilized by GTT and the companies it had acquired, including Interoute.

43.    To prepare for fact witness depositions, the review team was divided into small subgroups, and each group was assigned to conduct an in-depth review of the custodial files of a particular deponent, identify a set of key documents for that deponent, and prepare a memorandum explaining why that deponent was important to the case and which issues should be addressed during the deponent's deposition.

44.    Because of the complex issues presented by this case, Lead Counsel was required to utilize the services of multiple experts. For example, Lead Counsel consulted with an IT expert, Mr. Michael Maldari, to assist in analyzing GTT's cloud networking and cloud services businesses. Additionally, Lead Counsel engaged Mr. Chad Coffman, CFA of Global Economics Group to provide opinions on the complex securities-litigation-specific issues of market efficiency, loss causation, and damages.  Lead Counsel also consulted with other members of the Global Economics Group team to assist in developing the Plan of Allocation for the Settlement. Plaintiff also engaged Ms. Kirsten Flanagan of Friedman LLP, a highly experienced accounting expert to consult on GTT's accounting of its acquisitions.

80.    Plaintiff's Counsel also utilized the services of Exiger LLC to create an electronic document review platform that allowed Plaintiff's Counsel to review, code, and classify the more than 420,000 pages of documents produced in this case.  This allowed Plaintiff's Counsel to categorize documents based on, among other things, relevance, issue, and potential use in

14

depositions, settlement negotiations, and trial. Furthermore, to review these documents efficiently and expeditiously, Exiger LLC provided Lead Counsel with a TAR platform that Lead Counsel coded to help prioritize documents for review.

### D.     Class Certification

45.     On August 7, 2020, Plaintiff filed its motion for class certification, together with the expert report of Mr. Coffman who opined on market efficiency. ECF Nos. 65, 67-1. The documents Mr. Coffman relied upon in his expert report were produced to Defendants on August 12, 2020.

46.     On September 3, 2020, Defendants notified Class Counsel that they would not oppose Plaintiff's motion for class certification.  On September 4, 2020, the Parties filed a joint stipulation and proposed order requesting that the Court certify this Action, as alleged in the Amended Complaint, and appoint Plaintiff as Class Representative, Saxena White as Class Counsel and Cohen Milstein as Liaison Class Counsel.  ECF No. 70.  On September 10, 2020, the Court granted the stipulation and certified this Action as a class action. ECF No. 71.

### E.     The Filing of the Second Amended Complaint

47.     During the discovery phase of the Action, GTT made additional filings with the SEC that Lead Plaintiff relied upon as the basis for the SAC's new allegations.  Specifically, GTT was due to file its Form 10-Q for the quarter ending June 30, 2020 on August 10, 2020. Instead, GTT filed a notification of a late filing in a Form 12b-25 on that date stating that it had identified issues related to the "recording and reporting of Cost of Telecommunications services and related internal controls." GTT also stated that its management and the Audit Committee of its Board of Directors were conducting a review of these accounting issues and were assessing

15

the effect on GTT's financial statements both in the second quarter of 2020 and for previous quarters, as well as whether there were any other material weaknesses in GTT's internal controls.

48.    On August 19, 2020, GTT filed a Form 8-K stating that it had received a notice from the NYSE advising the Company that it was "not in compliance with the NYSE's continued listing requirements" due to its failure to timely file its Form 10-Q and that GTT would be delisted if it did not file the 10-Q by February 17, 2021.

49.    Then, on September 15, 2020, GTT filed another Form 8-K with the SEC disclosing that the accounting review had "identified a number of issues in connection with the Company's previously issued financial statements," including issues that impacted the financial statements the Company issued during the Class Period, and that it was "reassessing its previous conclusions regarding the effectiveness of its internal control over financial reporting" during the "years ended December 31, 2019, 2018 and 2017, each of the quarters during the years ended December 31, 2019, 2018 and 2017, and the quarter ended March 31, 2020," and expected "to identify material weaknesses in the Company's internal control over financial reporting."

50.    Based on these new developments, Plaintiff prepared a Second Amended Complaint to include allegations that Defendants had engaged in an accounting fraud to, among other things, hide the negative impact of the Interoute integration, during the Settlement Class Period. On October 12, 2020, the Parties moved the Court for leave to file the SAC and amend the case schedule, attaching the proposed 115-page SAC.  ECF No. 72-2.  On October 16, 2020, the Court granted this motion, at which point the SAC was made effective. ECF No. 78. Defendants were on the eve of filing a motion to dismiss the SAC when Settlement was reached.

16

### III.    THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE

51.    The Settlement was the result of arm's length negotiations between experienced counsel, conducted under the auspices of Hon Daniel Weinstein (Ret.), a highly accomplished former State of California Judge and a founder of JAMS, and Jed D. Melnick, Esq., a well-respected independent mediator with extensive experience mediating securities class actions. The Settlement provides the Settlement Class with an immediate and substantial benefit before trial, and eliminates the very real risk of protracted litigation against Defendants under circumstances where a favorable recovery—or any recovery at all—cannot be assured. Lead Plaintiff and Lead Counsel accordingly believe that the Settlement is fair, reasonable, and an excellent result for the Class considering GTT's financial condition and the risk of recovering a lesser amount, or nothing at all, after substantial delays that would likely have lasted several years.

### A.    The Parties' Mediation Sessions

52.    After Plaintiff moved for class certification and while Plaintiff was still actively pursuing fact discovery, the Parties agreed to participate in a private mediation. Over two mediation sessions, the Parties and Defendants' Directors and Officers liability insurers ("Insurers"), engaged in vigorous negotiations regarding a potential resolution of the Action.[5]

53.    The Parties engaged Judge Weinstein and Mr. Melnick to facilitate the Parties' mediations.  Judge Weinstein is recognized as one of the premier mediators of complex, multi-party, high-stake cases, both in the United States and abroad.  Judge Weinstein has overseen the resolution of challenging securities class actions involving Enron, Homestore, Qwest, Adelphia, Dynegy, Providian, Clarent, and other major NYSE and NASDAQ corporations. Mr. Melnick

---

[5] The mediation sessions are discussed below for the purpose of describing key events in this Action, and do not constitute a waiver of any privilege, doctrine, law, or rule protecting information from disclosure.

17

serves as a Mediator and Special Master in complex business litigation pending throughout the United States and internationally. Since becoming a full-time mediator in 2005, Mr. Melnick has resolved over one thousand disputes, with an aggregate value in the billions of dollars.

54.     On October 8, 2020, the Parties held their first mediation session.  In advance of the session, the Parties submitted and exchanged detailed mediation statements detailing the relevant facts and analyses concerning falsity, scienter, loss causation and damages. During the session, Plaintiff shared its positions and conveyed to the mediators its understanding of the strengths and weaknesses of the claims and defenses in this Action, as well as potential sources of recovery.  However, at the conclusion of this session, it was clear that the Parties maintained highly divergent views on the strengths and weaknesses of their claims and defenses, as well as the settlement value of the Action.  Plaintiff also notified Defendants of its intention to move for leave to file the SAC and provided them with a copy.  Thereafter, Defendants notified Plaintiff that they would consent to Plaintiff's filing of the Second Amended Complaint but planned to move to dismiss it.  As a result, the Parties agreed to jointly move the Court for leave to amend, even though both Parties recognized that this would have the effect of staying discovery.

55.     After the October 8, 2020 mediation session, the Parties remained in dialogue with the mediators about a potential resolution of the Action. On November 6, 2020, the Parties participated in a second remote, full-day mediation session before Hon. Weinstein and Mr. Melnick, during which the Parties agreed in principle to settle this Action for $25 million.

**B.     The Settlement Agreement and Preliminary Approval**

56.     After agreeing on the principles of the proposed settlement, the Parties engaged in extensive negotiations regarding the material terms of the Stipulation; the Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from

the Settlement Class reach a certain threshold—a standard agreement in securities class action settlements generally called a "blow provision"; and various supporting documents, including proposed Class notices and proposed orders for the Court.

57.     On December 14, 2020, Plaintiff filed its motion for preliminary approval of the proposed Settlement, along with the memorandum in support, the Stipulation and its exhibits. ECF Nos. 83, 84.  On January 28, 2021, the Court granted Plaintiff's motion and authorized Notice for the proposed Settlement to be sent to potential members of the Settlement Class and set a Settlement hearing for April 23, 2021 (the "Preliminary Approval Order", ECF No. 89).

**C.     Reasons for the Settlement**

58.     Lead Plaintiff and Lead Counsel fully endorse the Settlement. *See* Ex. A (Lead Plaintiff's Decl.) attached hereto.  Lead Plaintiff is the Court-appointed Class representative and is a sophisticated institutional investor who has actively overseen the prosecution of this Action nearly two years and who understands its fiduciary duty to act in the best interest of the Settlement Class. Lead Counsel, Saxena White, is a law firm that specializes in complex securities class action litigation and is highly experienced in such litigation. *See* Ex. 3 to Ex. D (Saxena White firm resume). Based on their experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead Plaintiff have determined that the Settlement is in the best interest of the Settlement Class.

59.     Although Lead Plaintiff and Lead Counsel believe that the claims asserted in this action are meritorious, continued litigation against Defendants posed significant risks that made any recovery from them uncertain.  For example, Lead Plaintiff was aware of the significant challenges Defendants raised in their motion to dismiss, their answer, and in their mediation statement on the key issues of falsity, scienter, loss causation, and damages.  Indeed, although

19

Lead Plaintiff was successful at the initial motion to dismiss stage, these risks would arise at every stage of the litigation—on summary judgment, at trial, and on appeal.

60.    Moreover, Plaintiff was further aware that Defendants' damages expert had calculated maximum possible damages below the maximum aggregate damages Plaintiff's expert had calculated, including credible scenarios that the Class had suffered no cognizable damages as a result of Plaintiff's allegations—which would undoubtedly result in a "battle of the experts" at trial with no certainty as to which of the experts the jury would credit.

61.    Finally, GTT's current financial condition posed additional significant risks.  As detailed in the SAC and above, GTT had disclosed, among other things, that: (i) it is undertaking a review of accounting and internal control issues; (ii) the Company has not filed recent Quarterly Reports on Form 10-Q (and still has yet to do so); and (iii) GTT had been informed by the NYSE that GTT's stock may be delisted if it could not comply with its reporting requirements by February 2021 (subsequently extended by the NYSE until August 2021). Between September 2019 and December 2020, GTT has had a succession of four different CFOs.  Moreover, since August 2020, GTT's stock price has traded roughly between $2 and $6 and has recently been around $2 per share, with GTT's market capitalization at $120 million.

62.    At the same time, the proceeds of Defendants' Directors' and Officers' insurance were rapidly wasting. Continued litigation likely could, at some point, have exhausted the remaining proceeds and left the Class with no recovery, even should the Class have prevailed in full at summary judgment or trial. Thus, there were very significant risks attendant to the continued prosecution of the Action against Defendants.

20

63.     The Settlement eliminates these substantial risks and guarantees the Settlement Class a favorable, certain cash recovery.  Lead Counsel firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

### D.     Lead Plaintiff's Compliance with the Court's Preliminary Approval Order Requiring Issuance of Notice

64.     As required by the Court's Preliminary Approval Order, by February 26, 2021, Lead Plaintiff, through the Court-approved Claims Administrator JND Legal Administration ("JND"), notified potential members of the Settlement Class of the Settlement by mailing a copy of the Notice to potential members of the Settlement Class and their nominees.  *See* Ex. B.

65.     JND used several resources to reasonably identify Settlement Class Members. For example, under the Preliminary Approval Order, GTT was required to provide JND records reasonably available to GTT or its transfer agent concerning the identity and last known address of potential Settlement Class members.  The Preliminary Approval Order also requires brokers or nominees within ten business days, to either (i) request additional copies of the Notice to send to the beneficial owners of the shares, or (ii) to provide JND with the names and addresses of such persons. JND also sent the Notice to entities identified on a proprietary list maintained by them of the most common banks, brokers, and other nominees. *See* Ex. A to Ex. B.

66.      In the aggregate, as of March 18, 2021, JND has disseminated 19,586 copies of the Notice to potential members of the Settlement Class and their nominees.  *See* Ex. B at ¶10.

67.     In addition, on February 22, 2021, the Summary Notice was published through *Investor's Business Daily* and over *PR Newswire.* Information regarding the Settlement, including copies of the Notice and Claim Form, was posted on the website established by JND specifically for this Settlement (www.GTTsecuritieslitigation.com) and on Lead Counsel's website. The settlement website also provided potential Class Members with information

21

concerning the Action and access to downloadable copies of the Notice, Claim Form, Stipulation of Settlement, Preliminary Approval Order, and redacted SAC. Class Members also have the option to submit a claim online at the website.  JND also reserved a toll-free phone number for the Settlement, 888-906-0555.  This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a reasonable manner to all class members who would be bound by the Settlement.  *See* Fed. R. Civ. P. 23(e)(1).

68.     The Notice advises members of the Settlement Class of the essential terms of the Settlement, sets for the procedures for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the Final Approval Hearing. The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed Plan of Allocation.  As explained in the Motion, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.

### E.     The Plan of Allocation

69.     Lead Plaintiff has proposed a plan to allocate the proceeds of the Settlement Fund among members of the Settlement Class who submit valid proofs of claim.  The objective of the proposed Plan of Allocation (the "Plan") is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

70.     Plaintiff worked extensively with Global Economics Group in formulating the Plan. In developing the Plan, Plaintiff's expert calculated the amount of estimated artificial inflation in the per share closing price of GTT common stock that was allegedly proximately

caused by Defendants' alleged false and misleading statements. Plaintiff's expert considered price changes in GTT common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces. The Notice set forth and explained the proposed Plan of Allocation to members of the Settlement Class. It tracks a theory of damages asserted by Plaintiff, is similar to other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate.

## IV.   LEAD PLAINTIFF'S APPLICATION FOR PLAINTIFF'S ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

### A.   Lead Counsel's Application for Attorneys' Fees

71.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiff also submits its application to the Court, on behalf of Plaintiff's Counsel, for an award of attorneys' fees and reimbursement of litigation expenses. Specifically, Lead Plaintiff is applying for a fee of one-third of the Settlement Fund to be paid from the Settlement Fund. Lead Plaintiff also requests reimbursement of $453,866.36 in litigation expenses, to also be paid from the Settlement Fund. Lead Plaintiff further requests the reimbursement of its time and costs related to representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

72.    In support of these applications, Plaintiff's Counsel attach the declaration of Lester R. Hooker, filed on behalf of Saxena White ("Saxena White Declaration," Ex. D), and the declaration of Daniel S. Sommers, filed on behalf of Cohen Milstein ("Cohen Milstein Declaration," Ex. E).

73.    Plaintiff's Counsel's declarations list the lodestar of Lead and Liaison Counsel, including the amount of time spent by each attorney and professional support staff member on the case. The declarations also provide a breakdown of the principal tasks that each attorney performed, as well as brief biographies for each timekeeper, including information about his or

her position, education, and relevant experience.  The declarations also described the expenses for which Plaintiff's Counsel seek reimbursement.

74.     Lead Plaintiff supports Plaintiff's Counsel's fee request. *See* Ex. A, ¶¶11-14.  The support and approval of court-appointed lead plaintiff weighs heavily in favor of approval of a fee request. *See, e.g., In re Veeco Instruments Inc. Sec. Litig*., 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff ... —a large public pension fund—conscientiously supervised the work of lead counsel and has approved the fee request[.]"); *In re Genworth Fin. Sec. Litig*., 2016 WL 7187290, at *2 (E.D. Va. Sept. 26, 2016) ("Lead Plaintiffs are sophisticated institutional investors that have been directly and extensively involved in the prosecution and resolution of the Action and have a substantial interest in ensuring that any fees paid to the Plaintiffs' Counsel are duly earned and not excessive.").

75.     Plaintiff's Counsel's request for a fee based on a percent of the Settlement Fund is in line with the most typical method of awarding attorney fees in securities and other complex class actions in the Fourth Circuit and in federal courts nationwide. This method is favored because it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time.

76.     As set forth in the Motion, courts in the Fourth Circuit are guided by the *Cendant* factors in evaluating fee awards from a common fund, which include: (1) the results obtained for the class; (2) the presence or absence of substantial objections by members of the class to the fees counsel requested; (3) the skill and efficiency of attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time plaintiffs' counsel

24

devoted to the case; and (7) awards in similar cases. *See Genworth*, 210 F. Supp. 3d at 843;

*Robinson v. Carolina First Bank NA*, 2019 WL 2591153, at *13 (D.S.C. June 21, 2019).

77.     District courts also review the Fifth Circuit's *Johnson* factors, which were

adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc*., 577 F.2d 216, 226 n.28 (4th Cir.

1978): (1)  the time and labor expended; (2) the novelty and difficulty of the questions raised; (3)

the skill required to properly perform the legal services rendered; (4) attorneys' opportunity costs

in pressing the litigation; (5) the customary fee for like work; (6) attorneys' expectations at the

outset of the litigation; (7) time limitations imposed by the client or the circumstances; (8) the

amount in controversy and the results obtained; (9) the experience, reputation, and ability of the

attorneys; (10) the undesirability of the case within the legal community in which the suit arose;

(11) the nature and length of the professional relationship between the attorneys and client; and

(12) fee awards in similar cases.

78.     The *Barber* factors are used to assess the reasonableness of the lodestar fee. *See,*

*e.g., Scott v. Family Dollar Stores, Inc.*, 2018 WL 1321048, at *5 (W.D.N.C. Mar. 14, 2018)

(applying *Cendant* factors in common fund settlement). Lodestar is used as a "cross-check" in

PSLRA cases in this District, however, because the *Barber* factors overlap with the *Cendant*

factors, Plaintiff addresses the factors together in its Motion. *See Genworth*, 210 F. Supp. 3d at

843; *Phillips*, 2016 WL 2636289, at *4 (noting that the *Barber* factors "incorporate and

recognize most of the *In re Cendant* factors"). Based on consideration of these factors and on the

additional legal authorities set forth in the Motion, Lead Plaintiff and Lead Counsel respectfully

submit that the requested one-third fee is fair and reasonable, and should be granted.

### 1. The Outstanding Results Obtained for the Class Support the Fee Award[6]

79.    The $25 million Settlement achieved here is an outstanding result for the Class by any measure. The Settlement represents between 7.6% and 31% of likely recoverable damages – a high percentage, and far more than the typical recovery achieved in a securities class action.

80.    Moreover, Plaintiff was able to obtain this result despite GTT's current financial condition. GTT has not filed its quarterly filings with the SEC since March 31, 2020 and GTT's stock price has been recently trading around $2, with the Company's market capitalization at approximately $120 million (less than five times the Settlement Amount). Meanwhile Defendants' D&O Insurance tower was rapidly wasting due to the costs of litigation. Lead Counsel had to race through discovery of a highly technical and complex matter, to develop the facts of its case sufficiently as to prove the strength of its claims before all insurance proceeds were exhausted.

81.    Accordingly, as elaborated more fully in the Motion, the outstanding recovery obtained in the Settlement wholly supports the requested fee.

### 2. The Positive Reaction of the Settlement Class[7]

82.    The wholly positive reaction of the Settlement Class to the Motion further supports its approval. The Notice advised Settlement Class Members that Lead Counsel would apply for fees not to exceed one-third of the Settlement Fund, and the deadline for filing objections to the fee application is April 2, 2021.  To date, not one member of the Settlement Class has filed an objection the Settlement, Plan of Allocation, or the request for fees and expenses.  This reaction is particularly significant given that the vast majority of the Settlement

---

[6] This section addresses *Cendant* Factor One and *Barber* Factor Eight.

[7] This section addresses *Cendant* Factor Two.

Class, approximately 82%, is comprised of sophisticated institutional investors who have the resources, professional staff, and financial motivation to object to the requested fee. *See* ECF No. 66 at 21; *Genworth*, 210 F.Supp.3d at 844 ("lack of objections by class members as to fees requested by counsel weight in favor of the reasonableness of the fees").

### 3. The Skill Required and the Experience, Reputation and Ability of the Attorneys Involved[8]

81.     Lead Counsel are highly skilled and experienced securities litigators, who expended a substantial amount of time and effort litigating the Action.  The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers, overseen numerous litigations, and recovered billions of dollars on behalf of investors over the course of decades.[9]  Informed by this experience, they developed and implemented strategies to overcome the challenges raised by Defendants.

82.     Plaintiff's Counsel's depth of skill and experience successfully prosecuting securities class actions, allowed Lead Plaintiff and the Settlement Class to achieve a result that might not have been achieved by less skillful or experienced counsel.

83.     Pleading securities fraud—always a challenging and complex endeavor under the PSLRA—presented special challenges that required skilled lawyering. This Action involved complex and intricate legal and factual issues that also added a significant level of difficulty unique to this case.  Lead Counsel, therefore, continually consulted with experts throughout the litigation.

---

[8] This section addresses *Cendant* Factor Three and *Barber* Factors Three and Nine.

[9]  Recent securities class action settlements obtained by Lead Counsel include *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *7 (D. Del. Nov. 19, 2018) ($210 million common fund in securities class action); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *3 (M.D. Fla. Oct. 5, 2017) ($73 million common fund in securities class action); *In re HD Supply Holdings, Inc. Sec. Litig.*, 2020 WL 8572953, at *1 (N.D. Ga. Jul. 21, 2020) ($50 million common fund).

84.    In addition, the quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Cravath, Swaine & Moore LLP and Troutman Pepper Hamilton Sanders LLP, two of the country's most prestigious and experienced defense firms.[10]

### 4.    The Complexity and Duration of the Litigation[11]

85.    The risks undertaken and difficulties presented in a complex securities class action such as this one favor approval of the requested fee award.

86.    As noted above, Lead Counsel spent substantial hours familiarizing themselves with the details of GTT's acquisitions of Interoute and several other companies; the software systems and technical aspects of GTT's and Interoute's systems operations; the cloud networking and cloud services industries, including various technologies and business lines; and accounting rules related to acquisitions, goodwill, and off-balance sheet assets. As noted, GTT made a series of announcements in August and September of 2020 which Lead Counsel had to examine and consider in a short time-frame, while continuing full-on litigation of the Action.

87.    As discussed herein and in the Motion, Defendants had made credible arguments directly challenging the sufficiency of Plaintiff's allegations on the basis of falsity, materiality, and loss causation.  Defendants were also on the eve of filing a motion to dismiss the new allegations made in the Second Amended Complaint when the Settlement was reached.

88.    Whether on a second motion to dismiss, at summary judgment, or trial, had Defendants' arguments prevailed, the pool of available damages would be a small fraction of what it was at the time of the Settlement.  Similarly, at trial, a jury could have dramatically

---

[10] *See* https://www.cravath.com/ ("Cravath has been known as one of the premier U.S. law firms for two centuries").

[11] This section addresses *Cendant* Factor Four and *Barber* Factor Two.

reduced the available damages by finding that only a part of the stock drops after the disclosures was a result of the fraud. Accordingly, Lead Counsel's ability to successfully navigate these and other complex legal and factual obstacles fully supports the requested fee award.

### 5. The Contingent Nature of the Fee, the Risk of Nonpayment and Preclusion of Other Employment[12]

89.    As with all contingency fee cases, Plaintiff's Counsel faced a substantial risk that they would obtain no fee whatsoever. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. Indeed, Lead Counsel initiated this litigation by filing the initial complaint. Had Saxena White not willingly and vigorously undertaken the responsibility of representing the Class's interests here, the Class would almost certainly have recovered nothing for their claims.

90.    Additionally, securities class actions such as this one are not only time- and labor-intensive, but require substantial up-front cost outlays. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. Lead Counsel not only had to pay for its standard overhead expenses during the entirety of the litigation, but had to cover costs and expenses, including substantial electronic discovery costs and the fees of various IT, accounting, economic and market efficiency experts, all without guarantee of any recovery. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, which heavily supports the requested fee.

---

[12] This section addresses *Cendant* Factor Five and *Barber* Factors Four, Six, and Ten.

91.    Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws. However, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors. If this important public policy is to be carried out, Plaintiff's Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.

92.    At each step of the process, Plaintiff's Counsel faced a substantial risk that the litigation could end either without remuneration to them or with remuneration far less than the time, effort, and expense put in by Lead Counsel.  Lead Counsel could have had the Complaint dismissed by the Court after expending the substantial effort and expense required to complete their investigation and draft the Complaint.  And even after surviving that hurdle, were litigation to continue, Plaintiff could have faced an adverse determination on summary judgment, a total loss at trial, or—even in the event of a victory at trial—a minimal recovery or a reversal on appeal. Any of these occurrences would have deprived Lead Counsel of the opportunity to earn any fee whatsoever for their nearly two years of work and expenditure—efforts that necessarily precluded other projects.

### 6.    The Amount of Time Devoted to the Case by Plaintiff's Counsel[13]

93.    As described further *supra*, Lead Counsel engaged in an exhaustive and comprehensive investigation, drafted an initial complaint and two amended complaints, and successfully opposed Defendants' motion to dismiss.  Lead Counsel engaged in extensive discovery negotiations, including multiple meet-and-confers with Defendants and exchanged

---

[13] This section addresses *Cendant* Factor Six and *Barber* Factor One.

substantial amounts of contentious correspondence.  Lead Counsel reviewed and analyzed over 415,000 pages of documents, and consulted with various experts to better understand the issues in the case.  Lead Counsel also briefed a motion for class certification. In total, Plaintiff's Counsel expended over 11,000 hours litigating this matter.

94.     Thus, the prosecution of the Action was significantly labor-intensive, and is often the case with complex securities class actions, the attorneys involved routinely had to spend significant stretches of time focusing exclusively or near-exclusively on litigating this Action. Accordingly, Lead Counsel's extensive litigation efforts fully support the requested fee.

**7.     A One-Third Fee Award is Customary and in Accordance with Other Similar Cases in this District, the Fourth Circuit and Nationwide[14]**

95.     As set forth more fully in the Motion, "[f]ee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one." *In Re Celebrex (Celexoxib) Antitrust Litig.*, 2018 WL 238201, at *5 (E.D. Va. Apr. 18, 2018) (awarding one-third of $94 million recovery as an attorneys' fee award); *Thorpe v. Walter Investment Management Corp.*, 2016 WL 10518902, at *11 (S.D. Fla. Oct. 17, 2016) (awarding fees of one-third of $24 million recovery in a securities class action).

96.     Lead Counsel's request for an award of one-third of the Settlement Fund is inherently reasonable given that it is well in line with fees recently awarded in similar securities and other complex actions in this District, Circuit, and around the country. *See, e.g., In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding fees of one-third in $163.5 million recovery); *Celebrex*, 2018 WL 2382091, at *5 (awarding one-third of $94 million settlement); *Seaman*, 2019 WL 4674758, at *3 (awarding one-third of $54.5

---

[14] This section addresses *Cendant* Factor Seven and *Barber* Factors Five and Twelve.

million recovery); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *9 (D. Ariz. Apr. 20, 2012) (awarding fees of one-third of $145 million recovery); *In re Flowers Foods, Inc. Sec. Litig.*, 2019 WL 6771749, at *1 (M.D. Ga. Dec. 11, 2019) (awarding a one-third fee in a $21 million recovery); *In re Star Sci., Inc. Sec. Litig.,* 2015 WL 13821326, at *1 (E.D. Va. June 26, 2015) (awarding one-third of recovery in securities class action).

97.   The following chart demonstrates that the requested fee is firmly in line with fees awarded in comparable securities and other complex class actions by Courts in the Fourth Circuit:

| Comparable Cases Within the Fourth Circuit | Settlement Amount | Fee Award |
|---|---|---|
| *DeLoach v. Phillip Morris Co.*, 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) | $211,800,000 | 33.3% |
| *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) | $163,500,000 | 33.3% |
| *In Re Celebrex (Celecoxib) Antitrust Litigation*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) | $94,000,000 | 33.3% |
| *Krakauer v. Dish Network*, 2019 WL 7066834, at *7 (M.D.N.C. Dec. 23, 2019) | $61,342,800 | 33.3% |
| *Seaman v. Duke University*, 2019 WL 4674758, at *3 (M.D.N.C. Sept. 25, 2019) | $54,500,000 | 33.3% |
| *Scott v. Family Dollar Stores, Inc.*, 2018 WL 1321048, at *5 (W.D.N.C. Mar. 14, 2018) | $45,000,000 | 33.3% |
| *Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) | $32,000,000 | 33.3% |
| *Sims v. BB&T Corporation*, 2019 WL 1993519, at *5 (M.D.N.C. May 6, 2019) | $24,000,000 | 33.3% |
| *Kelly v. Johns Hopkins University*, 2020 WL 434473, at *7 (D. Md. Jan. 28, 2020) | $14,000,000 | 33.3% |
| *Clark v. Duke University*, 2019 WL 2579201, at *5 (M.D.N.C. June 24, 2019) | $10,650,000 | 33.3% |
| *In re BearingPoint, Inc. Securities Litigation*, No. 1:05-CV-00454, ECF No. 200 at 8 (E.D. Va. Sept. 28, 2010) | $7,500,000 | 33.3% |

32

| Comparable Cases Within the Fourth Circuit | Settlement Amount | Fee Award |
|---|---|---|
| *In re Star Scientific, Inc. Securities Litigation,* 2015 WL 13821326, at *1 (E.D. Va. June 26, 2015) | $5,900,000 | 33.3% |
| *Roman Zak v. Pedder.*, 2016 WL 5109167, at *1 (W.D.N.C. Sept. 19, 2016) | $5,500,000 | 33.3% |
| *In re Constellation Energy Group, Inc. Securities Litigation*, 2013 WL 12461134, at *1 (D. Md. Nov. 4, 2013) | $4,000,000 | 33.3% |
| *Sponn v. Emergent Biosolutions, Inc.*, 2019 WL 11731087, at *2 (D. Md. Jan. 25, 2019) | $6,500,000 | 33% |

98.     Indeed, the following chart demonstrates that the requested fee is also firmly in line with fees awarded in comparable securities and other complex class actions by Courts nationwide:

| Comparable Class Cases Nationwide | Settlement Amount | Fee Award |
|---|---|---|
| *Cook v. Rockwell International Corporation*, 2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017) | $375,000,000 | 40% |
| *Haddock v. Nationwide Life Ins. Co.*, No. 3:01-cv-01552-SRU ECF No. 601 at 11 (D. Conn. Apr. 9, 2015) | $140,000,000 | 35% |
| *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1110 (D. Kan. 2018) | $1.51 billion | 33.3% |
| *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | $835,000,000 | 33.3% |
| *In re Initial Public Offering Securities Litigation*, 671 F. Supp. 2d 467, 516 (S.D.N.Y 2009) | $586,000,000 | 33.3% |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) | $297,000,000 | 33.3% |
| *Hale v. State Farm Mut. Auto Ins. Co.*, 2018 WL 6606079, at *16 (S.D. Ill. Dec. 16, 2018) | $250,000,000 | 33.3% |
| *In re Tricor Direct Purchaser Antitrust Litig.*, 1:05-cv-00340-SLR, ECF No. 543 at 9-10 (D. Del. Apr. 23, 2009) | $250,000,000 | 33.3% |
| *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) | $150,000,000 | 33.3% |
| *In re Apollo Group Inc. Sec. Litig.*, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) | $145,000,000 | 33.3% |
| *Cabot East Broward 2 LLC v. Cabot*, 2018 WL 5905415, at *2, 9 (S.D. Fla. Nov. 9, 2018) | $100,000,000 | 33.3% |

33

| Comparable Class Cases Nationwide | Settlement Amount | Fee Award |
|---|---|---|
| *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *17 (N.D. Tex. Apr. 25, 2018) | $100,000,000 | 33.3% |
| *Landmen Partners, Inc. v. Blackstone Grp.*, 2013 WL 11330936, at *3 (S.D.N.Y. Dec. 18, 2013) | $85,000,000 | 33.3% |
| *Gutter v. E.I. DuPont De Nemours & Co.*, No. 1:95–cv–02152–ASG, ECF No. 626 at 7 (S.D. Fla. May 30, 2003) | $77,500,000 | 33.3% |
| *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2019 WL 4734396, at *6 (S.D.N.Y. Sep. 23, 2019) | $75,000,000 | 33.3% |
| *In re General Instrument Securities Litigation*, 209 F.Supp.2d 423, 435 (E.D. Pa. 2001) | $48,000,000 | 33.3% |
| *Schleicher v. Wendt*, No. 1:02-cv-01332, ECF No. 458 at 5-6 (S.D. Ind. Feb. 17, 2011) | $41,465,000 | 33.3% |
| *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. Sept. 30, 1999), *cert. denied* 530 U.S. 1223 (2000) | $40,000,000 | 33.3% |
| *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Celulose S.A.*, No. 08-cv-23317, ECF No. 201 at 7 (S.D. Fla. July 17, 2013) | $37,500,000 | 33.3% |
| *In re Cnova N.V. Securities Litigation*, No. 1:16-cv-00444, ECF No. 148 at 5 (S.D.N.Y. Mar. 20, 2018) | $28,500,000 | 33.3% |
| *Thorpe v. Walter Investment Management Corp.*, 2016 WL 10518902, at *11 (S.D. Fla. Oct. 17, 2016) | $24,000,000 | 33.3% |
| *In re Flowers Foods, Inc. Securities Litigation*, 2019 WL 6771749, at *1 (M.D. Ga. Dec. 11, 2019) | $21,000,000 | 33.3% |
| *Indiana State District Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 2019 WL 7483663, at *1 (E.D. Ky. June 27, 2019) | $20,000,000 | 33.3% |
| *In re Deutsche Bank AG Securities Litigation*, 2020 WL 3162980, at *1 (S.D.N.Y. June 11, 2020) | $18,500,000 | 33.3% |
| *Machado v. Endurance International Group Holdings, Inc.*, 2019 WL 4409217, at *1 (D. Mass. Sept. 13, 2019) | $18,650,000 | 33.3% |
| *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-2399-VDG-CAB, ECF No. 156 at 2 (S.D. Tex. Nov. 24, 2020) | $15,500,000 | 33.3% |
| *Martin v. Altisource Residential Corporation*, No. 1:15-cv-00024, ECF No. 232 at 2 (D.V.I. Feb. 14, 2020) | $15,500,000 | 33.3% |
| *In re Ubiquiti Networks, Inc. Securities Litigation* (2018), No. 18-cv-01620 and No. 1:18-cv-02242, ECF No. 49 at 6 (S.D.N.Y. Mar. 27, 2020) | $15,000,000 | 33.3% |
| *Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) | $163,900,000 | 33% |
| *In re Banc of California Securities Litigation*, 2020 WL 1283486, at *1 (C.D. Cal. Mar. 16, 2020) | $19,750,000 | 33% |

34

99.      Furthermore, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request. As set forth in Exhibits D and E, Plaintiff's Counsel expended a total of 11,000 hours in the investigation, prosecution, and resolution of this Action from inception up through March 5, 2021. The resulting lodestar is $5,396,627.50. In light of this, the requested fee of one-third of the Settlement Fund yields a multiplier of 1.54—well below the range of multipliers award in this Circuit and around the country in comparable contingent securities and other complex class actions. *See, e.g., Genworth,* 210 F. Supp. 3d at 845 ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers"); *Seaman,* 2019 WL 4674758, at *6 ("lodestar multipliers 'on large and complicated class actions have ranged from at least 2.26 to 4.5'" and awarding a one-third fee equal to a 2.89 multiplier in a $54.5 million class action recovery); *Thorpe*, 2016 WL 10518902, at *7 ("there is no basis that a 3.58 lodestar multiplier is excessive" and awarding a one-third fee equal to this multiplier in a $24 million securities class action recovery).

100.      Furthermore, Lead Counsel's hourly rates are the same as, or comparable to, the rates submitted by comparable firms for lodestar cross-checks in other securities and other complex class action fee applications that have been granted in this District, Circuit, and others. *See, e.g., See Phillips v. Triad Guaranty Inc.*, 2016 WL 2636289, at *7 (M.D.N.C. May 9, 2016) (approving rates between $640 and $880 for partners, rates between $375 and $550 for attorneys, and a rate of $350 for staff attorneys because these rates are "within the range of reasonableness for PSLRA cases, where the marker for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"); *Seaman*, 2019 WL 4674758, at *5 (approving hourly attorney rates of between $395 and $900 as "in line with hourly rates used for Class Counsel in other cases" and finding that given "the complexity and risk involved, it is

reasonable to use a non-local hourly rate"); *Knurr v. Orbital ATK, Inc.*, 2019 WL 3317976, *2 and ECF. No. 453 at 9-10 (E.D. Va. June 7, 2019) (finding rates of up to $1,250 for attorneys as "fair and reasonable and consistent with awards in similar cases within the Eastern District of Virginia and the Fourth Circuit").[15] Indeed, Plaintiff's Counsel's blended hourly rate of $488 underscores the reasonableness of the fee request and is well in-line with blended hourly rates approved in this Circuit. *See Sponn v. Emergent Biosolutions Inc.*, 2019 WL 11731087, at *2 (D. Md. Jan. 25, 2019) (awarding 33% in a securities settlement where counsel had a blended rate of approximately $646); *Celebrex*, 2018 WL 2382091, at *5 (awarding one-third fee in $94 million settlement where counsel had a blended rate of approximately $500).

101.    Each attorney that prosecuted this Action performed substantive work that directly benefited the Class. The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiff's ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

### B.    Lead Counsel's Request for Reimbursement of Litigation Expenses

102.    Plaintiff's Counsel also request $453,866.36 in reimbursement of litigation expenses. Plaintiff's Counsel respectfully submit that these expenses were reasonable and necessary given the length and complexity of the litigation, and reimbursement of these expenses would be appropriate and fair to the Class.

---

[15] Lead Counsel's hourly rates are also far below the published hourly rates charged by Defendants' counsel in the Action. In a recent court filing, Cravath, Swaine & Moore LLP charged between up to $1,500 per hour for partners and between $415 and $1,240 for associate attorneys. *PG&E Corporation and Pacific Gas and Electric Company*, No. 19-30088, ECF No. 6310-2 (N.D. Cal. Mar. 16, 2020) (Darin McAtee billed at $1,500 and J. Wesley Earnhardt billed at $1,350).

103.    Courts in this District and nationwide have held that counsel in complex class actions are entitled to be reimbursed for reasonable expenses of the exact type incurred here, such as "travel, telephone, postage, delivery services, settlement costs, legal research, depositions, and so on." *Seaman*, 2019 WL 4674758, at \*7; *see also Genworth*, 210 F. Supp. 3d at 845-46 (approving $3.8 million in similar types of expenses); *Orbital*, 2019 WL 3317976, at \*1 (approving over $1.1 million in securities class action).

104.    The requested expense reimbursement of $453,866.36 is also significantly less than the $600,000 upper limit set forth in the Notice, and no Settlement Class Member has currently objected to the reimbursement request, further supporting its reasonableness.

## C.    Lead Plaintiff's Representative Reimbursement Request

105.    In accordance with the PSLRA, Lead Plaintiff seeks reimbursement of its reasonable costs and expenses incurred directly in connection with its representation of the Class, in the amount of $7,500—an amount that is less than the total estimated value of the time that Plaintiff spent in overseeing and participating in the Action. *See* Ex. A. The amount of time and effort devoted to this Action by Lead Plaintiff's representatives—who expended considerable time and effort in actively supervising the litigation over more than a year, including by collecting and producing numerous documents; responding to discovery requests; preparing for and traveling to counsel's office for preparation for its noticed deposition; and participating in ongoing settlement discussions—is detailed in Lead Plaintiff's Declaration. *See* Ex. A.

106.    Lead Plaintiff respectfully submits that the reimbursement requested is fully consistent with the congressional intent of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type. Atlanta P&F has been fully committed to pursuing the Class's interests. Lead Plaintiff's effort is precisely the type

37

of activities that courts have found to support reimbursement to class representatives, and fully support Lead Plaintiff's request for reimbursement.

## V. CONCLUSION

107. For all the reasons discussed above and in the Motion, Lead Plaintiff and Plaintiff's Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. In addition, as set forth above and in the Motion, Lead Plaintiff and Plaintiff's Counsel further submit that the requested fee in the amount of one-third of the Settlement Fund should be approved as fair and reasonable, the request for reimbursement of Litigation Expenses in the total amount of $453,866.36 should be approved, and Lead Plaintiff's Representative Reimbursement of $7,500 should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of March, 2021, at Boca Raton, Florida.

*/s/ Lester R. Hooker*
Lester R. Hooker

38